# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| RICKEY DONNELL CUMMINGS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 6:18-cv-00125-ADA |
| | § | |
| LORIE DAVIS, Director, Texas Department | § | |
| of Criminal Justice, Correctional Institutions | § | CASE INVOLVING THE DEATH |
| Division, | § | PENALTY |
| | § | |
| Respondent. | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY
## PURSUANT TO 28 U.S.C. § 2254

MAUREEN FRANCO
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF TEXAS

TIVON SCHARDL
CHIEF, CAPITAL HABEAS UNIT
Florida Bar No. 73016
TIMOTHY GUMKOWSKI
ASSISTANT FEDERAL DEFENDER
Texas Bar No. 24104788
919 Congress Avenue, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org

LEE B. KOVARSKY
PRINCIPAL
Phillips Black
A Non-Profit Law Practice
Texas Bar No. 24053310
500 West Baltimore, Room 436
Baltimore, Maryland 21201
434-466-8257 (tel.)
l.kovarsky@phillipsblack.org

March 26, 2019                    Attorneys for Petitioner

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ v

INTRODUCTORY STATEMENT ..................................................................................... 1

JURISDICTIONAL ALLEGATIONS ................................................................................ 2

STATEMENT OF FACTS .................................................................................................. 3

I.     TRIAL ..................................................................................................................... 3

       A. Guilt Phase...................................................................................................... 4

            1. The Gang-Revenge Narrative ................................................................ 6

            2. The Text Messages................................................................................ 10

            3. Villas Testimony .................................................................................. 12

       B. Sentencing Phase............................................................................................ 17

II.    DIRECT APPEAL ................................................................................................ 18

III.   STATE HABEAS PROCEEDINGS..................................................................... 18

CLAIMS FOR RELIEF ................................................................................................... 20

I.     CUMMINGS' RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS
       WERE VIOLATED WHEN THE PROSECUTION USED POST-INDICTMENT GRAND
       JURY PROCEEDINGS TO INTIMIDATE WITNESSES, PREPARE FOR TRIAL, AND
       SUPRESS INFORMATION NECESSARY TO SHOW THE FALSITY OF
       SUBSEQUENT TESTIMONY.............................................................................. 20

       A. Prosecutors Used Unlawful Post-Indictment Grand Jury Proceedings To Intimidate
            Witnesses, Prepare For Trial, And Suppress Information Necessary To Show The
            Falsity Of Subsequent Testimony. ............................................................. 21

            1. The prosecutors used the proceedings to threaten and intimidate witnesses........... 22

            2. The prosecutors used the proceedings to get ready for trial, and to question witnesses
               about defense preparation. ................................................................... 25

            3. The prosecutors used the proceedings to suppress information favorable to the
               defense that would have demonstrated the falsity of testimony that the State
               subsequently offered at trial............................................................... 27

       B. The Unlawful Post-Indictment Grand Jury Proceedings Violated Cummings Rights
            Under The Sixth And Fourteenth Amendments. ....................................... 28

            1. The proceedings violated due process under the Fourteenth Amendment............... 29

            2. The proceedings violated the Sixth Amendment, as applied to Texas through the
               Fourteenth. ........................................................................................... 32

       C. This Claim is Unexhausted.......................................................................... 33

II.    THE STATE VIOLATED *NAPUE V. ILLINOIS* WHEN IT KNOWINGLY ELICITED
       FALSE AND MISLEADING TESTIMONY.................................................... 33

A. The State Committed a *Napue* Violation When It Knowingly Elicited (Or Knowingly Failed To Correct) False Material Testimony From Detective Owens. ........................ 33

   1. The State knowingly elicited (or failed to correct) false and misleading testimony that Cummings wrote the inculpatory text messages. ............................ 34

   2. There is a reasonable likelihood that the false testimony affected the jury. ............. 37

B. The *Napue* Claim is Unexhausted And Not Defaulted. ................................. 39

III. THE CONVICTION AND SENTENCE VIOLATE DUE PROCESS BECAUSE THE PROSECUTION ENGAGED IN MISCONDUCT WHEN IT MISATTRIBUTED CRUCIAL TEXT MESSAGES TO CUMMINGS. ........................................... 39

A. The Prosecutor Misconduct Was A Due Process Violation. ....................................... 40

   1. The prosecutor repeatedly, deliberately, and falsely indicated that Cummings wrote the inculpatory text messages. ................................................. 40

   2. The misattribution of the text messages rendered the trial fundamentally unfair. ..... 40

B. The Claim is Unexhausted. ........................................................... 41

IV. THE STATE WITHHELD FAVORABLE, MATERIAL EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*. ............................................................. 42

A. The State Violated Due Process By Withholding Multiple Pieces of Exculpatory, Material Evidence. ..................................................................... 42

   1. The prosecution withheld information, favorable to Cummings, tending to undermine Micha'el Atkins' testimony. ................................................. 43

   2. The prosecution withheld information, favorable to Cummings, tending to undermine Nickoll Henry's testimony. ................................................. 47

   3. The prosecution withheld information showing that Cummings did not write inculpatory text messages the prosecution attributed to him. ................................. 55

   4. The State violated due process by suppressing information about Steve January's involvement with the victim's aunt. ................................................. 56

B. The *Brady* Claim is Unexhausted But Not Defaulted. ................................. 61

V. THERE WAS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION WHEN THE DEFENSE FAILED TO SEEK FOURTH AMENDMENT SUPPRESSION OF EXCLUDABLE MOBILE PHONE RECORDS. ............................................... 61

A. Trial Counsel Were Ineffective For Failing To Seek Fourth Amendment Suppression Of Excludable Wireless Provider Records. ................................................. 62

   1. Trial counsel's failure to seek Fourth Amendment suppression was objectively unreasonable. ......................................................................... 63

   2. Cummings was prejudiced by trial counsel's failure to suppress mobile phone records. ................................................................................ 67

B. Any Procedural Default Is Excused. ................................................... 68

VI.   THERE WAS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION
      BECAUSE DEFENSE FAILED TO INVESTIGATE AND DEVELOP A DEFENSE
      BASED ON ALTERNATE SUSPECTS.................................................................. 70

      A.  Trial Counsel's Failure To Investigate And Develop A Defense Based On Alternate
          Suspects Was a Sixth Amendment Violation. ........................................................... 70

          1.  The failure to investigate and develop the alternate-suspect evidence was objectively
              unreasonable.......................................................................................................... 71

          2.  Trial counsel's deficient failure to develop the alternate-suspect evidence was
              prejudicial. ........................................................................................................... 77

      B.  Any Procedural Default Is Excused. ......................................................................... 78

VII.  THERE WAS AS SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION
      BECAUSE THE DEFENSE FAILED TO INVESTIGATE AND PREPARE TO
      CONTEST CUMMINGS' GANG MEMBERSHIP......................................................... 79

      A.  Trial Counsel Were Constitutionally Ineffective For Failing To Investigate And
          Prepare For Gang Issues............................................................................................ 79

          1.  The failure to investigate and prepare to litigate the State's gang-revenge theory was
              objectively unreasonable........................................................................................ 80

          2.  Trial counsel's deficient approach to the gangland-revenge theory was prejudicial. 91

          3.  28 U.S.C. § 2254(d) Does Not Preclude Relief. ..................................................... 99

          4.  Section 2254(d) Does Not Preclude Relief Because This Claim Is Not The Same
              Claim That Was Adjudicated On The Merits In State Court................................... 99

          5.  In the Alternative, § 2254(d) Does Not Preclude Relief Because The State Decision
              Was Legally And Factually Unreasonable. .......................................................... 101

              a. The exception in § 2254(d)(1) is satisfied........................................................ 103

              b. The exception in § 2254(d)(2) is satisfied........................................................ 105

      B.  Any Procedural Default Is Excused. ....................................................................... 105

VIII. THERE WS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION
      BECAUSE THE DEFENSE TEAM WAS SUBJECT TO A CONFLICT OF
      INTEREST. ............................................................................................................... 106

      A.  The Defense Team Had Conflicts Of Interest That Deprived Cummings Of His Sixth
          Amendment Right To Effective Assistance Of Counsel........................................... 107

          1.  The defense team had a conflict of interest, which amounts to Sixth Amendment
              deficiency............................................................................................................ 108

          2.  The required quantum of prejudice is an "adverse effect" on the representation, and
              there were such effects here. ............................................................................... 112

          3.  In the alternative, if the required quantum of prejudice is that traditionally
              associated with *Strickland*, then the defense team's conflict had a reasonably
              probable impact on the outcome. ......................................................................... 116

B.  Any procedural default is excused. ............................................................. 118

IX.    THERE WAS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION
       BECAUSE THE DEFENSE FAILED TO RAISE AND COMPETENTLY ARGUE
       VIABLE CLAIMS UNDER *BATSON V. KENTUCKY* ............................................. 118

    A. There Was A Sixth Amendment Violation Associated With Trial Counsel's Ineffective
       *Batson* Litigation As To Cobb and Thomas. .......................................... 120

       1.  There Was A Sixth Amendment Violation Associated With Trial Counsel's
           Ineffective *Batson* Litigation As To Cobb. .......................................... 121

       2.  There Was A Sixth Amendment Violation Associated With Trial Counsel's
           Ineffective *Batson* Litigation As To Thomas. ....................................... 126

    B. Any Procedural Default of This Claim Is Excused. ................................. 127

X.     THE TRIAL COURT VIOLATED THE EIGHTH AND FOURTEENTH
       AMENDMENTS BY EXCLUDING RELEVANT MITIGATION EVIDENCE FROM
       THE PUNISHMENT PHASE OF THE TRIAL. ....................................... 128

    A. Cummings' Sentence Violated *Eddings* and *Tennard*, And Is Entitled To Relief
       Because The Error Was Not Harmless. .................................................. 129

       1.  There was an *Eddings* violation. .......................................... 129

       2.  Review is for harmless error because the TCCA did not decide the *Eddings* claim on
           the merits. ....................................................................... 132

       3.  The *Eddings* error was harmful. .......................................... 133

REQUEST FOR RELIEF ........................................................................ 134

VERIFICATION OF PETITION ........................................................... 136

# TABLE OF AUTHORITIES

**Federal Cases**

*Alcorta v. Texas*, 355 U.S. 28 (1958)..................................................................... 33, 106

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) ................................................ 106

*Arizona v. Youngblood*, 488 U.S. 51 (1988)............................................................. 32

*Atkins v. Virginia*, 536 U.S. 304 (2002) .................................................................. 138

*Banks v. Dretke*, 540 U.S. 668 (2004) ..................................................................... 33

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................. 18, 126

*Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) ....................................................... 116, 120

*Beverly v. United States*, 468 F.2d 732 (5th Cir. 1972) .......................................... 29

*Blankenship v. Estelle*, 545 F.2d 510 (5th Cir. 1977) ............................................. 39

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).............................................. 95

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................. 45, 121

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)........................................................... 143

*Cullen v. Pinholster*, 563 U.S. 170 (2011)......................................................... 105, 110

*Cuyler v. Sullivan*, 466 U.S. 335 (1980) ............................................................. passim

*Dassey v. Dittmann*, 201 F.Supp. 3d 963 (E.D. Wis. 2016) ................................... 117

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ................................................... 33

*Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) ................................................ 104

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ...................................................... 137, 141

*Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014) ............................................. 106

*Felde v. Blackburn*, 795 F.2d 400 (5th Cir. 1986).................................................. 43

*Ford v. Norris*, 67 F.3d 162 (8th Cir. 1995) .......................................................... 128

*Foster v. Chatman*, 136 S. Ct. 1737 (2016) ............................................................ 134

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................... 38, 40

*Glasser v. United States*, 315 U.S. 60 (1942) ..................................................... 118, 125

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) ...................................... 31

*Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003) ............................................ 115, 118, 119

*Harrington v. Richter*, 562 U.S. 86  (2011) ....................................................... 109, 110

*House v. Bell*, 547 U.S. 518 (2006) ............................................................... 74, 113, 126

*Illinois v. Fisher*, 540 U.S. 544 (2004) .................................................................. 32

*In re Grand Jury Proceedings*, 814 F.2d 61 (1st Cir. 1987)...................................... 29

*In re Oliver*, 333 U.S. 257 (1948) .......................................................................... 28

*Johnson v. California*, 545 U.S. 162 (2005) ...................................................... 127, 133

*Johnson v. Williams*, 568 U.S. 289 (2013) ............................................................. 109

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)........................................... 66, 67, 68, 71

*Kirkpatrick v. Blackburn*, 777 F.2d 272 (5th Cir. 1983)......................................... 43

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................. passim

*LaCaze v. Warden*, 645 F.3d 728 (5th Cir. 2011) ................................................... 51

*Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) ...................................................... 94

*Martinez v. Ryan*, 566 U.S. 1 (2012) .................................................................. passim

*Matthews v. U.S.*, 682 F.3d 180 (2d Cir. 2012) ..................................................... 119

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................................ 112

*Miller-El v. Dretke*, 545 U.S. 231 (2005) .......................................................... 134, 135

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................................... passim

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016) ..................................... 74, 113, 126, 137

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ........................................................ 67, 76, 85

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................ 138, 141, 143

*Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) ........................................ 116

*Porter v. McCollum*, 558 U.S. 30  (2009) ........................................ 111

*Powell v. Alabama*, 267 U.S. 45 (1932) ........................................ 34

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009)........................................ 134, 135

*Rhines v. Weber*, 544 U.S. 269 (2005)........................................ 34, 41, 65

*Rochin v. California*, 342 U.S. 165 (1952)........................................ 30

*Rompilla v. Beard,* 545 U.S. 374 (2005)........................................ 111

*Scott v. Hubert*, 610 F. App'x 433 (5th Cir. 2015) ........................................ 127

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990) ........................................ 51, 57

*Snyder v. Louisiana*, 552 U. S. 472 (2008)........................................ 134

*Sonnier v. Quarterman*, 476 U.S. 349 (5th Cir. 2007) ................................ 67, 76, 85, 97

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................ passim

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................ 40

*Tennard v. Dretke*, 542 U.S. 274 (2004)........................................ 137, 139, 141

*Trevino v. Thaler*, 569 U.S. 413 (2013)........................................ 73

*Trottie v. Stephens*, 720 F.3d 231 (5th Cir. 2013)........................................ 43

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................ 40

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................ 46, 59

*United States v. Barham*, 595 F.2d 231 (5th Cir. 1979) ........................................ 38, 40

*United States v. Dardi*, 330 F.2d 316 (2nd Cir. 1964)........................................ 29

*United States v. Dupree*, 117 F.3d 810 (5th Cir. 1997)........................................ 31, 34

*United States v. Dvorin*, 817 F.3d 438 (5th Cir. 2016)........................................ 35

*United States v. Garza*, 608 F.2d 659 (5th Cir. 1979) ........................................ 44

*United States v. Gelb*, 881 F.2d 1155 (2d Cir. 1989)........................................ 41

*United States v. Guidry*, 456 F.3d 493 (5th Cir. 2006)........................................ 30

*United States v. Iredia*, 866 F.2d 114 (5th Cir. 1989) ........................................ 44

*United States v. Johnston*, 127 F.3d 380 (5th Cir. 1997)........................................ 41, 42, 44

*United States v. Lane*, 474 U.S. 438 (1986)........................................ 143

*United States v. McAllister*, 693 F.3d 572 (6th Cir. 2012) ........................................ 127

*United States v. Nash*, 910 F.2d 749 (11th Cir. 1990) ........................................ 41

*Ward v. Stephens*, 777 F.3d 250 (5th Cir. 2015)........................................ 106

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ........................................ 38

*Webb v. Texas*, 409 U.S. 95 (1972)........................................ 34

*Wiggins v. Smith*, 539 U.S. 510 (2003)........................................ 94, 111, 143

*Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001) ........................................ 106

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................ 110

*Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991) ........................................ 58

*Wilson v. Sellers*, 138 S. Ct. 1188  (2018) ........................................ 108

*Wood v. Allen*, 558 U.S. 290 (2010) ........................................ 112

*Yushavayev v. United States*, 532 F.Supp.2d 455 (E.D. N.Y. 2008) ........................................ 31

**Federal Statutes**

28 U.S.C. § 2254(d)(1) ........................................ 105, 106, 110, 142

28 U.S.C. §2254(d)(2) ........................................ 105, 112

18 U.S.C § 242 ............................................................................................................ 31
18 U.S.C. § 241 ........................................................................................................... 30
18 U.S.C. § 3599 ....................................................................................................... 146
28 U.S.C. § 2254 .......................................................................................................... 2
28 U.S.C. § 2254(d) .............................................................................................. passim

## State Cases

*Cummings v. State*, No. AP-76,923, 2014 WL 12713256 (Tex. Crim. App. 2014) ..................... 2
*Dewberry v. State*, 776 S.W.2d 589 (Tex. Crim. App. 1989) (en banc) ..................................... 131
*Ex parte Cummings*, 2018 WL 1516614 (Tex. Crim. App. Mar. 28, 2018) ............................ 108
*Ex parte Reed*, 271 S.W.3d 698, (Tex. Crim. App. 2008) ................................................ 108, 109
*Ex parte Rogers*, 640 S.W.2d 921 (Tex. Crim. App. 1982) .................................................... 29
*Love v. State*, 543 S.W.3d 835 (Tex. Crim. App. 2016) ..................................................... 70, 71
*Pondexter v. State*, 942 S.W.2d 577 (Tex. Crim. App. 1996) ................................................ 102
*State v. Huse*, 491 S.W.3d 833 (Tex. Crim. App. 2016) ......................................................... 29

## State Statutes

Tex. Code Crim. P. art. 38.23(a)-(b) ....................................................................... 67
Tex. Const. art. I ................................................................................................... 62, 65
Tex. Code Crim. P. art. 11.071 ............................................................................... 33, 39

## Rules

Tex. R. Evid. 401 ....................................................................................................... 91
Tex. R. Evid. 402 ....................................................................................................... 91
Tex. R. Evid. 403 ................................................................................................ 91, 103
Tex. R. Evid. 404 ....................................................................................................... 91
Tex. R. Evid. 702 ..................................................................................................... 142
Tex. Sup. Ct. R. 5.03 .............................................................................................. 119

## INTRODUCTORY STATEMENT

The evidence that Rickey Donnell Cummings murdered Keenan Hubert and Tyus Sneed, derived from rumor and circumstance, was always paper-thin. Cummings carried a gun, but the ballistics evidence did not link him to the shooting. Cummings was in the housing complex the night of the murders, but no one identified him as a shooter. The State eked out its conviction and death sentence using three categories of evidence: (1) inculpatory text messages about destroying evidence and finding alibis; (2) pictures and testimony suggesting the murders were motivated by gang affiliation and revenge; and (3) testimony from witnesses who saw Cummings at the apartment complex before and after the shooting. As it turns out, and as this Petition shows, Cummings did not send the most incriminating text messages, the prosecution falsely characterized him a gang member (Bloods) in order to amplify the cultural gulf between an all-white jury and a black defendant, and law enforcement induced false testimony from its witnesses. No reasonable jury would convict Cummings today.

The evidence that the jury heard bore little relationship to reality because prosecutorial misconduct and deficient defense representation degraded the truth-finding function of the criminal trial. Among other things, prosecutors used unlawful grand jury proceedings to harass and threaten witnesses, and to spy on the defense team; prosecutors hid the fact that Cummings did not write crucial text messages—and then told the jury he did; and prosecutors failed to disclose major sources of bias affecting each of their two most important witnesses (one of whom has recanted). Playing their own part in the wrongful conviction and sentence, defense counsel inexplicably failed to move for suppression of the text messages, bungled its challenge to racially discriminatory peremptory strikes, failed to follow multiple pieces of evidence pointing to alternate suspects, and allowed the State to falsely portray the solidarity in East Waco's black community as evidence that Cummings was in a gang.

1

In some cases, when law enforcement cuts corners, it has little effect on the fairness and reliability of the trial. In other cases, when the defense falls down on the job, there can still be confidence that the outcome was just and accurate. Not here.

## JURISDICTIONAL ALLEGATIONS

Petitioner Cummings, by and through undersigned counsel, hereby petitions this Court to issue a Writ of Habeas Corpus on the grounds that he is held in custody in violation of the Constitution, laws, or treaties of the United States, and as specifically set forth herein. Cummings is being held by Respondent Lorie Davis, Director of the Institutions Division of the Texas Department of Criminal Justice. Respondent has custody of Cummings pursuant to the judgment entered against him on November 13, 2008, in *State of Texas v. Rickey Donnell Cummings*, No. 2011-1513-C1 (Tex. 19th Dist. Ct.—McLennan County), which was affirmed on December 17, 2014. *See Cummings v. State*, No. AP-76,923, 2014 WL 12713256 (Tex. Crim. App. 2014). This Court has jurisdiction pursuant to 28 U.S.C. §§ 2241, 2254, and venue is appropriate in the Western District of Texas, Waco Division.

## STATEMENT OF FACTS

On March 28, 2011, in East Waco, Texas, Tyus Sneed and Keenan Hubert were killed, and Deontrae Majors and Marion Bible were injured, when their car was ambushed by multiple gunmen in the parking lot of the Lakewood Villas Apartments ("the Villas"). Neighborhood rumors quickly generated a theory centering on Rickey Cummings and several accomplices, who could have been seeking retaliation against Hubert for what Cummings believed to be Hubert's role in the murder of Cummings' friend, Emuel Bowers, in April 2010. The official investigation piggy-backed on that theory, and the police ultimately arrested five people: Rickey Cummings, his younger brother D'Arvis Cummings, his older brother Tyrece Richards, Kennedy Hardaway, and Albert Love. There were no eyewitnesses to the shooting, and there was no forensic evidence connecting Cummings to the crime. The State eventually dismissed the charges against Richards and Hardaway.

## I.    TRIAL

Cummings was arrested on April 1, 2011. On April 2, the trial court appointed Russell Hunt, Sr. and Walter Reeves, Jr. to represent him. 1 CR 15. Michelle Tuegel, a recent law school graduate and newly licensed attorney, later joined the defense team as Hunt's associate. 5 WRR 132-33. Hunt and Reeves eventually rounded out the defense team by hiring cell phone expert Michael O'Kelley and investigator Ed McElyea, upon whom the lawyers relied heavily. 1 CR 58; 1 CR 16-18.

On June 29, 2011, a grand jury indicted Cummings for the capital murders of Hubert and Sneed. 1 CR 9. On July 22, Cummings was arraigned and entered a plea of not guilty, 1 CR 21, and the State announced its intent to seek the death penalty on November 10. 3 RR4.

Unbeknownst to Cummings, starting on January 12, 2012, and continuing throughout the calendar year, the prosecution haled various witnesses before a grand jury. *See e.g., In the Interest*

*Shacira Love* (Grand Jury of McLennan County. Jan. 18, 2012); *In the Interest of Richard Thomas* (Grand Jury of McLennan County. Jan. 18, 2012); In *the Matter of Takelia Love* (Grand Jury of McLennan County. Aug. 17, 2012); *In the Matter of Sheronica Patterson* (Grand Jury of McLennan County. Aug. 17, 2012); *In the Interest of Jasmine Davison* (Grand Jury of McLennan County. Sept. 5, 2012). These witnesses were not questioned for the purposes of charging anyone, but instead so that the prosecution could extract helpful information for trial, seek information about the defense team's preparation, and issue threats for communicating with the defense.

Voir dire in the Cummings case commenced on July 20, 2012, and concluded on August 29. 9 RR 5 to 28 RR 124. The State obtained an all-white jury by exercising peremptory strikes on every black panelist who the defense did not agree to dismiss.

### A.    Guilt Phase

The guilt phase of the trial began on October 22, 2012 and concluded on November 2. The State advanced its Bowers-retaliation theory by presenting various witnesses to establish that Bowers had been shot and killed on April 8, 2010. 30 RR 61-75, 76-131. Prosecutors elicited testimony showing that Bowers' family was frustrated and angry that his homicide remained unsolved almost a year later, and that some in the community believed Hubert was Bowers' killer. 30 RR 134-51, 158-211. In its opening, the State emphasized that the Cummings' retaliatory motive explained the homicides, telling the jury that the close relationship between Cummings and Bowers, combined with the fact that Cummings "held Keenan Hubert responsible," drove Cummings to "take justice into [his] own hands" when the investigation into Bowers' murder stalled. 30 RR 24, 28-29.

The State showed that, on March 28, 2011, Bible, Hubert, Majors, and Sneed were parked in a blue Mercury Grand Marquis in the Villas parking lot when they were ambushed from the rear by gunfire. Majors and Bible escaped to safety in nearby Apartment 81, but Hubert and Sneed died

in the car. 33 RR 104-19, 123-35. Hundreds of people converged on the crime scene, but there were no eyewitnesses to the shooting. 30 RR 214-32; 31 RR 17-18, 46-47. In addition to the damage from gunfire to the car itself, Apartment 81 had damage to an exterior wall and behind the living room couch. (A projectile was recovered from the couch.) There was one unfired .45 caliber cartridge recovered from the dining room floor (underneath a mop) in the apartment. 31 RR 32-44, 258-59, 265, 289; 32 RR 33.

Law enforcement also recovered various empty cartridge casings from around the vehicle and surrounding areas, including casings from multiple pistol calibers, as well as automatic rifle casings. 30 RR 231-32. The majority of the casings recovered were 7.62 x 39 caliber, which were consistent with an AK-47 or SKS assault rifle. Law enforcement also found .40 caliber shell casings and .38 caliber rounds, 30 RR 231-33; 31 RR 28, 238-50, 294, but recovered no weapons from the scene, 31 RR 287. A .45 caliber pistol belonging to Cummings was recovered from the car of his younger brother, D'Arvis Cummings, who was stopped by police shortly after the shooting.[1] When Rickey Cummings was arrested three days later, police recovered a .40 caliber Ruger pistol from his vehicle. 32 RR 143-65. After ballistic comparisons, neither the .45 caliber pistol recovered from D'Arvis' Cummings' car nor the .40 caliber Ruger recovered from Ricky Cummings' car matched projectiles and casings at the crime scene. 32 RR 180, 184-86; 36 RR 45.

Because there were no eyewitnesses who saw the shooting and because there was no inculpatory physical evidence, the case against Rickey Cummings was built almost entirely around (1) the implied revenge motive laced with innuendo about gang affiliations, (2) a set of text messages attributed to Cummings that, as it turns out, he did not write,[2] and (3) inferences from

---

[1] D'Arvis Cummings was stopped because he drove a car of the same make and model as the one involved in the shooting. 32 RR 55-61, 63, 70.
[2] *See infra* at Claims II, III, and IV.

witnesses who saw Cummings at the Villas before and after the shooting. (Cummings'
grandmother and numerous friends lived at the complex, and he visited them regularly.) 31 RR
74-82, 95-109; 32 RR 208-17; 33 RR 14-16, 25-29, 30-36, 73-75; 34 RR 84-96.

### 1. The Gang-Revenge Narrative

The prosecution developed a narrative in which Cummings, his alleged co-conspirators,
and Bowers were all part of a (non-existent) local Bloods set. In this telling, Cummings
masterminded the shooting as gangland-style retaliation for the killing of Bowers a year earlier—
believing that Hubert had been Bowers' killer. Among other things, the State used irrelevant gang
evidence to racialize the proceeding, repeatedly alluding to Cummings' putative Bloods
membership. In the very first seconds of its opening statement to the all-white jury, the prosecution
intoned:

> Ladies and gentlemen, in just a few moments we're going to enter into a world that
> to many of *us* is quite *foreign*. It's a world where people go by *street names*. It's a
> world where people organize into *neighborhood clicks* [*sic*]. It's a world where the
> street word, the word on the street, rumors, are very powerful things in this world.
> Unfortunately, as you'll see, it's also a world in which men commit brutal,
> premeditated murders.

30 RR 21-22 (emphasis added). The prosecution told the all-white jury that the "foreign" world
was organized into "neighborhood cli[ques]" full of people with "street names," but everyone
understood what that meant. The State went on to question three out of its first four witnesses
about whether Cummings was part of or otherwise connected to a gang.

Theresa Salazar was the first witness the State called, so that she could testify about the
Bowers murder. 30 RR 63. Specifically, she testified that she called Cummings when she noticed
something looked wrong with Bowers, knowing that Cummings and Bowers were friends. 30 RR
66-67. On re-direct examination, the State began to imply a black gang affiliation by eliciting
testimony from Salazar about what she saw Cummings wearing at the Bowers funeral: red and

black clothes. 30 RR 73-74. (The shirts were selected by Bowers' mother. 35 RR 36-38.) After Salazar stated that Cummings was likely among the many attendees wearing "red and black" outfits, the State continued to question her about whether those attendees wore "combat" badges and whether their clothes had a "military" feel—with the obvious intent of suggesting black gang membership to the all-white jury. 30 RR 74.

Paul Hall was the second witness the State called. 30 RR 76. Hall had been negotiating a marijuana transaction with Bowers in the days prior to Bowers' murder. 30 RR 80-83. Hall testified that Cummings was one of about nine people that came to his house the night of the Bowers murder, accusing Hall of the killing. 30 RR 91. Hall explained that Cummings was not the leader but that Cummings was the one that he talked to that evening. 30 RR 92-93. The two had a normal conversation, and things calmed down quickly. The State would later insinuate that Hall acquired a weapon because he felt threatened by Cummings, 37 RR 28, but Hall testified expressly that he was not afraid that Cummings was going to hurt him; he got the weapon because he knew rumors about his involvement were circulating everywhere. 30 RR 103-104. Of the first four witnesses, Hall was the only one from which the State did not elicit testimony about gang membership.

Shaniese Iglehart, Bowers' girlfriend at the time of his death and the mother to his son, was the third witness to testify in the State's case-in-chief. She testified that Cummings was part of a larger group that was friends with Bowers—a group that included Cummings' brother D'Arvis and Albert Love. 30 RR 130, 148. Also pressed by the State about the attire at Bowers' funeral—another instance in which the prosecution gratuitously questioned witnesses to imply black gang membership—she explained that Bowers' mother had picked out red shirts that Bowers and many of the mourners, including Cummings and Love, would wear. 30 RR 129, 146-47, 155-56. The State again insinuated Bloods membership by asking her about a music video that played at a

fundraising benefit for Bowers' son after Bowers' murder ("Starch it Down, Flame it Up")—a video in which Cummings did not appear and had no involvement. (The video would become a crucial piece of evidence in the case.) Iglehart clarified that Bowers had written the lyrics in high school, 30 RR 133, 147, which was consistent with the testimony of other witnesses. *See, e.g.*, 35 RR 33 (Shelia Bowers), 37 RR 34-35 (Cummings). She also stated that Hubert had approached her to tell her that he was not responsible for Bowers' death, and that Bowers' family eventually became frustrated with the lack of progress on the investigation. 30 RR 131-32, 138-39, 141, 143.

As its fourth witness, the prosecution called Waco Police Department ("WPD") Detective Michael Alston, who had been the lead detective on the Bowers murder. The State used Alston as a vehicle to characterize pictures from Bowers' funeral as proof of Cummings' gang membership. Reviewing group photographs admitted into evidence of assembled mourners at Bowers' funeral, the State questioned Alston about the red color and distinctive military-type design of the mourners' clothing. 30 RR 171, 174-175. The State also questioned Alston about whether he thought that hand gestures displayed by mourners at Bowers' funeral—as well as hand gestures made by Bowers himself, in other pictures—were gang signs. 30 RR 171-175. (Trial counsel objected to none of these questions, even though Alston was not a gang expert. 30 RR 170-171.)

During Cummings' case-in-chief, the defense called Shelia Bowers, Emanuel Bowers' mother. She testified that Cummings was friends with Bowers, but was not one of his very best friends. 35 RR 30. (Albert Love's brother, Lawrence Love, was among the closest to Bowers. 35 RR 30.) Shelia testified that red had been her son's favorite color, and that she had selected the shirts worn by Bowers' friends at his funeral—a choice that the State had used to suggest Cummings' gang membership—from a local store. 35 RR 31, 36. The shirts had originally been selected for the pallbearers, but a number of others decided to dress the same way to show their

support for Bowers—including the pastor who delivered the funeral's sermon. 35 RR 36-38, 55. She also explained that the hand gestures in the photographs and in the video were an "E" for "[Waco's] Eastside." 35 RR 34-35. Shelia Bowers denied that there was any gang significance either to the shirts or to the hand gestures in many of the photos. 35 RR 33-38. She explained that the music video in question was based on a song Bowers had written in high school—Bowers was a rapper who went by "T-Bucks"—and the video was produced after he died, to raise money for his young son. 35 RR 32, 51. Shelia Bowers herself had appeared in the video, though Cummings had not. 35 RR 32-33. As to Hubert, she testified that she knew he was one of several people rumored to be responsible for Bowers' death. 35 RR 40-41. She explained, however, that she actually became estranged from Cummings *because Cummings was not particularly hostile to Hubert*. 35 RR 41-42. (Rickey Cummings, testifying in his own defense, also spoke to his relationship with Shelia Bowers, including their temporary estrangement resulting from her anger that Cummings and Hubert had maintained a friendly relationship. 36 RR 80.).

Perceiving his defense team's failure to contest key issues, including his gang membership, Cummings decided to take the stand as a surrebuttal witness. Cummings himself testified about the Bowers murder, describing the events on the day Bowers was killed, including the conversation he had with Hall. 36 RR 74-78. Cummings acknowledged that he knew he was a suspect in the Villas shooting because of the neighborhood rumors and his connection to Bowers, but he emphatically denied having anything to do with the crime. 36 RR at 101-02. Because the defense had put on no witnesses to testify as to Cummings' gang membership, and needing to respond to the State's seemingly limitless interest in presenting the all-white jury with the suggestion that Cummings was a Blood, defense counsel opened the door by asking Cummings whether he was a gang member. 36 RR 73-74. Cummings categorically denied it. 36 RR 74.

At the start of the second day of Cummings' surrebuttal testimony, and outside the presence of the jury, the State announced its intent to introduce: photographs of the tattoos on Cummings' back, a photograph of Cummings with his two brothers (who were making hand gestures that the State intended to use to show gang membership), and a downloaded copy of the video, "Starch It Down, Flame It Up," that had been played at Bowers' funeral. The defense objected to *none of this* material, even though given the opportunity to lodge any objections outside the jury's presence. 37 RR 7 (defense counsel confirming no objection). The defense made a best-evidence objection to a fourth exhibit, the transcription of the lyrics in the video. 37 RR 8. Aided by the three uncontested exhibits, the State used its cross-examination to paint Cummings as a member of a Waco Bloods set, repeatedly calling attention to, among other things, his tattoos, the hand signs of people posing in pictures with him, and his spelling in text messages. In the climactic moment, the State played and dissected the incendiary music video before the all-white jury— using its lyrics and images to suggest that Cummings was a member of a menacing Waco Bloods set. 37 RR 30-37.

### 2.    The Text Messages

Significant pieces of non-testimonial evidence the State used in its case against Cummings were text messages recovered from his cell phone, as well as messages which had been deleted from the phone's memory but which were still reflected in the wireless service provider's master listing. The State obtained messages in the latter category—those retrieved from the wireless provider—without a warrant. Among the text messages obtained from the provider was one in which the sender instructed someone to "[t]ake dem bullets out the house," which was sent from Cummings' cell phone approximately twelve hours after the shooting—at 11:00 a.m. on March 29, 2011. 34 RR 71. During the guilt/innocence phase of Cummings' trial, and despite knowing that the text message was actually sent by Albert Love, the State repeatedly misattributed it to

Cummings,[3] suggesting that Cummings was trying to cover up his role in the shooting. 36 RR 101, 37 RR 158, 38 RR 34.

The first mention of the "dem bullets" message came in the State's redirect examination of WPD computer forensic lab Detective James Owens, II, a cell phone specialist asked to explain how to interpret the data retrieved from Cummings' cell phone:

> Q. Let's look at those for a moment. We see the text message of 303 here that comes from Righthand Man here, "Were yall at," but the next message is coming – **is sent from the target telephone belonging to Rickey Cummings**, isn't it, sir –
> A. Yes, sir.
> Q. – to another number here, and the message reads, **"Take dem bullets out the house."** Is that right?
> A. Yes, sir.
> Q. Approximately three minutes later, the individual to whom that message was sent at 11:00 a.m. responds back **to Rickey Cummings' telephone** and says, "U late did that last night baby am on top of it u good love u," with a tag of "Mrz.bloody." Correct?
> A. Yes, sir.
> Q. And then at 11:12, that same sender sends another message **to Rickey Cummings' telephone** saying, "What u want me to do with her," and again with the tag of "Mrz.bloody." Correct?
> A. Yes, sir.
> Q. And then some 16 minutes later at 11:28 a.m., **Rickey Cummings sends a message back** to that same recipient of, "Straight up love u too and wit who." And approximately one minute later 254-229-1881 sends a message back stating, "The caps u know what that is," again with the tag of "Mrz.bloody." Correct?
> A. Yes, sir.

34 RR at 70-72 (emphasis added).

The State similarly elicited testimony from Owens regarding text messages retrieved from the wireless provider in which the sender talks about getting an alibi. 34 RR 75 (Q: And the next message, again, from the individual identified as "5hakira" about a minute later **back to Rickey Cummings** says, "Yea ii kno bt ii gt antha alabi tu ima cll u in a sec." That message is not in your

---

[3] In separate grand jury proceedings before Cummings trial, and at Albert Love's trial, the State disclosed its knowledge that the text messages were composed by Albert Love. *See infra* at SECTION II.A.1.

report because that message was also deleted from Rickey Cummings' telephone, wasn't it? A: Yes, sir.") (emphasis added).

In short, despite Cummings' (accurate) denial that he had not composed the inculpatory text messages,[4] the State created the impression that Cummings had done so. And when the State made its closing argument, it simply and expressly attributed the messages about hiding evidence to Cummings. 38 RR 34. Maximizing the impact of these messages, the State used them to show that he committed the crime, covered it up, and was not a credible witness:

> But you know why Rickey Donnell Cummings did it, because he's not an innocent man. Does an innocent man tell others to get rid of evidence after the fact? No. But we know he did. Does an innocent man delete text messages, selective deletions, as you see it, the most incriminating things after this offense? No, they don't do that, because they don't have to, because they don't have text messages like this. Rickey Donnell Cummings did because, again, he's not an innocent man.

38 RR 75.

### 3. Villas Testimony

The prosecution presented several witnesses that had seen Cummings at the Villas before and after the murders, and two were crucial. The first critical witness was Miche'al Atkins, a high school student who had been spending the night with his father at his father's girlfriend's Villas apartment. 34 RR 83-87. Atkins testified that Cummings and Atkins' father were hanging out in the apartment's living room before the shooting, smoking a joint, and that Atkins was in one of the bedrooms. 34 RR 90. Atkins testified that he overheard Cummings utter that "he was going to shoot somebody." 34 RR 90-91. Atkins stated that he believed that gunshots began about twenty minutes after Cummings left the apartment. 34 RR 91-92.

---

[4] Cummings explained that his friends often used his phone, and it would not have been unusual for one of them to have sent a text message from it. 36 RR 100-01.

The surviving victims, Majors and Bible, both testified for the State as to the night's events and to their interactions with Cummings before the shooting. Majors testified that he had driven his blue Grand Marquis to the Villas and was parked in the lot. Bible joined him and they hung out in the car, listening to music and talking. 31 RR 137-141. Over the next hour, Sneed and Hubert joined them. 31 RR 141-143. Majors stated that, about an hour later, Cummings walked by the car, "mean-mugging" the occupants (which Majors described as a glaring, pronounced stare). 31 RR 145-146. Majors testified that he had no issues with Cummings, and didn't think anyone else did, either. 31 RR 147. A couple of minutes later, Cummings walked by the car again. 31 RR 148. About half an hour after that, the car was hit with gunfire. 31 RR 149.

Bible also testified that the four men were hanging out in Majors' car in the Villas lot, smoking marijuana and watching music videos. 31 RR 202-206. Bible testified that, when Cummings walked by, Hubert sang some mocking rap lyrics. 31 RR 207-209. Bible said he was tired of hearing about Hubert having to watch his back. 31 RR 209. The gunfire started sometime after that, shattering the car's back window before Bible fled the car and ran for cover. 31 RR 210-211.

The State also relied heavily on the account of Nickoll Henry, the second crucial witness and the aunt of Bible's girlfriend, to implicate Cummings. Henry lived in Villas Apartment 81. At trial, she testified that, on March 28, she had been asleep on her living room couch with a "pounding" headache when she awoke to the sound of gunfire. 32 RR 232. She stated that her front door flew open and she saw someone run into the house. 32 RR 234. Henry testified that she peeped out the front door and saw Cummings holding a gun, which had apparently jammed. 32 RR 235. She stated that she made eye contact with Cummings, who was wearing a black hoodie, before slamming and locking the door. 32 RR 236-238. She explained that she had heard a rumor

that, earlier in the day, "Lockie and the Cummings boys were in a beef." 32 RR 236. Though Henry was familiar with Cummings, she initially stated that she did not really "know" him, and was much better acquainted with Cummings' older brother, Tyrece Richards. 32 RR 239.

After closing her front door, Henry called 9-1-1.[5] 32 RR 238. She then ran down the hallway of her apartment and found Majors and Bible bleeding in the bathroom. 32 RR 242. Henry testified that she did not talk to police officers that night about what she had seen, because she was scared of doing so. 32 RR 245-246. Later that evening, Henry saw Cummings in the parking lot while the police were still there; she stated that he was not wearing a black hoodie at that time. 31 RR at 244-245. The next day, Henry found empty bullet casings and a live round on her doorsill and considered them to be a threat. 32 RR 246. She gave the ammunition to Detective Steven January, the lead detective on the case, and only *then* told him she had seen Cummings. 32 RR 247.[6] When Henry told January that she had seen Cummings outside in her entryway, she simultaneously gave a description of motive that clearly derived from rumors circulating in the community.[7] App. 29. Henry then looked at a photographic line-up prepared by Detective January and identified Cummings from it. 32 RR at 247-248. Though at the time she testified, Henry was on misdemeanor probation for an offense that was originally charged as a felony, 32 RR 262, and

---

[5] Mr. Cummings' post-conviction counsel was unable to obtain from the State working copies of 9-1-1 call from the night of the crime. App. 157-160; App. 165-169. Undersigned counsel also attempted to obtain the recordings from the State, but were likewise told that the State does not have them. App. 161. Undersigned counsel also requested the recordings from McLennan County and the City of Waco, per the Public Information Act, but were told that they no longer exist. App. 163; App. 164.

[6] Henry testified that this was the next day, 32 RR 246, but Detective January's report reflect that she came to see him two days later, on March 30, 2011. App. 27-30.

[7] Multiple witnesses testified about the rampant and rapidly spreading rumors surrounding the shooting. *See* 32 RR 224 ("Rumors float[ed] that same night."); 31 RR 91-92 ("Yeah, I heard rumors."); 35 RR 101 (Cummings' girlfriend at the time of the shooting confirming that "rumors were floating around about who was involved" and that Cummings had received a text that concerned him).

although her probation for a separate offense had not been revoked notwithstanding a serious probation violation, 32 RR 252, 276, she denied that she had received any special treatment in her own case in exchange for her testimony. 32 RR 279-280.

On cross-examination, Henry denied that she initially told people she had seen Tyrece Richards, not Rickey Cummings, outside her door. 32 RR 249-250. Cummings' attorneys further questioned Henry at length as to her psychiatric diagnoses and history of drug use, 32 RR 250-253, as well as her probation violation through drug use. 32 RR 275-276. Trial counsel later specified that Henry's arrest was for an aggravated assault, which was then reduced to a misdemeanor prior to her placement on probation. 32 RR 282-283. Trial counsel also walked Henry through her account of her and her children's positioning in their apartment the night of the crime, and the placement and number of bullet holes that Henry was able to observe in the walls when she briefly returned for clothing the next morning. 32 RR 276-278. Henry testified that the man she saw on her doorstep was 10 feet away from her door. 32 RR 281-282.

During its case-in-chief, the defense presented evidence attempting to impeach Henry, including a psychologist who testified that Henry suffered from borderline personality disorder, 35 RR at 16-18, as well as Alan Bennett, an attorney who represented Henry on a felony charge of aggravated assault with a deadly weapon in April 2011. 35 RR 75. Bennett testified that the judge assigned to Henry's case approved lowering or keeping her bond the same knowing she was a witness in a capital murder case. 35 RR 78-79. Ultimately, Henry's charge was reduced to a Class A misdemeanor. 35 RR at 79-80. Bennett testified that he believed her status as a witness had played a part in that offer. 35 RR 86. However, Bennett denied that Henry's testimony against Cummings had been offered in exchange for the plea deal. 35 RR 88.

When he eventually testified, Cummings provided a detailed narrative recounting the events of the night in question and his presence at the Villas. He testified that he had spent most of March 28 at a friend's house, smoking and playing a video game. 36 RR 85. He then drove his burgundy Impala to the Villas in order to check on his grandmother, as he often did. 36 RR at 85-88. Cummings also corroborated the interactions he had had with the witnesses who testified for the State, including those who saw him walk past the blue Grand Marquis in the parking lot. 36 RR 89-91.

While still at the Villas, Cummings called his brother D'Arvis for a ride. D'Arvis picked him up in his car—coincidentally, also a blue Grand Marquis—and Cummings got in the back seat. 36 RR 93. Cummings explained that he got in the back because the front seat might have been wet and because D'Arvis was only taking him a short distance. 36 RR 93-94. He took out his gun, a .45 Warthog, and put it in the pocket behind the passenger seat. D'Arvis took Cummings 0.7 miles away, to Clay Street, because Cummings planned to sell drugs. 36 RR 92-94.

While Cummings was on Clay Street, someone drove through and said there was a blue Grand Marquis shot up at the Villas. 36 RR 95. Because D'Arvis drove a blue Grand Marquis, Cummings feared his brother had been hurt. 36 RR 95. Cummings ran the 0.7 miles back to the apartments, went through the first gate and then through the breezeway where everyone else was standing around. 36 RR at 95-96. He interacted with several people, including Brittany Snell, who told him which car was involved and who had been fatally shot. 36 RR 97. Cummings took Snell into her apartment to get her a drink of water and calm her down. 36 RR 98. He used the apartment's restroom and, as there was no soap beside the restroom sink, went to the kitchen sink to wash his hands with dishwashing soap. 36 RR 98. Cummings had inadvertently left his cell phone in D'Arvis's car, so he remained in Snell's apartment to use her phone. 36 RR at 96-99.

### B.     Sentencing Phase

The State's punishment-phase case consisted of Cummings' prior criminal history. These included a 2003 juvenile charge of resisting arrest and trespass after refusing to leave a school he no longer attended, 39 RR 10-16, 21-28, 30-37, 2005 and 2007 assault charges, 39 RR 40-53, 88-89, and a 2008 arrest and brief incarceration for unlawful carrying of a weapon and making a terroristic threat. 39 RR 89-99, 102-107, 110. Throughout the liability phase, the prosecution had also introduced voluminous evidence in an effort to suggest that Cummings was a member of a Waco Bloods set (chapter), and that evidence did double duty as proof of danger and aggravation at sentencing.

The defense presented several of Cummings' family members,[8] who testified that Cummings was a good person and a devoted father to his young son. 40 RR at 7-60. Trial counsel then sought to present the expert testimony of Amy Nguyen, a community health expert, regarding community risk factors in the neighborhoods where Cummings lived. Ultimately, the trial court excluded Nguyen's testimony based on the fact that the court believed the proffered testimony to be non-relevant. 40 RR at 82-83. Finally, the defense presented Frank AuBuchon as a prison classifications expert. 40 RR at 96-124. Aubuchon testified on the question of future dangerousness, explaining that a life-without-parole sentence would trigger at least a mandatory "G3" classification in the prison system, which would involve severe limits on his freedom of movement, as well as on his ability to work and recreate, within the corrections facility. 40 RR 110-11. Although AuBuchon did not testify as to the question of whether Cummings was actually

---

[8] Testifying on Cummings' behalf were his grandmother Erma Richards (40 RR at 7-11); his aunt Annette Wilkerson (40 RR at 19-22); his cousin Jarrett Embry (40 RR at 25-28); his aunt Ruby Brown (40 RR at 32-42); and the mother of his son, Brittney Hayes (40 RR at 50-60).

in a gang, he testified that he would be classified that way by the correctional system because of his tattoos. 40 RR 123.

On November 7, 2012, the jury answered the Texas sentencing-phase questions such that the judge was required to enter a death sentence, and the judge did so thereafter. 41 RR 66.

## II.     DIRECT APPEAL

On appeal, Cummings was represented by Alexander Calhoun, who raised nine points of error: a due process claim for refusing to allow the Dr. Nguyen to testify about the East Waco neighborhood in which Rickey Cummings grew up; a claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), for misapplying procedures to evaluate whether a jury strike was animated by race; two claims alleging erroneous evidentiary rulings at the guilt phase; and four claims of instructional error. On December 17, 2014, the Texas Court of Criminal Appeals ("TCCA") denied all relief. *Cummings v. State*, No. AP–76,923 (Tex. Crim. App. Dec. 17, 2014).

## III.     STATE HABEAS PROCEEDINGS

On November 7, 2012, while the appeal from the conviction and death sentence remained pending, the TCCA appointed the Office of Capital and Forensic Writs ("OCFW") to represent Cummings in his state post-conviction litigation, pursuant to Article 11.071 of the Code of Criminal Procedure. On September 12, 2014, OCFW filed the state post-conviction application.[9]

The state post-conviction application contained fourteen claims. Ten of those were ineffective-assistance-of-trial-counsel ("IATC") claims under the Sixth Amendment for trial counsel's failure to: rebut or call an eyewitness expert to undermine the testimony of Nickoll Henry; call a forensic linguistics expert to bolster Cummings' assertions that he did not write the

---

[9] At the time that OCFW filed the state post-conviction application, the appeal from the conviction and sentence was still pending in the TCCA, and so none of the federal limitations period elapsed in between the date the conviction became final on the conclusion direct review and the date the limitations period began to toll under 28 U.S.C. § 2244(d)(2).

inculpatory text messages; call an expert to rebut the prosecution's assertion that Cummings was associated with the Bloods gang; object to the admission of inflammatory evidence about Cummings' alleged gang membership; object to the admission of an inflammatory photograph of a woman holding an AK-47 that law enforcement suspected to be the assault rifle used in the case; object to victim impact evidence used at the guilt phase of the trial; for failing to object to Marion Bible's hearsay testimony; fully investigate and present lay witnesses during the punishment phase of the trial; present punishment-phase evidence about Cummings' life history; and to preserve the record on appeal. I WCR 37-163; 189-194. The state application also included four boilerplate claims that the TCCA always encounters, and always rejects: through the "10-12" rule, that the Texas statute unconstitutionally bars the court from instructing the jury that a single holdout can result in a life sentence; that the future dangerousness issue is unconstitutionally vague and fails to sufficiently narrow death eligibility; that the Texas death penalty system is arbitrary; and that the Texas statute and jury instructions unconstitutionally restricted consideration of mitigating evidence. I WCR 163-189.

The trial judge, who was also supposed to preside over the state post-conviction proceedings, had to recuse himself for making public statements disparaging a defense expert. Following the recusal and appointment of a new judge, the state court held an evidentiary hearing. The evidentiary hearing focused on the IATC claims and, aside from a linguistics expert analyzing the "take dem bullets" text, 5 WRR 83-130, the witnesses consisted of trial counsel. Walter Reaves testified to his qualifications, case load at the time surrounding and during Mr. Cummings' trial, and the issues with defense experts Amy Nguyen and Mike O'Kelly. 4 WRR 39-113. Reaves also testified regarding trial counsel's decisions to forego an eyewitness identification expert regarding Nickoll Henry, and a linguistics expert regarding the text messages. 4 WRR 113-126. Reaves

called the gang-revenge angle the "integral part of the case," 4 WRR 127, and discussed trial counsel's failure to get an exclusion ruling on the record, failure to object to gang-related evidence, and failure to obtain a gang expert. 4 WRR 127-134. Reaves stated that trial counsel did not object to the inflammatory evidence so that it could highlight the weakness of the State's case. 4 WRR 130.

Given Michelle Tuegel's inexperience, she testified at length to her exact roles and responsibilities on Mr. Cummings' team, and her simultaneous or previous work on other cases. 5 WRR 132-177. Russ Hunt also testified to his background and caseload, as well as to the mitigation and investigatory work done on Mr. Cummings' case. 5 WRR 198-271. Mr. Hunt testified regarding the team's failure to procure an on-the-record ruling excluding gang evidence, 6 WRR 81-97, and their retention of a prison expert rather than a gang expert. 6 WRR 98-99.

The post-conviction judge ultimately declared that he would not consult the trial record, refused to decide claims based on pure questions of law, and wrote a memo explaining that he decided the IATC claims by reference to his out-of-court familiarity with trial counsel and their reputation in the community. V WCR 1419-1420. The TCCA therefore rejected the trial court findings *in toto*, as well as the memo. Its four-page opinion—only 1 sentence of which analyzed the fourteen claims at issue—nonetheless concluded: "Instead, based upon our independent review of the record and consistent with our role as the ultimate factfinder in habeas corpus proceedings, we deny relief." *Ex parte Cummings*, No. WR-84,324-01, 2018 WL 1516614, at *4 (Tex. Crim. App. Mar. 28, 2018). No certiorari petition was filed on Cummings' behalf.

### CLAIMS FOR RELIEF

I. **CUMMINGS' RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WERE VIOLATED WHEN THE PROSECUTION USED POST-INDICTMENT GRAND JURY PROCEEDINGS TO INTIMIDATE WITNESSES, PREPARE FOR TRIAL, AND SUPRESS INFORMATION NECESSARY TO SHOW THE FALSITY OF SUBSEQUENT TESTIMONY.**

Cummings' conviction was obtained through the prosecution's unlawful use of grand jury proceedings to prepare for trial, to harass and intimidate potential witnesses (especially those who might testify for the defense), to secretly investigate the defense's trial preparation, and to suppress information necessary to show the falsity of subsequent trial testimony. The prosecution's abuse of the grand jury tainted the entire trial, violating Cummings' rights to due process and effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution. This claim is unexhausted and a Texas remedy remains available, so Cummings will be requesting the stay-and-abeyance order necessary to exhaust it.

This claim is based on the following facts and law, and on the allegations raised in other claims in this Petition, which are incorporated herein by this specific reference.

### A. Prosecutors Used Unlawful Post-Indictment Grand Jury Proceedings To Intimidate Witnesses, Prepare For Trial, And Suppress Information Necessary To Show The Falsity Of Subsequent Testimony.

Cummings was indicted on the charge of capital murder by the grand jury on June 29, 2011. I CR 9. Starting more than six months later and continuing throughout 2012, the Office of the McLennan County District Attorney ("MCDA") began obtaining grand jury subpoenas for a number of individuals, and had at least seven of them report to the grand jury: Shacira Love (January 18 and December 19), Richard Thomas II (January 18), Victoria Davis (January 18), Sheronica Patterson (August 16), Shelia Bowers (August 16), Takelia Love (August 17), and Jasmine Davison (August 30). (The defense would eventually call Bowers and Davison at Cummings' trial.) In virtually every instance of this practice for which information is available, investigator Steve January served the grand jury subpoenas.

These witnesses had not been charged with a crime, nor were they suspects. The proceedings were not being used to investigate an uncharged crime or to seek an indictment. Their sole purpose was to intimidate witnesses, prepare for trial, and suppress information favorable to

the defense that would have demonstrated the falsity of testimony the State elicited at trial. What follows is information necessary to structure the Court's analysis of the State's grand jury tactics, rather than an exhaustive accounting of the rather shocking abuse of the institution. The breadth of institutional overreach, however, is captured in the eight grand jury transcripts from the proceedings.[10]

> 1.   **The prosecutors used the proceedings to threaten and intimidate witnesses.**

Cummings' prosecutors threatened and intimidated every witness they brought before the grand jury, in various ways and to varying degrees. For example, Shacira Love, sister of Cummings' co-defendant Albert Love, was brought before the grand jury on January 18, 2012. *In the Interest of Shacira Love* (Grand Jury McLennan County Jan. 18, 2012) ("*Shacira Love* GJ transcript-1"). ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████ *Shacira Love* GJ transcript-1 at 1 RR 17. ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████ *Shacira Love* GJ

---

[10] The transcripts are the subject of a sealing motion that Petitioner has filed with the Court. Therefore, the contents of the proceedings, as reflected in the transcripts, have been redacted from this document.

transcript-1 at 1 RR 34 █████████████████████████

██████████████████████████████████████████████

████████████ *Shacira Love* GJ transcript-1 at 1 RR 34-35 ████████

██████████████████████████████████████████████

██████████████████████████████████ *Shacira Love* GJ transcript-1 at ███

██████████████████████████████████████████████

██████████████████████████ *Shacira Love* GJ transcript-1 at 1 RR 35. Shacira was

summoned to appear before a grand jury again in December 2012, after Cummings' trial, but

before her brother's; ████████████████████████████████

████████ *See In the Interest of Shacira Love* (Grand Jury McLennan County Dec. 19, 2012) 1

RR 15.

Victoria Davis was also called before the grand jury on January 18, 2012, █████████

██████████████████████████ *See In the Interest of Victoria Davis* (Grand

Jury McLennan County Jan. 18, 2012) 1 RR 5 ("*Davis* GJ transcript"). █████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

*Davis* GJ transcript at 1 RR 6. ██████████████████████████

███, *Davis* GJ transcript at 1 RR 7-8 █████████████████████████

*Davis* GJ transcript at 1 RR 16-17. ███████████████████████████

███████████████████ *Davis* GJ transcript at 1 RR 17.





*Davis* GJ transcript at 1 RR 17-18.

Sheronica Patterson**,** Takelia Love's sister, was another individual subjected to threats and intimidation in the unlawful grand jury proceedings. *See In the Interest of Sheronia Patterson* (Grand Jury McLennan County Aug. 8, 2012) ("*Patterson* GJ transcript"). ███████████████

████████████████████████████████████████████████████ *Patterson* GJ transcript at 1 RR 15. ████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████

*Patterson* GJ transcript at 1 RR 22. ██████████████████

███████████████████████████████ *Patterson* GJ transcript at 1 RR 42. ████████████

███████████████████████ *Patterson* GJ transcript at 1 RR 42

████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Patterson* GJ transcript at 1 RR 42.

> **2.** **The prosecutors used the proceedings to get ready for trial, and to question witnesses about defense preparation.**

The Cummings prosecutors also used the unlawful grand jury proceedings to collect evidence from witnesses generally, and to try to extract information about the defense planning specifically. For example, on August 30, 2012, two days after jury selection in Cummings' trial had concluded, investigator Steve January (then with the MCDA's Office) obtained a grand jury subpoena for Jasmine Davison, Cummings' girlfriend at the time of his arrest, and served it on her the following day. App. 62. On September 5, Davison appeared before the grand jury and was questioned extensively by Cummings prosecutor Greg Davis. *See In the Interest of Jasmine Davison* (Grand Jury McLennan County Sept. 5, 2012) ("*Davison* GJ transcript").



████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ *See*, *e.g. Davison* GJ transcript at 1 RR 10 ████████████

████████████████████ *Davison* GJ transcript at 1 RR 11 ████████████

████████████████████████ *Davison* GJ transcript at 1 RR 13 ████████

████████████████████████████████████████████████████████

████████████ *Davison* GJ transcript at 1 RR 22 ████████████████

████████████████████████████████████████████████████████

*Davison* GJ transcript at 1 RR 4, ████████████████████████████

████████████████████████████████████



*Davison* GJ transcript at 1 RR 43-44.

*Davison* GJ transcript at 1 RR 44-46

*Davison* GJ transcript at 1 RR 46

*Davison* GJ transcript at 1 RR 47.

*Davison* GJ transcript at 1 RR 47.

*Davison* GJ transcript at 1 RR 49.  He continued:

*Davison* GJ transcript at 1 RR 49. Davison was called by Cummings at trial, and then by the State as a rebuttal witness. 35 RR 90; 36 RR 64-65.

Prosecutor Davis's unlawful use of grand jury proceedings to override the will and civil rights of witnesses is also evident in the records related to Shelia Bowers, another defense witness

to appear before the grand jury, and who received her subpoena from Steve January on August 16. App. 61. Apparently not interested in cooperating, Bowers "turned it back in and said she wasn't going to the grand jury." *Id.* The following day, Bowers heeded the apparent authority of the subpoena and testified before the grand jury. *See In the Interest of Shelia Bowers* (Grand Jury McLennan County Aug. 17, 2012) ("*Bowers* GJ transcript"). ██████████████████

████████████████████████████████████████████████

██████████ *Bowers* GJ transcript at 1 RR 73.

### 3. The prosecutors used the proceedings to suppress information favorable to the defense that would have demonstrated the falsity of testimony that the State subsequently offered at trial.

The Cummings prosecutors also used the unlawful grand jury proceedings to effectuate other constitutional violations. On August 17, in the midst of Cummings' jury selection, Takelia Love (née Patterson), then the girlfriend of Cummings' co-defendant, Albert Love, appeared before a grand jury where Davis questioned her extensively about the Villas shooting.[11] *See In the Matter of Takelia Love* (Grand Jury McLennan County August 17, 2012) ("*Takelia Love* GJ transcript"). ████████████████████████████

████████████████████████████████ *Takelia Love* GJ transcript at 1 RR 61-62. At Cummings' trial, however, Davis deliberately misattributed the incriminating texts to Cummings. ██████████████████████████

████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[11] Investigator Steve January "assisted with" three witnesses testifying before the grand jury, including Takelia Love. App. 61.

*Takelia Love* GJ transcript at 1 RR 64.[12] Davis continued:



*Takelia Love* GJ transcript at 1 RR 53. ███████████████████████

████████████████████████████████████████                        *Takelia Love* GJ transcript at

1 RR 59.

### B.      The Unlawful Post-Indictment Grand Jury Proceedings Violated Cummings Rights Under The Sixth And Fourteenth Amendments.

The State's inquisition violates foundational due process principles enshrined in the Bill of Rights and Fourteenth Amendment. *See In re Oliver*, 333 U.S. 257, 266-70 & n.22 (1948). That the law prohibited the prosecutor's actions was clear. Long before he issued post-indictment subpoenas in this case, the TCCA declared that "'it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial.'" *Ex parte Rogers*, 640 S.W.2d 921, 923 (Tex. Crim. App. 1982) (*en banc*) (quoting *United States v. Dardi*, 330 F.2d 316 (2nd Cir. 1964)). The Fifth Circuit emphasized the same rule a decade before that. *See Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972) ("It is true . . . that it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial.") (internal quotations omitted).

In both Texas and federal courts,

it has been widely recognized by commentators and courts that have addressed the issue squarely "that it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial[,]" since by that time "the grand jury's investigative role is ended, and the rules of pretrial discovery take effect to govern the extent to which the parties may use the legal process to obtain information about the case."

---

[12] The questioning about text messages is detailed in Section II.A.1.

*State v. Huse*, 491 S.W.3d 833, 845 (Tex. Crim. App. 2016) (quoting SANDRA BEALE, ET AL., 1 GRAND JURY LAW AND PRACTICE § 6:2, at 9–95, 9–96 (2d ed. 2015) and citing SUSAN W. BRENNER & LORI E. SHAW, 2 FEDERAL GRAND JURY: A GUIDE TO LAW AND PRACTICE § 21:10, at 234 (2d ed. 2006) ("It is improper to use a grand jury to obtain evidence for use at the trial of one who has already been indicted.")); *In re Grand Jury Proceedings*, 814 F.2d 61, 70 (1st Cir. 1987) ("It is well established that a grand jury may not conduct an investigation for the primary purpose of helping the prosecution prepare indictments for trial."). In this case, the prosecutors used the unlawful post-indictment grand jury proceedings to effectuate violations of the Sixth and Fourteenth Amendments.

### 1. The proceedings violated due process under the Fourteenth Amendment.

The unlawful use of the grand jury violates due process in three distinct ways, all of which represent structural error: First, the illegal use of subpoenas to require witnesses' presence at an illegal grand jury proceeding violates due process because it "shocks the conscience." In *Rochin v. California*, 342 U.S. 165 (1952), the Supreme Court held that due process prohibits the use of "conduct that shocks the conscience" to secure a conviction in a criminal trial. *See id.* at 172 (declaring rule in case where law enforcement pumped a suspect's stomach to obtain evidence). In the present case, law enforcement illegally seized innocent witnesses, ordered them to appear before a grand jury for an illegitimate reasons, then abused the State's secrecy law to threaten and silence them. The unlawful use of a grand jury subpoena to require a victim/witness's presence constitutes a violation of the victim-witness's civil rights and amounts to kidnapping under 18 U.S.C. §§ 241 or 242 (providing criminal sanction for "[w]hoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the

United States" or for conspiring to do so). *Cf. United States v. Guidry*, 456 F.3d 493, 510-511 (5th Cir. 2006) (rejecting Texas police officer's contention that he could not be convicted of kidnapping under § 242 because he had not transported victim across state lines); *Yushavayev v. United States*, 532 F.Supp.2d 455, 474-475 (E.D. N.Y. 2008) (describing factual basis for conviction of immigration inspector who, acting under color of law, conspired to inveigle cooperating witness out of country).

Second, the prosecutors' use of the grand jury proceedings violated due process insofar as it was used to dissuade witnesses from speaking to the defense. Prosecutors and other members of law enforcement violate a defendant's due process rights when they advise a witness not to talk to the defense, or to do so only in the presence of the prosecutor. *See Gregory v. United States*, 369 F.2d 185, 188-89 (D.C. Cir. 1966). In the Fifth Circuit, "[S]ubstantial governmental interference with a defense witness' choice to testify may violate the due process rights of the defendant. However, no due process violation exists so long as the investigation of witnesses is not prompted by the possibility of the witnesses testifying, and so long as the government does not harass or threaten them." *United States v. Dupree,* 117 F.3d 810, 823 (5th Cir. 1997) (internal citations and quotations omitted).[13] ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

---

[13] *See also United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979) (cited in *Dupree* and reversing because FBI agent told defense witness that he would have "nothing but trouble" in pending state prosecution if he persisted in testifying); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977) (cited in *Dupree* and reversing where government threatened to void plea bargain if potential witness testified); *United States v. Smith*, 478 F.2d 976, 979 (D.C. Cir. 1973) (cited in *Dupree* and reversing where government threatened to prosecute witness if he testified in pending trial).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Third, the unlawful grand jury proceedings violated due process because law enforcement acted in bad faith and caused the spoliation of "potentially useful evidence." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam) (affirming bad-faith rule in spoliation scenarios). Here, the act of spoliation was the use of the grand jury proceedings to make unavailable testimony from potentially useful defense witnesses. The harassment and intimidation of potential defense witnesses made some unavailable for trial, either because they ceased defense cooperation or because defense counsel was cut off from cooperation sufficient to determine whether the individuals would make good witnesses to begin with.

One particularly vivid example of bad-faith spoliation centers on the *Napue* violation, set forth as Claim II in this Petition. The State violates due process when it knowingly allows false testimony to go uncorrected, *see Napue v. Illinois*, 360 U.S. 264, 269 (1959), even if the testimony merely gives a false impression, *see Alcorta v. Texas*, 355 U.S. 28, 31 (1958). Here, the unlawful grand jury questioning of Takelia Love demonstrated that the State understood the falsity of testimony it would later elicit at Cummings' trial. Nevertheless, the prosecutor used the grand-jury secrecy law to keep the falsity of the subsequent testimony, and his knowledge thereof, from being communicated to the defense.[14] Thus, the prosecutor also violated due process by misusing the

---

[14] In addition, anyone behaving as the prosecutor did would have expected that one or both of two things would happen. Either the harassed witnesses would not testify at all, or, if they testified and were asked whether they had met with the prosecutor to discuss the case, they would have had to lie because of the prosecutor's threat to have them taken before the local judge if they revealed his illicit use of the grant jury.

grand jury secrecy statute to suppress evidence favorable to the defense. *See Banks v. Dretke*, 540 U.S. 668, 693-695 (2004) (discussing State's knowing misrepresentations that concealed evidence showing knowledge of falsity).

### 2. The proceedings violated the Sixth Amendment, as applied to Texas through the Fourteenth.

The State's unlawful use of the grand jury also violated Cummings' Sixth Amendment right to counsel, as applied to Texas through the Fourteenth. "When specific provisions of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Cummings had a Sixth Amendment right to effective assistance of counsel and that included the right to investigate. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984); *Powell v. Alabama*, 267 U.S. 45, 57 (1932). That right also includes "the right to present witnesses to establish his defense without fear of retaliation against the witness by the government." *Dupree*, 117 F.3d at 823 (citing *Webb v. Texas*, 409 U.S. 95, 98 (1972)).

Here, the prosecution's interference with the defense function was so pervasive that it amounted to structural error. The prosecutors repeatedly made impermissible use of auxiliary law enforcement officials, subpoenas, and threats of retaliation. These practices infringed on the defense's investigation—and in particular, on its equal-footed access to information from potential defense and prosecution witnesses. ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ *See Davison* GJ transcript at 1 RR 49. And the treatment of Davison was the norm, not the exception.

### C.    This Claim is Unexhausted.

This grand-jury claim is not exhausted, and Cummings will be submitting a request under *Rhines v. Weber*, 544 U.S. 269 (2005), to stay and hold in abeyance these proceedings so that he may exhaust it in state court, along with other unexhausted claims for which state remedies are available. There remains a clear path to merits consideration of the claim in state court. *See* Tex. Crim. Pro. Art. 11.071 § 5.

## II.    THE STATE VIOLATED *NAPUE V. ILLINOIS* WHEN IT KNOWINGLY ELICITED FALSE AND MISLEADING TESTIMONY.

Under the Fourteenth Amendment, a prosecutor may not knowingly elicit false testimony at trial or, although not actively seeking false testimony, knowingly allow it to go uncorrected. *See Napue*, 360 U.S. at 269 (citing *Alcorta*, 355 U.S. at 78). In this case, the prosecution knowingly elicited false testimony from Detective James Owens II when it asked him to confirm that Cummings sent inculpatory text messages about destroying evidence, and knowingly failed to correct Owens when he answered affirmatively. At the time the question was asked and answered, the State knew that Albert Love sent the messages, not Cummings. This claim is unexhausted and a Texas remedy remains available, so Cummings will be requesting the stay-and-abeyance order necessary to exhaust it.

This claim is based on the following facts and law, and on the allegations raised in other claims in this Petition, which are incorporated herein by this specific reference.

### A.    The State Committed a *Napue* Violation When It Knowingly Elicited (Or Knowingly Failed To Correct) False Material Testimony From Detective Owens.

The State must avoid presenting evidence that might be considered misleading, and evidence presented to the jury that is false or gives it a "false impression" must be corrected by the prosecution. *See Napue*, 360 U.S. at 269; *Alcorta*, 355 U.S. at 31. In the Fifth Circuit, a *Napue*

claimant must prove three elements: (1) the falsity of a witness statement; (2) the State's knowing elicitation or failure to correct it; and (3) materiality. *See United States v. Dvorin*, 817 F.3d 438, 451-52 (5th Cir. 2016). The State knowingly elicited false testimony from Owens when it asked him to confirm that Cummings sent the inculpatory text messages, and when Owens did so. Given the centrality of the text exchange to the State's case, that false testimony had a reasonable likelihood of affecting the verdict.

        **1.**      **The State knowingly elicited (or failed to correct) false and misleading testimony that Cummings wrote the inculpatory text messages.**

For ease of discussion, this Petition combines falsity and knowledge thereof into a single subsection. The State knowingly elicited false testimony attributing messages about destroying evidence to Cummings, when it knew that they were sent by Love.

*The unlawful grand jury proceedings.* As stated in Claim I, *supra*, 14 months after Mr. Cummings was indicted, and four months before the start of Cummings' trial, the *Cummings* prosecutors unlawfully summoned Albert Love's wife Takelia to appear before the grand jury, and the transcript of that questioning establishes knowing falsity with respect to the "take dem bullets" message. ███████████████████████████████████████████████████████

███████████████████████████████████ *See, e.g.*, *Love* GJ transcript at 1 RR 52 ██████████████

████████████████████████████████████ *Love* GJ transcript at 1 RR 55 ██████████████████

███████████████████████████████████████████████████████████████████

██████████████ *Love* GJ transcript at 1 RR 56-67 ███████████████████████

██████████████████████████████████ *Takelia* GJ transcript at 1 RR 59 █████████████

████████████████████████████████████████ *Love* GJ transcript at 1 RR 61 ████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████

*Testimony at the Cummings trial.* At the secret, unlawful grand jury proceedings the State

revealed ██████████████████████████████████████████████ At

Cummings trial, however, the State worked extremely hard to elicit false testimony about that

exchange when it questioned WPD Det. Owens:

> Q:      . . . but the next message is coming - - is sent from the target telephone belonging to Rickey Cummings, isn't it, sir - -
> A:      Yes, sir.
> Q:      - - to another number here, and the message reads, "Take dem bullets out the house." Is that right?
> A:      Yes, sir.
> Q:      Approximately three minutes later, the individual to whom that message was sent at 11:00 am responds back to Rickey Cummings' telephone and says, "U late did that last night baby am on top of it u good love u," with the tag of Mrz.bloody." Correct?
> A:      Yes, sir.
> Q:      And then at 11:12, that same sender sends another message to Rickey Cummings' telephone saying, "What u want me to do with her," and again with the tag of "Mrz.bloody." Correct?
> A:      Yes, sir.
> Q:      And then some 16 minutes later at 11:28 am, **Rickey Cummings sends a message back to that same recipient of**, "Straight up love u too and with who." And approximately one minute later 254-229-1881 sends a message back stating, "The caps u know what that is," again with the tag of "Mrz.bloody." Correct?
> **A:      Yes, sir.**

34 RR 70-71 (emphasis added).[15]

But the State wasn't done. The coup-de-grace was the State's closing argument, when the

prosecutor exploited his knowing use of false testimony to full effect, thundering: "Does an

innocent man tell others to get rid of evidence after the fact? No. But we know he did." 38 RR 75-

---

[15] ████████████████████████████████████████████████████████ *See Patterson* GJ transcript
at 1 RR 24-25.

77. The closing argument is relevant both to whether the prosecutor knowingly misled the jury (this Subsection), as well as to whether there is a reasonable likelihood that the knowingly elicited falsehood affected the verdict (the next one). *See Giglio v. United States*, 405 U.S. 150, 152 (1972); *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979); *see also Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (considering prosecution's closing in context of assessing materiality in *Brady* claim and citing *Napue*). As reflected in the grand jury transcripts (above) and the transcripts from Albert Love's trial (below), the State knew that Cummings had not participated in this text exchange.

*Questioning in the Love trial.* That the State had knowingly elicited false testimony in *Cummings* is also evident from review of the transcripts in the Love trial, which came later. There, the State was committed and consistent in explaining that it was Love (using Cummings' phone) who sent the "take dem bullets" texts to his wife Takelia (who was using a phone belonging to her sister, Sheronica Patterson). Prosecutor Greg Davis told the jury in his opening statement at Love's trial: "But on the day after the shooting, you're going to see records that indicate that [Albert Love] had a discussion again with his girlfriend, Takelia [Love], in which he instructed Takelia to, quote, 'Get them bullets out of the house.'" App. 175-176.

Four days later, when Love's defense counsel objected to the introduction of evidence about the text message exchanges, Davis again stated that the messages were instructions from Albert Love to Takelia Love to destroy evidence. App. 183. When questioning Takelia, the *Love* prosecutor said to her: "You didn't send that first text. You didn't use the word 'bullets' your husband did. He used, 'Take dem bullets . . .'" App. 186. In his *Love* closing, Davis proclaimed:

> The next morning, 'Take dem bullets out the house,' and you know now that he was talking to his wife, Takelia [Love]. 'Take dem bullets out the house.' And I ask you simply this, as you look at that exchange about the bullets, are those the words

of an innocent man or are they the words of a cold-blooded killer who is trying to cover his tracks immediately?

App. 189.

\*        \*        \*

The grand jury transcripts, combined with the trial transcripts from *Love* and *Cummings*, satisfy the falsity and knowledge requirements of *Napue*. *See Blankenship v. Estelle*, 545 F.2d 510, 513-14 (5th Cir. 1977).[16] Whether the State intended to elicit the false statement or merely failed to correct it is immaterial; a State meets *Napue*'s knowledge criterion merely by allowing false evidence to go uncorrected. *See Napue*, 360 U.S. at 269. The State's behavior was appalling; it *knew* that Cummings did not write the text messages when it aggressively elicited the false testimony and leveraged it to the hilt in its closing arguments.

2.    **There is a reasonable likelihood that the false testimony affected the jury.**

The standard for *Napue* materiality is whether, taking all the false testimony together, "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). *Napue*'s "reasonable likelihood" standard is lower than the *Brady* materiality standard, and is akin to a harmless-error rule: "It is a brother, if not a twin, of the standard ('harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless. A strict standard is appropriate because, as the

---

[16] What the prosecutors apparently knew at the moment they were misattributing the text messages to Mr. Cummings—that he did not write them—is also supported by the state habeas record on another claim not pursued here. In support of that claim, state habeas counsel introduced an affidavit by Hofstra University Linguistics Professor Robert H. Leonard. App. 336-368. Dr. Leonard was a forensic linguist, which means that he "applies the science of linguistic investigation to issues of law . . . by applying rigorous, scientifically accepted principles of analysis to legal evidence like contracts, letters, confessions, and recorded speech." App. 341. After carefully analyzing the string of texts at issue, he concluded that they are "not consistent with the language patterns" in texts known to be written by Mr. Cummings. App.347.

Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.'" *Barham*, 595 F.2d at 242 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976) and other internal citations omitted); *see also Strickler v. Greene*, 527 U.S. 263, 299 (1999) (Souter, J., concurring in part and dissenting in part) (explaining that reasonable-likelihood standard is a harmless-error rule).

Because the prosecution was unusually thin, the false testimony was especially consequential, and it likely affected the jury. As explained in the STATEMENT OF FACTS, *supra*, the text messages were one of three planks making up the State's case against Cummings, and even the three-planked case was almost entirely circumstantial. The false testimony was offered by a police officer, meaning that the jury was especially likely to credit it.[17] The State berated Cummings himself as a non-credible witness when he denied writing the text messages. 37 RR 158-59. In doing so, the State feigned ignorance as to whose phone sent text messages that auto-populated with a "Mrz.bloody" signature, because the actual source of the signature—Takelia's sister Sheronica Patterson, known to prosecutors—points clearly to Love as the sender. 37 RR 159.

Most prejudicially, and as explained above, the State made a dramatic return to the wireless provider records during closing, invoking the text messages as evidence of Cummings' having shot Hubert and of his contemporaneous association with other suspects in the case; "I want you to think about the mobile phone records, and I want you to look at those records, because you're

---

[17] *See, e.g.*, Alison L. Patton, *The Endless Cycle of Abuse: Why 42 U.S.C. 1983 is Ineffective in Deterring Police Brutality*, 44 HASTINGS L. J. 753, 765 (1993) ("[J]uries almost always believe the police.") (internal citations omitted). Courts across jurisdictions often try to control for this by instructing jurors that law enforcement testimony must not receive any greater weight than anyone else's testimony. *See, e.g., United States v. Nash*, 910 F.2d 749, 755 (11th Cir. 1990); *United States v. Gelb*, 881 F.2d 1155, 1165 (2d Cir. 1989).

going to have them back there with you, because I think that the evidence shows exactly what Rickey did on the night all this took place." 38 RR 51. The fruits of prosecutor misconduct are especially prejudicial when used during the State's closing, because those comments are presented to the jury moments before it begins deliberations. *See United States v. Johnston*, 127 F.3d 380, 399 (5th Cir. 1997).

### B.     The *Napue* Claim is Unexhausted And Not Defaulted.

The *Napue* claim is not exhausted, and Cummings will be submitting a request under *Rhines*, 544 U.S. 269, to stay and hold in abeyance these proceedings so that he may exhaust it in state court, along with other unexhausted claims for which state remedies are available. There remains a clear path to merits consideration of the *Napue* claim in state court. *See* Tex. Crim. Pro. art. 11.071 § 5.

### III.    THE CONVICTION AND SENTENCE VIOLATE DUE PROCESS BECAUSE THE PROSECUTION ENGAGED IN MISCONDUCT WHEN IT MISATTRIBUTED CRUCIAL TEXT MESSAGES TO CUMMINGS.

Faced with weak evidence to support its prosecution, the State knowingly misattributed inculpatory text messages to Cummings. Specifically, and as explained in the STATEMENT OF FACTS, *supra*, one pillar of the prosecution's case against Cummings consisted of inculpatory text messages in which the sender told the receiver to get rid of bullets in the receiver's home. At trial, the prosecution attributed these messages to Cummings—characterizing the message as part of Cummings' "cover up"—although it is now clear that Albert Love, and not Cummings, was the participant in the pertinent text exchanges, and that the prosecution knew that all along. This claim is unexhausted and a Texas remedy remains available, so Cummings will be requesting the stay-and-abeyance order necessary to exhaust it.

The facts supporting this claim are set forth below and in the other claims in this Petition, which are incorporated by this specific reference as if fully set forth herein. This claim differs from

the *Napue* claim in that it does not require false testimony, and centers on the prosecution's questions and use of testimony, whatever the truth status of any testimony formally elicited.

### A.      The Prosecutor Misconduct Was A Due Process Violation.

When prosecutors ask questions that are "clearly improper and highly prejudicial," they potentially commit "serious prosecutorial misconduct" and can transgress an obligation "to refrain from improper methods calculated to produce a wrongful conviction[.]" *United States v. Johnston*, 127 F.3d 380, 395–96 (5th Cir. 1997) (internal citations and quotation marks omitted). A prosecutor misconduct claim requires, generally speaking, a showing of impropriety and prejudice. *See Trottie v. Stephens*, 720 F.3d 231, 253 (5th Cir. 2013). For a misconduct claim based on improper prosecutor comments, the improprieties are sufficiently prejudicial if they render the trial fundamentally unfair within the meaning of the Fourteenth Amendment's Due Process Clause. *See Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1983). Cummings meets both criteria.

### 1.      The prosecutor repeatedly, deliberately, and falsely indicated that Cummings wrote the inculpatory text messages.

As set forth in Section II.A, *supra*, the prosecution appears to have deliberately crafted and dispensed to the jury the misimpression that Cummings sent the inculpatory text messages about getting rid of evidence—knowing that the text messages were sent by Albert Love. That material is hereby incorporated by reference.

### 2.      The misattribution of the text messages rendered the trial fundamentally unfair.

To establish fundamental unfairness, a federal habeas claimant must show "either persistent and pronounced misconduct or that the evidence [against him] was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986). Cummings actually satisfies *both variants* of the unfairness

inquiry—in fact, the text messages became such an important part of the prosecution precisely because the case was so weak and circumstantial.

In making a collateral determination of fundamental unfairness, this Court must consider: (1) the magnitude of the prejudicial effect of the comment, (2) the effect of any curative instructions, and (3) the strength of other evidence indicating guilt. *See United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989). There was no curative instruction given, so the inquiry focuses on the prejudice of the improper comments, in light of other evidence demonstrating guilt. In appropriate situations, the effects of multiple improprieties can be cumulated in order to evaluate the fairness of the proceeding. *See, e.g., Johnston, supra*, 127 F.3d at 402 ("Weighing the evidence of Hill's guilt against the extreme prejudice he suffered due to the prosecutors' misconduct, we conclude that the cumulative effect of the errors substantially affected Hill's right to a fair trial."); *United States v. Garza*, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not we think it beyond question that the prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant."). The effects should be cumulated here, because all of the pertinent improprieties are deliberate misstatements of the same thing, and are therefore mutually reinforcing. *See Johnson*, 127 F.3d at 402 (cumulating over improprieties that consist of the same content).

The effect of the false text-message attribution is robustly set forth in Subsection II.A.2 *infra*, and is hereby incorporated by reference.

## B.    The Claim is Unexhausted.

The misconduct claim is not exhausted, and Cummings will be submitting a request under *Rhines*, 544 U.S. 269, to stay and hold in abeyance these proceedings so that he may exhaust it in state court, along with other unexhausted claims for which state remedies are available. There

remains a clear path to merits consideration of the claim in state court. *See* Tex. Code Crim. P. art. 11.071 § 5.

## IV.   THE STATE WITHHELD FAVORABLE, MATERIAL EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*.

By withholding evidence that was favorable and material to the defense, the State violated *Brady v. Maryland*, 373 U.S. 83 (1963). Prior to trial, Cummings' defense counsel requested that the prosecution turn over all favorable evidence. I CR 145. Notwithstanding the request, the prosecution withheld evidence that would have allowed Cummings to discredit two essential prosecution witnesses, question the law enforcement investigation, and cast doubt on the prosecution's overarching theory of the homicides. The *Brady* claim was not adjudicated on the merits in state court, and is therefore unrestricted by 28 U.S.C. § 2254(d). It is also unexhausted and a Texas remedy remains available, so Cummings will be requesting the stay-and-abeyance order necessary to exhaust it.

This claim is based on the following facts and law, and on the allegations raised in other claims in this Petition, which are incorporated herein by this specific reference.

### A.   The State Violated Due Process By Withholding Multiple Pieces of Exculpatory, Material Evidence.

"[T]he suppression . . . of evidence favorable to the accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The prosecutor's duty includes an affirmative duty to learn of any favorable evidence known to other law enforcement entities acting on the government's behalf. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

In this case, the State suppressed four categories of evidence favorable to Cummings: (1) evidence undermining the credibility of testimony from Micha'el Atkins, who told the jury that he heard Cummings tell Atkins' father, while the two were sharing marijuana in the dining room, that

Cummings was going to shoot someone; (2) evidence undermining the credibility of testimony provided by Nickoll Henry, who testified that she saw Cummings outside her door trying to un-jam a gun after the shooting; (3) information showing that Cummings did not send inculpatory text messages about getting rid of bullets; and (4) information about lead investigator Steven January's relationship with the victim's family.

The suppressed evidence was material because, evaluated cumulatively, there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Kyles*, 514 U.S. at 434 (internal citations omitted) (requiring cumulative analysis); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (stating reasonable probability standard).

> ### 1. The prosecution withheld information, favorable to Cummings, tending to undermine Micha'el Atkins' testimony.

Micha'el Atkins was a key witness for the prosecution. In the month leading up to Cummings' trial, State investigator Steve January interviewed the seventeen-year old Atkins at least three times. Atkins' interview responses were inconsistent with his subsequent trial testimony, containing no reference to the part of the testimony that was most damaging to Cummings: that Cummings allegedly told Atkins' father that he (Cummings) was going to shoot someone. Before the trial, the State disclosed neither the existence nor content of these interviews. They were detailed in investigator January's later-discovered logs.

Atkins testified that, on the night of the shootings, he was in the Villas parking lot and saw his father pull up in a car driven by a women named Tilly. 34 RR 88. As the car was pulling into the complex, it approached Cummings, who was walking from his car. 34 RR 88. When Tilly's car stopped short of Cummings, Atkins said he heard Cummings say, in the car's direction, "If you had hit me with that car, I would have shot this car up." 34 RR 88. Atkins' father then got out of

43

the car and walked with Cummings into the apartment. 34 RR 88. The two talked as they walked, as if the incident was no big deal. 34 RR 109-10. Atkins' father and Cummings knew each other from the neighborhood and through a mutual friend. 36 RR 88.

Atkins also testified that he heard Cummings make a more threatening statement a few minutes later. Atkins said that later that evening he was at the Villas, inside the apartment of a woman with whom his father had a child. 34 RR 85. Atkins said he was in one of the back bedrooms with his sister, while his father and Cummings were in the dining room talking and smoking marijuana. 34 RR 90. Atkins told the jury that he overheard Cummings say "something about he was going to shoot somebody, but we didn't know who he was talking about." 34 RR 91. The prosecutor then confirmed, twice, that Atkins heard Cummings make this statement. 34 RR 91. Atkins went on to testify that after he overheard the comment, Cummings received a phone call, and then left the apartment. 34 RR 91-92. About 20 minutes after Cummings left the apartment, Atkins heard gunfire. 34 RR 92.

*Suppression of information favorable to the defense. Brady* material includes impeachment evidence, *see Bagley*, 473 U.S. at 676, and prior inconsistent statements are valuable impeachment. *See Kyles*, 514 U.S. at 444 ("the evolution over time of a given eyewitness's description can be fatal to its reliability"). The State did not disclose the fact that January had interviewed Atkins at least three times prior to trial, and that the content of these interviews was favorable to Cummings. The prior interviews were documented in January's yet-to-be-disclosed investigative logs and in corresponding notes. 6 WRR 176-79. Only during a post-conviction inspection of the district attorney files were the materials discovered. App. 422.

If the logs had been disclosed, defense counsel would have been alerted to the fact that the prosecutor's investigator took young Atkins out of class three times. That disclosure would have

prompted the defense to ask how January's treatment made the 17-year-old feel. Atkins would have told the jury he thought January was harassing him, App. 417, and that by the time he was brought before the District Attorney, he was in tears because he was threatened. App. 418.

The account offered in the undisclosed interviews differed substantially from Atkins' testimony. Specifically, in the first two interviews, documented in Steve January's subsequently discovered logs as having occurred on September 18 and October 9, 2012, Atkins never mentioned overhearing *any* conversation between Cummings and his father, or otherwise hearing Cummings say he was going to go shoot someone. App. 65, 70. Finally, on October 19, three days before trial, January and prosecutor Greg Davis re-interviewed Atkins a third time, at Atkins' high school. App. 73. The substance of that interview is not documented in January's logs. *Id.* However, it is now known that on that third occasion, January and Davis not only went to Atkins' school, but that they then took him to the MCDA's Office to meet with the District Attorney, Abel Reyna. App. 418. Atkins was scared and crying. *Id.* Only after MCDA personnel "pressured" him and "threatened" him with jail did Atkins say (and apparently agree to testify) that Cummings had come to the apartment the night of the killings and talked to his dad. *Id.*

Disclosure of the logs would have led to impeachment of Atkins—whose post-conviction affidavit shows that, once he was out of the prosecution's clutches and being questioned by other officers of the court, he was willing to disclose that he had not heard Cummings say anything about shooting during a conversation in the apartment. App. 417-419.

*Materiality*. The suppression of information about Steve January's three prior interviews with Atkins, along with other suppressed evidence, had a reasonably probable effect on the outcome, alone or considered cumulatively with other evidence. The materiality of evidence "is best understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444. The prosecution

relied heavily on Atkins's trial testimony at closing, theatrically referencing the statement Atkins attributed to Cummings—"I'm going to shoot somebody"—no less than *seven* times. 38 RR 24, 27, 28, 74, 75. The closing also included a request that the prosecutor said he had not made in 35 years: that the jurors take the transcript of the Atkins testimony with them to deliberations, so that it could remember him recounting Cummings' declaration to his father, over a dining-room joint, that he intended to kill someone. 38 RR 73-74.

The undisclosed prior interviews, during which Atkins made no mention of the statement that Atkins subsequently alleged Cummings to have made, would have been used to impeach Atkins's credibility. Had Cummings' trial counsel known of the prior interviews, and their material omissions, an interview with Atkins would have revealed the conditions under which he initially provided that information to the State. And if Cummings had known that Abel Reyna and two others from the MCDA Office dragged Atkins out of school to conduct the interview, Cummings would have learned about how the State first "harassed" then "pressured" and "threatened" Atkins, and how Reyna told Atkins that he "would go to jail" if he did not testify. App. 418. After the threats and pressure, Atkins told Reyna *et al.* that Cummings had come to his dad's girlfriend's apartment on the night of the shooting and talked with his father. *Id.* To be clear, Atkins has recanted; he denies hearing Cummings say that he "was going to shoot" anyone when he was in the apartment; the only reference to shooting was apparently in jest when the car the elder Atkins was in came close to Cummings. App. 417-419. According to Atkins, "the prosecutors twisted my words." App. 418.

Because Nickoll Henry's testimony was so precarious, the State needed a credible witness to support its theory. Atkins was that witness, and the State underscored his credibility at closing:

> Miche'al Atkins [sic]. There is absolutely nothing before any of you that shows that young man had any bias toward this man over here, that he had any reason

whatsoever to lie to you, and that he had anything whatsoever to gain by coming down here and telling you the truth or a lie. In fact, the evidence is pretty clear from what you've seen that he had everything to lose by coming down here, a man that was scared for his life, who sat up there, and I think we ought to be proud that there is still young people in this community like Miche'al [sic] Atkins that in the face of evil like Rickey Cummings is still willing to come down here and tell you the truth that you need to hear in order to reach a true verdict in a case like this.

38 RR 73. Several minutes later, the prosecution continued: "Does an innocent man sit there at a dining room table and tell a companion he's about to go out and shoot a man? No. But you know what Rickey Donnell Cummings did it, because he's not an innocent man." 38 RR 75.

The prosecutor was misleading the jury. Atkins had reasons to allow the prosecutor to twist his words and get him to testify to a statement Cummings never made—Atkins was harassed, pressured, and threatened. *Cf. Kyles*, 514 U.S. at 445-46 (discussing materiality of evidence that "would have raised opportunities to attack not only the probative value of … evidence … but the thoroughness and even the good faith of the investigation").

### 2. The prosecution withheld information, favorable to Cummings, tending to undermine Nickoll Henry's testimony.

*Brady* obligations include obligations to disclose sources of potential bias affecting prosecution witnesses. *See LaCaze v. Warden*, 645 F.3d 728, 736-37 (5th Cir. 2011), *op'n amended on denial of reh'g*, 647 F.3d 1175 (5th Cir. 2011); *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *rev'd on other grounds*, 503 U.S. 930 (1992). In this case, the State failed to do so with respect to Nickoll Henry, the aunt of Bible's girlfriend and one of its key witnesses. Henry testified that, following the shooting, she saw Cummings standing ten feet from her in her entryway, trying to un-jam a firearm. 32 RR 236, 249. Trial counsel attacked her testimony, including her credibility, but the prosecution withheld information that would have significantly amplified those attacks. Specifically, it would have corroborated the defense team's attempt to show that, perhaps because of the grandiosity typically associated with her mental health problems, Henry was

reporting as a witnessed experience what was in actuality a neighborhood rumor circulating in the immediate aftermath of the shooting.

The importance of the suppressed evidence, discussed below, is evident from the obvious problems with Henry's existing testimony, the accuracy and credibility of which were already on a razor's edge. *See Strickland*, 466 U.S. at 696 (explaining that a finding with weak support in record is more likely to be affected by error). Henry testified that, on the night of the shooting, her "head was pounding," so she took a "Tylenol PM" and laid down on her living room couch. 32 RR 232-33. At the time she testified, Henry was on probation for an assault charge, and had completed probation for credit card abuse. 32 RR 229. She admitted to using marijuana and cocaine, 32 RR 252-53, 280, and had been diagnosed with post-traumatic stress disorder, psychotic disorder, paranoid schizophrenia, and borderline personality disorder. 32 RR 248, 251. She was also suffering from paranoid delusions. 32 RR 250-51.

As for her purported identification of Cummings outside her apartment, reported to police two days later, Henry testified that she was "100 percent sure" it was him. 32 RR 237. But, she also testified that the person she claimed was Cummings was wearing a hooded sweatshirt that covered his head. 32 RR 238-39. This type of clothing would have covered the person's hair, hairline and other identifying features. Notwithstanding the fact that the person's appearance was shrouded, Henry testified that she was sure it was Cummings because she saw him, and "looked him eye to eye." 32 RR 239. Yet, when asked about knowing Cummings, she admitted that she "didn't really know him like that," but did know his brother, Tyrece. 32 RR 239. During testimony geared at distinguishing whether, when she identified Cummings, she had identified (on the one hand) a stranger or (on the other) someone she knew and who had become the subject of widespread neighborhood rumors, her account evolved from "not knowing [Cummings] like that,"

to having seen him "a couple of times," to having seen him "lots of times." 32 RR 239. (It is now known that Henry bore substantial animus towards Cummings.[18]).

Since Cummings' trial, however Henry has told Cummings' state post-conviction counsel that her trial testimony—that she was "100 % certain" that she saw Cummings racking a gun at her door on the night of March 28, 2011—"had not been truthful."[19] App. 444-445. Henry told post-conviction counsel "emphatically" that she could not say who the man in the hoodie was or whether she knew him, as it was very dark and it all happened so fast. App. 445. Henry confirmed her uncertainty as to the identity of the person outside her door in a follow up conversation with state post-conviction counsel about a week later. App. 447.

At trial, Henry testified that after she saw Cummings, she called 9-1-1.[20] 32 RR 238. Although she eventually claimed to see Cummings after the shooting, ten feet from her and in her entryway with a gun, Henry never mentioned this fact to any police officer on the scene. Nor was there evidence that she mentioned it when she called 9-1-1. It was not until two days later that Henry mentioned Cummings. Henry testified that she did not immediately tell the police about her

---

[18] At Albert Love's trial, Nickoll Henry acknowledged animus toward Cummings that was improperly withheld at Cummings trial, which belied her claim to have barely known him and which stemmed from an incident two weeks prior to the shootings. App. 179-180. Henry said that she saw Cummings with a gun in one hand and his other hand on her son's shoulder. App. 179-180. Henry said she told Cummings that if he didn't "get his damned hands off [her] son, they were going to have a problem." App. 180.

[19] Henry was in jail facing charges when she spoke to Cummings' state post-conviction counsel. After that conversation, and after consulting with her lawyer, Henry sent a letter and affidavit to state post-conviction counsel stating that at Cummings' trial, she "answered all of the questions asked me . . . as truthfully as possible based on the facts known to me and my understanding of the questions." App. 452. She also indicated that, if called on to testify again about her testimony at trial, her testimony would be the same as when she testified at trial if asked similar questions. *Id*.

[20] The 9-1-1 call was never admitted at trial. While there is an indication that 9-1-1 calls were provided in discovery to trial counsel, no such calls were found in counsels' files. CDs identified as containing 9-1-1 calls were blank.

"eye-to-eye" encounter with Cummings outside her apartment because she never talked to the police that night. 32 RR 245. In her own testimony, however, she admitted talking to the police when they arrived at the Villas on the night of the shootings, notifying them before they left that there was a shell casing on the mop in her apartment. 32 RR 240. Henry testified that she told investigator Steve January "the very next day," about what she claimed to have seen. 32 RR 246. January's own reports revealed that Henry actually gave that statement two days after the shooting, on March 30. App. 27-30.

Henry told the jury that, at the same meeting with January, she viewed a set of photographs and identified Cummings from the photographs. 32 RR 247-48. What she did not say, and what was not disclosed to the defense, was that prior to viewing the photos, January told her that Cummings had already been identified as a person involved in the shooting.[21] App. 445-446..

Substantial trial questioning of Henry revolved around the fact that, in April 2011, less than a month after the shootings, she was charged with, and later indicted for, aggravated assault with a deadly weapon. 32 RR 264. Her appointed attorney, Alan Bennett, made contact with Steve January in May of 2011, after learning that Henry was a witness in the Villas shooting and that January was the detective working the case. 35 RR 76. Bennett stayed in contact with January while Henry's case was pending, and "let him know that things were going forward pretty smoothly." 35 RR 79. Henry's felony charge was eventually reduced to a misdemeanor, she pled guilty to the reduced charge, and received a sentence of two years' probation. 35 RR 79-80; 32 RR

---

[21] Because Henry tells so many false (or at least inconsistent) stories, it is unclear at this time whether the story she told Cummings' post-conviction attorney was true. If it was true, then it was *Brady* information that the State should have disclosed before trial. If it was false, then it is evidence of Henry's unreliability that therefore supports both Cummings' innocence and a miscarriage-of-justice showing. A hearing is necessary because, if Henry's claim is proved true, Cummings is entitled to relief under *Brady*, and if proved false, it would contribute to the larger body of evidence showing a miscarriage of justice.

280. The sentence included "a year suspension of a year county jail time." 32 RR 279-80. Bennett conceded that such a reduction was "the exception" under the District Attorney's administration, 35 RR 80, and that he had other clients that "did not get that kind of offer" with similar facts, 35 RR 84. After her plea, and while on probation, a motion was filed to revoke it for a drug-related violation of its terms. 32 RR 252; 275-76. Facing the year in county jail, Henry was instead mandated to treatment, and the motion to revoke her probation was withdrawn. 32 RR 276.

In sum, and even in the absence of the suppressed evidence, Henry's testimony sat precariously close to the edge of non-credibility. Referencing the extensive rumors circulating about Cummings' involvement in the immediate aftermath of the shooting, trial counsel impeached her testimony in an effort to show that she was repackaging those rumors as an eyewitness encounter—by suggesting that her admitted and documented mental health issues caused her to falsely identify Cummings, 32 RR 250-52; 38 RR 43, 46-47; that her drug use affected her recollection, 32 RR 253; 38 RR 47; and that, in (implicit or explicit) exchange for her testimony, she was receiving lenient treatment with respect to her current probation status, 32 RR 282.

*Suppression of information favorable to the defense.* There were multiple pieces of information about Nickoll Henry that the State withheld: (1) that a woman named Manuela Garcia had spent the day with Henry prior to the shooting; (2) that, at the time, Garcia had been using PCP; (3) that Henry was passed out on her couch after she had spent the day with Garcia, and that in recounting the shooting to Garcia the next day, Henry said nothing about having come face to face with a man with a gun, let alone Rickey Cummings; and (4) throughout the investigation, Henry and her family received material benefits from investigator Steve January.

Suppressed investigative logs compiled by Steve January show that, prior to trial, on September 12, 2012, January interviewed a woman named Manuela Garcia, who knew Nickoll

Henry and her family well, including: Henry's niece, Jacqueline Rocha; her brother, Larry Henry; and her sister, Natalie Rocha (who had been convicted of a murder in Waco). App. 64. Garcia and Henry had spent the day of the murders together. *Id*. During that interview, January took notes, and he later recorded the interview in his investigative logs. According to the log, on the day of the shooting, Garcia and Henry traveled to Dallas to shop. Garcia admitted to using PCP at the time. *Id*. Despite her contemporaneous drug use, Garcia remembered that she and Henry returned to Waco before dark. *Id*. The "very next day during daylight hours," Henry called Garcia and told her about the shooting. *Id*. Henry told her that "Jacqueline Rocha's boyfriend had been shot in the arm and 3 more people were in the car." *Id*. According to Garcia, those three were either shot or killed, but she couldn't remember how many died. There is no mention in January's report that Henry told Garcia that she saw Rickey Cummings, or *anyone*, outside her apartment with a firearm. *Id.*

Manuela Garcia's existence, Steve January's interview with her, and the substance the interview, all contained in January's logs, were not disclosed to Cummings' trial counsel. 6 WRR 178. That information would have been or given rise to powerful impeachment evidence to attack Henry's credibility. That Garcia was with Henry the day of the murders and using PCP then is clearly information favorable to the defense—Henry had an extensive history of drug use, 32 RR 252, 267-70, a changing story, and an account in which she described herself as having been asleep on the couch because she had a pounding headache 32 RR 232. That Garcia was with Henry and using PCP obviously gives rise to the question of whether Henry, who admitted to her serious drug abuse on the stand, was also using hallucinatory drugs or was otherwise impaired *that day*. That Garcia was a close friend with Henry and spoke with Henry about the shootings just hours after

they occurred—when Henry failed to mention that she had seen a perpetrator in her entryway—would have been a significant source of impeachment.

The prosecution also failed to disclose that, prior to and throughout Cummings' trial, Steve January provided Nickoll Henry and her family with material benefits. January himself provided Henry with cigarettes on multiple occasions and, also on multiple occasions, individuals acting on his behalf provided Henry and her mother with boxes of food. January confirmed the substance of these claims during the state post-conviction hearing. 3 WRR 32-36. This information was suppressed, and it was favorable because it would have been a permissible area of cross-examination on the issue of a government witness's bias.

*Materiality.* Nickoll Henry's testimony was an important part of the State's circumstantial case. "It is a commonplace that eyewitness testimony is highly regarded by juries, rather more than its objective appraisal might warrant." *Smith v. Black*, 904 F.2d at 967. The suppression of information about Manuela Garcia and the material benefits provided to Henry, along with other suppressed evidence, had a reasonably probable effect on the outcome.

This information about Henry would have powerfully amplified the defense's ability to prove what it was implying on its cross examination: that Henry was repackaging as an eyewitness experience the information that had been circulating as neighborhood rumor in the thirty-six hours following the shootings. Henry's delay in reporting, her internally inconsistent and contradictory testimony, her criminal history, her drug use, her mental health issues, and the fact that she had blatantly violated probation without revocation during the pendency of Cummings' proceedings, all made her credibility, and the "facts" anchored to it, quite precarious.

For example, jurors armed with Manuela Garcia's testimony would have wondered why Henry, when talking to a good friend only hours after the shooting, failed to mention that she'd

come face to face with the killer, but, days later, when talking to law enforcement, reported seeing Cummings. The defense would have provided a ready answer: she hadn't seen Cummings. And if jurors had known that Henry, a serious drug user who reported being passed out with a "pounding headache" at the moment of the shooting, had spent the day with someone who was using hallucinogenic drugs, then they would have been alerted to the possibility that Henry, too, was impaired when the shootings occurred. Information of this sort is part of "a crucial assessment for the jury in its deliberations." *Williams v. Whitley*, 940 F.2d 132, 134 (5th Cir. 1991) (commenting on materiality of suppressed information showing witness lied in reporting methadone use).

So too would information about Steve January's material support, withheld by the prosecution, been effective in impeaching Nickoll Henry's credibility. When Henry told state post-conviction counsel that she had testified falsely, she also detailed how January and others at the district attorney's office had provided her with material benefits. App. 446. Specifically, she discussed how two men, who said they were acting on January's behalf, provided her and her mother with large boxes of food—on at least three occasions. *Id.* She also mentioned receiving cigarettes directly from January and new clothes and shoes for trial from a woman at the MCDA's office. App. 446-447. Henry's statements about her false testimony in the context of her describing the benefits she received is significant. The presence of such support represents an obvious incentive to shade testimony in favor of the supporter's preferred outcome, and January was never called to the stand so that he could be asked if such support was offered. Had January's logs, and other evidence of material support been disclosed, it also would have amplified other evidence that law enforcement personnel on the Cummings case were working behind the scenes to improperly incentivize and secure favorable testimony. What was otherwise an isolated data point—a suspiciously deferred action on a probation violation—would have been connected to other

inducements from law enforcement, and would have been cohered for the jury in the more persuasive form of a pattern.

### 3. The prosecution withheld information showing that Cummings did not write inculpatory text messages the prosecution attributed to him.

Prior to Cummings' trial, the prosecution knew that Cummings did not send the "take dem bullets" text the day after the shooting. *See* Subsection II.A, *supra*. Neither this fact, nor the information which supported such knowledge, was disclosed to defense counsel prior to or during trial. *See* Section II.A, *supra*. Again, only on June 12, 2015, long after OCFW filed the initial state habeas application, did it learn of this exculpatory information. App. 422. At the time of Cummings' trial, the prosecutors knew that Albert Love, one of Cummings' co-defendants, sent the "take dem bullets" message to his then girlfriend (now wife), Takelia Love.

*Suppression of information favorable to the defense. Brady* requires disclosure of information, not just documents. *See Bagley*, 473 U.S. at 677. Here, the prosecution failed to disclose the information that allowed it to "know" that it was Albert Love who sent the "get dem bullets" text messages, not Cummings. This information was plainly favorable to the defense.

Information showing that the prosecution knew that Cummings did not send the "take dem bullets" text messages would have eliminated the significance that the prosecution attributed to them at trial: that he committed a crime, was seeking to dispose evidence, and was coordinating with an extended network of conspirators. Additionally, it would have eliminated an area of cross-examination that the prosecution used to impeach Cummings. Cummings adamantly denied sending the texts. 36 RR 101; 37 RR 158. The prosecution used Cummings' denials to attack his credibility, asking him on cross-examination whether a "mystery person" sent them. 37 RR 162.

*Materiality*. The suppression of information that Cummings did not write the inculpatory text messages, along with other suppressed evidence, had a reasonably probable effect on the

outcome. The effect of the text messages on the trial outcome is set forth fully in Subsection II.A.2, *supra*, and is hereby incorporated by reference.

### 4.    The State violated due process by suppressing information about Steve January's involvement with the victim's aunt.

The State's failure to call Steve January for testimony, when he was *the* pivotal figure in the investigation, was baffling. The reason might be straightforward. January is now widely believed to have been in a romantic relationship—prior to, during, and after his investigation—with Charlotte Woods, Hubert's aunt. If true, then the existence of this relationship was favorable information never disclosed to Cummings or his counsel.

If true, the prosecution's failure to disclose January's relationship to the victim's family, when considered alongside other unlawfully suppressed content, was a material suppression. Such information would have been a crucial link to pockets of evidence about over-aggressive investigation that appeared otherwise disconnected: why law enforcement quickly became so preoccupied with Cummings to the exclusion of other clear suspects, why January served subpoenas for unlawful grand jury proceedings to threaten witnesses, why multiple witnesses have identified January as a source of coercion or inducement, and why January effectuated a warrantless search of wireless provider records.

*Suppression of information favorable to the defense.* Charlotte Woods' name appears throughout Steve January's investigation, yet nowhere is there any acknowledgment of their personal connection. In fact, in his reports, January depicts Woods as just another witness. Woods was one of the first people January spoke to when he arrived at the Villas after the shooting. According to January's report, as he was maneuvering his vehicle in an attempt to get to the crime scene, he was "out on spring st when [he] was approached by a BF that identified herself as

Charlotte Woods." App. 21. January wrote the report so as to suggest he did not know Woods when she approached him.

Without detailing his source, Steve January reported that, on the night of the shooting, he "knew" that Hubert's vehicle had been brought to the apartment complex and had been pointed out to him (a white Lincoln Town Car). App. 21. January reported that he "would later run the registration at the PD and found out it was registered to [Hubert's] aunt that [he] had spoken to previously by the name of CHARLOTTE WOODS at 309 Turner." *Id.* That same night, a member of the Crime Scene Unit, Officer Vaughn, was told by January that one of the victims had a white Lincoln Town Car parked in the parking lot and that January wanted to release the vehicle to "family members." App. 25. Only hours into the investigation of a double murder, January ordered the release of one of the victims' cars to the victim's family, without the car having been properly processed for evidence. This vehicle could have contained crucial evidence in the investigation. But, because January was so quick to release the vehicle to Hubert's family, any opportunity to discover evidence was lost.

Belief that Steve January was in a relationship with one of the victim's family members ran deep, and is widespread across the community. Specifically, four different people have signed declarations acknowledging the likely existence of this undisclosed relationship. Two others have provided corroborating information, but have elected not to sign any written statements at this time.

Pastor Richard Thomas, who has led the congregation at the Life Cathedral Worship Center in Waco for twenty-two years, remembers hearing that "Detective Steve January had a relationship with [Hubert]'s aunt." App. 439. Patricia Chisolm-Miller, the current Commissioner for Precinct 2 in McLennan County, and a resident of Waco for fifty years, remembers from formal meetings

with family members from both the Bowers and Hubert murders, that "there was some type of personal/intimate relationship" between Steve January and someone in Keenan Hubert's family. App. 442. Shaniese Iglehart, who was dating Emuel Bowers when Bowers was killed, remembers that "there was talk in the community," and it was "commonly known" that January had a relationship with one of Hubert's family members. App. 457. Igelhart does not remember that family member's name, but does know that the person is Aphton Ochoa's mother. (Ochoa is Woods' daughter.) Igelhart recalls that people were saying that January was in an intimate relationship with Hubert's aunt, and Hubert and Ochoa are first cousins. *Id.* Annetta Wilkerson, Rickey Cummings' aunt, went to school with Woods. App. 441. Ms. Wilkerson has also heard that Woods and January were in a relationship "and even had a daughter together." *Id.* While she has not confirmed it, she knows that the relationship has been "a big thing that a lot of people have talked about." *Id.*

In addition to these individuals from different segments of the community, two additional people have provided corroborating information. One of the individuals, whose identity is not being disclosed at this time, provided detailed firsthand knowledge regarding the undisclosed relationship. This individual, who grew up with Aphton Ochoa and went to school with her, remembers being at Ochoa's house, where she lived with her mom (Woods), and the individual remembers Steve January coming over to the home. App. 454. This person recalls asking Ochoa and Woods who the "white man" was and why the police were at the house. *Id.* Woods said that January was a "friend." *Id.* This individual also remembers Ochoa explaining that January would buy Woods gifts, and saw January as Woods' "sugar daddy." *Id.*

Another piece of corroboration appears in a WPD offense report from August 2011. On August 16, Ochoa and Freddie Hilliard, Emuel Bowers' uncle, had a run-in at a convenience store.

App. 34-36. Mr. Hilliard called 9-1-1 around 10:20 pm to report that Ochoa was intimidating him. App. 49.  When the police arrived on the scene, they spoke to Mr. Hilliard, and, after interviewing him, opened a retaliation case with Ochoa as the "suspect". App. 34-36. The offense report indicates that, on the following day, Ochoa walked into the WPD "as directed by Det. Steve January on the night of 8/16/11, to give a statement." App. 37. Ochoa arrived at the police station with a three-page, pre-written, WPD "Statement of Witnessed Actions," in hand. App. 50-52. The statement identified the "Officer taking statement" as January, and the time and place of the statement being 10:30 pm, at the convenience store. App. 50. Officer Mary Crook, who met with Ochoa made the following entry in her report:

> Ms. Ochoa gave her written statement to me. The time on the original statement was 2230 as that was the time she contacted Det. January. Due to the statement being given to me, I marked out Det. January's name and replaced it with mine. I also marked out the original time and put the correct time 1110 hours on the form. These changes were initialed by me.

App. 37. Ochoa's arrival at WPD with a pre-written witness statement with January's name on it—that was supposedly made within minutes of Hilliard calling 9-1-1 the night before—suggests something quite beyond normal police protocols.

Yet another piece of corroboration appears in another police report. In May 2013, WPD officers happened upon a disturbance at the residence of Woods and Ochoa. App. 44-46. When the officers arrived, Woods told them that she and her two daughters had been attacked by another group. App. 45-46. As the officers interviewed the witnesses and took written statements, Woods "kept asking for Detective January." App. 46.  As January no longer worked for the WPD, Woods agreed to speak to someone else regarding the case. *Id.* Although a report was made, the responding officer advised Ochoa that the incident seemed "to be like a mutual fight between all parties involved." App. 47. Three months later, Woods contacted WPD to check on the case. *Id.* Woods

was told that "this was a case of a mutual fight between the involved parties," and if the girls came back to her house again, she needed to call the police before getting into a fight with them. *Id.* In response, Woods told the officer that she would "be in contact with Investigator January at the DA's office" in reference to the case. *Id.*

The extensive combination of witness statements, interviews, and police reports strongly indicates that information favorable to the defense was not disclosed. In a case involving serious questions about the degree to which overly-aggressive law-enforcement practices corrupted the truth-finding function of the criminal proceeding, law enforcement appears to have suppressed information showing that the investigation's point person had a close personal relationship with a victim's family.

*Materiality.* The suppression of information about January's relationship with Hubert's aunt (and cousin), along with other suppressed evidence, had a reasonably probable effect on the outcome. That information bore on the credibility and integrity of the criminal investigation. Even though January did not testify at trial,[22] the investigation he led was on full display there. Knowledge that the lead investigator had a romantic relationship with one of the victims' family members, who was also a witness in the investigation, would have been favorable to Cummings.

Evidence of his relationship with a victim's family would cause the jury to question the integrity of the law enforcement inquiry, and question whether the need to find an accountable party swamped the interest in accuracy—thereby rushing the investigation, causing police to overlook or neglect viable leads, and facilitating tunnel vision. January's undisclosed relationship with the family could have caused him to steer the investigation by reference to the street rumors

---

[22] January testified at a state post-conviction hearing that he believed it was the prosecution's strategy *not* to call him as a witness, but the prosecutors had prepared approximately ten pages of potential questions in the event he was called by either side. 3 WRR 37.

driving the family's theory of criminal responsibility. Because the State's case was based on evidence obtained through January's investigation—most being circumstantial—the suppressed information would have cast serious doubt on the integrity of the investigation, and the evidence that it yielded. *See e.g.*, *Kyles*, 514 U.S. at 447 (noting that defendant could have used suppressed evidence to outline a vigorous argument attacking the integrity of the police investigation).

### B.    The *Brady* Claim is Unexhausted But Not Defaulted.

The *Brady* claim is not exhausted, and Cummings will be submitting a request under *Rhines*, 544 U.S. 269, to stay and hold in abeyance these proceedings so that he may exhaust it in state court, along with other unexhausted claims for which state remedies are available. There remains a clear path to merits consideration of the claim in state court. *See* Tex. Code Crim. P. art. 11.071 § 5.

### V.    THERE WAS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION WHEN THE DEFENSE FAILED TO SEEK FOURTH AMENDMENT SUPPRESSION OF EXCLUDABLE MOBILE PHONE RECORDS.

Under the two-pronged IATC test announced in *Strickland*, there is a Sixth Amendment IATC violation if trial counsel performed below an objective standard of reasonableness ("deficiency"), and if there is a "reasonable probability" of a different outcome absent those mistakes ("prejudice"). *See* 466 U.S. at 687, 694. Trial counsel rendered constitutionally ineffective assistance by failing to seek Fourth Amendment suppression of text-message records ("wireless provider records"),[23] which were obtained without a warrant from a wireless service provider and then used to convict and sentence Cummings. *See Kimmelman v. Morrison*, 477 U.S.

---

[23] This claim generally refers to the theory as one of "Fourth Amendment suppression," but the unreasonably omitted suppression motion would have relied both on the Fourth Amendment and on the parallel provision of the Texas constitution. *See* Tex. Const. art. I, § 9. Any reference this Petition makes to "Fourth Amendment suppression" should be interpreted to include suppression under the parallel Texas provision.

365, 375 (1986) (establishing that familiar IATC rules are applicable to failure-to-seek-suppression claims). To demonstrate prejudice, a *Kimmelman* claimant must show that "there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman,* 477 U.S. at 384. Although the deficiencies in this Petition are subdivided into five distinct IATC claims, this court must cumulate prejudice across all five when determining whether there was a reasonably probable effect on the guilt- and punishment-phase outcomes.[24]

The facts supporting the *Kimmelman* claim are set forth below and in the other claims presented in this Petition, which are incorporated by this specific reference as if fully set forth herein. The claim was not decided on the merits in state court, and is therefore unrestricted by 28 U.S.C. § 2254(d).

A.    **Trial Counsel Were Ineffective For Failing To Seek Fourth Amendment Suppression Of Excludable Wireless Provider Records.**

The State obtained, through a court order rather than a warrant, a wireless provider's record of texts sent to and from Cummings' cell phone. App. 387-388.  The order was not based on a finding of probable cause but on the judge's "reasonable belief" that the records were "relevant to a law enforcement inquiry." App. 388. Separately, the State obtained a warrant to access the contents of Cummings' phone. App. 395-413. But the wireless provider's records included text messages that were not stored locally on Cummings' device.

---

[24] IATC prejudice inquiry is supposed to mirror the *Brady* materiality analysis for unconstitutional prosecutorial suppression. *See Strickland*, 466 U.S. at 694 ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution[.]") (citing leading *Brady* precedent). In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court repeatedly emphasized that both the IATC-prejudice and *Brady*-materiality analyses were cumulative. *See id.* at 436 (after noting identity between IATC prejudice and *Brady* materiality, explaining that, "[for materiality purposes], suppressed evidence [must be] be considered collectively, not item by item"); *id.* at 436 n.10 ("We evaluate [the] cumulative effect [of undisclosed evidence] for purposes of materiality separately and at the end of the discussion . . . ."); *id.* at 441 ("The result . . . is incompatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by [precedent].").

Two sets of messages present in the wireless provider records but not on Cummings' phone were a central part of the State's circumstantial case against Cummings. The first set of messages discussed getting rid of bullets, and the second was a conversation about identifying alibis. 34 RR 70-71; 74-76. The State used the unlawfully obtained texts at trial to show that Cummings conspired with other suspects, that he disposed of evidence, and that he sought an alibi. 38 RR 75-77. The evidence would have been excluded as the fruit of a Fourth Amendment violation—it was suppressed in Albert Love's case—and there was no strategic or tactical justification for the decision not to move for suppression.

### 1.   Trial counsel's failure to seek Fourth Amendment suppression was objectively unreasonable.

*Strickland* deficiency requires a showing that trial counsel's performance was objectively unreasonable. *See Padilla v. Kentucky*, 559 U.S. 356, 366 (2010); *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007). *Kimmelman* observed that "[a] single, serious error" may support an IATC claim, *Kimmelman,* 477 U.S. at 383, and that the failure to file a plainly meritorious suppression motion might be such a mistake, *id.* at 385. The error here was grievous.

In not seeking Fourth Amendment suppression,[25] trial counsel performed deficiently. Professional norms for defense attorneys lay out the importance of pre-trial motion practice, including motions for suppression of the precise kind of evidence at issue here. *See* NATIONAL LEGAL AID AND DEFENDER ASSOCIATION, *Performance Guidelines for the Criminal Defense Representation* at 5.1(b)(7)(A), (rev. ed. 2006), *available at* http://www.nlada.org/defender-standards/performance-guidelines/black-letter ("NLADA GUIDELINES") (trial counsel should file

---

[25] At trial, the defense objected to the State introducing a report generated from the inspection of Mr. Cummings' cellular phone on relevance and prejudice grounds. 33 RR 152-53, 163, 168. Trial counsel objected to a report related to the inspection of D'Arvis Cummings' phone on relevance and hearsay grounds. 33 RR 153-54.

pretrial motion where warranted for suppression of evidence gathered in illegal seizure, in violation of Fourth Amendment). Both the liability and punishment phases of a capital trial require counsel to seek to exclude State evidence where possible. *See* AMERICAN BAR ASSOCIATION, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* at Commentary to GUIDELINE 10.11, 31 HOFSTRA L. REV. 913 (rev. ed. 2003) ("ABA GUIDELINES") (describing counsel's duty in both phases to prepare for case by determining whether prosecution evidence can be excluded).

In Cummings' case, there was no strategic or tactical reason not to seek Fourth Amendment suppression. The State had quickly telegraphed to the defense team their intention to utilize mobile phone information in the prosecution. 4 WRR 86. Recognizing the importance of mobile phone evidence, trial counsel immediately requested the services of a cellular data expert (Michael O'Kelley). 4 WRR 86-105. Trial counsel, however, inexplicably failed to lodge a Fourth Amendment challenge to the admissibility of wireless provider records, obtained without a warrant, that the State used to inaccurately attribute inculpatory text messages to Cummings.

WPD Detective Steve January was tasked with obtaining the suspects' mobile phones and wireless provider records, which WPD Detective James Owens II then analyzed. In April and May of 2011, January obtained signed court orders (not warrants) authorizing retrieval of wireless provider records associated with various mobile phone numbers.[26] These court orders requested that wireless providers turn over information on all incoming/outgoing calls, incoming/outgoing

---

[26] On April 6, 2011, Det. January obtained a court order signed by Judge Matt Johnson, for caller information records for the following phone numbers: (1) 254-412-8179 (serviced by wireless provider Sprint, and used by Kennedy Hardaway), (2) 254-761-0188 (Metro PCS, D'Arvis Cummings), and (3) 254-426-6075 (Metro PCS, Rickey Cummings). App. 388. On April 25, 2011, Judge Strother granted the State's motion to order service provider AT&T to turn over caller information records pertaining to phone number 254-230-3842 (unspecified user).  App. 394.

text messages, subscriber information, and cellular phone tower usage information for the associated phone numbers.

Within its "Motion for Cellular Phone Records," the State provided less proof than the "probable cause" required for search and seizure under both the Fourth Amendment and under Article I, § 9 of the Texas Constitution. *See* U.S. Const. amend. IV ("[N]o [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.); Tex. Const. art. I, § 9  ("[N]o warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."). In the April 25, 2011 order, the court did not issue a probable-cause warrant but instead granted the State's motion and issued an order stating "[t]hat there is reasonable belief that the information is *relevant to a law enforcement inquiry*." App. 394. (emphasis added).

By May 12, 2011, January had obtained wireless provider records associated with mobile phones belonging to D'Arvis Cummings, Rickey Cummings, and Albert Love. App. 32-33. On May 26, January continued his investigation, completing search warrant affidavits for four mobile phones (as opposed to court orders for the wireless provider records associated with them).[27] Detective Owens examined these phones throughout 2011.

Ultimately, evidence from Cummings' wireless provider and his phone was admitted through two exhibits, one detailing content on the phone and the other detailing content from the wireless provider's records. *See* State Ex's. 231 & 241A.[28] The two sets of records were designed

---

[27] The warrant covered phones for D'Arvis Cummings, Rickey Cummings, Jazmyne Flowers, and Constance Jones. App. 395-413.

[28] State's Exhibit 241, the un-redacted report generated by Det. Owens, was admitted for record purposes only, and never shown to the jury. State's Exhibit 231 included subscriber information records obtained by court order for the phone numbers 254-761-0188 (purportedly used by

to demonstrate, through side-by-side comparison showing certain messages present in the provider records but not on the phones, that Cummings had written and then deleted inculpatory text messages from his device (detailed below).

Had trial counsel moved for the exclusion of the text-message records obtained from the wireless provider by "court order" and without a warrant, the messages would have been suppressed by the trial court or the TCCA—as they were in Albert Love's case. *See Love v. State*, 543 S.W.3d 835, 840, 845 (Tex. Crim. App. 2016). *Love* explained that people have a reasonable expectation of privacy in the content of text messages conveyed through a wireless service provider, which means that the State required a warrant to obtain that information. *See id.* at 845 ("[Love] had a reasonable expectation of privacy in the contents of the text messages he sent. Consequently, the State was prohibited from compelling [the wireless provider] to turn over [his] content-based communications without first obtaining a warrant supported by probable cause."). That a warrant was required for the content of such communications was evident, *Love* explained, from a lengthy thread of federal precedent dating back decades. *See id.* at 840-844 (tracing holding to longstanding federal-law distinction between "envelope information" and the contents of communication).

Trial counsel's failure to file a suppression motion is more unreasonable because Texas's exclusionary rule is broader than the federal rule. In Texas state courts, evidence of a warrantless search that is unconstitutional is suppressed without respect to whether law enforcement acted in good faith. *See* Tex. Code Crim. P. art. 38.23(a)-(b) (in Texas courts, limiting good faith exception to exclusionary rule to cases in which law enforcement relies in objective good faith on a valid

---

D'Arvis Cummings) and 254-426-6075 (attributed to Rickey Cummings). Within the records were call logs and text messages for both phone numbers.

warrant). Indeed, *Love* itself recognized that this evidence would not have qualified for the Texas good-faith exception. *See* 543 S.W.3d at 845.

**2.    Cummings was prejudiced by trial counsel's failure to suppress mobile phone records.**

For Cummings to demonstrate prejudice, he must show "there is a reasonable probability that the verdict would have been different absent the excludable evidence." *See Kimmelman,* 477 U.S. at 384. Trial counsel's unreasonable failure to move for suppression of Cummings' mobile phone records "altered the entire evidentiary picture" of the trial. *Strickland*, 466 U.S. at 695-96. The unreasonable failure to seek suppression of wireless service records permitted the State to admit two *extraordinarily* damaging text-message strings against Cummings: text exchanges about (1) disposing of bullets and (2) securing an alibi. 34 RR 71, 75.

With respect to the prejudicial admission of the "take dem bullets" messages, Subsection II.A.2, *supra,* explains the effects of the admission in the context of the *Napue* claim and is hereby incorporated by reference. The prosecution elicited (false) testimony from a WPD detective who stated that Cummings texted about destroying evidence, and it repeatedly harped on the "take dem bullets" exchange during closing—using it to show that Cummings committed the crime, had accomplices, and tried to cover it up.

With respect to the prejudicial admission of the alibi messages, the prosecution also elicited testimony from the WPD detective stating that Cummings texted with someone about locating an alibi. 34 RR 72-75.[29] As with the "take dem bullets" messages, the State used the alibi exchange to maximum conceivable effect during closing. *See*, *e.g.*, 38 RR 34 ("It goes from flirting with his

---

[29] Although the text never should have been admitted, Cummings explained that the person who sent him the message referring to an alibi did not understand the pejorative meaning of the word, and was merely conveying that there was someone who could vouch for his whereabouts. 37 RR 107.

girlfriend to business, fear, setting up alibis."); 38 RR 75-77 ("And does an innocent man need alibis? . . . Innocent men don't need alibis, because they haven't done anything criminal. This man needed alibis, at least one, apparently two, because, again, this man over here is anything but an innocent man.").

Finally, and with respect to both text message exchanges, the State argued that Cummings tipped his guilt by deleting his side of the conversation from his phone. The State's argument that Cummings had deleted them centered on the fact that a copy of the messages had been retained by the wireless provider, but was not stored locally on Cummings' phone. 34 RR 74-75. Alongside the content of the text message exchanges themselves, the State recited the *deletion* of the messages as evidence of a cover up and the underlying criminality: "Then the coverup started. . . . the text message, 'Get rid of them bullets,' 'set up an alibi.' Then how else do we know that it's a coverup? He erases those messages. If it's not a coverup, why erase them?" 38 RR 34. Of course, if the defense team had moved for the suppression of the wireless provider records, then the State would never have been able to point to how they differed from the records stored locally on Cummings' phone.

## B.   Any Procedural Default Is Excused.

This claim was not adjudicated on the merits by state courts and is therefore unrestricted by § 2254(d), and any procedural bar triggered by the failure of state post-conviction counsel to raise the IATC-suppression claim is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), which held that an ineffective state post-conviction representation can excuse procedural default of an IATC claim. *See id.* at 9. *Martinez* applies to Texas cases such as Cummings', where the state habeas proceeding is effectively the first forum to lodge an IATC claim. *See Trevino v. Thaler*, 569 U.S. 413, 417 (2013). A *Martinez* excuse for procedural default of an IATC claim requires petitioners to establish both cause (that state habeas counsel was ineffective under *Strickland*) and

substantiality of the underlying IATC claim (that the claim has "some merit" or is not "wholly without factual support"). *See Martinez*, 566 U.S. at 14, 16; *Norman v. Stephens*, 817 F.3d 226, 232 (5th Cir. 2016).

Cummings satisfies both the cause and substantiality elements for the *Martinez* excuse. With respect to cause, state habeas counsel (OCFW) failed to include the IATC-suppression claim, and did so for no strategic reason. App. 424; App. 428. OCFW lawyers were inexperienced, under-supervised, and grievously under-resourced, and these factors contributed to the failure to identify the *Kimmelman* claim. App. 423, 424; App. 427; App. 430-434. With respect to substantiality, the *Kimmelman* claim is not "without factual support," *Martinez*, 132 S. Ct. at 1319, and Cummings has more than demonstrated that he "might" be able to meet the *Strickland* test, *Norman*, 817 F.3d at 232.

Any procedural default is also excused under the miscarriage-of-justice gateway, which permits a federal court to consider the merits of a defaulted claim if, considering "all the evidence, old and new, incriminating and exculpatory," it is "more likely than not that any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 537-38 (2006) (internal quotation marks and citations omitted). In light of (1) all the material evidence that the State unlawfully suppressed and (2) all the evidence that ineffective trial counsel prejudicially failed to uncover—as set forth across all materiality and prejudice sections appearing in Claims I through IX—"any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. The State's case was built around three planks of evidence—text messages, a gangland revenge theory, and testimony of eyewitness stating that they saw Cummings before and after the shooting—and *none* of those evidence categories remain credible.

VI.   **THERE WAS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION BECAUSE DEFENSE FAILED TO INVESTIGATE AND DEVELOP A DEFENSE BASED ON ALTERNATE SUSPECTS.**

Cummings' trial counsel provided constitutionally ineffective assistance by failing to adequately investigate and present an alternate suspect defense—a defense that was supported by significant evidence, had it been explored and had the dots been connected. This claim is analyzed using the familiar two-pronged *Strickland* test, which requires Cummings to show deficiency and prejudice. *See* 466 U.S. at 687, 694.[30] The claim is supported by the following facts and those allegations in the other claims raised in the Petition, which are incorporated by this specific reference as though fully set forth herein. This claim was not adjudicated on the merits in state court, and is therefore unrestricted by 28 U.S.C. § 2254(d).

A.   **Trial Counsel's Failure To Investigate And Develop A Defense Based On Alternate Suspects Was a Sixth Amendment Violation.**

As explained in Subsection VII.A.1, *infra*, the professional norm of capital defense practice is to investigate all evidence pertaining to the liability and penalty phases of trial, and to develop and integrated strategy for both. In this case, trial counsel failed to develop a defense based on several pieces of crucial evidence identifying alternate suspects—most significantly, (1) an anonymous tip identifying Kirby Brown, Carlos Smith, and Paul Hall as the perpetrators of the shooting (with Kirby Brown as a primary shooter); (2) an affidavit provided by a witness stating that she heard someone yell "come on Carlos" after the gunfire; (3) testimony of a woman who told trial counsel that her sister heard Nickoll Henry tell people that Carlos Smith was the shooter; and (4) a report from a ballistics expert in the Texas Department of Public Safety who concluded one *could not rule out* that the 7.62 x 39 caliber casings found at the scene could have come from

---

[30] Although the deficiencies in this Petition are subdivided into five distinct IATC claims, this Court must cumulate prejudice across all five when determining whether there was a reasonably probable effect on the guilt- and punishment-phase outcomes. *See* note 24, *supra*.

the same gun as those that Kirby Brown fired at Tyrece Richards (one of Cummings' co-defendants) in a shootout just weeks earlier, at the same location. Due to the thin evidence against Cummings, the failure to develop a defense based on Smith and others mentioned in the tip was prejudicial. *See Strickland*, 466 U.S. at 695-96.

>        1.      **The failure to investigate and develop the alternate-suspect evidence
>                was objectively unreasonable.**

The *Strickland* deficiency prong is satisfied if trial counsel's performance was objectively unreasonable. *See Padilla*, 559 U.S. at 366; *Sonnier*, 476 F.3d at 356. ABA GUIDELINE 10.7.A describes the normal course of capital case development: "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *See also* Subsection VII.A.1, *infra* (collecting professional authority setting forth reasonable investigation norm). Trial counsel failed to investigate and develop evidence showing that another group of men were the shooters, even though that evidence was at their fingertips. That failure was objectively unreasonable.

Four pieces of evidence capable of supporting the alternate-suspects defense were delivered to trial counsel on a silver platter, but sat in trial counsel's files without further investigation or presentation at trial. First, counsel received an internal WPD email detailing an anonymous call to WPD identifying three suspects by name, including "Carlos Smith" and "Kirby Brown." Second, there was an affidavit from Lashonda Moten stating that she heard a man yell "come on Carlos" immediately after the shootings. Third, counsel received in discovery a ballistics report showing a potential match between the gun used at the shooting and one used in a prior shooting at the same apartment complex, by Kirby Brown, just weeks earlier. Fourth, trial counsel interviewed a woman who had been dating Carlos Smith, and she told counsel that her sister had

tried to get word to her, on the night of the shootings, that Nickoll Henry had told people that Smith was the shooter.

Trial counsel failed to reasonably follow up on the anonymous tip excluding Cummings as a participant in the shooting. On or about March 31, 2011, less than three days after the shootings, an anonymous caller phoned the WPD and provided detailed information about the double murder—including the names of the individuals who were responsible. The information provided by the caller was taken down by Sgt. John Hambrick. The sergeant then memorialized the call in an email to Det. Steve January and Captain Price.[31] App. 48. An exact copy of the email that had been sent from Sgt. Hambrick to Steve January was found in the files of Cummings' investigator, Ed McEleya. App. 149.

The caller, identified by the sergeant as a black female, provided the following information to WPD:

- Three individuals did the shooting: Paul Hall, Kirby Brown, and Carlos Smith.
- Kirby Brown had the AK-47.
- Kirby Brown was the same person who had shot Erma Richards earlier that month, at the same location.
- Kirby Brown had shot the victims in the Villas with the same Ak-47 that he had used when he shot Mrs. Richards.
- When Kirby Brown shot Mrs. Richards, Carlos Smith was also shooting.
- Kirby Brown went by the name "Kirby Jack," and was tall.
- Kirby Brown lived in apartment #8 of the Villas, but was currently staying in #200.
- Carlos Smith also lived in the Villas.

App. 48. The caller also provided WPD with the suspects' motive for the shooting—Paul Hall wanted to kill Hubert because he thought Hubert was going to tell the police about Hall killing

---

[31] The offense report for the Villas shooting suspiciously makes no mention of the call or the details provided by the caller.

"that boy in the park last year."[32] *Id.*  WPD was also advised that Hall disguised his appearance during the shooting and that the other two were wearing red hoodies. The caller also said that the three were "the ones who started the riot so they could escape." *Id.*

Trial counsel also failed to reasonably follow up on a written statement corroborating the tip. A witness, Lashonda Moten, provided supporting evidence for the caller's identification of Carlos Smith—one of the three men mentioned in the anonymous tip—as another of the perpetrators. Moten stated that on the night of the shooting, while walking in the apartment complex, she saw men with red hoodies pull out guns, walk to a car, and start shooting. App. 414. When the shooting stopped, Moten heard someone say, "come on Carlos," and the men ran out the front gates of the apartment complex. *Id.* Moten's statement was contained in a signed affidavit located in the files of Cummings' investigator. *Id.*

Trial counsel also failed to reasonably follow up on a witness interview with Constance Jones, who had been dating Carlos Smith. Jones explained that, after the shootings, her sister called her to advise her that "if she were anywhere around Carlos, she needed to get away from him" because "[Nickoll Henry] was among those people who had originally said that Carlos had been the shooter." App. 416. The interview took place on August 8, 2012, and a summary of the interview is located in the files of trial counsel Walter Reaves. App. 415-416.

Finally, trial counsel failed to connect the previous three dots with a corroborative ballistics report. Three weeks before the double murder, an individual identified as Kirby Brown, and as living in apartment #200 of the Villas, was seen firing a large caliber rifle within the Villas apartment complex—the same complex where Hubert and Sneed were killed—at Tyrece Richards,

---

[32] Sgt. Hambrick, of the WPD Theft Unit, who took the call, did not know the incident "in the park last year" to which the caller was referring. Clearly, the caller was referring to Bowers' murder in Hood Street Park one year before the Villas shooting.

Cummings' brother and co-defendant. App. 7-9. Kirby Brown was identified by both the manager

of the apartment complex and a maintenance worker on the property. *Id.* A crime scene technician

recovered five (5) 7.62 x 39 cartridge casings, and one 7.62 x 39 bullet from near where Kirby

Brown was seen firing the rifle. App. 11-12.  A 7.62 x 39 cartridge is consistent with that fired

from an AK-47. 32 RR 177. The cartridge casings recovered from the crime for which Cummings

was convicted were also of 7.62 x 39 caliber. 32 RR 174-75. All of this information and the details

of the shooting, including that Brown was fighting with Tyrece Richards, were documented in an

offense report under WPD case 11-4125.[33] App. 7-18.

On April 5, 2011, the five 7.62 x 39 cartridge casings from WPD case 11-4125 were sent

to the Texas Department of Public Safety Lab to be entered into the NIBIN database and

"forensically compared to the 7.62 x 39 Cartridge Casings submitted under [WPD] case 11-6115

[the Villas double murder]."[34] App. 14. The results of the comparison testing indicated that the

casings from the double murder "could not be eliminated or identified as having been fired from

the same firearm as [the casings from the Kirby Brown shooting] due to a similarity in class

characteristics and insufficient individual characteristics." App. 55.

Thus, three witnesses identified Kirby Brown as the man firing an AK-47 inside the Villas

on two separate occasions, three weeks apart. Moreover, law enforcement's comparison of

---

[33] On April 13, 2011, the investigation in to WPD case 11-4125 was "discontinued" due to the capital murder that occurred on March 28, 2011, and specifically because "the suspects in [the murder] case are the grandsons of [Cummings grandmother, who was hit the crossfire] and have been arrested as of 04/12/11." App. 15. The case was "suspended" because the investigating officer did not want to jeopardize the ongoing investigation Steve January was conducting on the capital murder. *Id.* The officer explained that he had been in contact with January "throughout his investigation and was aware three suspects had been arrested and were related to Mrs. Richards." App. 16.  He was also aware that January was still conducting interviews when the case was suspended. *Id.*

[34] A corresponding report in 11-6115, indicates that Detective Steven January requested to have the two sets of casings compared. App. 31.

physical evidence from both crime scenes could not exclude the weapon used in the first shooting (in which Kirby Brown was positively identified by two eyewitnesses) as the weapon used in the second (in which Brown was identified by an anonymous caller). 7.62 x 39 casings are not run-of-the-mill, small caliber cartridges that might commonly be found in urban residential settings. They are casings from a high-powered assault-type rifle. This was powerful evidence that supported a defense theory that Kirby Brown had been one of the perpetrators that killed Hubert and Sneed—a theory trial counsel never developed.

The ballistics evidence would have dealt a particularly heavy blow to the prosecution's theory of the case, insofar as it separates Cummings from the group of shooters. In the first shooting, Kirby Brown was firing at one of the gunmen originally believed to have been shooting at Hubert and Sneed in the second (Cummings' brother Tyrece Richards). The prosecution's case against Cummings was built around an us-versus-them theory of gangster revenge in which Cummings' tight-knit group, including Richards (his brother), sought revenge against Hubert. Evidence that the person who shot at Cummings' brother one day was among those shooting at Hubert and Sneed three weeks later would have undermined any theory that the latter group of shooters included Cummings.

Although defense counsel possessed the ballistics report, and even *got it admitted as evidence* at trial, 37 RR 175 (Defendant's Ex. 6), they (1) failed to mention the comparison testing between the two sets of 7.62 x 39 casings, let alone the results,[35] 32 RR 186-87, and (2) failed to

---

[35] Cassey Allen, a forensic scientist from the firearms section of Texas DPS Laboratory, testified for the state. 32 RR 172. She signed the report containing the comparison testing between two sets of 7.62 x 39 casings. App. 54-55. However, she was never asked by defense counsel about this testing. 32 RR 186-87. Defense counsel had the report admitted into evidence over a week after Ms. Allen had testified, and made no mention of the comparison testing when the doing so. *See* 32 RR 172 (October 24, 2012); 37 RR 175 (November 1, 2012).

point out that the target of the earlier shooting was supposedly a perpetrator of the later one. Trial counsel entered the report for the purpose of proving an unrelated finding: that the two firearms recovered in the investigation did not match any of the ballistics evidence recovered from the scene of the double murder.

In short, trial counsel had in their possession exceptionally important evidence to support a viable alternate-suspects defense, but unreasonably failed to investigate individual pieces of information, connect those pieces, or present the case the evidence suggested. The under-pursued evidence was more than the sum of its parts, because it was mutually reinforcing—providing a coherent account of motive, means, and opportunity, while also punching a large hole in the prosecution's theory. Lashonda Moten's affidavit reported that she heard a "Carlos" urged to flee after the shooting, and the anonymous tip also identifies Carlos Smith as a shooter, along with Paul Hall and Kirby Brown. The tip explained Paul Hall's motive as an attempt to eliminate the possibility that Hubert would disclose Hall's role in the Bowers murder, and Hall had indeed been treated as a significant suspect in that case.[36] And Kirby Brown, the other man identified by the anonymous caller, was seen firing an AK-47 in the apartment complex earlier in the month, and firing it at one of the alleged co-conspirators in the Hubert/Sneed murder. A ballistics report admitted at trial for other purposes showed that the same assault-style rifle was used in the Brown/Richards shootout and in the Hubert/Sneed murders.

Nor was the failure due to a strategic decision to avoid the theory; trial counsel appeared simply to have waited too long to meaningfully connect the dots. For example, the investigator did

---

[36] Det. Alston, who investigated Bowers' murder, testified at Cummings' trial that, in his investigation of the Bowers' murder, he had treated Paul Hall as a suspect in that murder. 30 RR 178-79. The offense report for Bowers' murder also documents Paul Hall as a suspect in the murder. App. 1-2.

not appear to move on the anonymous tip until the eve of trial, but at that point thought it significant enough to run criminal checks on the suspects mentioned there. App. 74-79; App. 80-86. Defense counsel made a passing reference to Paul Hall and a man named "Carlos" in her opening statement, but never followed through on their relevance.[37] Detective January, however, never faced questions about the caller or the connection to the Brown shooting because he was never called to the stand. Defense counsel never called Lashonda Moten as a witness.[38] In summary, the defense seemed to do nothing at all with the alternate-suspect evidence until days before trial, at which point their ability to meaningfully connect or develop it had long since passed.

## 2. Trial counsel's deficient failure to develop the alternate-suspect evidence was prejudicial.

There is *Strickland* prejudice when the deficiency had a "reasonable probability" of affecting the trial outcome. *See Strickland*, 466 U.S. at 694; *Sonnier*, 476 F.3d at 365. For the reasons set forth below, including newly discovered evidence that competent counsel would have discovered, trial counsel's deficient investigation into alternate suspects indeed had a reasonably probable effect on the outcome

Alicia Harrison was the sister of the woman who informed trial counsel that Nickoll Henry was telling people that Carlos Smith was the shooter, and her declaration, attached to this Petition, is evidence that would have devastated the State's theory generally, and Henry's credibility in particular. App. 420. Harrison states:

> At one point in the evening, I heard gunshots outside. I did not think much about it until I heard the sirens and firetrucks. After a while, I went outside to see what was

---

[37] The defense told the jury in its opening that it expected the evidence to show that Detective January "disregarded a man named Carlos," and "Paul Hall, who had been doing business with [Bowers] and suddenly lost his dealer." 30 RR 42-43.

[38] Cummings' trial counsel had a subpoena issued for her to testify at trial, but it appears the subpoena was never executed. App. 87. The subpoena indicates an "unknown" address in McLennan Co., TX. *Id.* Counsel ran some computer location searches and criminal searches for Ms. Moten in the middle of Cummings' trial. App. 88-102.

going on. Everyone was saying someone was shot. I walked over to where the incident occurred. I saw Nickoll Henry near the car that was shot up and she was very emotional, telling people, "I know who did this." She said Carlos Smith shot and killed "Lockie" and other people in the car. . . . As soon as I heard that, I became extremely anxious because I knew my sister Constance left with Carlos that night.

*Id.*. Not only would any testimony to this effect have damaged (severely) the global theory that Cummings was involved in the shootings, it would have also destroyed Henry's credibility, which was already under siege on the ground that, over the course of the next two days, she reimagined a neighborhood rumor and reported it as an in-person encounter taking place in her entryway. *See* Subsection IV.A.2, *supra*.

Given Harrison's declaration, the other evidence adduced at trial, the evidence that was available but never connected, and evidence that remains undiscovered because of trial counsel's unreasonable failure to follow up on the evidence they did have, the defense team's deficiency had a reasonably probable impact on the trial outcome. Trial counsel could not use alternate-suspects evidence to expose holes in the state's over-arching theory of the crime, to show law enforcement's investigatory bias and tunnel vision, or to puncture the credibility of Nickoll Henry.

**B.    Any Procedural Default Is Excused.**

Any procedural default of the IATC-gangs claim is excused under *Martinez*, the formal requirements of which—cause and substantiality—are specified in Section V.B, *supra*. With respect to cause, state habeas counsel (OCFW) completely omitted this claim, and lacked any strategic reasons for doing so. App. 423, 425; App. 427, 429; App. 430-434. With respect to substantiality, the claim is not "without factual support," *Martinez*, 132 S. Ct. at 1319, and he has more than demonstrated that he "might" be able to meet the *Strickland* test, *Norman*, 817 F.3d at 232.

Any procedural default is also excused under the miscarriage-of-justice gateway, which permits a federal court to consider the merits of a defaulted claim if, considering "all the evidence,

old and new, incriminating and exculpatory," it is "more likely than not that any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 537-38 (internal quotation marks and citations omitted). For the reasons set forth in Section V.B., *supra*, which are hereby incorporated by reference, Cummings meets that threshold.

## VII.    THERE WAS AS SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION BECAUSE THE DEFENSE FAILED TO INVESTIGATE AND PREPARE TO CONTEST CUMMINGS' GANG MEMBERSHIP.

Even though the State telegraphed its intention to prosecute the case as a gangland-revenge killing, defense counsel failed to reasonably investigate, prepare, and litigate gang evidence. As a result, the prosecution was able to introduce false and irrelevant information about gang affiliation throughout the trial—smuggling in otherwise inadmissible character evidence, falsely suggesting the existence of a criminal enterprise upon which Cummings' law-of-parties conviction was predicated, and blatantly racializing the liability- and punishment-phase proceedings before the all-white jury. Trial counsel's performance therefore violated the Sixth Amendment, as applicable to the States by the Fourteenth. This claim was not adjudicated on the merits in State court and this Court's review is therefore unrestricted by 28 U.S.C. § 2254(d).

This claim is supported by the following facts and those allegations in the other claims raised in the Petition, which are incorporated by this specific reference as though fully set forth herein.

### A.    Trial Counsel Were Constitutionally Ineffective For Failing To Investigate And Prepare For Gang Issues.

This claim is analyzed using the familiar two-pronged *Strickland* test, which requires Cummings to show deficiency and prejudice. *See* 466 U.S. at 687, 694. Trial counsel unreasonably failed to investigate and prepare for a crucial aspect of the State's case against Cummings, and also failed to challenge the State's gang evidence—despite multiple mechanisms for doing so.

Those failures were prejudicial to Cummings and a windfall for the prosecution, which was able to accomplish three things across the liability and punishment phases of the trial: (1) to smuggle in false character evidence that is otherwise barred because of its enormous prejudicial effect; (2) to suggest a false gang affiliation upon which to predicate a law-of-parties (accomplice liability) conviction for capital murder; and (3) to racialize the danger presented to the all-white jury.[39]

> 1. **The failure to investigate and prepare to litigate the State's gang-revenge theory was objectively unreasonable.**

*Strickland* deficiency requires a showing that trial counsel's performance was objectively unreasonable. *See Padilla*, 559 U.S. at 366; *Sonnier*, 476 F.3d at 356. Professional norms prevailing at the time of Cummings' trial underscore defense counsel's paramount duty to investigate and prepare both liability- and sentencing-related defenses. *See* Commentary to ABA GUIDELINE 1.1 ("With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client."); ABA GUIDELINE 10.7(A) ("[C]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); ABA GUIDELINE 10.11.A ("[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.").

Trial counsel's failure to prepare for the central narrative in the State's case against Cummings was comprehensive, but is most evident in two categories of deficiency. Specifically, trial counsel failed to: (1) investigate and develop information necessary to dispute Cummings' gang membership; and (2) object to the State's repeated liability-phase references to such

---

[39] Although the deficiencies in this Petition are subdivided into five distinct IATC claims, this Court must cumulate prejudice across all five when determining whether there was a reasonably probable effect on the guilt- and punishment-phase outcomes. *See* note 24, *supra*.

membership, despite multiple opportunities and devices for doing so. The defense team's *post-hoc* justification for failing to prepare a defense or to object to the admission of evidence—that they were simply going to "ridicule" the theory—is not a credible rationale for having failed to investigate and prepare evidence relating to Cummings putative Bloods affiliation.

*Failure to investigate and prepare.* Trial counsel knew from the outset that the State's central theory would be that, along with "other" gang members, Cummings orchestrated Hubert's murder as revenge for Hubert's killing of Bowers a year earlier. On May 31, 2012, well before jury selection began, the State made a motion to photograph Cummings' tattoos and to use the photographs as evidence at trial. 1 CR 100-101. In a pre-trial hearing on the motion, trial counsel raised no objection. 7 RR 8-9. Continuing to telegraph its theory of the case at voir dire, the State repeatedly questioned potential jurors about their attitudes toward gang membership, accepting onto the jury the majority of venire persons whom it questioned on the subject. *See, e.g.*, 13 RR 29, 14 RR 129, 21 RR 69, 23 RR 196, 24 RR 90. Trial counsel understood the crucial role that the gang evidence would play at the trial, and—undermining their subsequent assertion that they strategically opted for ridicule—they acknowledged that they were "concerned about" the gang evidence because of its "effect on the jury." 4 WRR 79. They were concerned about the effect on the jury because the "whole case kind of revolved around [gang] evidence." 4 WRR 128. In light of the clear notice as to the State's strategy, trial counsel's preparation and investigation fell *far* below what one would expect from a reasonable attorney. Those preparatory deficiencies are best reflected in the defense team's failure to speak with expert or lay witnesses capable of establishing that Cummings was not a gang member.

Billing records (not presented to the state court) show, for example, that trial counsel did not consult with a gang expert. At the state habeas hearing, trial counsel repeatedly admitted that

they consulted no gang expert. *See*, *e.g.*, 4 WRR 134 (trial counsel conceding that they had retained only a "prison conditions" expert, and that they did not get a "specific gang expert"); 6 WRR 98-99 (trial counsel again admitting that he had consulted with a prison classifications expert, but no gang expert); 6 WRR 119 ("Q: Who was Frank AuBuchon? A: He is a prison specialist."). Failing to consult a gang expert was unreasonable in part because it violated a clear norm of defense practice, and in part because the expert was necessary and appropriate to the defense case. *See* Commentary to ABA GUIDELINE 1.1 ("Counsel must be experienced in the utilization of expert witnesses and evidence . . . ."); Commentary to ABA GUIDELINE 4.1 ("Analyzing and interpreting [evidence central to a death penalty case] is impossible without consulting experts . . . .") NLADA GUIDELINE 4.1(7) ("Counsel should secure the assistance of experts where it is necessary or appropriate to . . . rebut the prosecution's case.").

At some point before trial, defense counsel spoke with Frank AuBuchon—a TDCJ *prison classifications expert* who they would call to testify as to dangerousness at the punishment phase. AuBuchon formed no expert opinion about whether Cummings, or anyone else, was in fact a Bloods member. 40 RR 122-24; *see also* 1 CR 113 (motion to authorize expert services stating that "Mr. AuBuchon is able to testify about how inmates are classified, and how the risk of violence can be minimized or eliminated"). AuBuchon himself has submitted a declaration explaining: "I am an expert on prison security classifications within the [TDCJ], and that was the capacity in which I was engaged in this case. I was not engaged to offer an opinion on whether Mr. Cummings was in a gang, and I developed no expert opinion on that question." App. 435.

Billing records not included in the state habeas application confirm that AuBuchon was a penalty phase, future-dangerousness expert who would testify as to how TDCJ would classify Cummings. He did no work on the case until September 28, 2012—*after voir dire was complete.*

82

At that time, all he did was review pictures of tattoos (1 hour).[40] App. 118. His next entry indicating substantive work is from October 22 (0.5 hours), which was the day that the liability phase began. App. 118. AuBuchon did not speak to Cummings or to anyone who knew him. App. 435. (explaining that his opinion was based on review of tattoos and criminal history only, and that he did no interviews with Cummings or anyone else).[41]

In Texas post-conviction proceedings, the State obtained identical affidavits from all three trial lawyers asserting that defense counsel had "consulted" with Terry Pelz, but opted not to present him because his testimony would have been repetitive of AuBuchon's. App. 121-129.[42] The contemporaneous evidence contradicts these identical claims in some respects and supports them in others. Defense-team *lawyers* appeared to have no contact whatsoever with Pelz, and there are no billing records showing that Pelz did work on the case. Pelz was at one point identified as a potential *punishment-phase* witness on a list compiled by a defense-team *investigator*. App. 130-131. That investigator's notes are consistent with counsel's affidavit(s) insofar as the notes state that Pelz would have fulfilled the same evidentiary function that AuBuchon did—namely, that he would have testified about how Cummings would be classified once he was in the state prison system. App. 131. At some point between when he was designated as a potential expert on October 26, 2012, and the start of the punishment phase, Pelz's name was crossed off the potential punishment-phase witness list. The document in which the investigator crossed off Pelz's name

---

[40] This record included a call to someone who confirmed AuBuchon's belief that TDCJ would treat a star tattoo on Cummings' back as an indicator of gang affiliation upon initial admission. App. 435.

[41] Other than the entries already mentioned, the only other billing entry prior to the close of the defense's punishment phase case was from October 23, 2002, which was an hour for "[r]eview[ing] jail records." App. 118.

[42] Trial counsel affidavits have been redacted to protect any privileged information contained therein. Petitioner will be seeking a protective order prior to un-redacting the documents.

recites what he would have testified to, including that: "in TDCJ Bloods are no big deal—*there are lots of imitators & wannabe's* [sic]." App. 131. (emphasis added).

The state habeas record conclusively shows a true gang expert capable of assisting the defense was readily available to trial counsel. Charles Rotramel, a Houston-based gang expert with 30 years of field experience and who state habeas counsel retained, was active in this field at the time of Cummings' trial, directing a gang intervention program. App. 369-372. His extensive analysis categorically excluding Cummings' gang membership, App. 377, is recited in the discussion of prejudice below. In addition to their failure to consult an expert on gang validation, trial counsel failed to identify lay witnesses who the jury would perceive as disinterested and who would be capable of straightforwardly explaining that Cummings was not a Bloods member—a distinct failure that violated clearly established capital defense norms. *See* Commentary to ABA GUIDELINE 10.7 (appropriate investigation should include "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), and the degree of culpability for the offense."); Commentary to ABA GUIDELINE 10.11 (trial counsel has duty at both stages to "thoroughly investigate" to determine whether State evidence can be "excluded, rebutted, or undercut").

*Failure to seek exclusion of State's evidence.* Unlike Albert Love's defense team, which moved successfully to exclude gang references, App. 172, Cummings' lawyers filed a motion *in limine*, 1 CR 139-42, but then abandoned it. *See* 4 WRR 130. That act of abandonment is all the more unreasonable because counsel strengthened their position through an off-the-record agreement in which the State was to refrain from adverting to gang membership ("Gang Evidence Agreement"). But the Gang Evidence Agreement, like the motion, was stillborn because defense counsel seemed content to ignore it almost immediately. When the State repeatedly violated it, and

despite realizing that the prosecutor "had gone back on his word," 6 WRR 94, defense counsel did not: (1) seek a ruling on its motion *in limine* which, if granted, would have barred such references; (2) ask for sanctions or a mistrial, 6 WRR 94-95; or (3) do anything else to preserve the issue for appeal, 6 WRR 96-97. Specifically, defense counsel deficiently failed to object to any elements of the gangland-revenge theory that came in by way of exhibits, witness testimony, or stray remarks from the prosecution. The failure to do so, especially when trial counsel recognized that the "whole case kind of revolved around [gang] evidence," 4 WRR 128, violated clearly established professional norms. *See* ABA GUIDELINE 10.8(B)(2) (outlining counsel's duty to ensure full record legal proceedings is made); Commentary to ABA GUIDELINE 10.8 ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review . . ."); NLADA GUIDELINE 5.3 ("[C]ounsel should be prepared to renew a pretrial motion if new supporting information is disclosed in later proceedings.").

Defense counsel made their concern about the prejudicial impact of black gang evidence a matter of record when, on August 13, 2012, they filed a pre-trial motion to exclude testimony asserting that Cummings had a gang affiliation. 1 CR 139-42. Specifically, the motion argued that the State's use of gang evidence would violate TEXAS RULES OF EVIDENCE 401 through 404 insofar as the evidence was not relevant (under RULES 401 and 402), that its probative value was substantially outweighed by the potential for unfair prejudice (under RULE 403), and that it was an impermissible attempt to introduce character evidence in order to prove behavior in conformance therewith (under RULE 404). 1 CR 139, 140, 141. As explained above, however, counsel sought no ruling on the motion. 4 WRR 130. Counsel's unreasonable failure to seek exclusion of the gang evidence—by seeking a ruling on the motion *in limine*, otherwise enforcing the Gang Evidence

Agreement, or asking for a mistrial—therefore became a deficiency that ran throughout the entire proceeding, rearing its head every time the State adverted to gang affiliation without challenge.

Both deficiency and prejudice emerge from the first hours of the trial. In a transparent attempt to get evidence about menacing black gangs before the all-white jury as soon as possible, and in blatant violation of the Gang Evidence Agreement, the State asked three of its first four witnesses about gang membership and activity. The State elicited from the first trial witness, Theresa Salazar, that Cummings and all of Bowers' friends wore red and black at Bowers' funeral. 30 RR 73-4.

The State asked its third witness—Shaniese Iglehart, Bowers' girlfriend and the mother of his child—about the significance of red clothing worn during Bowers' funeral. 30 RR 123-24. During the Iglehart questioning, the State insisted that the red shirts had a "military" appearance and those wearing them considered themselves members of a gang. 30 RR 153-54. The State then offered ten separate exhibits consisting of photographs of Cummings, Bowers and their friends pictured in various red and black clothing, a photograph of Cummings' and Bowers' sons together, and photographs of attendants in red attire at Bowers' funeral and graveside. 30 RR 125-130. Never missing an opportunity to reference the incendiary "Flame it Up" music video, the State questioned Iglehart extensively about its violent lyrics and Bloods imagery. 30 RR 132-33. (Neither the video nor the lyrics had been introduced.)

Photographs of Cummings and others making hand signals gave rise to uninterrupted State examination of the fourth witness, WPD Detective Michael Alston. Alston was not a gang expert, and was not offered as one, but he testified, without objection from the defense, that Bowers was making a gang sign in a photograph. 30 RR 171.

Trial counsel lodged no formal or informal objection to any of the aforementioned questioning, or to the predicates for it.

The State later questioned defense witness Jasmine Davison, seeking evidence of Cummings' supposed gang ties. Davison was Cummings' girlfriend who was attending the University of Texas and living in Austin. Cummings' counsel had asked Davison general questions—without referencing Cummings—about hand signs in East Waco, her knowledge of gangs in Waco, and the Waco High School colors. 35 RR 91, 94-95. This questioning, disconnected from Cummings specifically, was apparently part of counsel's "strategy" to "ridicule" gang evidence without opening the door. The defense did absolutely nothing, however, when the State's cross-examined Davison, treated the scope of direct as having been about *Cummings'* use of hand signs, 35 RR 113, and interrogated Davison about whether Cummings' tattoos and text messaging indicated *his* gang membership. 35 RR 113-16. Defense counsel lodged no objections, and the counsel's redirect examination omitted any mention of the State's gang questioning. 35 RR 116-17.

Defense counsel's unreasonable failure to seek exclusion of the gang evidence had a ripple effect. Cummings decided to testify in sur-rebuttal in large part because trial counsel had so badly mishandled the gang evidence. App. 436. Because counsel had put on no witnesses to testify as to Cummings' non-gang membership, and because the defense needed to respond to the State's relentless assertions that Cummings was in a gang—defense counsel opened the door by asking Cummings whether he was a gang member. 36 RR 73-74. The State thereafter cross-examined him about the gang significance of (among other things) his tattoos,[43] repeatedly suggesting to the

---

[43] The State also questioned him about his use of certain alphanumeric characters in his text messaging—use that was superficially similar to alphanumeric substitution that Bloods members

jury that the tattoos meant he was a member of a non-existent Waco Bloods set. 37 RR 37-54. For each question, Cummings explained that gang membership did not account for the relevant tattoos, clothes, texting habits, names, and hand gestures. Although the subject of the State's questions were cultural markers consistent with gang-*unaffiliated* African-American teenagers from East Waco—a group that routinely mimicked the iconography of West Coast street gangs—trial counsel neither objected nor rehabilitated their client.

Before cross-examining Cummings, the State offered into evidence, with no defense objection, the "Flame it Up" video itself. 37 RR 14. (as explained below, trial counsel falsely stated that the defense objected to the video). Critically, trial counsel did not object even though the State offered the exhibits when the jury was not present. 37 RR 7. (Trial counsel has falsely suggested that ███████████████████████████████████████████ App. 122; App. 124-125; App. 128.). The video was admitted and played for the jury (twice), and the State proceeded to question Cummings relentlessly about the "gangster lifestyle" it featured. 37 RR 35-37. In an unchallenged argument, the State also told the jury that the title of the song itself invoked gang symbolism. 37 RR 38-39. Trial counsel did not even object to the State's misleading implication that Cummings appeared in the video ("Are you still telling this jury you, your brother, and your best friends who appear in this video are not in some sort of organized gang?"). 37 RR 37.

There is no reasonable account of defense representation that is consistent with trial counsel's comprehensive failure to challenge the admission of gang evidence.

---

use. 37 RR 48-51. The State also asked him about his uncle, whose nickname was "Bloody," 37 RR 18-19, and whether an "E" formed with his hand was a gang symbol. 37 RR 15.

*Proffered "strategy."* Ordinarily, trial counsel's subsequent explanation for its decision-making will make its approach seem more reasonable. Not here. Trial counsel's stated rationale for (contrary to professional norms) bypassing investigation, abandoning its motions strategy, forgoing the Gang Evidence Agreement, and presenting no witnesses—was ████████████ ██████████████████████. App. 124-125; App. 122; App. 128.

"Ridicule" is (at best) a tactic rather than a strategy, and there was nothing about a desire to ridicule the State's evidence that would be inconsistent with a professional approach to trial preparation. An inclination to ridicule evidence is therefore a legally insufficient substitute for the investigation and preparation sufficient to form a defense strategy. *See Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) ("Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court"); *see also Wiggins v. Smith*, 539 U.S. 510, 512 (2003) (strategic choices made after "less than complete" investigation not presumed to be reasonable judgment); *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."). The legal precedent is clear: trial counsel cannot reasonably settle on a ridicule strategy if they did not reasonably investigate the position that they intend to ridicule. And trial counsel here made the decision to "ridicule" without having consulted a gang expert or otherwise having sought evidence that Cummings was not a Bloods member. In other words, having failed to develop their own evidence, and despite a pending motion and the Agreement, defense counsel recklessly invited

explosive evidence they knew to be prejudicial on the theory they would just ridicule it with evidence they never investigated.

Perhaps the biggest tell that trial counsel unreasonably approached the gang question is that *so many* of their factual assertions supporting that decision are demonstrably false. First, each of the three trial attorneys submitted affidavits with identical (coordinated) language falsely stating that they consulted with a gang expert:

> Applicant's third claim is that we were ineffective because we failed to present an expert to rebut the State's assertion that Applicant was affiliated with the Bloods gang. ██████████████████████████████████
> ████████████████████████████████████████████████████████
> ████████████████████████████████████

App. 124; *see also* App. 121, App. 127-128. As discussed above, and as they admitted at other points in the state court hearing, trial counsel did not consult with a gang expert. The State's affidavits were a failed effort to have trial counsel pass off their *penalty-phase* consultation with a *prison-classification* expert (AuBuchon) off as *pre-trial* consultation with multiple gang experts qualified to opine on whether Cummings was actually part of a Bloods set.

Second, trial counsel's testimony that "we asked almost every witness that we talked to whether they had any evidence that he was in a gang," 4 WRR 133, was simply untrue. To the contrary, trial counsel failed to ask this question of a single witness other than Cummings himself. 36 RR 73-74.

Third, trial counsel reported that they omitted objections so that they did not credit the gang evidence before the jury, but the record shows that they failed to make objections *when given the opportunity to do so outside the jury's presence.* 37 RR 7-9. These omitted objections include those that would have challenged the State's introduction of Exhibits 248-250: the back tattoos,

the picture of Cummings and his brothers making hand gestures that the State would call gang signs, and the "Flame it Up" video. 37 RR 7-9.

Fourth, trial counsel falsely reported having objected to the admission of "Flame it Up" (Prosecution Exhibit 248), 6 WRR 85. No such objection ever happened. As explained above, Prosecution Exhibit 248 was admitted without objection from the defense. The defense made only a best-evidence objection to a printout of lyrics to be given to the jury for consideration alongside the unobjected-to video (Prosecution Exhibit 251). 37 RR 7-9.

*     *     *

Trial counsel's deficient approach to gang evidence was comprehensive. They did not investigate or develop evidence showing that Cummings was unaffiliated with the Bloods, and they repeatedly permitted the State to introduce false and inflammatory evidence to the contrary. Even if they actually planned on "ridiculing" evidence, such an approach was still unreasonable. Such a plan had no strategic advantage relative to the total exclusion of gang evidence—which would have severely damaged the State's theory of motive and denied it the opportunity to enter the penalty phase with the jury primed to convict on the first special issue—and it (if it ever really existed) was hatched in the absence of reasonable investigation and preparation.

### 2. Trial counsel's deficient approach to the gangland-revenge theory was prejudicial.

There is *Strickland* prejudice when the deficiency had a "reasonable probability" of affecting the trial outcome. *See Strickland*, 466 U.S. at 694; *Sonnier*, 476 F.3d at 365. A reasonable probability of a more favorable outcome exists in this case based on the individual omissions challenged here, the cumulative effect of those deficiencies, or the cumulative effect of those deficiencies and the other deficiencies shown in the other Sixth Amendment ineffectiveness

claims. Considered separately or cumulatively, *see* note 24, *supra*, trial counsel's deficient performance had a reasonably probable impact on the liability- and sentencing-phase outcomes.

Even trial counsel conceded that the evidence of gang membership affected the jury, 4 WRR 131, and the State allowed that the evidence "was in fact highly prejudicial." III WCR 559.[44] The multiple deficiencies here—the defense team's failure to develop its own evidence and its failure to contest admission of the State's—prejudiced the defense in both liability and punishment phases, and along three dimensions. First, it led the uncontested presentation of (false) gang evidence that is so inflammatory that it is ordinarily excluded under the evidence rules (as it was excluded from Love's state-court trial). Second, it worked to connect Cummings to the other suspects such that he could be found guilty as a "party" to the crime. Third, the constant reference to black gangs racialized the danger presented to an all-white jury, prejudicially enforcing stereotypes about homicidal criminality at the liability phase and prison violence at the punishment phase.

*Missing powerful evidence of non-membership.* The first aspect of the deficiency—the failure to investigate and develop evidence that Cummings was not actually in a gang—was perhaps most prejudicial. The defense team litigated the entire issue without consulting an expert capable of explaining to them, to the trial court that should have been called upon to rule on the motion *in limine*, and potentially to the jury, that Cummings was not in fact in a gang. A gang expert would have been able to inform the court and jury that the choices that Cummings made with respect to clothes, tattoos, and language were not uncommon and were not indicative of actual gang membership.

---

[44] The State simply asserted that this "highly prejudicial evidence" was outweighed by its probative value. III CWR 559.

In the same way that people enthusiastically wear five-pointed blue stars on hats but do not actually work for the Dallas Cowboys, that young black men in certain urban environments might speak, dress, and tattoo themselves in ways that resemble gang members does not mean that they are *actually in a gang*. According to the gang expert from the state habeas pleading, "young men in urban areas often adopt certain symbols of gang culture to make themselves appear 'tough'" and to give themselves "street cred." App. 379. These symbols, also employed by famous athletes and singers, *id.,* have no bearing on actual gang membership. Indeed, the defense team's prison classifications expert, Frank AuBuchon, explains that "[f]or reasons of safety and security, TDCJ's classification of gang-members is over-inclusive, meaning that inmates who are suspected of affiliation with a gang will be classified that way upon admission, whether they are actually in a gang or not." App. 456. (It is for precisely that reason that AuBuchon continues to have no opinion about whether Cummings is actually a gang member, despite having testified that TDCJ would classify him that way upon admission. *Id.*)

If a qualified gang expert had been consulted, then they could have *testified*—explaining that the State's evidence amounted to a common form of street mimicry, not Bloods membership. First, a gang expert would have told the jury that the Bloods *do not even have* a Waco presence. App. 379. Bloods sets are primarily located on the coasts; young men in places like inner-city Waco simply mimic the signs and symbols of the gang as cultural markers, and in order to project toughness. *Id.* Young men with Cummings' background use Bloods imagery because it is prevalent in popular culture, as a way to gain respect, and to showcase the street smarts necessary to avoid being a target of violence. App. 377, 384-385.

Second, the expert would have explained that the location and combination of tattoos on Cummings' back was also inconsistent with gang membership, because (1) Bloods membership

requires more prominent back placement; (2) Bloods membership requires certain imagery that Cummings lacks, such as a crown and lettering proclaiming affiliation; (3) both Bloods and People Nation tattoos were present, demonstrating that Cummings "lack[ed] fidelity to any particular set or gang"; (4) the "59" tattooed inside a woman's picture is not indicative of actual gang membership; and (5) that the numbers 5 and 9 on Cummings' back—repeatedly referenced by the prosecution—were unlikely to reference Bloods membership, because those numbers are specific to a California set (the 59 Piru Bloods) to which a Texan would not belong. App. 379-381. These observations would have been part of the expert's more general explanation: that the ink pattern on Cummings back is a marker of culture, not gang membership. App. 381.

Third, the expert would have put to rest the State's preferred inference regarding Cummings' text-messaging habits, explaining that his inconsistent use of certain idiosyncratic letter and number patterns in his written communication, as well as his failure to capitalize each "B", are inconsistent with Bloods membership. App. 381-382. Moreover, the expert would have explained that Cummings' spoken language was also inconsistent with gang membership, as his diction and sparing use of slang were markedly different from the way actual gang members speak. App. 382.

Finally, the expert would have emphasized other important ways that Cummings had distinguished himself from Bloods members, including his use of his brother's *blue* car, his pursuit of educational and professional goals, and his focus on his biological family. App. 382-383. Even Cummings' public denial of membership itself was indicative of non-affiliation, because a false denial is treated as the "ultimate . . . disrespect and would earn him instant [member] sanction . . . ." App. 383.

The trial team's deficient failure to adequately investigate gangs went far beyond its failure to consult with a qualified expert. Trial counsel *also* failed to seek credible witness testimony capable of disproving putative Bloods affiliation. For example, Pastor Richard Thomas, who spoke at the funeral that the State portrayed as a violent gang summit, would have spoken to trial counsel, had trial counsel asked. App. 438-439. Pastor Thomas had known Cummings very well, for about fifteen years, and stated without qualification that "Rickey was not in a gang." App. 438. Pastor Thomas also explained that the State's insinuation that attendees wore red because of a "gang thing" and to show Bloods membership was "nonsense." *Id.* Pastor Thomas himself wore the "red shirt and black slacks" alleged by the State to signify gang affiliation. *Id.* Pastor Thomas, and the other sixty-some-odd people at Bowers' funeral wore red "to show unity for this man that was lost" and because Bowers' mother "had told people they were going to wear red shirts for solidarity with [Bowers'] favorite color." *Id.* The testimony that could have been elicited from Pastor Thomas is broadly representative of testimony about gang activity that could have been elicited from other highly credible witnesses, had trial counsel simply attempted to do so. *See*, *e.g.*, App. 441 (Cummings' aunt and an office manager at a family medicine practice stating that, notwithstanding his tattoos, "I have known Rickey since his birth [and he] is not in a gang"); App. 442 (McLennan County commissioner who knew Cummings and explained that the State misrepresented the existence of "gang problems" to "play on the fears of the community").

The evidence from Rotramel (expert) and the lay witnesses would have bolstered the motion *in limine* and dramatically altered the evidentiary picture presented to the jury. In the unlikely event that the State could circumvent a reasonably litigated motion *in limine* or a reasonably enforced Gang Evidence Agreement, reasonable preparation would have ensured that the evidentiary picture presented to the jury would *still* have differed entirely from what the jury

actually experienced. The jury would have seen not only that the State's incessant gang innuendo was hugely inflammatory, but also that its assertion of Cummings' Bloods affiliation was *false*. It is improbable that reasonable jurors would have credited the gangland-revenge theory, or the assumptions about substantial participation, culpability, cover-ups, and danger that came with it. The omitted evidence thereby prejudiced both the outcome of a liability-phase proceeding that was substantially a jury referendum on the gangland-revenge theory, as well as the outcome of a punishment phase proceeding suffused with a false view of remorselessness and danger attributed to Bloods membership.

*Inflaming the jury.* The second aspect of the deficiency—the inexplicable failure to object to the State's gang evidence and innuendo—permitted the state to present *extraordinarily* inflammatory, but insufficiently relevant, information to the jury. The State never alleged nor introduced any actual evidence that, because Bowers and Cummings were Bloods and Hubert was in another gang, the crime was gang related. Instead, it simply injected general, inflammatory references to gang membership throughout the trial, disconnected to the criminal motive the State was actually alleging and seeking to prove—a close friendship between Cummings and Bowers. Had trial counsel sought a ruling on its motion *in limine*, sought to enforce the Gang Evidence Agreement, moved for mistrial, or otherwise objected, the evidence would have been excluded— as it was in the Albert Love trial.

Setting aside the motion *in limine* or Gang Evidence Agreement, the references to Cummings' alleged Bloods membership were *still* inadmissible under Rules 401, 402, 403, and 404 of the Texas Rules of Evidence—a state of affairs that trial counsel had highlighted in its

pretrial motion *in limine*.[45] Evidence of gang affiliation is inadmissible if it is "introduced simply as an attempt to connect appellant to gangs in order to show his bad character." *Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996). Moreover, even if the Director were to hypothesize some attenuated relationship to the gang evidence and the theory that the State alleged, the State's evidence would still have been excluded under TEX. R. EVID. 403, because its "probative value [was] substantially outweighed by a danger of . . . unfair prejudice."[46] This was not a case where gang membership was necessary to show motive—everyone acknowledged that Cummings and Bowers were quite close, including Cummings himself.

Because trial counsel was asleep at the switch, the State ceaselessly presented the jury with legally irrelevant information about people's clothes, their hand signs, and texting habits. The State was permitted to narrate Mr. Bowers' funeral as a gathering of violent attendees wearing red, military-style shirts in a display of gang loyalty, 30 RR 73-74, 123-24, 153-54, and was permitted to view a music video (*in which Cummings did not appear*) to showcase his "gangster lifestyle."

---

[45] *See* TEX. R. EVID. 401 ("[Relevant evidence] has any tendency to make a fact more or less probable than it would be without the evidence");TEX. R. EVID. 402 ("Evidence which is not relevant is inadmissible."); TEX R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."). TEX. R. EVID. 404(a)-(b) ("Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith . . . . Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

[46] The fact that a small subset of the evidence might be characterized as "impeachment" material as to Cummings makes no difference. The State repeatedly referenced "Flame it Up" before Cummings ever took the stand—during its opening statement, and when it questioned its third witness. 30 RR 39; 30 RR 132-34. But the video was not relevant within the meaning of TEX. R. EVID. 401 because Cummings was not in it and he otherwise had nothing to do with it, 30 RR 156, so it could not operate to disprove the statement of non-affiliation that he made on the stand. Moreover, even if nominal impeachment material might be considered relevant, under TEX. R. EVID. 403, its probative value was far outweighed by the risk of unfair prejudice. Finally, and as explained in above-the-line text, the State would have had no opportunity to get the evidence into the record on an impeachment rationale if trial counsel had adequately litigated the gang issue, because Cummings would have never taken the stand.

37 RR 34. The State devoted a staggering amount of its cross-examination of Cummings to the music video. During its cross-examination of Cummings, the state played "Flame it Up" for the jury twice—once all the way through, and a second time with pauses necessary to ask Cummings questions. 37 RR 36. In other words, just before the State made its liability phase closing and the jury retired to deliberate, the music video presented the all-white jury with a sensory mélange of threatening black gang activity: young black men making gang signs, discussing firearms, using inflammatory racial language, wearing gang-suggestive clothing, proclaiming a gangster lifestyle, and using illegal drugs. Those images then prejudicially remained with jurors as they undertook their sentencing-phase inquiry, including deliberations on future dangerousness.

   *Forcing Cummings to the stand.* Trial counsel's deficiency created the need for Cummings himself to address his gang membership from the stand. *Compare Draughon v. Dretke*, 427 F.3d 286, 295 (5th Cir. 2005) (trial counsel's deficient performance forced defendant to testify as "sole source of evidence available" to contradict State's case, for which defendant paid a "high price"). Here, Cummings' decision to testify resulted directly from his lawyers' deficiencies in addressing, challenging or rebutting the State's gang evidence. App. 436. After witnessing his lawyers' failure throughout the liability phase to mount a defense to the State's gang retaliation theory, Cummings eventually felt he was left with no choice but to testify on his own behalf. *Id.* By then, defense counsel let the State make the video a central part of its case, teasing the jury with its inflammatory content. Cummings had to explain that he was not a member of a local Bloods set. And it was as a result of *that* statement, opening the door in response to trial counsel's question, that the State was permitted to play the video—*in which Cummings did not even appear*—and submit the inflammatory lyrics to the jury. 38 RR 65.

*     *     *

The conviction and sentence violated the Sixth Amendment because trial counsel simply failed to prepare to litigate the gang issue, despite recognizing that it was prejudicial. Trial counsel did not consult with a gang expert about the liability phase of the trial, and failed to develop evidence of non-membership. Instead, it made a motion *in limine* to exclude references to gang affiliation, but abandoned the motion in favor of off-the-record agreement with the State that they also shelved even though the State spent the entire trial in wanton breach thereof. Trial counsel's deficiency had a maximally prejudicial effect—permitting the State to introduce false, inflammatory, and otherwise inadmissible character evidence; to build an accomplice liability theory on a false premise of gang affiliation; and, before an all-white jury, to racialize the presumed danger that Cummings presented.

### 3.    28 U.S.C. § 2254(d) Does Not Preclude Relief.

28 U.S.C. § 2254(d) precludes relitigation of claims "adjudicated on the merits" in state court, subject to two exceptions applicable here—when the state decision was either legally unreasonable under § 2254(d)(1) or factually unreasonable under §2254(d)(2). Section 2254(d) does not preclude relitigation in this case because the IATC-gangs claim presented here is not the same as the two gang-related IATC claims "adjudicated on the merits" in state court, and (in the alternative) because the state decision with respect to those two claims was legally unreasonable under § 2254(d)(1), factually unreasonable under § 2254(d)(2), or both.

### 4.    Section 2254(d) Does Not Preclude Relief Because This Claim Is Not The Same Claim That Was Adjudicated On The Merits In State Court.

Section 2254(d) creates a relitigation bar only for claims that state courts "adjudicated on the merits." In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court announced a rule of evidence for satisfying the legal unreasonableness exception to § 2254(d) specified in § 2254(d)(1), but § 2254(d)(1) is at issue only if the federal claim is the same claim as a claim

"adjudicated on the merits" by Texas courts. *See Pinholster*, 563 U.S. at 181; *id.* at 186 n.10 & 187 n.11. In the Fifth Circuit, a claim is not the same simply because "a somewhat similar state law claim was made." *Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) (quotation marks omitted). If there are new allegations or material new evidence that "fundamentally" alter the claim presented to the state court, then the federal claim is not the same. *See Ward v. Stephens*, 777 F.3d 250, 258-59 (5th Cir. 2015).[47]

A federal claim exhibits fundamental alteration when it (1) makes new factual allegations, *see Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008), or (2) includes new, material evidence that does more than "supplement" the existing record, *see Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014). New allegations and new material evidence create distinct claims because they "places the [prior] claim[] in a significantly different legal posture," *Anderson v. Johnson*, 338 F.3d 382, 387 (5th Cir. 2003) (internal quotation marks and citations omitted). No matter which way one particularizes the "fundamental alteration" standard, Cummings meets it. He asserts both new grounds for deficient performance and new material facts in support thereof.

First, the grounds asserted for deficiency and prejudice are different. In the state habeas application, state habeas counsel alleged two types of deficiency: that trial counsel failed (1) "by not *presenting testimony* from a gang expert" (emphasis added), and (2) by not "object[ing] to the admission of" the inflammatory gang evidence. I WCR 82, 93. State habeas counsel failed to allege the originating deficiency to which the others traced—the failure to investigate and develop information about Cummings' gang membership, including the failure to consult with a gang

---

[47] *See also Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014); *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012); *Anderson*, 338 F.3d 382, 386-88 (5th Cir. 2003); 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE § 23.3[c][ii], at 1231-32 (6th ed. 2011).

expert about the liability phase of the trial. Moreover, the prejudice allegations made by state counsel omit several of those presented here: that the gang evidence was an important way for the State to secure a conviction on an accomplice liability theory, and that the constant emphasis on black gangs in front of the all-white jury effectively racialized the threat assessment.[48]

Second, the *evidence* used to support the federal claim is materially different. The state post-conviction claim does not include the billing records, witness list, or AuBuchon declarations submitted herein, showing that trial counsel did not in fact consult with a gang expert. App. 118-120; App. 131; App. 435. Additionally, the federal claim is supported by lay declarations that speak to the prejudice of the claim. App. 438-440.

The claim presented herein therefore contains allegations and material evidence that differ from the superficially similar claims in the state habeas application such that, under Fifth Circuit law, this claim was not "adjudicated on the merits" in state court and § 2254(d) does not preclude relitigation.

> **5.    In the Alternative, § 2254(d) Does Not Preclude Relief Because The State Decision Was Legally And Factually Unreasonable.**

To the extent that this Court finds that the IATC claim presented here is "the same" as the two gang-related IATC claims adjudicated on the merits by the state court, it is *still* permitted to consider those claims de novo, provided that Cummings satisfies one of the two subsections that specify exceptions to the relitigation bar in § 2254(d). Namely, where the state proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[48] *See* Wilson, J. P. et. al., *Racial bias in judgments of physical size and formidability: From size to threat*, JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY, 113, 59-80 (2017). (explaining effect of blacknesss on perception of threat).

28 U.S.C. § 2254(d). The TCCA's adjudication of Cummings' IATC claim was both legally and factually unreasonable.

Before considering whether it was reasonable, this Court must identify the decision under review. Ordinarily, when a higher state court affirms a reasoned lower state court in a one-sentence ruling on the merits—which is what happened here—federal courts are to apply a "look-through" presumption that the higher court adopted the lower court's reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Unlike the scenario in *Wilson*, however, the TCCA expressly refused to adopt the lower court's findings. *Ex parte Cummings*, No. WR-84,324-01, 2018 WL 1516614, at *4 (Tex. Crim. App. Mar. 28, 2018). Instead, the TCCA disposed of all claims in the state post-conviction application in a single sentence: "[B]ased upon our independent review of the record and consistent with our role as the ultimate factfinder in habeas corpus proceedings, we deny relief." *Id.* In doing so, the TCCA cited *Ex parte Reed*, 271 S.W.3d 698, (Tex. Crim. App. 2008), thereby indicating that it believed that the lower court "findings and conclusions were wholly unreliable and beyond repair," *id.* at 722.[49]

In situations in which the state decision is unreasoned, federal courts are to apply a set of presumptions to determine what legal rationale "could have supported" the result. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011). The look-through rule from *Wilson* is one such presumption. *See* 138 S. Ct. at 1192; *see also Johnson v. Williams*, 568 U.S. 289, 293 (2013) (federal court must apply rebuttable presumption that state court opinion addressing only some claims, also meant to dispose of petitioner's other claims). In this highly unusual posture, when determining what "could

---

[49] The unsupported findings in the trial court's opinion included the presiding Judge's own professional history with Mr. Cummings' trial counsel, based on which he deemed them competent attorneys. The presiding Judge admitted to not viewing Mr. Cummings' trial record, instead basing his opinion that trial counsel did not perform deficiently upon the "excellent reputation" he believed them to have locally. V WCR 1419-20.

have supported" the decision, this court should look to the grounds asserted in the State's briefing, which is what the TCCA had in hand when it affirmed the lower court without adopting its findings.

### a.  The exception in § 2254(d)(1) is satisfied.

Section 2254(d)(1) disables the relitigation bar when a state inmate can show that the state decision was "contrary to" or "involved an unreasonable application of" federal law that the Supreme Court has clearly established. An application of clearly established law is unreasonable under the provision when it is "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). Pursuant to *Pinholster*, the § 2254(d)(1) inquiry can only consider reasonableness in light of evidence presented to the state court. 563 U.S. at 181. In adjudicating Cummings' IATC claim regarding trial counsel's litigation of the gang issue, the TCCA's decision relies on a correct statement of *Strickland*'s governing legal principle, III WCR 518-19, but goes on to unreasonably apply both *Strickland* prongs to Cummings' case.[50]

*Deficiency.* Assuming that the State's deficiency arguments are what "could have supported" the TCCA's holding, the state adjudication frames trial counsel's performance as "sound trial strategy." III WCR 556.[51] Although § 2254(d) inquiry into the state court's resolution of deficiency must be deferential, federal courts applying § 2254(d) "may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions[.]" *Richter*, 562 U.S. at 109 (internal quotation marks and citations omitted). Moreover,

---

[50] To be clear, Cummings maintains that no fairminded jurist would concur with any basis—articulated in the State's briefing or not—that might theoretically be invoked to defend the TCCA's decision.

[51] The content discussed in the "Deficiency" subsection here was included under the heading "Prejudice Analysis Under *Strickland*" in the State's brief. III WCR 555-556. However, it involves analysis of trial counsel's performance, which is clearly part of *Strickland*'s first prong. *See* 466 U.S. at 687-89.

under Supreme Court decisional law for deficiency analysis controlling the state adjudication, trial counsel's decisions to forego evidence, to permit the state to present inflammatory and otherwise inadmissible gang content to the jury without objection, and to instead "ridicule" the State's theory—decisions made without reasonable investigation or preparation—are not treated as strategic. *See*, *e.g.*, *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Rompilla v. Beard,* 545 U.S. 374, 396 (2005); *Wiggins*, 539 U.S. at 528.

*Prejudice.* Assuming the TCCA decision could have been supported by the State's arguments, it also misapplied clearly established Supreme Court law on *Strickland*'s prejudice prong. First, to the extent that the TCCA adopted the State's position, it simply adopted the wrong prejudice standard, failing to analyze whether there was a reasonable probability that trial counsel's deficiencies undermined confidence in the trial's outcome. Instead, the presumptively incorporated briefing material states that there is no prejudice if "the record shows the fundamental fairness achieved in the trial process[.]" III WCR 556. Although *Strickland* identifies the abstract interest in "fundamental fairness" as the reason for permitting IATC relief, 466 U.S. at 696, the rule is particularized in the form of a prejudice rule about the reasonable probability of a different outcome. *See Strickland*, 466 U.S. at 694 (setting forth prejudice inquiry).

The prejudice reasoning that "could have supported" the decision was also objectively unreasonable because it cites as overwhelming evidence precisely the information that would have been excluded had trial counsel performed adequately. Specifically, the presumptively incorporated reasoning explains that "the totality of the evidence strongly showed that Applicant was in fact a member of a criminal street gang." III WCR 558. But it is the failure to challenge that very evidence that was the subject of the state IATC claim. The TCCA cannot find that the

deficient failure to exclude evidence was nonprejudicial because the evidence that was not excluded was strong; that is an argument *in favor* of a prejudice finding, not against it.

### b.  The exception in § 2254(d)(2) is satisfied.

Under 28 U.S.C. § 2254(d)(2), an inmate is entitled to federal review of a claim decided on the merits in state court if the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Although the Supreme Court has cautioned that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance[,]," *Wood v. Allen*, 558 U.S. 290, 301 (2010), it has also made clear that "deference does not imply abdication of judicial review" and that it does not "by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The state reasons that "could have supported" adverse deficiency and prejudice findings here are based on an unreasonable determinations of fact, including: the proposition that trial counsel put on "a number of other defense witnesses" denying Cummings' gang affiliation, III WCR 558; that the defense "sought to minimize the effect of the evidence by not over-emphasizing its importance by making objections," III WCR 559; and that trial counsel reasonably declined to present a liability phase gang expert because "trial counsel chose not to duplicate the testimony of prison expert AuBuchon with the testimony of gang expert Terry Pelz," III CWR 558.

\*        \*        \*

For the foregoing reasons, § 2254(d) does not restrict relief.

### B.  Any Procedural Default Is Excused.

The procedural default of the IATC-gangs claim is excused under *Martinez*, the formal requirements of which—cause and substantiality—are specified in Section V.B, *supra*. With respect to cause, state habeas counsel (OCFW) completely omitted this claim, and lacked any

strategic reasons for doing so. App. 423-424; App. 427; App. 430-434. With respect to substantiality, the claim is not "without factual support," *Martinez*, 566 U.S. at 16, and he has more than demonstrated that he "might" be able to meet the *Strickland* test, *Norman*, 817 F.3d at 232.

Any procedural default is also excused under the miscarriage-of-justice gateway, which permits a federal court to consider the merits of a defaulted claim if, considering "all the evidence, old and new, incriminating and exculpatory," it is "more likely than not that any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 537-38 (internal quotation marks and citations omitted). For the reasons set forth in Section V.B., *supra*, which are hereby incorporated by reference, Cummings meets that threshold.

## VIII.  THERE WS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION BECAUSE THE DEFENSE TEAM WAS SUBJECT TO A CONFLICT OF INTEREST.

The defense team was burdened by a serious conflict of interest that materially impaired its representation and violated Cummings' right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *See Cuyler v. Sullivan*, 466 U.S. 335 (1980). The defense team's chief investigator and its chief expert were working for Cummings, who stood accused of killing Hubert to avenge Hubert's supposed murder of Bowers, and were simultaneously working for Steven Peace, who stood accused of killing Bowers. Due to the State's theory of the case against Cummings, defense counsel's duty of loyalty to Cummings required that the defense develop evidence that Peace killed Bowers, and its duty of loyalty to Peace required that the same members of the defense team develop evidence that Peace did not kill Bowers.

The conflicting duties resulted in tangible damage to Cummings' defense. There was scattered evidence at trial—evidence never developed nor connected by the defense—that Cummings did not hold Hubert accountable as Bowers' killer. Even the State didn't really think

Hubert killed Bowers. Despite receiving information from multiple sources that Hubert was Bowers' killer, the WPD never arrested or even questioned Hubert about it. *See* 30 RR 185-87 (Detective Alston testifying that the police had no credible evidence that Hubert had murdered Bowers, and did not seek an arrest warrant for Hubert). Instead, Peace was the only person arrested and charged in connection with Bowers' murder. Peace was arrested after multiple informants came forward, including Cetha Sneed, Tyus Sneed's sister. App. 3-6.

This claim was not adjudicated on the merits by the state court, and it is therefore unrestricted by 28 U.S.C. § 2254(d). The facts supporting this claim are set forth below and in the other claims in the Petition, which are incorporated by this specific reference as if fully set forth herein.

### A.     The Defense Team Had Conflicts Of Interest That Deprived Cummings Of His Sixth Amendment Right To Effective Assistance Of Counsel.

The Sixth Amendment claim here is governed by *Cuyler v. Sullivan*, 466 U.S. 335 (1980), under which Cummings must establish that "an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350. Were this Court to apply *Strickland*'s two-pronged ineffectiveness rule, Cummings would be required to show trial counsel's acts and omissions—relying upon an investigator and expert who were simultaneously representing another defendant whose interests conflicted with Cummings'—were objectively unreasonable, and that, absent the deficient representation, there is a reasonable probability of a different outcome. *See* 466 U.S. at 687, 694.[52] Although Cummings can satisfy both prongs of the traditional *Strickland* standard, and although he pleads content necessary to demonstrate his entitlement to *Strickland* relief, he does

---

[52] Although the deficiencies in this Petition are subdivided into five distinct IATC claims, this Court must cumulate prejudice across all five when determining whether there was a reasonably probable effect on the guilt- and punishment-phase outcomes. *See* note 24, *supra*.

not need to prove a reasonably probable effect on outcome (*Strickland* prejudice) because this claim is properly analyzed under *Cuyler*.

> ### 1. The defense team had a conflict of interest, which amounts to Sixth Amendment deficiency.

"Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Strickland*, 466 U.S. at 688 (citing *Cuyler*, 446 U.S. at 346). "Prevailing norms of practice" serve as guides for determining the reasonableness of trial counsel's challenged acts and omissions, *id.*, and those norms are violated when the defense team includes an investigator subject to a conflict of interest. *See Guy v. Cockrell*, 343 F.3d 348, 352-55 (5th Cir. 2003). Cummings' representation at trial was deficient because his defense team was subject to actual conflicts that interfered with what were clear investigative priorities.

Under the prevailing professional norms, counsel owed a duty of loyalty to Cummings that required them to "be alert to all potential and actual conflicts of interest that would impair counsel's ability to represent a client." NLADA GUIDELINE 1.3(B); *see also* AMERICAN BAR ASSOCIATION, *Model Rules for Professional Conduct* at Rule 1.7(a)(1) (1983), *available at* https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pr ofessional_conduct/model_rules_of_professional_conduct_table_of_contents/ ("ABA MODEL RULES") (conflict of interest exists if the representation of one client "will be directly adverse to another client"). Here, the defense team included, and trial counsel unreasonably relied upon, an investigator and expert whose loyalty was divided between Cummings' interest in showing that there was reason to suspect that Peace (not Hubert) killed Bowers, and Peace's interest in showing the opposite. Counsel's reliance upon conflicted professionals for developing the facts of the defense constitutes deficient performance. Although the Fifth Circuit has an overly-restrictive rule

about which duty-of-loyalty violations are *per se* deficient and analyzed under *Cuyler*, it has squarely held that the conflict at issue here is: one client's case should not be limited by the defense team's ethical duties to a different client. *See Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (*Beets II*); *see also Perillo v. Johnson*, 205 F.3d 775, 805-806 (5th Cir. 2000) (counsel compromises "duty of loyalty and zealous advocacy" to [client] by choosing between or attempting to blend the divergent interests of multiple clients).

Trial counsel's investigator, Ed McElyea, and cell phone expert, Mike O'Kelly,[53] were simultaneously representing Cummings and Peace, the person the State actually charged with killing Bowers.[54] The stronger the evidence that Peace killed Bowers, the weaker the State's preferred inference that Cummings killed Hubert to avenge Bowers' death. But McElyea and O'Kelly's work for Peace, at a minimum, created a disincentive for them to develop evidence that pointed to him as Bowers' killer.[55]

---

[53] O'Kelly eventually became infamous as the investigator from the hit TV show "Making a Murderer," which showed him extracting a written confession from his own client—Brendan Dassey, a 16-year-old, intellectually disabled Wisconsin murder defendant. Before O'Kelley extracted his own client's written confession—the extraction of which was videotaped—Dassey maintained his innocence. *See Dassey v. Dittmann*, 201 F.Supp.3d 963, 978 (E.D. Wis. 2016). O'Kelly's questioning read like a police interrogation, *id*. at 977-78, with his "primary goal to uncover information that would bolster the prosecution's case." *Id*. at 977. O'Kelly maintained a low opinion of his own client, calling him a "kid without a conscience" based only on the inconclusive results of O'Kelly's polygraph examination, expressing contempt for his client's family, and endeavoring to limit contact between his client and his client's attorney. *Id*.

[54] McElyea was appointed to Peace's team on December 19, 2011, App. 132, and worked on Peace's case from then through April of 2012. App. 133-134. O'Kelly was appointed to Peace's team on May 11, 2012. App. 150.

[55] McElyea's notes indicate that he did not even attempt to treat the cases separately. In one example of the casual commingling of the investigations, he lists "Cummings and Peace" in the *Case Number* section of a form for investigation notes. App. 148. In another, he visited Shelia Bowers (Hilliard) along with Michelle Tuegel on September 5, 2012, but documentation of the interview shows that he was conducting the interview for both the Cummings case and the Peace case simultaneously. App. 458-461.

Cummings was being tried first. Anything McElyea or O'Kelly developed for use in Cummings' defense would have been available for the District Attorney's use against Peace in his trial. If the lawyer for Peace believed that McElyea or O'Kelly was trying to develop a case for Cummings in which Peace was the likelier killer of Bowers, she would have been forced to fire him. Whether their duty of loyalty as part of the Peace team required them to avoid evidence implicating Peace, or their interest in their jobs on the Peace team inspired them to do so, McElyea and O'Kelly had, at best, divided loyalties that prevented them from fulfilling the defense team's duty of loyalty to Cummings. McElyea and O'Kelly were required to keep for Peace's exclusive benefit anything helpful to Cummings that either man learned in the course of preparing Peace's defense. But at the same time Cummings was entirely dependent upon them to gather the evidence to support his defense.[56] Where the defense's "struggle to serve two masters cannot be doubted," there is an actual conflict that violates the Sixth Amendment. *Glasser v. United States*, 315 U.S. 60, 75 (1942) (quoted in *Cuyler*, *supra*, 446 U.S. at 349).

That the defense team was subject to a conflict of interest by way of its investigators and experts, rather than because trial counsel themselves represented the other client creating the conflict, is immaterial under two principles. First, for the purposes of the deficiency analysis, trial counsel and the experts and investigators that work for them are not distinct Sixth Amendment entities. *See Guy*, 343 F.3d at 352-55 (treating Sixth Amendment deficiency as question of whether investigator ignored investigation because of a conflict). The "Sixth Amendment . . . relies . . . on the legal profession's maintenance of standards sufficient to justify the law's presumption that

---

[56] O'Kelly prepared a document on May 7, 2012—five-and-a-half months before Cummings' trial—that laid out for Peace's trial counsel the cell phone evidence purportedly connecting Peace to Mr. Bowers' murder, and detailing the extensive labor O'Kelly proposed to undertake on Peace's behalf, totaling over 100 hours. App. 154-156.

counsel will fulfill the role in the adversary process that the Amendment envisions." *Strickland*, 466 U.S. at 688. One such standard is TEXAS SUPREME COURT RULE 5.03 (Responsibilities Regarding Nonlawyer Assistances), which provides that assistants such as investigators "act for the lawyer in rendition of the lawyer's professional services." TEX. SUP. CT. R. 5.03 (Commentary) (1990). *See also* AMERICAN BAR ASSOCIATION, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases* at Guideline 4.1(C) (2008), *available at* https://www.americanbar.org/content/dam/aba/ uncategorized/Death_Penalty_Representation/Standards/National/2008_July_CC1_Guidelines.p df  ("All members of the defense team are agents of defense counsel.").

Second, as an alternative to the vicarious attribution of investigator conflict, trial counsel was deficient in failing to sufficiently supervise the potential conflicts of the defense team. Professional norms require that trial counsel direct the work of experts and investigators. *See Texas Bar Guidelines and Standards for Texas Capital Counsel* at GUIDELINE 10.1(A) (2006) ("[L]ead counsel bears overall responsibility for the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards."), *available at* https://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_ Representation/Standards/State/TX_Bar_Association_adopted_version_of_ABA_Guidelines.aut hcheckdam.pdf.

Indeed, *Guy* treats as distinct Sixth Amendment theories that (1) trial counsel was deficient because the investigator conflict was simply attributed to him for Sixth Amendment purposes and (2) trial counsel was deficient for failing to supervise the defense team. *See* 343 F.3d at 352-55; *see also*, *e.g.*, *Matthews v. U.S.*, 682 F.3d 180, 188 (2d Cir. 2012) (where someone trial counsel "relies on for information in formulating a defense" has conflict of interest, trial counsel's knowing

reliance on that person bears on trial counsel's effective discharge of duty to make reasonable investigations).

> **2.    The required quantum of prejudice is an "adverse effect" on the representation, and there were such effects here.**

There is an exception to the requirement that an ineffective-assistance claimant show *Strickland* prejudice (a reasonably probable effect on the outcome) where "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350; *see also Strickland*, 446 U.S. at 692 (relaxing prejudice showing necessary in conflict-of-interest scenarios); *Cuyler*, 446 U.S. at 349-50 ("defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief"); *Beets II*, 65 F.3d at 1265 (citing *Cuyler*, 446 U.S. at 348). *Strickland* itself explains why the *Cuyler* test supersedes the traditional prejudice inquiry in conflict-of-interest scenarios: because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692. This case sits in the heartland of *Cuyler*, even in the Fifth Circuit—which (wrongly) limits *Cuyler* to "multiple representation" scenarios rather than to any situation giving rise to a defense team's ethical conflicts. *See Beets II*, 65 F.3d at 1265-66.

McElyea and O'Kelly's simultaneous representation of defendants with conflicting interests adversely affected the Cummings defense team, which failed to explore and target the obvious holes in the State's revenge narrative. Hubert was only one of several people suspected of having a role in Bowers' murder, and the others to whom suspicion attached were known in the community. A non-conflicted defense team would have attacked the State's theory that Cummings was orchestrating retaliation against Hubert—principally, by showing that Hubert was not considered responsible for killing Bowers.

Steven Peace was a key suspect in the Bowers murder—known to law enforcement and on the street alike. The problems that such a cloud of suspicion created for the State's narrative—that Cummings orchestrated a hit on Hubert to avenge Bowers—were never explored before, or exposed at, Cummings' trial. The most obvious place for a non-conflicted defense investigation to start would have been to request the records of law enforcement related to the case against Peace. The evidence implicating Peace was favorable to Cummings' defense, and therefore discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Defense counsel made no such request.

In the trial itself, a non-conflicted defense team would have called attention to the involvement of Steven Peace—*the person who the State had already arrested for Bowers' murder*. Peace, however, was barely mentioned at Cummings' trial. The few times his name came up, trial counsel allowed the references to pass without drawing out the details or connections that would have highlighted the widespread knowledge of Peace's role in the Bowers killing. *See* 30 RR 148-49 (Iglehart testifying that Peace had also been a subject of rumors, and that he had been arrested); 30 RR 197 (Alston testifying to Peace's arrest); 35 RR 41 (Shelia Bowers mentioning that she thought Peace was potential culprit).

The State thought the Bowers murder so central to its case that, on the very first day, it called the lead investigator in the Bowers case, Detective Alston, to add color to the gang-revenge narrative. 30 RR 159-75. Alston's testimony presented an obvious opportunity to attack that narrative by, among other things, calling attention to Hubert's non-culpability in the Bowers death. Even when cross-examining Alston, however, trial counsel made only passing reference to Peace, suggesting (in the interest of Peace but not Cummings) that the case against Peace was extremely

weak.[57] *Cf. Cuyler*, 446 U.S. at 348-49 (discussing finding of adverse effect in *Glasser*). Trial counsel conducted no cross-examination following up on Alston's earlier testimony that multiple informants had come forward about Peace, which would have provided the sorely needed counterpoint to the State's focus on Hubert as the source of neighborhood suspicions. Indeed, Cummings himself offered testimony, which the defense team failed to corroborate with investigation, that he was on such *good* terms with Hubert that he alienated Bowers family. *See* 36 RR 80.

The defense also bypassed numerous opportunities to elicit testimony from *other witnesses* that would undercut the Cummings-avenging-Bowers narrative by pointing to the evidence against Peace. Trial counsel failed to question witnesses about neighborhood rumors that Peace killed Bowers, leaving them unable (1) to undermine the prosecution's assertion that Cummings was fixated on Hubert and (2) to corroborate Cummings' assertion that he was not. For example, trial counsel failed to question Theresa Salazar (the first person to see Bowers after he was shot), Brittany Snell (Villas resident and girlfriend of informant Delarontae Walker), Marion Bible (surviving victim), and Deontrae Majors (surviving victim) regarding rumors about Peace's culpability. All were firmly ensconced in the East Waco social network and in the community closest to the Bowers shooting, and all were potential sources of information about street rumors involving Peace.

The defense team's conflicting incentives were also evident in its approach to Bowers' gang membership. As representatives of Peace, they would have been maximally incentivized to

---

[57] 30 RR 211 ("Q: In fact, in your case, do you have a murder weapon in the Emanuel Bowers case? A: No, I don't. Q: You don't have DNA either, do you? A: No, I do not. Q: You don't have fingerprints either, do you? A: No, I don't. Q: And yet Steven Peace is awaiting trial on murder, isn't he? A: Yes, he is.").

highlight Bowers' gang ties, which multiply the potential motives (and suspects) for his murder. As representatives of Cummings, however, they needed to develop evidence showing the absence of gang affiliation. Indeed, the result of this conflict was palpable throughout the representation, reflected in the complete absence of any investigation into gang membership. *See* Section VII.A, *supra*.

The effects of the conflict are reflected in the work product of investigator Ed McElyea, who translated the raw information he collected into material to be used at Cummings trial. In the process he appears to have suppressed Peace's name as an alternative shooter in the Bowers killing. McElyea's notes reference the State's theory of the case as revolving around Cummings' supposed motive of retaliation for Bowers' murder, App. 146, and demonstrate McElyea's knowledge that both Peace and Hubert were potential suspects in the Bowers killing. *Id.* McElyea also kept a list of potential witnesses, with columns indicating whether the State or defense had interviewed them. App. 140-147. This list of witnesses included an entry for Paul Hall, whom McElyea noted as another suspect. App. 147. Peace, however, is conspicuously absent from the list, indicating that he was not being treated as an investigatory target, despite his demonstrated status as a suspect in Bowers' murder. App. 140-147.

Cetha Sneed's presence in the file is particularly troubling from a conflicts standpoint. Cetha, victim Tyus Sneed's sister, was also the star eyewitness accusing Peace of killing Bowers. App. 108-116. McElyea's investigation of Cetha is billed in invoices for both Peace and Cummings. App. 134; App. 137. Cetha appears to have been the only victim sibling that McElyea spoke to. *Id.* Notwithstanding the fact that McElyea appears to have sought Cetha out, and even though Cetha identified Peace as Bowers' killer, such information never made its way to the

defense team. She was never mentioned by trial counsel at Cummings' trial, let alone called as a witness. The scenario involving Cetha appears to be part of pattern.

The conflict, expressed through the investigatory choices discussed above, had an adverse effect on both phases of the trial. At the guilt phase, it resulted in the failure to effectively question Hubert's role in the Bowers murder, and in the otherwise inexplicable willingness of the defense team to allow Bowers' funeral to be characterized as a gang summit. The effects of the anemic gang investigation were also evident at the punishment phase, where Cummings status as a gang member loomed over the jury's deliberations over future dangerousness.

> ### 3. In the alternative, if the required quantum of prejudice is that traditionally associated with *Strickland*, then the defense team's conflict had a reasonably probable impact on the outcome.

Even if this Court did not apply *Cuyler*, relief is warranted because the conflict of interest had a reasonably probable effect on the outcome of the proceeding. *See Strickland*, 466 U.S. at 694. The reason is straightforward—there could have been no conviction without an airtight revenge narrative.

The State used its opening to emphasize that the "why" would explain the "who," and called this motive the "key" to pinpointing Cummings as one of the perpetrators. 30 RR 23. The State told the jury that it was the close relationship between Cummings and Bowers, and the fact that Cummings "held Keenan Hubert responsible," that drove Cummings to "take justice into [his] own hands," when the investigation into Bowers' murder stalled. 30 RR 24, 28-29. The State continued to hone in on this theory as they questioned witnesses, repeatedly returning to the close friendship that Cummings and Bowers shared. *See, e.g.,* 30 RR 118-19 (questioning Bowers' girlfriend, Shaniese Iglehart, about Bowers' friendship with Cummings); 37 RR 21 (emphasizing while cross-examining Cummings that Bowers' death hit him hard). The State also attempted to show that Hubert was believed by the denizens of East Waco to be behind Bowers' murder, and

endeavored to elicit testimony connecting Cummings as a purveyor of this rumor. *See* 30 RR 134-35. The logical conclusion, in the State's telling, was that the neighborhood gossip had winnowed down the shooting suspects to Hubert, whom Cummings then targeted for retaliation. In its closing argument to the jury, the State presented, as fact, that Hubert had been fingered as Bowers' killer, and that he subsequently paid the ultimate price for it. 38 RR 24.

There is a reasonable probability that trial counsel was unable to refute the State's theory of Cummings' motivation to kill Hubert because of this conflict of interest. As in *Guy*, Cummings was prejudiced by McElyea's and O'Kelly's conflict, which would have required them to impossibly "serve two masters," *Glasser*, 315 U.S. at 75, in collecting evidence distancing Peace from Bowers' murder for Peace's defense, while also collecting evidence for Cummings' team that demonstrated Peace's culpability in the same murder. Although Cummings himself explained that he did not hold Hubert accountable for Bowers' death, the defense let the revenge narrative suffuse the entire proceeding by failing to point out that Hubert was not actually regarded as the primary suspect.

The prejudice at both phases of the trial was also the result of the deficient representation on the issue of Cummings' gang membership, which also reflected the defense team's conflicting duties of loyalty. At the guilt phase, and as explained in Subsection VII.A.2, *supra*, this deficiency allowed the state to introduce otherwise inadmissible gang evidence to prove behavior in conformance with a violent personality, to lay a predicate for a law-of-parties conviction for capital murder, and to racialize the entire proceeding before an all-white jury. The effects of that deficiency also had a reasonably probable effect on the sentencing phase, at which point the State was effectively rewarded for spending the entire guilt phase making Cummings look like a dangerous member of a non-existent Waco Bloods set.

### B.    Any procedural default is excused.

Any procedural default of this claim is excused under *Martinez*, the formal requirements of which—cause and substantiality—are specified in Section V.B, *supra*. With respect to cause, state habeas counsel (OCFW) completely omitted this claim, and lacked any strategic reasons for doing so. App. 423-425; App. 427-428; App. 430-434. With respect to substantiality, the claim is not "without factual support," *Martinez*, 566 U.S. at 16, and he has more than demonstrated that he "might" be able to meet the *Strickland* test, *Norman*, 817 F.3d at 232.

Any procedural default is also excused under the miscarriage-of-justice gateway, which permits a federal court to consider the merits of a defaulted claim if, considering "all the evidence, old and new, incriminating and exculpatory," it is "more likely than not that any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 537-38 (internal quotation marks and citations omitted). For the reasons set forth in Section V.B, *supra*, which are hereby incorporated by reference, Cummings meets that threshold.

### IX.    THERE WAS A SIXTH AMENDMENT RIGHT-TO-COUNSEL VIOLATION BECAUSE THE DEFENSE FAILED TO RAISE AND COMPETENTLY ARGUE VIABLE CLAIMS UNDER *BATSON V. KENTUCKY*.

*Batson v. Kentucky*, 476 U.S. 79 (1986) provides the modern framework for applying the rule that the prosecution may not strike jurors based on race. *See id.* at 84. An inmate can show a Sixth Amendment ineffective-assistance-of-counsel violation based on defense counsel's deficient litigation of a *Batson* challenge ("IATC-*Batson*" claim). *See, e.g.*, *Scott v. Hubert*, 610 F. App'x 433, 434 (5th Cir. 2015).

*Batson* involves a "familiar" three-step process: (1) the defendant must make out a "prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"; (2) if a prima facie case is made, the State must "explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes"; and (3) if the

State provides a race-neutral explanation, the court must determine "whether the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California*, 545 U.S. 162, 168 (2005) (internal citations and quotations omitted). The familiar deficiency-prejudice framework applies to IATC-*Batson* claims, *see Scott*, 610 F3d. App'x at 434 (citing *Strickland*, 466 U.S. at 687), although the prejudice inquiry involves the effect of deficient performance on the outcome of the corrupted *Batson* challenge—not the guilt or sentencing phase determination. *See Scott*, 610 F. App'x at 434-35 (noting that because "a *Batson* violation would be a structural error," an IATC-*Batson* claim requires a prejudice showing involving the likely success of the deficiently litigated *Batson* claim). The reason the pertinent outcome is the *Batson* challenge itself rather than the guilt or sentencing-phase outcomes is indeed because *Batson* errors are structural. *See Scott*, 610 F. App'x at 434-35; *United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012); *Ford v. Norris*, 67 F.3d 162, 171 (8th Cir. 1995).

There were IATC-*Batson* violations with respect to two female African American panelists—venirepersons Cindy Cobb and Thressa Thomas—and each is an independent ground for Sixth Amendment relief. With respect to Cobb, defense counsel failed to put forth the necessary factual basis for a prima facie case at *Batson* Step 1, and was appeared to misunderstand the whole *Batson* framework. Then, seemingly flummoxed by her mix up during voir dire of Cobb, defense counsel failed to raise any *Batson* challenge at all to Thomas—the very next panelist, an African American woman upon whom the prosecution exercised a peremptory strike.

With respect to both Cobb and Thomas, the deficient *Batson* litigation was prejudicial. It is at least reasonably likely that competent presentation of the challenge would have resulted in a finding of discrimination. In addition, because trial counsel engaged in deficient jury selection

process, Cummings ended up with an all-white jury maximally susceptible to the State's strategy of bombarding the courtroom with images of violent black gangs.

This claim is based on the following facts and law, and on the allegations raised in other claims in this Petition, which are incorporated herein by this specific reference.

**A.      There Was A Sixth Amendment Violation Associated With Trial Counsel's Ineffective *Batson* Litigation As To Cobb and Thomas.**

In general, capital defense counsel are expected to "be familiar with the precedents relating to questioning and challenging of potential jurors[.]" ABA GUIDELINE 10.10.02.B. Defense counsel should be "particularly" fluent in those challenges "relating to bias on the basis of race or gender." ABA GUIDELINE 10.10.02.A. In light of the fact that "the history of capital punishment in this country is intimately bound up with its history of race relations," the Commentary to the Guidelines explains that "[c]ounsel should listen closely to the prosecutor's voir dire, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record." Commentary to ABA GUIDELINE 10.10.2. Reflecting *Batson*'s heavily context-dependent test, trial counsel must "ensure that it is clear from the record not only that the prosecutor struck a particular juror, but the race of the juror, of every other member of the venire, and the extent to which the unchallenged venire members shared the characteristics claimed to be justifying the challenge." Commentary to ABA GUIDELINE 10.8.

With respect to both Cobb and Thomas, defense counsel's performance fell woefully short of professional standards. The voir dire of Cobb and Thomas fell to the most junior member of the defense team, Michelle Tuegel. Tuegel had graduated from law school in July 2010, obtaining her license a few months later. 5 WRR 132. She joined Cummings' team as third chair in July 2011, 5 WRR 132, after working on a single murder trial. 5 WRR 134-35. She did not conduct the voir

dire in that case. 5 WRR 135. Before Cummings' trial, Tuegel had worked on one other capital murder trial. 5 WRR 133. Prior to trial, Cummings's lead counsel, Russell Hunt, acknowledged that Tuegel had "never before *seen* individual voir dire." App. 117. (emphasis added). As to each juror, had Tuegel been able to effectively litigate *Batson*, there is a reasonable probability that a *Batson* challenge would have been sustained.

### 1.   There Was A Sixth Amendment Violation Associated With Trial Counsel's Ineffective *Batson* Litigation As To Cobb.

*Deficiency.* On the afternoon of August 23, 2012, venireperson Cindy Cobb took the witness stand to be questioned by both the parties. 25 RR 145. Prosecutor Michael Jarrett questioned Cobb, and following his questioning, challenged her for cause. 25 RR 145-199. Tuegel asked to question Cobb before the judge ruled, 25 RR 199, and the judge allowed Tuegel to question her for the purpose of "rehabilitation," 25 RR 201. Following Tuegel's questioning, the prosecutor clarified that his challenge was based on his understanding that Cobb was unable to assess the death penalty for a non-shooter. 25 RR 205. Before the judge ruled on the challenge for cause, Jarrett announced: "Judge, I don't think we need to go any further. We will exercise a peremptory challenge." 25 RR 207.

At that point, Tuegel stated, "we're going to make a *Batson* challenge, that this was not a race neutral reason for them exercising a peremptory." 25 RR 207. Anticipating his burden at *Batson* Step 2, Mr. Jarrett responded, "I'll state my race neutral reasons on the record." 25 RR 207. Before doing so, Mr. Jarrett flagged Tuegel's failure to carry her Step-1 burden: "it's the defense's obligation to prove a prima facie case that the State has violated the juror's rights." 25 RR 208. Tuegel responded with a non-sequitur, stating only that "Cobb is one of the only African American jurors on this panel that we've even gotten close to qualifying." 25 RR 208. In a shared colloquy, the judge and the prosecutor stated:

> Court:  Well, I want to make it clear that every other one has been - -
> Jarrett: -- agreed to by the defense.
> Court:  -- an agreed challenge or an agreed excuse by the State and the defense.

25 RR 208.

Tuegel was asked by the court if she had anything else to add to her Step 1 position, and she responded with an observation about the State's failure to satisfy *Batson* Step 2: "No, Your Honor. Just that I don't think the State has come up with a race neutral reason, and I thought that was their burden." 25 RR at 209. The court explained that it was the State's burden only after the defense had, in the court's view proven a prima facie case at Step 1, and the court "[did not] see one." 25 RR at 209. Tuegel told the court she had nothing else to add, and the court denied the *Batson* challenge.[58] 25 RR at 209.

The court did not *see* a prima facie case because Tuegel unreasonably failed to articulate one. As explained above, she merely stated that Cobb was "one of the only African American jurors on this panel that [the parties had] even gotten close to qualifying." 25 RR 208. Competent *Batson* litigation required more, even though satisfying *Batson* Step 1 was not intended to be difficult task. *See Dewberry v. State*, 776 S.W.2d 589, 591 (Tex. Crim. App. 1989) (en banc). To the contrary, in *Batson* itself, the Supreme Court held that a defendant can make a *prima facie* case of discrimination by offering a wide variety of evidence, so long as the sum of the proffered facts gives "rise to an inference of discriminatory purpose." 476 U.S. at 94. And, a defendant may rely on "all relevant circumstances" to raise an inference of purposeful discrimination. *Id*. at 96-97.

Because she misunderstood *Batson*, Tuegel offered very little of the available evidence to overcome the low *Batson* Step 1 bar. By the time Cobb was questioned, ten jurors had already

---

[58] Mr. Jarrett, nonetheless, stated his race neutral reasons for striking Cobb. 25 RR 209-210.

been seated—all of whom were white. Tuegel did not offer this fact in support of her challenge. Prior to Cobb, several African American panelists were disqualified from serving on the petit jury. As the court and prosecutor pointed out, these prospective jurors had been excused due to agreements from both sides. 25 RR 208. Therefore, before Cobb was questioned, the State had never been forced to use a peremptory strike in order to exclude a black juror.[59]

The State's change of position on Cobb, the first qualified prospective black juror, gave rise to an inference of discrimination. Initially, the prosecutor led Cobb to agree that she would not vote for the death penalty under the law of parties for a non-shooter, and that prompted the challenge for cause. 25 RR 198-99. Then defense counsel rehabilitated Cobb, showing that she would not automatically vote no on the second special issue for a non-killer. 25 RR 203-204. The prosecutor returned to questioning Cobb, and, upon hearing her say that she could consider a death sentence for a non-killer, the prosecutor became frustrated, rude, and resorted to a false attack on defense counsel. First, the prosecutor challenged Cobb to tell him "what changed your mind in the last three minutes." 25 RR 206. In response to Cobb saying she had thought "about the circumstances and knowing that it would be like another trial and we would hear more evidence, the prosecutor shot back "Here's the deal, Ms. Cobb. I think Ms. Tuegel misstated the law." 25 RR 206. That prompted an objection from the defense. 25 RR 206-207. Even though the court overruled the objection, allowing the prosecutor to continue questioning Cobb, he abruptly changed course and used a peremptory strike. 25 RR 207. It was at that point that the defense brought the *Batson* challenge.

---

[59] The State did exercise a peremptory strike against a non-white female prospective juror when it struck juror number 315, Roxanna Lamkin, a Hispanic female. 21 RR 223.

The State's use of a peremptory strike on Cobb not only kept the first qualified prospective African American juror off the jury, but it also allowed the State to maintain what remained an all-white jury, with only two more seats to fill.[60] These facts could have been raised in support of defense counsel's *Batson* Step-1 argument, which would have been sufficient evidence to overcome step one and shift the burden to the State in Step 2.

Tuegel was clearly confused about *Batson*, having attempted to satisfy her Step-1 burden by reference to whether the State had offered sufficient justification for a Step-2 finding—even though Step 2 had not been reached. In short, Tuegel did not appear to understand the burden shifting framework for a *Batson* challenge. That failure was *Strickland* deficiency.

*Prejudice.* Had defense counsel properly litigated the *Batson* challenge as to Cobb, there is a substantial likelihood that the challenges would have succeeded. To establish a prima facie case necessary for *Batson* Step 1, defense counsel could have offered a "wide variety of evidence." *See Johnson v. California*, 545 U.S. at 169. Defense counsel only needed to offer enough evidence to support an inference of discrimination. *Id*. And there was ample evidence available for defense counsel to present to satisfy Step 1. By the time Cobb was questioned, ten of the twelve regular juror seats had been filled—all of them with white jurors. And, up until that point, no African American panelist had even gotten as far as Cobb. In other words, Cobb presented the first real threat to disrupt the racial homogeneity of the jury. Had the defense called attention to the prosecutor's reaction to that threat, the defense would have met its burden under Step 1, at least.

The prosecutor recognized that "some Court later on down the line" might find that a *prima facie* case was established. 25 RR 281. Also recognizing this possibility, the trial judge noted for the record that, had the defense established "in the first place," the State's proffered reasons for

---

[60] The two remaining seats were filed with white jurors, as were the two alternate seats.

striking Cobb were, "in fact, race neutral and valid . . . ." 25 RR 281.[61] As a result, the prosecution's sole proffered reason for striking Cobb is known—because she supposedly vacillated about whether she could impose the death penalty on a non-shooter. 25 RR 209. This reason, however, was likely pretextual. Had the *Batson* challenge been competently litigated, there was at least a reasonable probability of success.

An analysis of similarly situated white panelists that were ultimately seated discloses the pretextual character of the race neutral reason the State offered, and thereby demonstrates the merit of the mishandled *Batson* claim. This comparative analysis is evidence that would have supplemented the arguments raised in support of a *prima facie* case, and also to establish a reasonable probability that the asserted justification was a pretext for discrimination. *See Miller-El v. Dretke*, 545 U.S. 231, 247-48 (2005) (*Miller–El II*); *see also Foster v. Chatman*, 136 S. Ct. 1737, 1751 (2016) (finding "otherwise legitimate reason" for striking prospective black jurors "difficult to credit in light of the State's acceptance of" white juror to whom same reasons also applied); *Snyder v. Louisiana*, 552 U. S. 472, 483 (2008) (same); *Reed v. Quarterman*, 555 F.3d 364, 372–73 (5th Cir. 2009) (same).

The first seated juror, Glenda Reed, a white female, expressed similar, if not greater, uncertainty in her ability to impose a death sentence than did Cobb. Reed was very clear that, since learning that the case involved the possibility of a death sentence, her "sole thought" was "could I do a death penalty or not." 13 RR 17. Reed explained her position on imposing a death sentence in this case:

> The only way that I've come to terms with it or that I've been able to process that very well is to consider if someone came into my house and tried to kill me or my

---

[61] Because of counsel's deficient performance in arguing step one, the trial court's hypothetical finding does not account for the overlooked and unpresented facts that support viable *Batson* challenges.

> children, and at that point I could sentence someone to a death sentence by my own hand and with my own gun. . . . Whether I could say right now unequivocally that if we came to a decision of guilt and for me to say right now I absolutely could sign that form and say a death sentence, yes, I can't say unequivocally. For me, it would depend on the evidence and how strongly I felt like the benefit to society and the benefit to the community and the punishment phase. That's when I would have to make that decision. I don't know that I could say I could absolutely sign that paper. I just don't know.

13 RR 17-22. These statements by Reed—a seated, white juror—were nearly identical to the statements the prosecutor cited as the reason for striking Cobb—an African American venireperson.

The comparison between the treatment of Reed and Cobb was not only evidence that a competent defense team could have easily satisfied *Batson* Step 1, but also that they could have prevailed at Step 3. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller–El II*, 545 U.S. at 241; *see also Reed*, 555 F.3d at 376 (relying upon the Court's guidance in *Miller-El II* to find that the prosecution's asserted reasons for the acceptance of non-black jurors with the same, particular characteristics as struck black jurors were sufficient to constitute pretextual discrimination).

### 2. There Was A Sixth Amendment Violation Associated With Trial Counsel's Ineffective *Batson* Litigation As To Thomas.

Immediately after the prosecution exercised a peremptory strike against Cobb, the very next person called to the stand for individual voir dire, and the last for the day, was Thressa Thomas. Thomas, like Cobb who proceeded her, was an African American female. The prosecutor, Greg Davis, questioned Thomas before ceding questioning to Tuegel. 25 RR 211-263. At multiple points during Tuegel's questioning, the judge instructed Tuegel to "ask some questions," 25 RR 264, "about [Thomas's] qualifications," 25 RR 268, and advised her that she was "getting very repetitive." 25 RR 269. When Tuegel concluded her questioning of Thomas, the prosecution

exercised another peremptory strike, its second in a row against an African American prospective juror. 25 RR 279. Neither Tuegel, nor any other member of Mr. Cummings's defense team, raised a *Batson* challenge as to Thomas.

Defense counsel's failure to do so was deficient. Every fact mentioned above (with respect to Cobb) could have been presented in support of a *Batson* challenge as to Thomas. Moreover, that the prosecution used a second peremptory strike against an African American panelist, immediately following its strike of Cobb, means that the defense's Step 1 and Step 3 arguments were actually *stronger* with respect to Thomas. Like Cobb before her, Thomas was another African American panelist who was one step away from being seated in what was at that point, an all-white jury.

*Prejudice.* Defense counsel's failure to challenge the peremptory strike of Thomas prejudiced Mr. Cummings. The prosecutor was never burdened with explaining his justification for striking a second African American juror in a row. However, it is clear that the case for a successful *Batson* challenge as to Thomas would have been even stronger than that for Cobb, regardless of the State's proffered reason.

> **B.   Any Procedural Default of This Claim Is Excused.**

The procedural default of the IATC-*Batson* claim is excused under *Martinez*, the formal requirements of which—deficient state post-conviction representation and substantiality—are specified in Section V.B, *supra*. In terms of state post-conviction deficiency, there was no strategic reason" for omitting an IATC-*Batson* claim. App. 423, 425; App. 427-428; App. 430-434.  Also for the reasons set forth above, Cummings' IATC-*Batson* claim is "substantial" under *Martinez* and *Trevino*. It is not "without factual support," *Martinez*, 566 U.S. at 16, and he has demonstrated that he "might" be able to meet the *Strickland* test, *see Norman*, 817 F.3d at 232.

X.   **THE TRIAL COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS BY EXCLUDING RELEVANT MITIGATION EVIDENCE FROM THE PUNISHMENT PHASE OF THE TRIAL.**

The Eighth and Fourteenth Amendments to the United States Constitution require that jurors in a capital case be able to consider any relevant evidence offered by the defense that may result in a sentence of less than death. *See Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) (holding that courts may not use any legal device to screen relevant mitigating evidence). The standard for the "relevance" of mitigation is the same as the standard for any other type of evidence: "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (citations and internal quotation marks omitted). "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds* by *Atkins v. Virginia*, 536 U.S. 304 (2002) (internal quotation marks and citation omitted). Here, the trial court prohibited Cummings from presenting evidence that he came from a disadvantaged background that was found by a U.S. Department of Justice to contribute to criminal behavior, and that a juror could have relied upon to impose a non-death sentence. The *Eddings* claim was presented to the state court, but not "adjudicated on the merits."

This claim is based on the following facts and law, and on the allegations raised in other claims in this Petition, which are incorporated herein by this specific reference.

A.  **Cummings' Sentence Violated *Eddings* and *Tennard*, And Is Entitled To Relief Because The Error Was Not Harmless.**

The trial court excluded evidence relevant to mitigation, which is a straightforward *Eddings* violation. The court phrased its holding as having an alternative dimension—based on the "reliability" of the expert testimony—but what it called "reliability" was plainly a holding as to relevance. Assuming relevance in Cummings' favor, the TCCA decided the question against him on a cramped reliability rationale alone. The state courts therefore failed to adjudicate the merit of the claim under the federal constitution, so this Court's review is for harmless error, and is unrestricted by 28 U.S.C. § 2254(d).

1.  **There was an *Eddings* violation.**

During the punishment phase of his trial, Cummings sought to present the testimony of Amy Nguyen, a geographical information specialist, relating to the socio-economic circumstances and crime rates of the local neighborhoods in which Cummings had been raised. Nguyen had been involved in 23 cases at the state level and 11 at the federal level in which another expert had used her maps, 40 RR 83, and she had testified in three capital cases in other jurisdictions. 40 RR 65. Nguyen proposed to discuss "community risk factors, including lack of education, exposure to violence, and the general unhealthiness of the community where [Cummings] lived." 40 RR 62. Her proffered testimony was based on studies—including one published by the U.S. Department of Justice—identifying risk factors, census information, and other crime related data. 40 RR 63, 71.

Nguyen explained that her expertise was in community risk factors, and that her testimony would focus on the community in which Cummings grew up. 40 RR 66-67. When the prosecution challenged the relevance of her proffered testimony, she explained that she relied on studies reflecting that "community shapes who a young person will grow up to be . . . [and that] community

risk factors go into the make-up of who a young person becomes." 40 RR 69. Given her specialization, Nguyen explained that she would not opine on how risk factors *actually* (as opposed to probabilistically) affected Cummings' development. 40 RR 70. Nguyen also discussed the slides she intended to present and explained that they reflected data for the Waco neighborhoods in which Cummings was raised. 40 RR 70-76. As compared to the rest of the county, the pertinent areas had significantly higher rates of: single-mother households, poverty, adults lacking a ninth grade education, and crime. 40 RR 72-76.  All of this information met the low relevance threshold; it had a "tendency to make the existence of [a] fact that is of consequence to the [mitigation question] more probable or less probable than it would be without the evidence." *Tennard*, 542 U.S. at 284.

The trial court was clearly unwilling to accept the idea that testimony about risk factors was relevant. Before viewing Nguyen's slides, the judge asked skeptically, "Ma'am, are you telling me that the village raises the child? Is that what you're trying to say?" 40 RR 69. After Nguyen went through her slides, he continued to express his view that risk assessment was not relevant:

> I grew up on a hardscrabble farm. Does that make - - you know, and I'm a judge. So what's the connection between those two? I'm trying to - - I'm trying to understand how you're going to use this and how you're - - what you're claiming. What is it are you're trying to prove here.

40 RR 76. After more discussion, the trial judge challenged defense counsel to "tell me why this is relevant and why it's admissible." 40 RR 78. Trial counsel urged the admission of Nguyen's testimony, contending that the community and environment where he grew up were relevant to the mitigation issue. 40 RR 79. The State countered, "Our objection is that this is not relevant" because "sentencing in a capital case is to be an individualized procedure," and the study that focused on risk factors in the area where Cummings grew up had "no relationship whatsoever to this defendant." 40 RR 80. Asked by the court to respond to the objection, the defense noted that information specific to Cummings' family and household circumstances had already been

presented, so that Nguyen's testimony would establish a link between that evidence and outcomes in the community typically associated with such conditions. 40 RR 82.

The trial court then excluded the testimony: "I'm going to sustain the State's objection. I don't think this information was proven to be scientifically reliable. I don't see any - - I don't think the methodology has been proven. I don't think the standard of reliability is there." 40 RR 83. The court's statement was confusing because it was sustaining the State's objection—which had been to relevance—but the court mentioned scientific reliability, which the State had not raised. The trial court thereafter clarified that it was in fact making a relevance ruling, using the same terms the prosecutor had used in his objection: "I might have a different opinion if this data were individually tailored to this defendant, but it's not. It's a series of generalizations that you all are asking the jury to apply specifically to this defendant, and there is no—*there is really no connection*, so I'm not allowing it." 40 RR 83 (emphasis added). *Compare* 40 RR 80 ("If she were able somehow to tie any of these risk factors to this particular defendant, I might have a different opinion, but simply to get up here and cite a study with no relationship whatsoever to this defendant . . . . They are generalized information, and she's unable to tie it to this particular defendant."). Despite having been asked to do so by the State, the trial court did not exclude the testimony on the ground that the expert was not qualified. *Compare* 40 RR 81 (State's objection based in part on Nguyen being "not qualified as an expert in this matter") *with* 40 RR 83 (trial court's grounds for sustaining State's objection, which did not include any deficient qualifications).

The court's grounds for excluding the testimony—that "there really is no connection" between a defendant's criminal behavior and his disadvantaged background—was contrary to the Supreme Court's conclusion that there is a "belief, long held by this society" that a defendant's disadvantaged background diminishes his culpability. The trial court's relevance determination

was a straightforward violation of *Tennard* and *Eddings.* Under *Eddings* the jury has to be permitted to hear any relevant mitigating evidence, 455 U.S. at 144, and under *Tennard* the test is simply whether the evidence tends to "prove or disprove some fact or circumstance which a fact-finder *could* reasonably deem to have mitigating value," 542 U.S. at 284 (internal quotation marks and citations omitted) (emphasis added). The mitigating value of a disadvantaged background was so well-established by the time of *Penry*, 492 U.S. at 319 (1989), that the trial court's holding was beyond the range fairminded judicial disagreement.

### 2. Review is for harmless error because the TCCA did not decide the *Eddings* claim on the merits.

Although, as stated above, Cummings easily satisfies 28 U.S.C. § 2254(d)(1), the provision does not apply. On appeal, Cummings squarely presented the *Eddings* claim to the TCCA. App. 268-288.  In doing so, Cummings explained that the Court mislabeled what was clearly a relevance ruling as a scientific reliability determination under the Texas rule for admitting expert evidence, Tex. R. Evid. 702. "As a matter of caution" only, he addressed a Rule 702 reliability argument. App. 281-284. That brief included no argument pertaining to Nguyen's qualifications, because the trial court had not ruled on that basis.

Nonetheless, at the State's urging, the TCCA assumed for the sake of argument that the evidence was relevant and based its entire appellate opinion on defects in Nguyen's qualifications. App. 193.  In so doing, it necessarily predicated its decision on things that had little to do with the trial court's decision: that, although "she has a degree in Physical Science and a Master-level certification in Geographic Information Systems," she did not have a degree in social work or anthropology; that she did not "participate" in the DOJ study that produced some of the data informing her expert opinion on community risk factors; and that she knew nothing about

Cummings' "family, his education, his income level, or background aside from the specific addresses at which he resided from birth to present day." App. 194.

In short, the TCCA did not decide the merit of the constitutional question—whether Nguyen's planned testimony was relevant because it tended to prove or disprove some something that a fact-finder could reasonably deem to have mitigating value. For that reason, the *Eddings* claim was not "adjudicated on the merits" by the state courts, and it is unrestricted by 28 U.S.C. § 2254(d). And, also because the TCCA did not adjudicate the merits of the claim, this Court's review is for harmless error. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

### 3.      The *Eddings* error was harmful.

The *Eddings* error was not harmless because there was "actual prejudice" to the sentencing-phase verdict. *See Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). Like cases involving counsel's failure to present mitigation evidence at the sentencing phase of a capital trial, the degree to which an error affected a sentencing-phase outcome in a jurisdiction requiring unanimity is whether it is reasonably likely that the excluded evidence could have influenced a single juror. *See Wiggins,* 539 U.S. at 537. Had the trial court's personal views about the subject of Nguyen's testimony not resulted in the exclusion of "constitutionally relevant mitigation evidence," there is ample reason to believe that at least one juror would have found Cummings insufficiently blameworthy under the Texas mitigation issue.

As the Supreme Court explained in *Penry*, our society generally believes a defendant's disadvantaged background diminishes his culpability. *See* 492 U.S. at 319. Nguyen's proffered testimony would have presented empirical, scientifically assessed (by the U.S. Department of Justice) information on the "community risk factors, including lack of education, exposure to violence, and the general unhealthiness of the community where [Cummings] lived." 40 RR 42, 63, 71. At the punishment phase, each individual juror determines for herself whether the capital

defendant deserves death. Nguyen's testimony would have contextualized the "who, what, where, and why" surrounding Mr. Cumming's offense and why he was deserving of a life sentence.

Nguyen would have testified that Cummings' community reflected significantly higher rates of single-mother households, poverty, adults lacking a ninth grade education, and crime than those of the county as a whole. 40 RR 72-76. A reasonable juror could have deduced that Cummings was less culpable due to the impact those adverse conditions had on him as he grew up. Nguyen would have provided an analytic framework for that juror to vote for Cummings on the third special issue.

### REQUEST FOR RELIEF

Wherefore, based on the foregoing, Mr. Cummings respectfully requests that the Court:

(1) Issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint on the bases set forth in this Petition;

(2) Allow Mr. Cummings to amend further his Petition after discovery and the investigation based thereon, and in the event of any other changes in the law or facts relevant to his case;

(3) Allow Mr. Cummings to respond to any procedural or affirmative defenses, including assertions of procedural default, and to any other arguments that the Respondent might raise in this action;

(4) Allow Mr. Cummings to submit further briefing and oral argument related to the precedential and statutory law relevant to his case in light of the record and the allegations raised by his Petition;

(5) Entertain a motion to stay these proceedings and hold them in abeyance pending exhaustion of additional state-court remedies;

(6) Entertain a motion for discovery, pursuant to Rule 6, Rules Governing § 2254 Cases in the United States District Courts;

(7) Entertain a motion to expand the record pursuant to Rule 7, Rules Governing § 2254 Cases in the United States District Courts;

(8) Entertain a motion for evidentiary hearing pursuant to Rule 8, Rules Governing § 2254 Cases in the United States District Courts, and conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in his Petition;

(9) Grant such other relief as may be necessary and appropriate.

DATED:  March 26, 2019

Respectfully submitted,

MAUREEN FRANCO
FEDERAL PUBLIC DEFENDER

 /s/ Tivon Schardl

TIVON SCHARDL
Capital Habeas Unit Chief
Fla. Bar No. 73016
Timothy Gumkowski
Assistant Federal Defender
Texas Bar No. 24104788
Federal Defender Office
919 Congress, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org

*/s/ Lee Kovarsky*

LEE KOVARSKY
Phillips Black Project
Texas Bar No. 24053310
500 West Baltimore Street, Room 436
Baltimore, Maryland 21201-1786
434-466-8257 (tel.)
713-222-0260 (fax)
l.kovarsky@phillipsblack.org


Attorneys for Petitioner


## VERIFICATION OF PETITION

I, the undersigned, am the attorney appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Rickey Donnell Cummings in these proceedings. Pursuant to that appointment, I have met with Mr. Cummings, consulted with his co-counsel, Lee Kovarsky, and retained and directed experts and investigators to inquire into the circumstances surrounding judgements of conviction and death imposed on Mr. Cummings by the State of Texas. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on March 26, 2019.

Subscribed by me this 26th day of March 2019 in Austin, Texas.

*/s/ Tivon Schardl*

Tivon Schardl

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of March, 2019, I electronically filed the foregoing

Petition with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

Stephen M. Hoffman
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711

*/s/ Tivon Schardl*

Tivon Schardl
