UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | | |
|---|---|---|
| RICKEY DONNELL CUMMINGS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 6:18-cv-00125-ADA |
| | § | |
| LORIE DAVIS, Director, Texas Department | § | |
| of Criminal Justice, Correctional Institutions | § | CASE INVOLVING THE DEATH |
| Division, | § | PENALTY |
| | § | |
| Respondent. | § | |

**PETITIONER'S REPLY TO RESPONDENT'S
ANSWER AND BREIF IN SUPPORT**

MAUREEN FRANCO
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF TEXAS

TIVON SCHARDL
CAPITAL HABEAS UNIT CHIEF
Florida Bar No. 73016
TIMOTHY GUMKOWSKI
ASSISTANT FEDERAL DEFENDER
Texas Bar No. 24104788
919 Congress Avenue, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org
Tim_gumkowski@fd.org


*Counsel for Petitioner*

LEE B. KOVARSKY
PRINCIPAL
Phillips Black
A Non-Profit Law Practice
Texas Bar No. 24053310
500 West Baltimore, Room 436
Baltimore, Maryland 21201
434-466-8257 (tel.)
l.kovarsky@phillipsblack.org

# TABLE OF CONTENTS

I.   RESPONSES TO PROCEDURAL DEFAULT ARGUMENTS ARE NOT FORFEITED SIMPLY BECAUSE THEY WERE NOT ANTICIPATORILY "BRIEFED" IN THE PETITION. ........................................................... 1

II.  CUMMINGS IS ENTITLED TO RELIEF ON HIS CLAIMS. ............................... 6

A.  Cummings is entitled to relief because the State unconstitutionally abused the grand jury. ........................................................................... 6

  1.  The unlawful grand jury proceedings violated the Constitution. ............................ 6

  2.  The claim is unexhausted, but the lack of exhaustion does not mean that procedural default precludes merits review of the claim. ..................................... 10

  3.  The *Teague* bar does not preclude relief. ............................ 14

  4.  The State's misconduct requires a new trial. ........................................ 16

B.  Cummings is entitled to relief pursuant to *Napue v. Illinois*, as the State culpably elicited or failed to correct false trial testimony concerning critical text messages. ........................................... 16

  1.  Cummings satisfies the requirement of *Napue*. ..................................... 16

  2.  Cummings' *Napue* claim remains viable in state court, and procedurally default does not preclude merits consideration. ..................................... 20

C.  Cummings is entitled to relief under the Fourteenth Amendment because prosecutors committed misconduct in misattributing text messages to him. ............ 22

  1.  The prosecutors' actions constituted "serious prosecutorial misconduct" and rendered Cummings' trial fundamentally unfair. ........................................... 22

  2.  Cummings' prosecutorial misconduct claim remains viable in state court, and any procedural default should be excused. ..................................... 24

D.  Cummings is entitled to relief on his *Brady* claim. ..................................... 25

  1.  Micha'el Atkins ..................................... 25

  2.  Nickoll Henry ..................................... 28

  3.  "Take dem bullets" text ..................................... 31

  4.  Steve January's relationship with Hubert's aunt ..................................... 32

  5.  Cumulative effect of all undisclosed evidence ..................................... 33

  6.  Cummings' *Brady* claim remains viable in state court, and any procedural default should be excused. ..................................... 34

E.  Cummings is entitled to relief because trial counsel deficiently and prejudicially failed to seek suppression of inculpatory evidence. ..................................... 35

  1.  Merits-Deficient Performance ..................................... 35

i

2. Merits—Prejudice ........................................................................... 40

3. Any default is excused under *Martinez v. Ryan*. .................................... 41

F. Cummings is entitled to relief because trial counsel deficiently and
prejudicially failed to investigate and develop a defense based on alternate
suspects. ........................................................................................ 46

   1. The absence of trial-counsel affidavits admitting fault does not preclude a
deficiency finding. ......................................................................... 47

   2. The admissibility of the information available to trial counsel has no
bearing on the merit of the IATC-AC claim asserted here. ...................... 48

   3. The fact that trial counsel introduced the ballistics report for another
purpose does not preclude a deficiency finding. .................................... 49

   4. The failure to investigate the alternative suspects was prejudicial. ........... 49

   5. Any procedural default of the claim would be excused. .......................... 50

G. Cummings is entitled to relief because trial counsel deficiently and
prejudicially failed to prepare to contest Cummings' gang membership. ................. 51

   1. Trial counsel was constitutionally ineffective. ..................................... 52

   2. 28 U.S.C. § 2254(d) does not restrict relief because Claim 7 was not
adjudicated on the merits in state court. .............................................. 53

   3. The object of decisional inquiry is the TCCA decision, not the vacated state
findings, and the vacated findings receive no deference. .......................... 56

   4. Cummings showed the exception specified in § 2254(d)(2) applies, and the
Director waived any response. .......................................................... 58

   5. Cummings showed the § 2254(d)(1) exception applies. .......................... 58

   6. Any procedural default is excused under *Martinez*. .............................. 59

H. Cummings is entitled to relief because the defense team was subject to a
conflict of interest. ........................................................................... 60

   1. Conflicted agents on the defense team resulted in the denial of Cummings'
Sixth Amendment right to effective assistance of counsel. ....................... 60

   2. If Claim 8 is procedurally defaulted, then any default is excused. .............. 64

   3. Relief is not *Teague*-barred. ............................................................ 65

I. Cummings is entitled to relief because trial counsel deficiently and
prejudicially litigated *Batson*. .............................................................. 66

   1. There was a *Batson* violation with respect to Cobb. ............................. 66

   2. There was a *Batson* violation with respect to Thomas. .......................... 69

   3. If Claim 9 is defaulted, any default is excused. .................................... 71

J.   Cummings is entitled to relief because the state violated *Eddings* when it excluded mitigating evidence at the punishment phase. .......................................... 72

1.   There was an *Eddings* violation. .......................................................... 72

2.   Review of the *Eddings* claim is unrestricted by 28 U.S.C. § 2254(d). .................. 73

3.   This Court can decide the claim because the procedural ground imposed by the Texas court was inadequate....................................................................... 75

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abdul Kabir v. Quarterman,*
  550 U.S. 233 (2007) ............................................................................................ 72
*Alcorta v. Texas,*
  355 U.S. 28 (1957) ............................................................................................ 17
*Alvarez v. Davis,*
  2017 WL 4844570 (S.D. Tex. Oct. 25, 2017) .......................................................... 13
*Anderson v. Johnson,*
  338 F.3d 382 (5th Cir. 2003) .......................................................................... 53, 54
*Banks v. Dretke,*
  540 U.S. 668 (2004) ...................................................................................... 13, 14
*Barclay v. Florida,*
  464 U.S. 939 (1983) ............................................................................................ 8
*Barnett v. Hargett,*
  174 F.3d 1128 (10th Cir. 1999) ............................................................................ 11
*Barrios v. Quarterman,*
  2007 WL 295634 (S.D. Tex. Jan. 26, 2007) ............................................................ 6
*Batson v. Kentucky,*
  476 U.S. 79 (1986) ............................................................................................ 66
*Blue v. State,*
  125 S.W.3d 491 (Tex. Crim. App. 2003) ................................................................ 45
*Bounds v. Smith,*
  430 U.S. 817 (1977) ............................................................................................ 4
*Bracy v. Gramley,*
  520 U.S. 899 (1997) ....................................................................................... 2, 48
*Brewer v. Quarterman,*
  550 U.S. 286 (2007) .......................................................................................... 72
*Brisco v. Quarterman,*
  2007 WL 1237951 (N.D. Tex. Apr. 26, 2007) .......................................................... 6
*Brown v. Estelle,*
  701 F.2d 494 (5th Cir. 1983) .............................................................................. 54
*Brown v. Johnson,*
  224 F.3d 461 (5th Cir. 2000) ................................................................................ 1
*Bruton v. State,*
  875 So. 2d 1255 (Fla. Dist. Ct. App. 2004) ............................................................ 38
*Burden v. Zant,*
  498 U.S. 433 (1991) ............................................................................................ 9
*Burdine v. Johnson,*
  262 F.3d 342 (5th Cir. 2001) (en banc) ...................................................... 14, 15, 65
*Butler v. Stephens,*
  2014 WL 2575743 (N.D. Tex. Jun. 9, 2014) ............................................................ 6
*Caldwell v. Mississippi,*
  472 U.S. 320 (1985) .......................................................................................... 10
*Caspari v. Bohlen,*

510 U.S. 383 (1994) ...................................................................................................... 65

*Cassette v. Stewart,*
406 F.3d 614 (9th Cir. 2005) ........................................................................................ 12

*Castille v. Peoples,*
489 U.S. 346 (1989) ...................................................................................................... 11

*Chiasson v. Zapata Gulf Marine Corp.,*
988 F.2d 513 (5th Cir. 1993) ...................................................................................... 26

*Chamberlain v. State,*
998 S.W.2d 230 (Tex. Crim. App. 1999) .................................................................... 45

*Clark v. Johnson,*
227 F.3d 273 (5th Cir. 2000) ...................................................................................... 18

*Clark v. Thaler,*
673 F.3d 410 (5th Cir. 2012) ...................................................................................... 54

*Coble v. Quarterman,*
496 F.3d 430 (5th Cir. 2007) ...................................................................................... 23

*Coble v. State,*
330 S.W.3d 253 (Tex. Crim. App. 2009) .............................................................. 45, 76

*Coleman v. Thompson,*
501 U.S. 722 (1991) .......................................................................................... 14, 21, 24

*Cone v. Bell,*
556 U.S. 449 (2009) ...................................................................................................... 75

*Cuyler v. Sullivan,*
446 U.S. 335 (1980) .......................................................................................... 61, 62, 65

*Darden v. Wainwright,*
477 U.S. 168 (1986) ........................................................................................................ 8

*Day v. Quarterman,*
566 F.3d 527 (5th Cir. 2009) .................................................................................. 48, 50

*Donnelly v. DeChiristoforo,*
416 U.S. 637 (1974) ........................................................................................................ 9

*Druery v. State,*
225 S.W.3d 491 (Tex. Crim. App. 2007) .................................................................... 45

*Duvall v. Dallas County,*
2008 WL 4561563 (N.D. Tex. Oct. 10, 2008) .............................................................. 6

*Earhart v. State,*
877 S.W.2d 759 (Tex. Crim. App. 1994) .................................................................... 45

*East v. Scott,*
55 F.3d 996 (5th Cir. 1995) .......................................................................................... 1

*Eddings v. Oklahoma,*
455 U.S. 104 (1982) ...................................................................................................... 72

*Emory v. Johnson,*
139 F.3d 191 (5th Cir. 1997) ........................................................................................ 3

*Escamilla v. Stephens,*
749 F.3d 380 (5th Cir. 2014) .................................................................................. 53, 54

*Ex parte Cummings,*
2018 WL 1516614 (Tex. Crim. App. Mar. 28, 2018) .................................... 17, 44, 63

*Ex parte Granados,*
No. WR-51,135-01, 2007 WL 9683726 (Tex. Crim. App. Jan.10, 2007) .................. 44

*Ex parte Reed,*
  271 S.W.3d 698 (Tex. Crim. App. 2008)................................................................57
*Felde v. Blackburn,*
  795 F.2d 400 (5th Cir. 1986) ................................................................................23
*Fisher v. Texas,*
  169 F.3d 295 (5th Cir. 1999) ................................................................................3
*Ford v. Wainwright,*
  477 U.S. 399 (1986) ..............................................................................................1
*Graham v. Johnson,*
  94 F.3d 958 (5th Cir. 1996) ..................................................................................54
*Gray v. Netherland,*
  518 U.S. 152 (1996) ..........................................................................................3, 10
*Green v. Johnson,*
  116 F.3d 1115 (5th Cir. 1997) ..............................................................................38
*Guy v. Cockrell,*
  343 F.3d 348 (5th Cir. 2003) ..........................................................................61, 63
*Harrington v. Richter,*
  562 U.S. 86 (2011).................................................................................................57
*Hernandez v. Johnson,*
  108 F.3d 554 (5th Cir. 1997) ................................................................................62
*Horn v. Banks,*
  536 U.S. 266 (2002) ..............................................................................................15
*James v. Kentucky,*
  466 U.S. 341 (1984)..........................................................................................75, 76
*Jefferson v. Christus St. Joseph Hosp.,*
  374 F. App'x 485 (5th Cir. 2000)........................................................................6
*Jenkins v. Anderson,*
  447 U.S. 231 (1980)...............................................................................................26
*Johnson v. Puckett,*
  929 F.2d 1067 (5th Cir. 1991) ..............................................................................4
*Johnson v. State,*
  68 S.W.3d 644 (Tex. Crim. App. 2002)................................................................45
*Johnson v. Texas,*
  509 U.S. 350 (1993) ..............................................................................................72
*Johnson v. Williams,*
  568 U.S. 289 (2013) ..............................................................................................73
*Johnson v. Zerbst,*
  304 U.S. 458 (1938) ..............................................................................................2
*Jones v. Jerrison,*
  20 F.3d 849 (8th Cir. 1994) ..................................................................................4
*Kimmelman v. Morrison,*
  477 U.S. 365 (1986) ................................................................................38, 48, 49, 66
*Kyles v. Whitley,*
  514 U.S. 419 (1995) .......................................................................................passim
*Lambrix v. Singletary,*
  520 U.S. 518 (1997) ..............................................................................................12
*Lee v. Kemna,*

534 U.S. 362 (2002) .......................................................................................... 75

*Lewis v. Thaler,*
   701 F.3d 783 (5th Cir. 2012) .................................................................... 53, 54

*Lonchar v. Thomas,*
   517 U.S. 314 (1996) .................................................................................... 4, 5

*Love v. Johnson,*
   57 F.3d 1305 (4th Cir. 1995) ........................................................................ 15

*Love v. State,*
   543 S.W.3d 835 (Tex. Crim. App. 2016) ................................... 20, 35, 38, 43

*Martinez v. Ryan,*
   566 U.S. 1 (2012) ........................................................................... 41, 46, 59

*Martinez v. State,*
   924 S.W.2d 693 (Tex. Crim. App. 1996) ..................................................... 45

*Matthews v. United States,*
   682 F.3d 180 (2d Cir. 2012) ........................................................................ 63

*Mayle v. Felix,*
   545 U.S. 644 (2005) .................................................................................. 1, 4

*McFarland v. Scott,*
   512 U.S. 849 (1994) ...................................................................................... 1

*McFarland v. State,*
   928 S.W.2d 482 (Tex. Crim. App. 1996) ..................................................... 45

*McKoy v. North Carolina,*
   494 U.S. 433 (1990) .................................................................................... 72

*Miller v. Johnson,*
   200 F.3d 274 (5th Cir. 2000) ...................................................................... 29

*Miller-El v. Cockrell,*
   537 U.S. 322 (2003) .................................................................................... 67

*Miller-El v. Dretke,*
   545 U.S. 231 (2005) .............................................................................. 67, 68

*Moore v. Quarterman,*
   526 F. Supp. 2d 654 (W.D. Tex. 2007) ...................................................... 23

*Murphy v. Davis,*
   901 F.3d 578 (5th Cir. 2018) .................................................................. 23, 57

*Murthy v. Abbot Labs.,*
   847 F. Supp. 2d 958 (S.D. Tex. 2012) .......................................................... 6

*Napue v. Illinois,*
   360 U.S. 264 (1959) ................................................................. 16, 17, 18, 19

*Neal v. Puckett,*
   286 F.3d 230 (5th Cir. 2002) (en banc) ...................................................... 58

*Nelson v. Estelle,*
   642 F.2d 903 (5th Cir. 1981) ...................................................................... 36

*Norman v. Stephens,*
   817 F.3d 226 (5th Cir. 2016) .................................................................. 41, 46

*Ortega v. McCotter,*
   808 F.2d 406 (5th Cir. 1987) ........................................................................ 9

*People v. Turner,*
   840 N.E.2d 123 (N.Y. 2005) ....................................................................... 38

*Perillo v. Johnson,*
  205 F.3d 775 (5th Cir. 2000) ................................................................. 62
*Pike v. Guarino,*
  492 F.3d 61 (1st Cir. 2007) ................................................................. 11
*Resendiz v. State,*
  112 S.W.3d 541 (Tex. Crim. App. 2003)................................................. 45
*Rhines v. Weber,*
  544 U.S. 269 (2005) ........................................................................... 24
*Rochin v. California,*
  342 U.S. 165 (1952) ............................................................................. 8
*Saffle v. Parks,*
  494 U.S. 484 (1990) ...................................................................... 15, 65
*Sandgathe v. Maas,*
  314 F.3d 371 (9th Cir. 2002) ............................................................... 11
*Santellan v. Cockrell,*
  271 F.3d 190 (5th Cir. 2001) ............................................................... 58
*Sawyer v. Butler,*
  881 F.2d 1273 (5th Cir. 1989) (*en banc*), *aff'd*, 497 U.S. 227 (1990) ......................... 15
*Schriro v. Landrigan,*
  550 U.S. 465 (2007) ............................................................................. 2
*Sells v. Stephens,*
  536 F. App'x 483 (5th Cir. 2013)........................................................... 54
*Smith v. Quarterman,*
  515 F.3d 392 (5th Cir. 2008) ............................................................... 54
*Smith v. Robbins,*
  528 U.S. 259 (2000) ........................................................................... 42
*Snowden v. State,*
  353 S.W.3d 815(Tex. Crim. App. 2011)................................................. 20
*Strickland v. Washington,*
  466 U.S. 668 (1984) ................................................................... passim
*Strickler v. Greene,*
  527 U.S. 263 (1999) ............................................................... 14, 29, 35
*Summers v. Dretke,*
  431 F.3d 861 (5th Cir. 2005) ................................................................. 9
*Teague v. Lane,*
  489 U.S. 288 (1989) ........................................................................... 15
*Toulson v. Breyer,*
  987 F.2d 984 (3rd Cir. 1993) ............................................................... 11
*Trest v. Cain,*
  522 U.S. 87 (1997) ............................................................................... 3
*Trevino v. Thaler,*
  569 U.S. 413 (2013) ........................................................................... 41
*United States v. Agurs,*
  427 U.S. 97 (1976) ....................................................................... 18, 19
*United States v. Carthorne,*
  878 F.3d 458 (4th Cir. 2017) ............................................................... 38
*United States v. Cervantes,*

132 F.3d 1106 (5th Cir. 1998) ....................................................................................... 6

*United States v. Conley,*
349 F.3d 837 (5th Cir. 2003) ........................................................................................ 37

*United States v. Dvorin,*
817 F.3d 438 (5th Cir. 2016) ........................................................................................ 16

*United States v. Fields,*
565 F.3d 290 (5th Cir. 2009) ........................................................................................ 37

*United States v. Garza,*
429 F.3d 165 (5th Cir. 2005) ........................................................................................ 62

*United States v. Johnson,*
127 F.3d 380 (5th Cir. 1997) ........................................................................................ 23

*United States v. Mendoza,*
522 F.3d 482 (5th Cir. 2008) ........................................................................................ 18

*United States v. O'Keefe,*
169 F.3d 281 (5th Cir. 1999) ........................................................................................ 18

*United States v. Olano,*
507 U.S. 725 (1993) ........................................................................................................ 2

*United States v. Stock,*
948 F.2d 1299 (D.C. Cir. 1991) .................................................................................... 26

*United States v. Viera,*
819 F.2d 498 (5th Cir. 1987) .................................................................................... 8, 10

*United States v. Williamson,*
183 F.3d 458 (5th Cir. 1999) ........................................................................................ 42

*Valdez v. Cockrell,*
274 F.3d 941 (5th Cir. 2001) ........................................................................................ 57

*Vaughn v. Stephens,*
2015 WL 3504941 (N.D. Tex. Jun. 3, 2015) ................................................................. 6

*Walker v. Johnston,*
312 U.S. 275 (1941) ........................................................................................................ 4

*Ward v. Stephens,*
777 F.3d 250 (5th Cir. 2015) .................................................................................. 53, 54

*Wardlow v. Davis,*
750 F. App'x 374 (5th Cir. 2018) (same) .................................................................... 57

*Wearry v. Cain,*
136 S. Ct. 1002 (2016) .................................................................................................. 18

*Webb v. Texas,*
409 U.S. 95 (1972) ..................................................................................................... 7, 10

*Wetzel v. Lambert,*
565 U.S. 520 (2012) ...................................................................................................... 59

*Whitten v. Cockrell,*
2003 WL 21509163 (N.D. Tex. Apr. 11, 2003) ............................................................ 6

*Wiggins v. Smith,*
539 U.S. 510 (2003) ................................................................................................ 47, 55

*Williams v. Runnels,*
640 F. Supp. 2d 1203 (C.D. Cal. 2009) ...................................................................... 15

*Williams v. Taylor,*
529 U.S. 362 (2000) ................................................................................................ 55, 66

*Wilson v. Sellers,*
 138 S. Ct. 1188 (2018) ...................................................................................58, 59
*Wright v. State,*
 28 S.W.3d 526 (Tex. Crim. App. 2000)..........................................................45
*Yakus v. United States,*
 321 U.S. 414 (1944) .............................................................................................3
*Young v. Dretke,*
 356 F.3d 616 (5th Cir. 2004) ............................................................................9

## Statutes

28 U.S.C. § 2242 ................................................................................................3, 4
28 U.S.C. § 2254(d) ........................................................................................passim
28 U.S.C. § 2254(e)(1) ..........................................................................9, 57, 63
Tex. Code Crim. Proc. art. 11.071, § 5(a)(1) .......................................12, 13, 21
Tex. Code Crim. Proc. art. 11.071, § 5(e) .......................................11, 12, 21, 24
Tex. Code. Crim. Proc. art. 38.23 ......................................................................39

## Rules

Fed. R. Civ. P. 11(b) ..............................................................................................2
Fed. R. Civ. P. 15 ...................................................................................................6
Rule 2 of Rules Governing § 2254 Cases in the United States District Courts .................1, 3, 4, 16
Rule 2(c) of the Ruels Governing § 2254 Cases in the United States District Courts .................3, 4
Rule 2(d) of the Rules Governing § 2254 Cases in the United States District Courts.....................4
Rule 5(b) of the Rules Governing § 2254 Cases in the United States District Courts.................3, 7
Rule 5(e) of the Rules Governing § 2254 Cases in the United States District Courts .................3, 4
Tex. R. Evid. 607 .................................................................................................26

## Treatises

2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 23.3[c][ii]
 (7th ed. 2017) .................................................................................................54

## Other Authorities

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty
 Cases, 31 Hofstra L. Rev. 913 (rev. ed. 2003) ............................................42

## I. RESPONSES TO PROCEDURAL DEFAULT ARGUMENTS ARE NOT FORFEITED SIMPLY BECAUSE THEY WERE NOT ANTICIPATORILY "BRIEFED" IN THE PETITION.

What appears in the following parts are claim-by-claim replies to the Director, but there is a global issue with respect to her Answer ("Ans."): it relies extensively on argumentation that is completely divorced from the procedural posture of the case, making extravagant claims that Cummings forfeited things for which he had no pleading burden. The salient question at this stage is simply whether Cummings' "factual *allegations* ... are facially sufficient to establish a *prima facie* ... claim." *East v. Scott*, 55 F.3d 996, 1001 (5th Cir. 1995) (emphasis added). *See also Brown v. Johnson*, 224 F.3d 461, 466 (5th Cir. 2000) (concluding petitioner's "*account*, if true, is sufficient to demonstrate that he was prejudiced by his attorney's deficient performance" and therefore his "*pleadings* make out a facially adequate claim of ineffective assistance of counsel") (emphasis added).

Examples of this problem are legion, and one of the most egregious is the Director's incessant requests that this Court reject allegations based on inventive adverse inferences without evidentiary support. *See, e.g.*, Ans. 43 ("the State must have been investigating other matters related to this offense"). Orderly process does not permit that this case be terminated at the pleading stage on such bases, because doing so would deny Cummings "the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected." *Ford v. Wainwright*, 477 U.S. 399, 414 (1986) (internal quotation marks omitted).

If the grounds for relief in the Petition are not frivolous,[1] and if fact development mechanisms are not foreclosed, then Cummings must be given then the opportunity to prove his case. "[W]here

---

[1] "Habeas corpus petitions must meet heightened pleading requirements," *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citing Rule 2 of Rules Governing § 2254 Cases in the United States District Courts ("Habeas Rules")), but "the purpose of the heightened pleading standard ... is to help a district court weed out frivolous petitions before calling upon the State to answer." *Mayle v. Felix*,

specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (internal quotations and alterations in original omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("federal court must consider whether … a hearing could enable an applicant to prove the petition's factual allegations, which, *if* true, would entitle the applicant to federal habeas relief") (emphasis added). Contrary to the Director's theory of pleading, a habeas petitioner meets the "good cause" standard for court-ordered discovery, which presumably is higher than the standard for merely pleading a facially sufficient claim, even if his claim is "quite speculative," "only a theory at this point," and premised on facts that "might be equally likely" to support an inference contrary to the one the petitioner advanced. *Bracy*, 520 U.S. at 905, 909.

In keeping with the failure to honor pleading burdens, the Answer repeatedly asserts that Cummings "waived for lack of adequate briefing" arguments related to procedural defenses asserted for the first time in the Answer. *See, e.g.*, Ans. 32-33, 50, 64 n.24. There are two problems with this position. First, a complaint cannot waive a response to a defense that the responding party has not yet asserted. Second, issues asserted in pleadings are not "waived" for lack of "adequate briefing."

First, the Director repeatedly states that, in failing to anticipatorily respond to her subsequent assertion of procedural defenses like exhaustion and procedural default, Cummings has "waived" a right to reply. *See, e.g.*, Ans. 50, 64 & n.24. "[W]aiver is the 'intentional relinquishment or abandonment of a *known right*.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) (emphasis added). The related concept of forfeiture is "the

---

545 U.S. 644, 669-670 (2005). The heightened pleading standard in habeas is not a license for the State to indulge in speculation without conducting an "inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b).

failure to make *timely* assertion of the right before a tribunal having jurisdiction to determine it." *Yakus v. United States*, 321 U.S. 414, 444 (1944) (emphasis added). The only known right at issue here is the right to *reply* to the Director's Answer. *See* Habeas Rule 5(e). That is the appropriate time to reply to a procedural defense. Hence, there has been no waiver and no forfeiture.

Habeas litigation does not change the way waiver and forfeiture work. The statute, rules, and case law require that a habeas corpus petition set out the basis for the court's jurisdiction by "alleg[ing] the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known." 28 U.S.C. § 2242. *See also* Habeas Rule 2(a). Second, the "petition must: (1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; (3) state the relief requested" and do so legibly and under penalty of perjury. Habeas Rule 2(c). Cummings did those things and more.

Whereas Habeas Rule 2(c), which governs petitions, says nothing about briefing procedural defenses, Habeas Rule 5(b) provides that the answer "must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations." The expressed requirement that the answer address procedural default was added in 2004 so that the rule "conforms to current case law and statutory provisions." Habeas Rule 5(b) advisory committee's notes to 2004 amendment. The change is consistent with the Supreme Court's observation that "procedural default is an affirmative defense for the [State]" such that the State is "obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter." *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996). *See also Trest v. Cain*, 522 U.S. 87, 89 (1997) (explaining procedural default as a Sate defense); *Fisher v. Texas*, 169 F.3d 295, 301 (5th Cir. 1999) ("A state waives a procedural bar defense by failing to raise the defense in the district court."); *Emory v. Johnson*, 139 F.3d 191, 195 n.4 (5th Cir. 1997) (holding that the State waives the defense by failing to assert it in district court).

Because she asserts that the complaint waived responses to a yet-to-be-asserted defense, the Director also ignores the longstanding rule that the "petition and traverse [reply] ... should be [treated] as together constituting the application for the writ." *Walker v. Johnston*, 312 U.S. 275, 284 (1941). The reply subsumes the traditional role of a traverse, Habeas Rule 5(e) and commentary on 2004 amendment, and completes the pleading stage of the proceedings. Because the reply completes the application, even if the law required that an application include responses to procedural defenses, Cummings could not have waived or forfeited his right to make those responses before now.

Habeas Rules 2 and 5 plainly contemplate that habeas claimants reply to procedural defenses after the State asserts them in a responsive pleading—in the same way that complainants respond to defenses after they are asserted in other types of cases. This Court should reject the Director's invitation to impose a heretofore undiscovered, ad hoc requirement that Cummings plead anticipatory responses to yet-to-be-asserted defenses. *Cf. Lonchar v. Thomas*, 517 U.S. 314, 324-328 (1996) (habeas court lacks cannot dismiss initial habeas petition for ad hoc equitable reasons distinct from habeas rules and statutes).

Second, the Director incorrectly asserts that many positions—including Cummings' ability to reply to procedural defenses—are waived for lack of "adequate briefing" in the Petition. The statute governing the content of a habeas application, however, does not require briefing on any point of law. 28 U.S.C. § 2242 (listing what application "shall" contain). Nor does the applicable rule. *See* Habeas Rule 2(c) (listing what "petition must" include and not mentioning legal argument); *Felix*, 545 U.S. at 649; *id.* at 655-56 (Habeas Rule 2 governs contents of petition). The Supreme Court has said a "habeas petition ... need only set forth facts giving rise to the cause of action." *Bounds v. Smith*, 430 U.S. 817, 824 (1977); *see also Johnson v. Puckett*, 929 F.2d 1067, 1070 (5th Cir. 1991) ("Traditionally, a petition need only 'allege the facts concerning the applicant's commitment or detention;' it need not plead the law.") (footnotes and citations omitted). Habeas Rule 2(d) requires

that a petition "must substantially follow either the form appended to the[] rules or a form prescribed a local *district-court* rule" (emphasis added). Both the standard form, and this Court's form, tell petitioner *not* to cite or argue law. The Director's "adequate briefing" position is a rule for appellate briefing, not habeas pleadings.

Applying an "adequate briefing" rule to this case would raise issues of due process, denial of access to the courts, and the use of ad hoc procedures contrary to *Lonchar*, 517 U.S. at 322. When Cummings requested leave to file a petition 160 pages long, this Court responded that "even minimally-competent federal habeas counsel should be able to set forth the factual and legal bases for federal habeas relief in the amount of space provided for by the Court's Order" limiting Cummings to 100 pages. Doc. 30, Order filed Mar. 26, 2019, at 1. Faced with that sharp rebuke of his counsel, Cummings filed a petition 135 pages long. Subsequently, this Court found the same request for 160 pages, when made by the Director, was reasonable "[g]iven the complexity of the issues raised in this death penalty proceeding." Doc. 41, Order filed Jul. 22, 2019.

The essence of due process is notice and an opportunity to be heard, both of which must be appropriately calibrated to the circumstances of the case. As regards notice, this Court's March 26, 2019, Order directed Cummings only "to set forth the factual and legal bases for federal habeas relief"; it did not provide notice that the Court expected him to anticipate procedural defenses and brief proleptic replies to them. As regards Cummings' opportunity to be heard, by questioning whether Cummings' counsel were "even minimally-competent" habeas lawyers if they needed anything more than 100 pages, the Court pitted counsel's interest in preserving their professional reputations against Cummings' interest in exceeding the scope of briefing called for in the Order and extant rules. The limited scope of the Court's order, and its chilling effect, gave Cummings only notice and an opportunity to be heard regarding the factual and legal bases he has for habeas relief.

5

The Director cites *nine* cases that she claims support her position. Ans. 64 n.24. None of them does. Five of the cited cases involve scenarios where the inmate tried to raise a new constitutional claim in the Reply. *See Vaughn v. Stephens*, 2015 WL 3504941 at *1 n.1 (N.D. Tex. Jun. 3, 2015); *Butler v. Stephens*, 2014 WL 2575743 at *5 n.3 (N.D. Tex. Jun. 9, 2014); *Barrios v. Quarterman*, 2007 WL 295634 at *5 (S.D. Tex. Jan. 26, 2007); *Brisco v. Quarterman*, 2007 WL 1237951 at *4 n.8 (N.D. Tex. Apr. 26, 2007); *Whitten v. Cockrell*, 2003 WL 21509163 at *2 n.4 (N.D. Tex. Apr. 11, 2003). The Director cites *United States v. Cervantes*, 132 F.3d 1106 (5th Cir. 1998), for the proposition that "a district court does not abuse its discretion in refusing to consider new issues raised in a § 2255 reply brief after the government filed its answer." Ans. 64 n.24. But *Cervantes* was not a holding about waiver, it was a holding about whether a habeas petitioner could use Fed. R. Civ. P. 15 to amend her petition and add omitted affidavits. 132 F.3d at 1111. None of the three remaining cases involve a habeas petitioner's attempt to reply to a defense that a respondent raised in an answer. *See Jefferson v. Christus St. Joseph Hosp.*, 374 F. App'x 485, 492 (5th Cir. 2000); *Murthy v. Abbot Labs.*, 847 F. Supp. 2d 958, 977 & n.9 (S.D. Tex. 2012); *Duvall v. Dallas County*, 2008 WL 4561563 (N.D. Tex. Oct. 10, 2008).

In short, the Answer is saturated with arguments that are premature because they fail to acknowledge the pleading posture of the case. In order to secure further process necessary to develop facts, Cummings was required to plead a prima facie case. He did that.

## II. CUMMINGS IS ENTITLED TO RELIEF ON HIS CLAIMS.

### A. CUMMINGS IS ENTITLED TO RELIEF BECAUSE THE STATE UNCONSTITUTIONALLY ABUSED THE GRAND JURY.

#### 1. The unlawful grand jury proceedings violated the Constitution.

After the grand jury indicted Cummings, the State broke Texas law by subpoenaing witnesses to appear before that same body for the purpose of preparing the State's case for trial. During the

illicit grand jury proceedings, the prosecutors (1) acted under color of state law, but without a lawful purpose, to compel innocent civilians to leave their homes or work to assist the prosecutors; (2) demonstrated their knowledge of false testimony that they would elicit at trial; (3) investigated the defense team's preparations and concealed that investigation by improperly invoking the State's grand-jury-secrecy law to silence witnesses to their misconduct; and (4) threatened and intimidated defense witnesses to prevent the defense from presenting a stronger case. The State's illegal conduct violated the Due Process Clause of the Fourteenth Amendment because it shocks the conscience, because it resulted in the loss of potentially useful evidence for the defense, and because it violated his Sixth Amendment right to counsel under *Webb v. Texas*, 409 U.S. 95, 98 (1972). Pet. 20-32.

The Director produces no evidence and cites nothing in the record that refutes Cummings' allegations. The Director does not deny that Texas law prohibits prosecutors from conducting post-indictment grand jury proceedings for the purpose of preparing their case for trial. Nor does she deny that prosecutors summoned witnesses to appear before the grand jury after Cummings was indicted, and then questioned them about the evidence that would be presented at trial. Nor does she deny that the prosecutor's questioning showed knowledge that he would elicit false testimony at trial. Nor does she deny that the prosecutor questioned witnesses about the pre-trial preparations of Cummings' defense team. Nor does she deny that the prosecutor threatened witnesses if they revealed that they had been summoned to the illegally instituted proceeding.

Rather than straightforwardly "address the allegations in the petition," Habeas Rule 5(b), the Answer obfuscates with non-sequiturs. First, the Director contends the prosecutors could not have illegally used the grand jury for a post-indictment purposes because "there is no federal constitutional right to a grand jury indictment in a state prosecution." Ans. 36, 42. (The claim in the Petition has nothing to do with whether there is a right to a grand jury in state criminal prosecutions.) Second, the Director contends that Cummings' evidence is deficient because the State has not "validate[d]

7

this assertion," and offers theories about what "may well have" happened, or "must have been" happening. (She offers no evidence that these things in fact did happen. Ans. 43.)

Moreover, the Director offers scattershot responses on what she calls the merits: that the claim is *Teague*-barred (Ans. 36-40); that there is no habeas relief for violations of state law (Ans. 41); that there was no misconduct (Ans. 41-46); that the conduct produced no Sixth Amendment right-to-counsel violations (Ans. 46-47); that the "defect" in the grand jury proceedings was harmless (Ans. 47-48). This Reply analyzes *Teague* as a procedural defect in Section II.A.3, *infra*, and addresses the rest of these arguments now.

The Director's attempt to argue Cummings' claim is not cognizable because it asserts "errors of state law," Ans. 41, is mere evasion. Cummings does not claim is entitled to habeas relief because the prosecutors violated Texas law. Cummings relies on state law to demonstrate the prosecutors' actions were improper, and to provide a partial explanation for the prosecutors' extra efforts to silence the illegally subpoenaed witnesses. He is entitled to habeas relief because those illegal acts produced Sixth and Fourteenth Amendment violations.[2] *See United States v. Viera*, 819 F.2d 498, 503 (5th Cir. 1987).

The Director claims she "[p]resumably" does not have to address Cummings' claim under *Rochin v. California*, 342 U.S. 165 (1952), because "[i]n habeas, the appropriate standard ... is 'the narrow one of due process, and not the broad exercise of supervisory power.'" Ans. 41 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Cummings does not rely on a supervisory rule, just a different due process rule than the one the Director prefers to address. Additionally, the Director omits text that contradicts its position. *Darden* and *Ortega v. McCotter*, 808 F.2d 406 (5th

---

[2] Errors of state law do not concern federal law "*unless* they rise for some other reason to the level of a denial of rights protected by the United States Constitution." *Barclay v. Florida*, 464 U.S. 939, 957-958 (1983) (emphasis added).

Cir. 1987), involved prosecutors' use of improper closing arguments. *See Darden*, 477 U.S. at 181 ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Donnelly v. DeChiristoforo*, 416 U.S. 637 (1974)). The Director excised the Supreme Court's qualification that "the appropriate standard of review *for such a claim* ... is 'the narrow one of due process ....'" *Ibid.* (emphasis added). The cases the Director cites simply do not hold that *DeChristoforo* applies here, when the claim at issue is not an improper prosecutorial argument.[3]

The Director also fails to refute Cummings' showing that the prosecutors committed misconduct. Her arguments regarding the legality of the subpoenas and the admonitions to the witnesses, Ans. 41; *id.* at 43-44, all turn on the speculative assertions that the prosecutors "*may have been* investigating other, uncharged, conduct of Cummings," or that they "*must have been* investigating other matters related to this offense." Ans. 43 (emphasis added). Cummings' quotations from the transcripts and the dates of the testimony more than counter the Director's speculation about what may have been happening.

Indeed, implicit in the state trial court's order giving Cummings access to the post-indictment grand jury transcripts is a finding that the proceedings were conducted for the unlawful purpose of preparing the prosecution's case for trial. That implicit finding is presumed correct. 28 U.S.C. § 2254(e)(1); *see Burden v. Zant*, 498 U.S. 433, 436 (1991) (*per curiam*) (applying presumption of correctness to finding adverse to State); *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005) (implicit findings presumed correct); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) (applying presumption of correctness to implicit state court determination adverse to State). Speculation about what may have been falls far short of the clear and convincing evidence § 2254(e)(1) requires.

---

[3] Cummings hereby preserves the argument that he meets the *DeChristoforo* standard, in any event.

If the prosecutors' unlawful use of grand jury subpoenas and secrecy laws was "improper and egregious" conduct "resulting in the loss of a witness," then "the facts of this case are on all fours with [*Webb*], in which the Supreme Court reversed a defendant's conviction without regard to prejudice." *Viera*, 819 F.2d at 503 (citing *Webb*, 409 U.S. at 98). The Director does not deny that the prosecutors' conduct resulted in the loss of evidence for the defense. Ans. 45-46. Rather, in another string of *non sequiturs*, the Director notes that Cummings had three lawyers and investigative and expert assistance, Ans. 46, that defense counsel are usually not allowed in the grand jury, *ibid.*, and that the prosecutors did not elicit "any information that was attorney-client privileged," *id.* at 47. Those contentions have no relevance under *Webb*.

### 2. The claim is unexhausted, but the lack of exhaustion does not mean that procedural default precludes merits review of the claim.

The Director argues that this Court cannot reach the merits of the claim because it is procedurally defaulted. Ans. 28-36. As with the rest of the claims that state post-conviction counsel did not present to Texas courts, Cummings concedes that this claim is unexhausted, but not that it is defaulted. Unless it is entirely clear that the state court would refuse to consider the claim under state procedural law, this Court should give the state court the opportunity to consider the claim by granting the *Rhines* stay that Cummings has requested.

Ordinarily, to preclude merits consideration, "the state court must *actually* have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) (emphasis added). That rule does not dictate the outcome here—the Texas Court of Criminal Appeals ("TCCA") has not applied a procedural bar. The Director, Ans. 30, relies upon a narrow exception to the plain-statement requirement in which a federal habeas court may find an unexhausted claim procedurally barred "'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" *Gray*, 518 U.S. at 161 (quoting with original

modifications *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Where the state court has not addressed the issue, and state law provides a possible remedy, the State "bears the burden not only of asserting that a default occurred, but also of persuading the court that the factual and legal prerequisites of a default ... are present." *Pike v. Guarino*, 492 F.3d 61, 73 (1st Cir. 2007) (internal quotation marks and citation omitted).

The Director fails to demonstrate entitlement to the exception to the plain-statement requirement because she fails to establish that it is entirely clear the state courts would not entertain the claim on the merits. *See Pike*, 492 F.3d at 74 (where there has been no state court ruling "procedural default defense depends on a *high degree of confidence* that the state court, if asked to adjudicate the claim, would declare it to be procedurally defaulted"); *Sandgathe v. Maas*, 314 F.3d 371, 376 (9th Cir. 2002) (holding that, in order to find a claim procedurally defaulted where there is no plain statement, the it must be "*clear* that the state court would hold the claim procedurally barred") (emphasis added and internal citations omitted); *Barnett v. Hargett*, 174 F.3d 1128, 1135 (10th Cir. 1999) (declining to apply bar where "it is *not at all clear* that Oklahoma would find ... claim barred") (emphasis added); *Toulson v. Breyer*, 987 F.2d 984, 987 (3rd Cir. 1993) ("Before exhaustion will be excused, state law must *clearly foreclose* state court review of unexhausted claims.") (emphasis added).

Indeed, the very arguments the Director makes in support of procedural default underscore the urgency of granting the *Rhines* stay and allowing Cummings to seek available state remedies. Even Director the Director's Answer reveals that the state-law question turns, at least in part, on the interpretation and application of Texas's "reasonable diligence" requirement, which is defined in article 11.071, § 5(e) of the Texas Code of Criminal Procedure. Ans. 34 (arguing what "[d]ue diligence suggests"). Where the application of a procedural bar turns on a fact-intensive inquiry, or other discretionary factors, federalism and comity—the doctrines giving rise to the doctrine in the

11

first place, *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)—counsel against a federal court substituting its judgment about matters of state law for the judgment of the state courts. *See Cassette v. Stewart*, 406 F.3d 614, 622-23 (9th Cir. 2005).

The Director's argument that the claim is barred by art. 11.071 § 5 flouts the statutory language in two respects. First, she argues that Cummings' claim would be rejected because the transcripts giving rise to it were available at the time of his state habeas application, as were procedures to obtain such transcripts. Ans. 31-34. This position skirts the statutory definition of "availability," which ends up sinking the argument. Ans. 32. As relevant here, the statute authorizes consideration of a claim that for which "the factual or legal basis ... was unavailable *on the date the applicant filed the previous application*," § 5(a)(1) (emphasis added), and then statutorily defines a factually unavailable claim as one for which "the factual basis was not ascertainable *through the exercise of reasonable diligence* on or before" the date of the initial timely application," § 5(e) (emphasis added). Federalism and comity would demand this Court give effect to the reasonable diligence requirement, which the Director ignores.

There is no credible argument that reasonable diligence required counsel to request the transcripts earlier, and the Director doesn't even try to make one. The declaration of Ashley Steele explains in detail that Cummings' counsel only learned of the illicit grand jury proceedings after the trial court ordered the State to provide Cummings access to its files. App. 421-22, ¶¶ 5-7. Prior to that court-ordered disclosure, the State had *misrepresented* that it had produced everything favorable to the defense. App. 421, ¶ 4. The Director contradicts herself to the extent she argues that reasonable diligence required appellate or state habeas counsel to request the transcripts earlier. Ans. 33-34. First, the Director concedes that the prosecutors relied upon Texas' grand-jury secrecy law to keep the defense from learning about the post-indictment proceedings, Ans. 44, and thus admits there was no reason for counsel to know about the transcripts. It is well-settled that defendants

12

and petitioners are entitled to presume that prosecutors will not break the law. *Banks v. Dretke*, 540 U.S. 668, 697-97 (2004). Second, in an argument that contradicts the Director's position here, during state post-conviction proceedings the State attempted to block Cummings from gaining access to the transcripts, claiming they were privileged. App. 422-23, ¶¶ 9-11.

Second, the Director asserts that § 5 would bar Cummings' claim because he could have filed a successive state application while his first application was pending. Ans. 35. There is no Texas supporting that assertion. Neither the plain language of Article 11.071, § 5(a)(1), nor any case applying it, precludes consideration of a claim that otherwise meets its requirements but that was not asserted in some subsequent application. She cites *Alvarez v. Davis*, No. 4:09-cv-3040, 2017 WL 4844570 at *38 (S.D. Tex. Oct. 25, 2017), as "noting that the state court likely barred [the] petitioner's subsequent application as an abuse of the writ 'because the operative facts underlying his successive claims were available to him during the course of his initial state habeas action.'" Ans. 35. A federal district court's speculation regarding what an unexplained state-court order "likely" meant falls far short of demonstrating there is a state rule that clearly bars Cummings' claim.[1] Relatedly, the Director contends it is significant that state habeas counsel contemplated filing a successive application. Ans. 35.

Even if this Court were to conclude the theoretical application of § 5 is independent and adequate—and that that the claim is therefore defaulted—Cummings is entitled to de novo review of the merits because he can show the cause and prejudice necessary to excuse it. Prior to trial, and in post-conviction proceedings, the prosecutor represented that he had complied with his affirmative

---

[1] The Director cites *Alvarez* because the district court there made the same elisions regarding Texas law that she makes here: it failed to evaluate the claim under Texas' reasonable diligence standard, and it failed to consider that the Texas courts deem new claims successive even when filed during initial habeas proceedings. By inviting this Court to commit the same errors, the Director asks this Court to violate the very principles of comity and federalism that gave rise to the adequate and independent state grounds doctrine.

constitutional duty to disclose favorable information to the defense. App. 421, ¶ 4. It is undisputed, however, that he did not disclose the grand jury transcripts prior to trial or in state habeas proceedings. A prosecutor's false assertions regarding compliance with disclosure requirements constitutes cause for an alleged failure to investigate. *See Banks*, 540 U.S. at 691-694.

In addition to demonstrating a structural error under the Sixth Amendment, the grand jury transcripts were material with respect to the underlying claim, and therefore establish prejudice with respect to default. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("cause and prejudice parallel two of the three components of the *Brady* violation itself"). The transcripts would have enabled Cummings to "attack[] the reliability of the investigation," *Kyles v. Whitley*, 514 U.S. 419, 446 (1995), by showing the prosecutors were so unsure of their case that they resorted to illegal means to prepare it. Such an "attack [on] the process by which the police gathered evidence and assembled the case," *id.* at 449 n.19, would have called into question the entire case. But, in particular, the defense would have been able to demonstrate to the jury that the prosecutor culpably elicited false testimony about the test messages.

Because he makes a sufficient showing of innocence, Cummings also satisfies the miscarriage-of-justice gateway, which excuses default without any need to show cause. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The evidence proffered with the Petition negates the State's case at trial.

### 3.  The *Teague* bar does not preclude relief.

The Director presents lengthy boilerplate arguments asserting that the grand-jury claim "is *Teague*-barred." Ans. 36-40. It is well-settled "that the application of established general procedural principles in an analogous context is not a new rule barred by *Teague*." *Burdine v. Johnson*, 262 F.3d 342, 344 (5th Cir. 2001) (*en banc*). Yet, the Director makes precisely that argument. Ans. 45

("*Any* such extension of *Youngblood* is *plainly Teague*-barred.") (emphasis added); *id.* at 46 ("such a rule appears to be *Teague*-barred").

As an initial matter, the Director has a pleading problem. This Court must consider the anti-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), *only if* it is "properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272 (2002). Courts have noted the great difficulty in determining whether a rule is "new." *See, e.g., Saffle v. Parks*, 494 U.S. 484, 488 (1990); *Sawyer v. Butler*, 881 F.2d 1273, 1279 (5th Cir. 1989) (*en banc*), *aff'd*, 497 U.S. 227 (1990); *Burdine*, 262 F.3d at 342. Because the Director fails to explain why relief would be predicated on a new rule, Ans. 38, this Court should refuse to consider the *Teague* bar on the ground that her "[nonretroactivity argument] borders on frivolous." *Love v. Johnson*, 57 F.3d 1305, 1315 (4th Cir. 1995); *see also Williams v. Runnels*, 640 F. Supp. 2d 1203, 1222 (C.D. Cal. 2009) (refusing to consider *Teague* because State had "not identified any Supreme Court holding that would constitute a 'new rule'"). Indeed, the Director's contention that Cummings' claim is *Teague* barred "regardless of the claim's constitutional underpinning," Ans. 40, reveals her *Teague* position to be defectively pled. *Rochin*, *Youngblood*, or *Webb*—the Supreme Court decisions upon which the grand jury claim is based—existed before Cummings' case became final.

In order to suggest that the *Teague* bar has anything to do with this case, the Director distorts the claim into something it isn't. First, she asserts that, in claiming an unconstitutional use of the grand jury, Cummings is urging a "federal constitutional right to a grand jury indictment in a state prosecution." Ans. 36. The Petition, however, involves no such claim. The claim against which the Director asserts *Teague* is not the claim alleged, so the defense fails. Second, the Director repeats this straw-man strategy when it conflates the claim alleged—which is that the *judgment* is constitutionally tainted by the effects of the grand jury abuse—with a claim that the *indictment* was constitutionally defective. Ans. 37-38. Cummings does not allege an infirmity in the indictment, or

15

misconduct in the process of securing it. All of the grand jury abuse took place *after* the indictment, and gave rise to the distinct constitutional violations described in the Petition.

The Director's decision to plead *Teague* in the vaguest terms and against straw-man claims denies Cummings notice of a *Teague* defense to the actual claim raised in the Petition. Cummings cannot answer an argument when he does not know what it is.

### 4. The State's misconduct requires a new trial.

The Director claims that Cummings has failed to show that the State's misconduct resulted in the loss of testimony favorable to the defense. Ans. 47. Cummings identified such testimony, and showed that it was suppressed by the prosecutors' illegal threats to witnesses; he has therefore satisfied Habeas Rule 2 by pleading a prima facie case. Pet. 22-28. Those facts, if proved, will entitle him to relief, and there has been no state merits adjudication. Therefore, Habeas Rule 6 entitles him to discovery and Habeas Rule 8 entitles him to an evidentiary hearing. As in *Viera* and *Webb*, *supra*, his conviction should be vacated without any greater showing of prejudice.

### B. CUMMINGS IS ENTITLED TO RELIEF PURSUANT TO *NAPUE V. ILLINOIS*, AS THE STATE CULPABLY ELICITED OR FAILED TO CORRECT FALSE TRIAL TESTIMONY CONCERNING CRITICAL TEXT MESSAGES.

#### 1. Cummings satisfies the requirement of *Napue*.

The State unconstitutionally elicited material testimony from Detective Owens that it knew or should have known to be false, and that testimony gave the "false impression" that Cummings participated in the inculpatory text exchange. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). A *Napue* claimant must show: (1) the falsity of testimony; (2) the State's culpable elicitation or failure to correct it; and (3) materiality. *See United States v. Dvorin*, 817 F.3d 438, 451-52 (5th Cir. 2016).

*Falsity.* The Director's primary argument on falsity is that the false testimony about Cummings' authorship was cured because other parts of the testimony refer to text messages sent to and from *Cummings' phone*, rather than to and from *Cummings himself.* Ans. 54-55; *see also* Ans.

16

55 (describing testimony as "for the most part" faithful to the distinction). This argument is meaningless lawyerly parsing. That the witness was referring to "texts sent to Cummings" and "texts sent to Cummings' phone" interchangeably aggravates, rather than diminishes, the falsity of the testimony. Falsity is not determined by reference to whether the State can reconstruct the transcript to plausibly defend an answer. It is determined by reference to whether it left jurors with a "false impression." *See Napue*, 360 U.S. at 269; *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)s.

The rest of the response on knowledge is misdirection and armchair epistemology designed to suggest, roughly, "but what if Cummings did write the inculpatory text messages?"[5] The Director comments that "without a videotape or an eyewitness .... it is impossible for anyone beside the text sender to definitively say who sent any given text message." Ans. 55. The test for falsity is not whether some observer could reasonably draw more than one conclusion from false testimony. The test is whether the evidence—including evidence not presented to the jury—shows that the testimony was false. Every piece of evidence available to both Parties in this case and in Albert Love's indicates that it was Love, and not Cummings, who sent the text messages. Pet. 34-37.

The closing argument bears on falsity and knowledge thereof. With respect to falsity, the Director emphasizes that the closing is not evidence and that the prosecutor is entitled to make reasonable deductions from evidence at that time. Ans. 55. Her response is a red herring, and the

---

[5] The Director argues that the state court rejected "the linguistics expert claim," attempting to suggest that the linguistic expert's analysis, which is consistent with all the other evidence that Cummings did not send the pertinent text messages, should be ignored. Ans. 58 (citing *Ex parte Cummings*, 2018 WL 1516614, at *1-3 (Tex. Crim. App. Mar. 28, 2018)). The "linguistics expert claim" referenced is the state post-conviction claim that trial counsel was ineffective for failing to present a forensic linguistics expert. Pet. 18-19. The TCCA expressly vacated the trial court findings on that ineffective assistance of trial counsel ("IATC") claim, and its order denying relief said nothing about the accuracy of the expert's exculpatory finding. It grouped that IATC claim with all of the others in the state post-conviction application, and simply said there was no deficiency and no prejudice. Pet. 20. There is no state finding on the linguistics expert that is "entitled to deference on federal habeas" litigation of a distinct *Napue* claim. Ans. 58.

authority the Director cites has no bearing on the argument here. The closing argument hammering away at the text exchange matters here *not because* it goes to the truth of some matter asserted, but because it goes to the way the jury experienced and interpreted the false testimony of Detective Owens.[6] *See Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (holding that closing argument is relevant insofar as it goes to experience of jurors).

*Culpable Elicitation (Knowledge).* Whether the State intended to elicit the false statement or merely failed to correct it is immaterial; the State meets *Napue's* knowledge criterion merely by allowing false evidence to go uncorrected. *See Napue*, 360 U.S. at 269. The use of false testimony can also be unconstitutional if it is merely the case that the prosecution "should have known" of its falsity. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. O'Keefe*, 169 F.3d 281, 292 (5th Cir. 1999). That the prosecution intended for the jury to understand that Cummings sent the inculpatory text messages is evident from the closing, when the State dropped any pretense of distinguishing between texts sent from Cummings and texts sent from his phone.[7]

The Director's primary response on the knowledge prong is to feign indignation about suborning perjury. Ans. 56-57. Cummings does not claim that Detective Owens perjured himself; the allegation is that the State knew or should have known that the testimony was false. The Director also attempts to cast these allegations as a dispute about what a jury might infer from evidence. *See*

---

[6] In *Clark v. Johnson*, 227 F.3d 273, 279 (5th Cir. 2000) (cited in Ans. 55), the Fifth Circuit held that closing argument in the trial of a co-defendant was not proof that information in it was suppressed as to the petitioner. In *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (cited in Ans. 55), the Fifth Circuit simply made the familiar observation that the prosecution is entitled to draw reasonable inferences from properly admitted evidence. In *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App. 1992) (cited in Ans. 55), the court made the same familiar observation. *Moody* and *Mendoza* are addressed to a *legal* question about whether the closing is itself a constitutional violation, not to the *factual* question of whether the jury understood Detective Owens to have testified that Cummings wrote the inculpatory text messages.

[7] As explained in footnote 6, *supra*, the closing is not asserted as the *legal* basis for the *Napue* violation; it is *factual* proof of what the jury understood, and what the State intended to elicit.

Ans. 56 ("The fact that the evidence cuts both ways does not mean that the prosecution suborned perjury, it simply means there was a factual question for the jury to resolve."). But the claim is not about what the jury was permitted to infer from the evidence presented at trial; it is about what the State knew or should have known when it presented that evidence. Given the testimony before the unlawfully convened grand jury, and the State's case in the Albert Love trial, it is beyond clear that the State knew that Cummings did not participate in the inculpatory text exchange. Pet. 34-37.

Secondarily, and assuming the falsity of the testimony, the Director argues that the prosecution did not culpably elicit the testimony because the State reasonably "deduc[ed] that texts sent from a certain person's phone were sent from that person[,]" and "[t]he fact that the evidence cuts both ways does not mean that the prosecution suborned perjury, it simply means there was a factual question for the jury to resolve." Ans. 55-56. Again, the State's culpability is not a question of what a trial observer would infer from the evidence presented at the trial itself, but whether the State knew or should have known that the testimony was false when the State presented it.

Finally, the Director offers the stray observation that "use of inconsistent theories in the separate trials of co-defendants is not a violation of the Due Process Clause." Ans. 57. Cummings, however, is not asserting that the inconsistency itself violates due process. Instead, the claim is that a false factual predicate of Cummings' conviction was culpably elicited by the State, and the inconsistent evidence in other cases demonstrates falsity. It is not the inconsistency of the two theories that represents the constitutional violation, but instead the fact that evidence for one of the theories demonstrates that the other is false, triggering *Napue*.

*Materiality.* The *Napue* materiality standard is whether, taking all false testimony together, "the false testimony could ... in any reasonable likelihood have affected the judgement of the jury." *Napue*, 360 U.S. at 271. This standard is strict because false testimony cases involve the "corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. The Director argues that,

19

even if Love sent the text messages, the culpably elicited falsity is harmless because of the "abundant other evidence" against Cummings. Ans. 58. The evidence to which the Director refers is unclear because—as the Petition recounts at length, the two other major evidence categories inculpating Cummings are themselves profoundly unsound: the Nickoll Henry testimony and the gangs evidence.

What distinguishes the materiality allegation here from the materiality allegation in other prosecutor misconduct claims is that the materiality of the text messages has been empirically verified. In Love's case, after concluding that the text messages were improperly admitted, the TCCA sent the case back for a new trial on the ground that the admission of the text messages had a sufficient effect on the outcome. *See Love v. State*, 543 S.W.3d 835, 858 (Tex. Crim. App. 2016).

Here, the State's closing is crucial. As the Petition explains, the strongest blow came during the closing argument when the prosecutor asked rhetorically, "Does an innocent man tell others to get rid of evidence after the fact? No. But we know he did." Pet. 35. In *Love*, the TCCA made the pertinent finding of constitutional harm after evaluating "the nature of the error, the extent to which it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error." 543 S.W.3d at 846 (citing *Snowden v. State*, 353 S.W.3d 815, 821–22 (Tex. Crim. App. 2011)) (emphasis added). The result should be the same here.

### 2. Cummings' *Napue* claim remains viable in state court, and procedurally default does not preclude merits consideration.

The parties agree that the *Napue* claim was not raised in state court and that it is therefore unexhausted. Ans. 50; Pet. 39. The Director argues that this Court should also anticipatorily declare the claim to be procedurally defaulted. Ans. at 50. This Court should reject the Director's argument on procedural default.

20

As an initial matter, there is a nontrivial argument that the TCCA would authorize subsequent litigation of the *Napue* claim. The operation of the pertinent state post-conviction statute is set forth in Section II.A.2, *supra*. Under Tex. Code Crim. Proc. art. §§ 5(a)(1) & 5(e), the *Napue* claim was "unavailable" to Cummings when he filed his initial application. And it was "unavailable" because the relevant grand jury transcripts were not discovered, and could not have been discovered with reasonable diligence, until after his initial application was filed. *See* Tex. Code. Crim. Proc. art. 11.071 § 5(e); *Rhines* Mot. 5-6. Two things follow from potential TCCA authorization under § 5(a)(1). First, the interests of comity, federalism, and judicial efficiency mean that this Court ought to grant the *Rhines* stay and permit Cummings to exhaust the claim. Second, this Court should not anticipatorily declare default because it cannot be absolutely certain that the TCCA would refuse to authorize litigation on a procedural ground. *See* Section II.A.2.

Even if Cummings' claim were defaulted, this Court could still reach the merits because he can establish "cause" for his default and "prejudice" as a result of the constitutional violation, and he can demonstrate that this Court's failure to review the claim will result in a fundamental miscarriage of justice. *See Coleman,* 501 U.S. at 750. Here, Cummings' *Napue* claim is founded on information contained in the transcripts of the illegal grand jury proceedings. The State's failure to disclose the existence of the illegal proceedings and to provide the transcripts of the proceedings to counsel prevented Cummings from raising the claim in state court, and therefore constitute cause. And, because the grand jury transcripts were material, Cummings satisfies the requisite prejudice showing. Therefore, for the same reasons set forth above regarding the grand jury abuse claim in Section II.A.2, and incorporated herein by reference, Cummings could demonstrate cause and prejudice to excuse any procedural default.

### C. CUMMINGS IS ENTITLED TO RELIEF UNDER THE FOURTEENTH AMENDMENT BECAUSE PROSECUTORS COMMITTED MISCONDUCT IN MISATTRIBUTING TEXT MESSAGES TO HIM.

#### 1. The prosecutors' actions constituted "serious prosecutorial misconduct" and rendered Cummings' trial fundamentally unfair.

Claim 3 requires a showing of sufficient impropriety and prejudice, Pet. 40, and there is a constitutional violation even if this Court were to determine that the words uttered by Detective Owens were not formally false. As set forth in Section II.B, *supra,* the prosecution posed questions to Detective Owens with the clear intention of making it appear as though Cummings authored the critical text messages—knowing Cummings had not. The State reinforced the assertion that Cummings sent the text messages by emphasizing the messages and their import during its closing argument to the jury. The prosecutor's use of the misattributed text messages is detailed in the Petition, Pet. 35-36, and that material is hereby incorporated by reference.

*Serious Prosecutorial Misconduct.* Consistent with her approach to other claims, the Director mischaracterizes the claim before responding to it. When the Petition stated that "[t]his claim differs from the *Napue* claim in that it does not require false testimony," the emphasis was on "testimony" and not on "false." In other words, the Director's arguments treat the claim as a constitutional challenge to *testimony that is true*, rather than to the *non-testimonial content that is false*.[8] The thrust of the Director's argument, therefore, is that if one supposes that Cummings wrote the text messages, then it is not misconduct for the prosecutor to ask questions and deliver arguments that attribute the messages to him. Ans. 60. Of course, if one supposes that the implication is true, there is no prosecutor misconduct; the whole point of the misconduct claim is that the implication is *not true*. The prosecution *knew* Albert Love sent the text messages at issue *at least four months*

---

[8] In other words, and as explained above, this claim complements the *Napue* claim, except the constitutional violation happened even if one is willing to treat Detective Owens as having stopped short of explicitly stating that Cummings sent the text messages.

*prior* to Cummings trial. Pet. 34-37. The Director's extended aside about the inapplicability of *Napue*, Ans. 60, and the lengthy string cite to Fifth Circuit authority, Ans. 61, is directed at an argument that Cummings does not make.

*Fundamental Fairness.* The Director argues that Cummings' non-authorship of the text messages "does not call into question the majority of the evidence against [him]." Ans. 62. But the State's case against Cummings was weak and circumstantial, and so the State leaned heavily on Cummings' putative participation in the pertinent text exchange. Because the State's other evidence was insubstantial and the prosecutor's misconduct was "persistent and pronounced," *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986), it resulted in fundamental unfairness. The other evidence the prosecution did marshal against Cummings was itself constitutionally unsound.

As set forth in the Petition, the effects of the multiple improprieties by the prosecutor should be cumulated in order to evaluate the fairness of the proceedings. Pet. 41. The Director tries to avoid this recognized Fifth Circuit cumulative-error rule by asserting that "all of Cummings's purported errors are meritless, procedurally defaulted, or both." Ans. 62. This broad conclusory statement is non-responsive to Cummings' argument that the effects of the misconduct should be cumulated "because all of the pertinent improprieties are deliberate misstatements of the same thing, and are therefore mutually reinforcing." Pet. 41 (citing *United States v. Johnson*, 127 F.3d 380, 402 (5th Cir. 1997)). Moreover, the Fifth Circuit cases that the Director offers in support of her position on cumulative error analysis hardly concern any issue currently before the Court on this claim.[9]

---

[9] In *Murphy v. Davis*, 901 F.3d 578, 598 (5th Cir. 2018), the Fifth Circuit could not consider *any* prejudice, as the court held that the petitioner's *Brady* claim was procedurally barred. The other cases cited by the Director are likewise unhelpful. *See Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (finding the petitioner did not present a federal claim); *Moore v. Quarterman*, 526 F. Supp. 2d 654, 711 (W.D. Tex. 2007) (petitioner procedurally defaulted his unexhausted "cumulative error" ineffective assistance of counsel claim). The Director's reliance on these cases is premature as this Court has yet to determine either the merits or procedural status of this claim.

### 2. Cummings' prosecutorial misconduct claim remains viable in state court, and any procedural default should be excused.

The parties agree that Cummings' prosecutorial misconduct claim was not previously raised in state court. Ans. 60; Pet. at 41. However, the Director finds the claim procedurally defaulted "for the same reasons as the previous *Napue* claim." Ans. 60. Since the filing of his initial federal petition, Cummings has asked this Court to stay and hold in abeyance his federal habeas proceedings under *Rhines v. Weber*, 544 U.S. 269 (2005), to permit him to present his unexhausted claims to the state courts. *See* Motion for Stay and Abeyance of Federal habeas Proceedings (Doc. 36) ("*Rhines* Mot."). As explained in Section II.A.2, *infra*, there remains a clear path to merits consideration of the claim in state court. *See* Tex. Code. Crim. Proc. art. 11.071 § 5. This claim was "unavailable" to Cummings, within the meaning of § 5, because the relevant grand jury transcripts were not discovered, and could not have been discovered with reasonable diligence, until after his initial application was filed. *See* Tex. Code. Crim. Proc. art. 11.071 § 5(e); *Rhines* Mot. 5-6. Accordingly, the Court should grant Cummings' motion for stay and abeyance to permit him to exhaust this claim in state court. However, if the Court were to determine that the claim is procedurally defaulted, any default would be excused.

Cummings would be excepted from the procedural default rule because he can establish "cause" for his default and "prejudice" as a result of the constitutional violation, and demonstrate that this Court's failure to review the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. Like the grand jury abuse claim and the *Napue* claim, this claim is also founded on the State's failure to provide counsel with information regarding the illegal grand jury proceedings or the transcripts from those proceedings.  The State's failure to disclose the existence of the illegal proceedings and to provide the transcripts to counsel prevented Cummings from raising the claim in state court. And, because the grand jury transcripts were material, Cummings satisfies

the requisite prejudice showing to excuse any default. Therefore, for the same reasons set forth above regarding the grand jury abuse claim in Section II.A.2, and incorporated herein by reference, Cummings has demonstrated cause and prejudice to excuse any procedural default.

### D.  CUMMINGS IS ENTITLED TO RELIEF ON HIS *BRADY* CLAIM.

The Director asserts that Cummings' *Brady* claim is meritless. She also argues that the claim is procedurally defaulted. Cummings has sought stay and abeyance from the Court so that he may return to state court to exhaust the claim. Nonetheless, Cummings' *Brady* claim has merit, is viable in state court, and any default should be excused.

#### 1.  Micha'el Atkins

The State withheld material evidence that would have been favorable to Cummings as impeachment of Micha'el Atkins, who testified that Cummings had announced, in a nearby living room, his intent to shoot somebody. Specifically, the State withheld Investigator Steve January's notes and logs, which revealed that January had interviewed Atkins multiple times prior to trial, and that what Atkins reported in those interviews was materially inconsistent with his subsequent trial testimony. The Director claims that Cummings' *Brady* claim as to Atkins fails because the information was not suppressed, favorable, or material, and that Cummings has failed to demonstrate that the information could not have been discovered using due diligence. Ans. 69.

*Suppression.* The Director has a cramped view of "suppression." According to her, the material at issue was not suppressed because it went to information that was "abundantly clear at trial." Ans. 69. Hardly. The testimony at trial was that, prior to testifying, Atkins had spoken to a detective once at his school about a month prior. 34 RR 95-86. There was no testimony that Atkins had spoken to any law enforcement or prosecutors before or after that one meeting. Significantly, his testimony did not reveal a third meeting, when January and prosecutor Greg Davis pulled Atkins out of school and took him to the District Attorney's Office. When Atkins was presented to District

Attorney Abel Reyna, Atkins was threatened with jail and pressured to the point of tears. Atkins' trial testimony did not mention repeated instances of threatening pressure.

*Favorable to the Defense.* The Director also suggests that Cummings "does not show that the information was favorable for the defense." Ans. 69. Specifically, Cummings should not have been "supris[ed]" that Atkins had spoken to the police or the prosecution, and that such conversations "do not appear to have much inculpatory or impeaching value." *Id.* The Director also contests the impeaching nature of the investigative notes. Ans. 69-70. The Director's argument has an implausibly thin view of what constitutes impeachment. Impeachment evidence is any evidence that is offered "to discredit a witness . . . to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] or [her] testimony." *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993) (alterations in original). *See also* Tex. R. Evid. 607 (anything that may "attack the witness's credibility" is impeachment evidence).

January's notes make no reference to what would become the headline of Atkins' testimony— that he heard Cummings say he was "going to shoot somebody" in the living room of his father's girlfriend, just prior to the gunfire. 34 RR 91. The Director erroneously suggests that the notes cannot be impeaching because their content does not *formally contradict* the testimony. Ans. 70. "Prior statements that omit details covered at trial are inconsistent if it would have been 'natural' for the witness to include them in the earlier statement." *United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991); *see also Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) ("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted."). The Director cannot seriously contend that Atkins' account would have been as persuasive to the jury if he were confronted with the fact that, when speaking with investigators, he omitted what was *by far* the most important element of his testimony.

*Materiality.* The Director also contends that the information was not material,[10] claiming, "Atkins's previous interviews with law enforcement and hesitancy to testify were clear in the record." Ans. 70. This is not accurate. The "record" did not show that law enforcement went to Atkins' school and repeatedly questioned him prior to trial, or that none of those interviews revealed a statement from Cummings about going to go shoot someone. The Director also misstates Cummings' argument. The Petition attaches and relies upon a written statement in which Atkins recants his trial testimony and details the threats and pressure inflicted upon him by the prosecution. App. 417-19. The Director appears to believe that Cummings' position is that the written statement from Atkins constitutes *Brady* material. Ans. 70. No such assertion has been made. Atkins' statement is not contemporaneous trial evidence that the State suppressed, but subsequent evidence of materiality. It corroborates the impeachment argument that could have been made at trial had the information in the logs been turned over: Atkins was not truthful on the stand.

According to the Director, the information in the investigative log—prior interviews, omission of the incriminating statement, etc.—"would have only seemed to offer, at best, a cumulative or marginal impact on the jury's credibility assessment." Ans. 70. This assessment of the evidence is not plausible. The State presented Atkins as a scared teenager terrified of implicating Cummings in the shooting. With no reason to question his testimony, or know that his fear was actually of the prosecutors—*not Cummings*, Atkins likely came off to the jury as a credible witness.[11] Presented with

---

[10] In determining whether evidence not disclosed by the State was "material," the effect of all suppressed evidence favorable to the defendant is considered cumulatively, rather than considering each item of evidence individually. *Kyles*, 514 U.S. at 436.

[11] The State likely opted to "use" Atkins, a timid teen-age boy, as the conduit for the alleged inculpatory statement rather than Atkins' father, "Bo," who was also present when the statement was allegedly made. Bo Atkins had a documented, inconsistent story that would have made him susceptible to impeachment. App. 63, 73.

the impeachment evidence, the perception of Atkins' testimony would have changed significantly: not believable and perhaps coerced and false.

The Director states, "the Atkins evidence was just one piece among many," and suggests that the materiality of Cummings' *Brady* claim should be analyzed as if Atkins "had not testified at all." Ans. 71. This argument misses for two reasons. First, "the Atkins evidence was just one piece [of *Brady* material] among many," and its materiality must be analyzed cumulatively with the others, not by itself. *See Kyles*, 514 U.S. at 436. Second, the just-pretend-it-didn't-happen argument ignores the far-reaching impact of an impeaching moment. The impeachment not only would have exposed the unreliability of Atkins trial testimony, but would have also reinforced the notion that the prosecution undertook a multi-front effort to threaten and pressure witnesses in a weak case.

*Due Diligence.* The Director claims that "this evidence was available through the exercise of due diligence," because it could have been "easily" discovered by the defense team "simply by interviewing Atkins prior to trial." Ans. 72. The Director provides no explanation or legal basis for this assertion. First, interviewing Atkins would not have uncovered January's investigation logs and notes, which contain the impeachment material. Second, the Director has offered no reason to believe that Atkins would have cooperated with defense counsel prior to trial. Finally, the State has an affirmative duty to provide *Brady* material. *Kyles*, 514 U.S. at 432.

## 2.  Nickoll Henry

Within January's undisclosed investigative logs was evidence concerning Nickoll Henry, an integral State witness. First, the undisclosed evidence showed that, on the day of the shooting, Henry had spent the day with her close friend Mansuela Garcia, who was on the hallucinogenic drug PCP. The withheld evidence also showed that Henry called Garcia the day after the shooting and described it in considerable detail, but failed to mention that she had come face to face with one of the shooters in her entryway. App. 64. *See also*, Pet. 51-52. The State also withheld evidence

regarding Henry beyond January's logs, including the fact that, prior to and throughout Cummings' trial, January provided Henry and her family material benefits, including cigarettes and food.[12]

*Suppression.* The Director claims that Cummings fails to show suppression because he has not provided statements from the defense team stating that the evidence was unknown to them. Ans. 76. Tellingly, the Director never suggests that the information *was* provided to defense counsel by the State. Rather, she posits, without a proffer or explanation, the "possibil[ity] that [trial] counsel was aware of the Henry information through other reports or sources." Ans. 76. Nonetheless, it is the State's affirmative duty to disclose the information. *See Kyles,* 514 U.S. at 432. Without legal support, the Director also claims that it is "an easy task for a petitioner to make a prima facie case that evidence was not disclosed by the State—all a petitioner has to do is submit affidavits from his trial counsel (preferably all attorneys)." Ans. 77.[13] While this approach might be convenient, there is no authority suggesting that counsel affidavits are *required* in order to sufficiently plead the claim.

*Favorable to the Defense.* The Director also wrongly contends that the Garcia information is not favorable. Ans. 77-79. First, this information would have opened an entirely new area of investigation that was otherwise unavailable. January's logs demonstrate *some* of the favorable evidence that investigation would have uncovered, but it is likely more existed. Evidence is favorable to the defense for *Brady* purposes if it is exculpatory or impeaching. *Strickler,* 527 U.S. at 281-82. Evidence that, on the day of the shooting, Nickoll Henry had spent the day with her close friend

---

[12] January confirmed the substance of these claims during the state post-conviction hearing. 3 WRR 32-36.

[13] Citing *Miller v. Johnson,* 200 F.3d 274, 282 (5th Cir. 2000), the Director contends that "without [affidavits from trial counsel attesting that the evidence was not disclosed] Cummings' assertions are conclusory." Ans. 77. *Miller* says no such thing. There, the court spoke specifically of allegations of ineffective assistance of counsel, not suppression of evidence, or what is necessary to plead a *Brady* claim. 200 F.3d at 282. The court explained that "[b]ecause [petitioner] failed to set forth the nature of *any* of the errors trial counsel purportedly failed to preserve and did not assert any resulting prejudice," the IATC claims were conclusory. *Id.* (emphasis in original).

who was using drugs, coupled with Henry's admission of her own drug use and her "headache" that led to her on the night of the shooting, would have supported a solid impeachment argument attacking the credibility of Henry's testimony. When she spoke with Garcia the day after the shooting, Henry failed to mention that Cummings, or *anyone else*, was outside her apartment with a gun after the shooting. Such an omission would obviously damage the credibility of her subsequent testimony.

As to January's personal and material support for Henry and her family, the Director relies on subsequent testimony from January to argue that the information would "have little impeaching value." Ans. 78-79. The fact that the lead investigator was providing one of the State's critical witnesses with material benefits, however, is certainly something that could cast doubt on her credibility and cause a juror to discredit her testimony. And, it would have added support to an argument that January dirtied up the investigation.

*Materiality.* The Director makes the conclusory assertion that any suppressed *Brady* evidence was "certainly not material." Ans. 79. For the most part, Cummings simply refers the Court to the initial pleading of materiality in the Petition, at 53-55. Two additional points are worth making.

First, Nickoll Henry's testimony was an important part in the State's case, as it placed Cummings outside her apartment and feet away from the crime scene, moments after the shooting and with a firearm in his hand. With no eyewitnesses to the actual shooting, Henry helped combine the other snippets of circumstantial evidence against Cummings. But evidence showing that Henry's story seemed to undergo major changes in a short period of time would have amplified the defense's ability to establish that Henry was repackaging as eyewitness testimony what was simply rumor that had permeated the neighborhood immediately after the shooting. Second, evidence of January's material support would have been part of a bigger pattern in which State was working to improperly incentivize and secure favorable testimony.

30

### 3. "Take dem bullets" text

The Director seemingly concedes that Albert Love wrote the text messages the prosecution falsely attributed to Cummings. Ans. 80 ("the Director has explained why Love writing the text message was not material in relation to Cummings's other claims"). She then asserts that Love writing the text message was not material because "the other evidence against Cummings was strong, and the fact that an accomplice used Cummings's phone to conceal evidence is still strongly inculpatory."[14] Ans. 80-81. The Director creates a diversion by focusing on the implications of *Love* writing the messages, and avoids the materiality of *Cummings not writing* the messages.

As stated in the Petition and in this Reply, the State's case against Cummings was not "strong." The State was dependent upon circumstantial evidence that was often provocative and inflammatory—gangland retribution, cover-ups, and alibis—to meet its burden. One crucial such piece of evidence was the "take dem bullets" text message exchange the prosecution falsely attributed to Cummings. If the State had disclosed its bases for knowing that Love was the offending text-message participant, then it would have unable to use false testimony about Cummings' participation to devastating effect. The State falsely attributed authorship to Cummings in order to suggest guilt and to impeach his credibility when he took the stand. *See* Pet. 55. The State's withholding of this information, along with the other suppressed material, had a reasonably probable effect on the outcome of the trial. *See* Pet. 37-39.[15]

---

[14] The Director does not appear to contest that the information was suppressed or favorable to the defense. Ans. 80-81.

[15] The Director argues that Love's use of the phone was still inculpatory, so the suppression of information about his text-message authorship could not be material. Ans. 81. Setting aside the myriad arguments why the premise is not true—arguments that cannot be adjudicated until there is fact development—the conclusion still doesn't follow. The materiality question simply involves whether the misattribution affected the outcome, and so the issue is how the jury would have reacted had it heard that Love, and not Cummings, sent the text messages that the State thundered against at closing.

31

#### 4.  Steve January's relationship with Hubert's aunt

The State failed to disclose the existence of a relationship between Steve January, the State's lead investigator, and Charlotte Woods, the aunt of victim Keenan Hubert. This information would have helped connect what otherwise appeared as disconnected pieces of evidence that the state was rushed and over-aggressive in prosecuting the subject of street rumors. *See* Pet. 56-57. Cummings has provided significant evidentiary proffers to support this claim, including four signed witness statements, a declaration describing another witness' first-hand account of the relationship between January and Woods, and police records. *See* Pet. 56-60; App. 34-52; 438; 441; 442; 454; 457. The Director challenges these proffers as hearsay and having "little relevance." Ans. 81-82.[16]

The signed witness statements include those of a longtime pastor in the community, App. 438-40; a current McLennan County Commissioner and 50-year resident of Waco, App. 442; and Cummings' aunt who was a former classmate of Charlotte Woods, App. 441. Cummings has corroborated the written statements through a witness who provided direct knowledge of the relationship, App. 454-55,[17] and Waco Police Department records, which detail two unlikely interactions among January, Woods and her daughter, *see* Pet. 58-60.

The Director discounts the written statements as "inadmissible hearsay and rumor," and suggests that the multiple incidents with January, Woods, and her daughter were serendipitous and have "little relevance to the murders." Ans. 81, 82. The Director's argument about January's interjection into unrelated matters involving Woods and her daughter only supports Cummings' point that these encounters suggest something beyond normal police protocols.

---

[16] The Director again suggests that Cummings cannot show suppression because he failed to attach trial counsel statements "confirming that they were unaware of this relationship."Ans. 82. As explained above, there is no such pleading requirement.

[17] The Director questions Cummings' reluctance to identify the witness by name, Ans. 82; however, in light of the detailed accounts of witness intimidation and coercion on the part of law enforcement (including January ), the witness' concerns are neither surprising nor unreasonable.

*Favorable to the Defense and Material.* Despite the Director's assertion, Ans. 82-83, the suppressed information is favorable to the defense even though January did not testify at trial. The extreme prosecutorial aggression present in this case had an enormous effect on the truth-finding function of the investigation. That the lead investigator was involved in a close relationship with a victim's family member would have provided crucial information about *why* the investigative and prosecutor choices in this case were compromised. Almost every facet of the State's case was tied to evidence obtained through January's investigation. With the entire investigation under suspicion, and an already weak case against Cummings, disclosure of the relationship, in combination with all the other withheld information, was material. *See Kyles*, 514 U.S. at 477 (in discussing materiality, noting that defendant could have used suppressed evidence to outline a vigorous argument attacking the integrity of the police investigation).

### 5.   Cumulative effect of all undisclosed evidence

Because multiple *Brady* violations are at issue, the materiality analysis must assess whether "the cumulative effect of all such evidence suppressed by the government" raises a reasonable probability that its disclosure would have produced a different result. *Kyles*, 514 U.S. at 421. Taken together, the undisclosed evidence would have allowed Cummings to attack the State's case from multiple angles. First, the information would have provided impeachment material for two of the State's key witnesses: Micha'el Atkins, who has since recanted trial testimony that he heard Cummings declare intent to shoot someone just before gunfire started, and Nickoll Henry, who told the jury that she saw Cummings outside her apartment with a firearm shortly after the shooting.

Second, the undisclosed information would have eliminated the State's ability to have misrepresented what ended up being extraordinarily damaging evidence. The "take dem bullets" text was highlighted throughout the trial, and used by the prosecution to suggest Cummings' guilt. All this, however, would have been impossible, had the State disclosed that Cummings did not author

33

the message. With no physical evidence connecting Cummings to the crime, this circumstantial evidence took on greater significance.

Third, the undisclosed evidence would have enabled Cummings to "attack[] the reliability of the investigation," *Kyles*, 514 U.S. at 446, by showing that the State was so unsure about its case that it resorted to coercion, inducements and misattribution of evidence to construct a case against Cummings. Specifically, the "Atkins evidence" would have supported the suggestion that the State, through its investigator, was threatening and pressuring this seemingly vulnerable witness to testify falsely in order to inflate its case. With Nickoll Henry, the prosecution's tactics involved supplying their key witness with benefits, both legal and material, to increase the likelihood that Henry would shade her testimony in its favor. And, knowingly misattributing the "take dem bullets" text to Cummings seriously undermines the prosecution's credibility and highlights its desperation in securing a conviction against Cummings, with little or no evidence.

### 6. Cummings' *Brady* claim remains viable in state court, and any procedural default should be excused.

For the reasons discussed in Cummings' motion for stay and abeyance, the *Brady* claim is unexhausted but not defaulted, and these proceedings should be stayed to allow Cummings to return to state court and seek available remedies. Nonetheless, the Court should reach the merits of the *Brady* claim even if it determines the claim is defaulted, because Cummings can show the cause and prejudice necessary to excuse the default.[18]

*Cause.* Three factors explain why Cummings did not raise his *Brady* claim at trial and provide cause for such failure. First, the State suppressed the favorable information. Second, Cummings reasonably relied on the presumption that the prosecution was fulfilling its duty to disclose such

---

[18] As with the other claims, Cummings could also excuse any default because he can satisfy the miscarriage-of-justice gateway.

evidence. And third, Cummings was not aware of the factual basis for making the *Brady* claim. All of these are appropriate for establishing cause for the failure to raise the claim at trial. *See Strickler*, 527 U.S. at 283, 289.

Just as it was reasonable for trial counsel to rely on the presumption that the State would perform its duty to disclose all constitutionally mandated material, it was equally reasonable for state post-conviction counsel to do the same.[19] *See Murray v. Carrier*, 477 U.S. 478, 491 (1986) ("the standard for cause should not vary depending on the timing of a procedural default").

*Prejudice.* As discussed above, the undisclosed information was material, both individually and cumulatively, and therefore establishes prejudice. *Strickler*, 527 U.S. at 282 ("cause and prejudice parallel two of the three components of the *Brady* violation itself").

### E.   CUMMINGS IS ENTITLED TO RELIEF BECAUSE TRIAL COUNSEL DEFICIENTLY AND PREJUDICIALLY FAILED TO SEEK SUPPRESSION OF INCULPATORY EVIDENCE.

Cummings is entitled to relief on his claim that his trial counsel were ineffective for failing to seek suppression of excludable cellular phone records ("*Kimmelman* claim"). The Director suggests that the *Kimmelman* claim fails on the merits, and is procedurally defaulted. Ans. 84. The Director is wrong on both counts.

#### 1.   Merits-Deficient Performance

The Director argues that, although trial counsel failed to lodge what would have been a successful suppression motion, they did not perform deficiently. Her arguments are based on the incorrect premise that trial counsel could not be deficient because *Love v. State*[20] had yet to be

---

[19] Moreover, during state post-conviction proceedings, the State represented that it had provided counsel with everything from its file that it could disclose. App. 421 at ¶ 4. This implicit representation that all favorable materials were turned over provides further cause for Cummings' failure to raise his *Brady* claim in state habeas. *See Strickler*, 527 U.S. at 283-84.

[20] *Love v. State*, 543 S.W.3d 835 (Tex. Crim. App. 2016) (holding that appellant had a reasonable expectation of privacy in the contents of the text messages he sent, and therefore, the

decided. *See* Ans. 93-94 (linking reasonability of trial counsel's performance to the fact that "the excludability of the text messages was [not] squarely settled by the Texas courts until [*Love* was decided] after Cummings's trial").[21] In so doing, the Director relies heavily on *Nelson v. Estelle*, 642 F.2d 903, 908 (5th Cir. 1981), for the proposition that this Court "cannot find counsel's performance objectively unreasonable where counsel would have to anticipate future court rulings." Ans. 94.

*Nelson* precedes *Strickland v. Washington*, 466 U.S. 668 (1984), and is inconsistent with now-controlling precedent in many ways, but even the text of *Nelson* itself is far less restrictive than the Director would have the Court believe. *Nelson* does have dicta stating that, "counsel is normally not expected to foresee future new developments in the law," *Nelson*, 642 F.2d at 908, but it instructs that "the methodology for applying the [ineffectiveness] standard involves an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered *based upon the totality of circumstances*," *id.* at 906 (emphasis added). Here, it is the "totality of the circumstances" that are important and highlighted by Cummings in his petition, and yet are ignored by the Director. As *Love* makes clear, the rule against warrantless searches of wireless provider records was a straightforward application of existing precedent. No reasonable trial counsel would ignore such low-hanging fruit in a case so dependent on the evidence in the records, as reflected by the fact that Albert Love's counsel made the objection in question.

The Director attempts to circumvent the totality-of-the-circumstances approach to deficiency—by misrepresenting a rule about when it is *per se* *unreasonable* to omit claims as a rule about when it is *per se* *reasonable* to omit them. Specifically, citing "Circuit precedent," she claims that *Strickland* requires *only* objections based on "[s]olid, meritorious arguments based on *directly*

---

State was prohibited from compelling the service provider to turn over the content-based communications without first obtaining a warrant supported by probable cause).

[21] The Director's reference to a plea is confusing. Cummings pled not guilty and was tried.

*controlling precedent.*" Ans. 94-95 (citing *United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009)) (emphasis added). *Fields*, however, is not a rule about when it is always *reasonable* to omit claims; it is a rule about when it is always *unreasonable* to do so. What *Fields* states is that "[s]olid meritorious arguments based on directly controlling precedent *should* be discovered and brought to the court's attention." 565 F.3d at 294 (emphasis added). It does not say counsel is never deficient in failing to raise claims rooted in less settled authority. An objective standard of reasonableness requires counsel to "research relevant facts and law," *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003), and to seek to exclude State evidence where possible, *see* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases at Commentary to Guideline 10.11, 31 Hofstra L. Rev. 913 (rev. ed. 2003).

*Fields* does state there is "no general duty on the part of defense counsel to anticipate changes in the law," but the "changes in the law" that *Fields* expressly contemplates involve scenarios in which some subsequent decision overturns an established rule. *See* 565 F.3d at 295 ("However, at the time of Fields's sentencing—before the Supreme Court had decided *Blakely* or *Booker*—the law of this circuit was clear: *Apprendi* did not prohibit courts from determining the amount of drugs for relevant conduct purposes under the Sentencing Guidelines.") (internal quotation marks omitted). In *Fields*, the state of the law at the time trial counsel failed to lodge an objection "was clear," 565 F.3d at 295, and a favorable resolution to trial counsel's omitted objection would have been "foreclosed by existing law," *id.* at 296. The "changes in the law" in *Fields* was that of "an absolute sea-change in federal sentencing." 565 F.3d at 297.

The court's decision in *Love*, by contrast, was not a "change[] in the law" as contemplated in *Fields*—a case typical of the Director's authority insofar as it involves trial counsel's failure to make an objection *then foreclosed by law that subsequently overruled. Love* was simply a formal declaration of what existing Fourth Amendment precedent logically required. Texas law was formally

open as to whether a search warrant based on probable cause was required to obtain wireless records like those at issue here, and available authority strongly indicated that a warrant was required. *See Love*, 543 S.W.3d at 840-45 (thoroughly discussing the precedent, empirical data and legal commentary that "leads us to conclude that the content of appellant's text messages could not be obtained a probable cause-based warrant"). In other words, the *Kimmelman* claim is valid because there was no "controlling precedent" that would have definitively foreclosed trial counsel's objection, *see Green v. Johnson*, 116 F.3d 1115, 1125 (5th Cir. 1997).

The evidence would have been suppressed had trial counsel simply asked, *see Love*, 543 S.W.3d 835, and competent representation requires that such objections be made even if parts of the law remain unsettled. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *see also People v. Turner*, 840 N.E.2d 123 (N.Y. 2005) (although issue was not definitively settled at the time of trial, "[a] reasonable defense lawyer ... might have doubted that the statute of limitations argument was a clear winner–but no reasonable defense lawyer could have found it so weak as to be not worth raising."); *Bruton v. State*, 875 So. 2d 1255 (Fla. Dist. Ct. App. 2004) (holding that, even though precedential status of issue was unsettled, it was "an issue that trial counsel should have recognized."); *United States v. Carthorne*, 878 F.3d 458 (4th Cir. 2017) (under the ineffectiveness standard, counsel may be required to raise material issues even in the absence of decisive precedent).

The only pertinent question under *Strickland*'s deficiency prong, therefore, is whether counsel's challenged actions or omissions were reasonable under all the circumstances. *See Strickland*, 466 U.S at 688. Trial counsel here unreasonably failed to seek suppression of the wireless records. The first reason that the failure to seek suppression was objectively unreasonable has to do with the importance of the wireless evidence to the State's case against Cummings—which was entirely circumstantial and had a credibility-challenged "star witness" who did not actually see the shooting.

38

The State planned to use wireless records to establish that Cummings committed the offense, conspired with accomplices, and covered up the crime. And, it did.

The second reason that trial counsel's failure to seek suppression was especially egregious was that Texas has no exception that allows courts to admit evidence unconstitutionally obtained in "good faith" but without a warrant. Tex. Code. Crim. Proc. art. 38.23. In other words, when a warrantless search is determined to have been unconstitutional, the familiar "good faith" exception is disabled by Texas statute. Here, Cummings' cellular records, including text messages, were obtained without a warrant, and so they would have been suppressed.  In federal court, one might have defended trial counsel's decision on the ground that any constitutionally defective search was undertaken with good faith; but not in Texas.

Third, the "totality of the circumstances" also includes the proceedings in Albert Love's capital murder trial. The same judge that presided over Love's trial presided over Cummings'. On February 23, 2012, Albert Love's attorneys filed a motion to suppress all cell phone records on the grounds that they were obtained without a search warrant supported by probable cause. *See* Defendant's Motion to Suppress Evidence Obtained Through Cell Phone Records, *State v. Love*, 2011-1511-C1 (19th Dist. Ct. Feb. 23, 2012), 1 CR 99-102. Jury selection in Cummings' case began five months later, on July 20, 2012, 9 RR 1, and the trial began on October 22, 2012. 30 RR 1. Cummings' trial counsel had an ongoing duty to keep themselves apprised of developments in Love's trial, given his status as an alleged co-conspirator. Assuming that counsel was actually following the trial of the accused co-conspirator before the same judge, they were on notice of the objection.

Finally, the Director argues, without explanation or legal authority, that because Cummings "has failed to produce any statements from trial counsel which could explain strategic decisions with regard to the mobile phone records," he "plainly fails to meet his burden to show deficiency." Ans.

95-96. This argument is puzzling; there is simply no pleading-sufficiency requirement that a petition include declarations from trial counsel.

## 2.  Merits—Prejudice

The Director claims that, even if trial counsel was deficient, "no prejudice accrued." Ans. 96. The Director optimistically asserts that, setting aside the text messages, "the remaining evidence against Cummings was strong." *Id.* She then rattles off five pieces of circumstantial evidence in support of her assertion, *id.* at 96-97, and concludes that there is "simply no reasonable probability" that the result of the proceedings would have been different, "either individually or in conjunction with any other cumulated claim." *Id.* at 97. In his Petition, Cummings has called into question at least three pieces of the circumstantial evidence the Director points to. Pet. 43-47 (credibility of Micha'el Atkins' testimony); 47-55, 77-78, (credibility of Nickoll Henry's testimony); 106-07; 112-17 (retaliation as motivation). The State's evidence against Cummings was weak, and the text messages provided a useful tool to inflate its case.

The State used the text messages at trial to show that Cummings committed the crime, had accomplices, and tried to cover it up. The text messages were highlighted and emphasized to the jury during the State's closing argument. Without question, and as detailed in the Petition, the text messages admitted at trial were extraordinarily damaging to Cummings. *See* Pet. 37-38, 67-68. The Director completely ignores Cummings' arguments regarding prejudice and simply points to pieces of circumstantial evidence, most of which has been called into question.[22]

---

[22] In *Love*, the court identified *sixteen (16)* examples of "independent circumstantial evidence" of Love's guilt, yet still concluded that, "[w]hile this independent, circumstantial evidence suggests that appellant was involved in the crime, the strongest evidence of his guilt came from the improperly admitted text messages. Further, the State relied heavily on these text messages to prove its case." *543* SW3d at *587.*

### 3.   Any default is excused under *Martinez v. Ryan*.

The Director asserts that the *Kimmelman* claim is "unexhausted and procedurally defaulted." Ans. 84. Cummings concedes the absence of exhaustion, but disputes that the claim is procedurally defaulted. In the event the claim is defaulted, however, any default would be excused. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that ineffective state post-conviction representation can excuse an otherwise procedurally defaulted ineffective assistance of trial counsel claim. *See id.* at 9. *Martinez* applies to Texas cases. *See Trevino v. Thaler*, 569 U.S. 413, 417 (2013). To satisfy *Martinez*, Cummings must show (1) cause for the default (that State habeas counsel's performance was objectively unreasonable) and (2) the substantiality of the underlying Sixth Amendment ineffective assistance of counsel claim (that the claim has "some merit" or is not "wholly without factual support"). *Martinez*, 566 U.S. at 14, 16; *Norman v. Stephens*, 817 F.3d 226, 232 (5th Cir. 2016). Cummings makes both showings.[23]

### a.   State habeas counsel were ineffective for failing to raise the Sixth Amendment violation.

*Deficient Performance.* State habeas counsel, the Office of Capital and Forensic Writs ("OCFW"), failed to raise the claim that Cummings' Sixth Amendment right to the effective assistance of counsel was violated when trial counsel failed to seek suppression of the cellular records, including inculpatory text messages, obtained without a warrant. State post-conviction counsel failed to do so despite the impact the mobile phone and text records had on the proceeding. The Director argues that the failure to raise the claim was reasonable.

First, the Director grossly misstates the legal "standards" for evaluating effective state post-conviction litigation. The standard is simply "whether counsel's assistance was reasonable

---

[23] As with the other claims, Cummings could also excuse any default because he can satisfy the miscarriage-of-justice gateway.

considering all the circumstances." *Strickland*, 466 U.S. at 688. The Director, however, proclaims, "*Only* 'solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention.'" Ans. 86 (emphasis added) (quoting *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999)). By adding the word "only" to the quoted sentence from *Williamson*, the Director completely alters and misrepresents the court's proposition. *Williamson* instructs that such arguments must, in fact, be raised, but it does not say that those are the *only* arguments that must be made to satisfy *Strickland*. *Id*.

The Director also tries to dilute the standard for open-ended *post-conviction* fact development pleading by equating it to the obligations of page-constrained *direct appeal* counsel working from a closed record. The Director quotes authority stating, "appellate counsel is obliged to raise and brief *only* those issues it believes have the best chance of success." Ans. 86 (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)) (emphasis added). Faced with strict page constraints for all points and authorities on a closed record, competent appellate counsel have incentives to prioritize the presentation of claims that do not operate in the same way on post-conviction pleadings. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases at Commentary to Guideline 10.15.1, 31 Hofstra L. Rev. 913 (rev. ed. 2003) ("Post-conviction counsel should seek to litigate *all issues*, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.") (emphasis added). Even in the appellate context, *Robbins*, 528 U.S. at 285, says no such thing—because no competent lawyer forfeits a claim just because they speculate that there exists at least one other claim might have a greater chance for relief. The Director misconstrues this precedent in

service of her attack on a straw man: an unasserted argument that state post-conviction counsel must put forth every "conceivable constitutional claim." Ans. 86.

Under the appropriate standard, post-conviction counsel was deficient for failing to raise the *Kimmelman* claim. As explained in the Petition, the wireless records had an enormous impact on the trial. Pet. 38-39. According to counsel who represented Cummings in state post-conviction proceedings, the decision to omit the claim was non-strategic. Ashley Steele, for example, attested that "[t]here was no strategic reason for OCFW leaving that important claim" out of the state application. App. 424. She explained that the "attorneys were operating under an extreme workload, and they lacked the experience, resources, and supervisory structure necessary to make sure that the claim did not slip through the cracks." App. 424. Benjamin Wolff, the Director of OCFW, and also a state post-conviction lawyer for Cummings, reinforces Steele's explanation: "there was not and could not have been any strategic reason for failing to include a *Kimmelman* claim ...." App. 428. Wolff characterized the claim as "especially important" because Texas has no "good-faith" exception to the exclusionary rule. App.428.[24]

The Director makes two arguments as to why OCFW's omission was reasonable: (1) state post-conviction counsel acted reasonably *per se* because the state post-conviction application was long, Ans. 87-88; and (2) state post-conviction counsel omitted the *Kimmelman* claim because it carefully pruned the state post-conviction of claims that were anything less than winners, Ans. 89-90.

With respect to the connection between document length and the reasonableness of state post-conviction counsel's performance, the Director touts OCFW's "181-page state habeas application raising [14] grounds for relief," which was "supported by [37] exhibits," as proof of the

---

[24] Although *Love* had not been formally decided, the inmate in that case was alleged to be Cummings' co-conspirator, and his lawyers were in the process of litigating just such a challenge. As recounted in *Love* itself, there was a robust trail of decisional law indicating that the State had obtained the records unlawfully. *Love*, 543 S.W.3d at 841-45.

"extent and thoroughness" of counsels' investigative efforts. Ans. 87. According to the Director, the "sheer volume" of OCFW's work "more than shows that state habeas counsel was not deficient ...." Ans. 88. But, as the court that ultimately assesses Texas writ applications, the TCCA has explained, "[c]ourts do not (and should not) measure the worth of a writ application by either the number of claims presented or the length of the application." *Ex parte Granados*, No. WR-51,135-01, 2007 WL 9683726, at *3 (Tex. Crim. App. Jan.10, 2007). The focus must be on whether "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Here, and as explained above, there was no strategic reason for OCFW failing to present the claim—and that is the only question that matters to the deficiency determination.

Nor was the state post-conviction application the collection of customized and carefully selected claims that the Director suggests. In fact, four of the claims in the state post-conviction application were boilerplate challenges with no chance of success: a boilerplate challenge to the "10-12" rule alleging that Texas judges unconstitutionally fail to instruct jurors about the effects of a refusal to vote for death (1 WR 163-69); a boilerplate vagueness challenge to the "future dangerousness" special issue that the sentencing-phase jury must answer (1 WR 169-73); a boilerplate challenge alleging that the Texas death penalty is unconstitutionally arbitrary (1 WR 174-83); and a boilerplate challenge alleging that the Texas capital sentencing statute unconstitutionally restricts evidence that can be considered in mitigation (1 WR 183-89). Before the TCCA, these claims were dismissed out of hand because the claims "were or should have been raised on direct appeal." *Ex parte Rickey Donnell Cummings*, No. WR–84,324–01, 2018 WL 1516614, at *3 (Tex. Crim. App. Mar. 28, 2018). Not only were they found to be inappropriate when presented in the post-conviction posture, the claims have been repeatedly rejected on the merits.[25] In fact, the "10-

_____

[25] Arguments challenging Texas' "10-12 Rule," like those raised in the state post-conviction application, have been previously and repeatedly rejected by the TCCA. *See, e.g., Coble v. State*,

12" claim is considered so inappropriate that courts have begun to *threaten sanctions* against attorneys that include it in their post-conviction pleadings. *See, e.g., Broadnax v. Davis*, No. 3:15-cv-01758, Doc. 73, at 17 n.18 (Jul. 23, 2019).

Given both the role of the wireless records in the case and the attacks that OCFW was leveling against them, the *Kimmelman* claim would have powerfully *reinforced* claims already in the petition. Steele explained, for example, that "none of [the other] arguments were inconsistent with a claim that trial counsel deficiently failed to seek Fourth Amendment suppression of the wireless provider records." App. 424. Wolff similarly observed that "[t]he state application did include other challenges to the text messages, but none of those challenges were *at all* inconsistent with the omitted *Kimmelman* claim." App. 428.

As Steele and Wolff both explain, Cummings' state post-conviction representation was defective because the OCFW lawyers were too inexperienced, insufficiently supervised, and under-resourced. App. 423-24 (Steele), 427-28 (Wolff). *Martinez* excuses default because, *in this case*, post-conviction counsel was ineffective and because, *in this case*, that ineffectiveness resulted in the forfeiture of a substantial Sixth Amendment ineffective assistance of trial counsel claim. The Director attempts to reframe Cummings' *Martinez* argument as a "[wholesale] assault on the Texas system of postconviction representation." Ans. 89. She reasons that, because Cummings is actually making what amounts to a wholesale challenge to the Texas post-conviction system, and because no court has upheld a wholesale challenge, the Court must rule in her favor here. None of this makes any

---

330 S.W.3d 253, 297 (Tex. Crim. App. 2009); *Resendiz v. State*, 112 S.W.3d 541, 548–49 (Tex. Crim. App. 2003); *Johnson v. State*, 68 S.W.3d 644, 656 (Tex. Crim. App. 2002); *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *McFarland v. State*, 928 S.W.2d 482, 519 (Tex. Crim. App. 1996). Arguments similar to that raised by OCFW regarding the future dangerousness special issue have also been previously rejected. *See, e.g., Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Blue v. State*, 125 S.W.3d 491, 504–05 (Tex. Crim. App. 2003); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *Earhart v. State*, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994).

sense; Cummings is not making a wholesale challenge to the Texas post-conviction scheme.[26] Because his state post-conviction counsel was ineffective in failing to raise the ineffective assistance of trial counsel claim, Cummings has satisfied *Martinez*'s first requirement.[27]

### b. Cummings' Sixth Amendment ineffective assistance of counsel claim is "substantial."

Having made the showing that state habeas counsel's performance was deficient, to satisfy *Martinez*, Cummings need only show that his underlying Sixth Amendment claim is substantial—that the claim has "some merit" or is not "wholly without factual support." *Martinez*, 566 U.S. at 14, 16; *see also Norman*, 817 F.3d at 232. For the reasons set out in his Petition, Pet. 62-68, which are incorporated here by reference, and above, Cummings has more than demonstrated that his claim is not "wholly without merit," and "that he *might* be able to satisfy" *Strickland. Norman*, 817 F.3d at 232 (emphasis in original).

### F. CUMMINGS IS ENTITLED TO RELIEF BECAUSE TRIAL COUNSEL DEFICIENTLY AND PREJUDICIALLY FAILED TO INVESTIGATE AND DEVELOP A DEFENSE BASED ON ALTERNATE SUSPECTS.

Claim 6 asserts the judgment against Cummings is invalid because his trial counsel's failure to investigate alternative suspects violated the Sixth Amendment requirement of effective assistance of counsel. Pet. 70-79. The Director makes five arguments in response to Claim 6: (1) there can be

---

[26] In the course of making this argument, the Director also suggests that there can be no ineffectiveness when the deficiency is a result of underfunding or limited resources. Ans. 89. However, as Cummings' proffers demonstrate, post-conviction counsel did not employ *any* "tactics and strategies" in omitting the claim—resource-driven or otherwise. Any presumption that the failure to raise the claim was the result of a reasonable tactical decision that fell within "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, is refuted by Cummings' proffers.

[27] In a footnote, the Director requests that, "to the extent the Court wishes to entertain granting relief or permitting factual development," the Court should "order Cummings to divulge both OCW's and trial counsel's files to the Director for evaluation." Ans. 88 n.37. The Director's request is premature, overly broad and inadequate to draw an appropriate response. When the issue is ripe and when the Director has made the request in a procedurally appropriate motion, Cummings will then address the request.

no deficiency because the petition does not include inculpatory affidavits signed by trial counsel; (2) there can be no deficiency because the information available in trial counsel's files was not in admissible form; (3) the failure to connect the ballistics report to the alternate suspects was not deficient because the report was introduced into evidence for another purpose; (4) the deficiency was nonprejudicial because the state court opinion contains a presumptively correct recitation of facts; and (5) there is no excuse for procedural default. These arguments should all be rejected, but there is a larger point.

The Director attempts to evade the *Strickland* standard by analyzing each of the four pieces of evidence in trial counsel's file—the anonymous tip, an affiant's sworn statement that she heard someone yell "Come on Carlos" in the aftermath of the shooting, the statement of a woman who told trial counsel that Nickoll Henry had first identified Carlos Smith as the shooter, and a corroborative ballistics report—in isolation from the others. *Cf. Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further"). The quantum of evidence known to counsel here includes all four items in trial counsel's file. Considered in full, it was unreasonable for trial counsel not to investigate *all four of them.*

### 1. The absence of trial-counsel affidavits admitting fault does not preclude a deficiency finding.

The Director repeatedly argues that courts must treat trial counsel's decision as strategically sound—and reject the *Strickland* claim as conclusory—if the Petition does not include affidavits from trial counsel. Ans. 100-04. There is no pleading-sufficiency requirement that a Petition include declarations from trial counsel.

Cummings' claim cannot be deemed "conclusory" on any basis. It is supported by the record, very detailed allegations regarding dates and times, places, persons, and things, and substantial

evidence demonstrating an ability to prove those allegations.[28] Such a claim entitles the petitioner to proceed. *Cf. Bracy*, 520 U.S. at 908-909.

### 2. The admissibility of the information available to trial counsel has no bearing on the merit of the IATC-AC claim asserted here.

Using a bit of misdirection, the Director repeatedly suggests that, because the raw information known to trial counsel was not in courtroom-admissible form, there can be no deficiency. Ans. 100 (asserting inadmissibility of tip and difficulty of calling witness); Ans. 102 (observing that sworn statement from Lashonda Moten did not indicate willingness to testify); Ans. 102-03 (same with respect to Constance Jones, and that her statement was hearsay). Implicit in the duty to investigate under prevailing professional norms is the idea that trial counsel cannot sit back and wait for admissible evidence to fall into their laps, much less forego the development of known, favorable information into admissible evidence. *Cf. Kimmelman*, 477 U.S. at 385 (finding deficient performance for failure to file discovery motion).

The claim is not that trial counsel should have introduced the call (although they could have looked for the caller), that they should have introduced Lashonda Moten's statement (although they should have looked for her before trial), or called Constance Jones (although they should have followed up on her statement). Counsel unreasonably failed to investigate an exculpatory collection of evidence.

The Director loads most of her argument regarding deficient performance on the back of *Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009). Ans. 101-103. But *Day* held the petitioner "fail[ed] to satisfy the prejudice showing required for ineffective assistance claims based on counsel's

---

[28] The Director's idea that a claim without a declaration is "conclusory" is specious. If, for example, four different people told trial counsel that someone other than the defendant committed a crime, and if post-conviction counsel obtained four corresponding affidavits, then the allegation is not "conclusory" simply because the Petition does not *also* include a declaration from the offending lawyer.

failure to call a witness." *566 F.3d at 538* (cited at Ans. 101-03). *Day* says nothing about the facial sufficiency of an allegation that trial counsel unreasonably failed to investigate known information supportive of a defense that there were other viable suspects in the charged offenses.

### 3.  The fact that trial counsel introduced the ballistics report for another purpose does not preclude a deficiency finding.

The Director rhetorically finds it "difficult to see how counsel could have been ineffective when they had the information and admitted [the ballistics report] (even though it was inconclusive)."[29] Ans. 103. In fact, that the ballistics report was introduced into evidence only underscores the egregiousness of the deficiency. Trial counsel did not bother to check it against other evidence at their fingertips, and so when counsel introduced the report, they introduced it to show a completely unrelated fact: that the bullets from the crime scene did not match the two firearms recovered in the course of the investigation. The actual reason for introducing the report does not zero-out the failure of trial counsel to introduce it for the right reason, to flag pertinent evidence, and to connect that evidence to other exculpatory information in the case. The performance of one act does not necessarily "lift counsel's performance back into the realm of professional acceptability." *Kimmelman*, 477 U.S. at 386.

### 4.  The failure to investigate the alternative suspects was prejudicial.

The Director devotes slightly over a page to Cummings' showing of prejudice. Ans. 104-05. Abandoning both *Strickland*'s reasonable-probability test and the State's burden of proof at trial, *cf. Strickland*, 466 U.S. at 695, the Director argues the pleading does not "conclusively establish the guilt of these other men[,]" and makes the conclusory assertion that "Cummings's petition and related evidence do not call into question the overall version of events presented by the State." Ans.

---

[29] To be clear, the report's author concluded that the bullets *were* from the same *class* of firearm, but could not affirmatively determine that the two bullets were fired struck by the same *tool* because there were "insufficient individual characteristics." App. 55.

105. For whatever reason, the Director fails to meaningfully engage the trove of alternate-suspect evidence, and the effect it would have had on the proceedings. Most importantly, the Director fails to discuss the declaration of Alicia Harrison, who swore under penalty of perjury that the State's star witness, Nickoll Henry, told a group of people in the shooting's immediate aftermath that Carlos Smith was the killer. App. 420. As explained in the Petition, such information would have been devastating not only for the State's theory of guilt, but also for the credibility of Henry.[30]

### 5.   Any procedural default of the claim would be excused.

Cummings' arguments answering the Director's position on this issue, made principally in the material on the *Kimmelman* claim, are hereby incorporated by reference. Cummings concedes that the claim is unexhausted but not that it is procedurally defaulted. Even if this Court were to find the claim defaulted, moreover, the default would be excused. The fact that state post-conviction counsel put together a long post-conviction application does not establish that they were effective in regard to the evidence presented in this claim, and certainly does not disprove much more specific evidence of ineffectiveness. *See* Section II.E.3.

There are also, however, claim-specific reasons why the default is excused under *Martinez*, which requires a showing (1) that state post-conviction counsel was ineffective and (2) that the underlying ineffectiveness claim is substantial. 566 U.S. at 14. With respect to the ineffectiveness of state post-conviction counsel, two of the state post-conviction attorneys on the case, Ashley Steele

---

[30] With respect to the probative value of the affidavit, the Director again relies on *Day* for the proposition that the declaration should not be considered because Harrison did not state that she was available for trial. Ans. 104 n. 44. (The Director also incorrectly characterizes the affidavit as hearsay.) *Day* does not apply, albeit for different reasons than it did not apply on the deficiency issue. *Day* is a holding about a specific type of claim—trial counsel's objectively unreasonable failure to *call a witness*—not about a failure-to-investigate-a-defense claim. *See* 566 F.3d at 538 (quoted *supra*). Finally, this is the pleading stage. If there are questions about Ms. Harrison's ability to testify, those can be addressed in the course of fact development and litigated during summary judgment, if necessary.

and OCFW Director Benjamin Wolff, explained that there was no strategic reason for omitting the claim. Rather, the "omission was simply an oversight resulting from having failed to connect the dots within our records." App. 425 (Steele Dec.); *see also* App. 429 (Wolff Dec.) ("[T]here was not and could not be a strategic reason for OCFW's failure to include that argument."). Steele and Wolff also emphasized that there was absolutely nothing about including the claim that would have compromised other positions in the application. *See* App. 425, ¶ 17 (Steele Decl.); App. 429, ¶ 13 (Wolff Decl.). With respect to the substantiality of the underlying claim, Cummings incorporates by reference the arguments in the Petition and herein.

Even if this Court determined that the claim is defaulted, it would still be able to reach the merits because Cummings satisfies the miscarriage-of-justice gateway. The Director responds that Cummings cannot satisfy that gateway "largely for the reasons set forth in the TCCA's state habeas opinion and the Statement of the Case, which show that Cummings is not actually innocent of the crime of conviction or the death penalty." Ans. 99. The TCCA opinion, however, reflects none of the alternate-suspects evidence—either the evidence presented in the Petition or other evidence yet to be discovered—because of trial and post-conviction counsel's prejudicial deficiency. The State's case against Cummings was entirely circumstantial; there was no ballistics or eyewitness evidence. The State relied heavily on the testimony of Nickoll Henry, whose credibility would have been demolished by the evidence showing the crime was perpetrated by another group of men, including Carlos Smith. Among the information that trial counsel failed to explore were statements that Henry had initially told people that Smith was the shooter. App. 415-16.

### G. CUMMINGS IS ENTITLED TO RELIEF BECAUSE TRIAL COUNSEL DEFICIENTLY AND PREJUDICIALLY FAILED TO PREPARE TO CONTEST CUMMINGS' GANG MEMBERSHIP.

With respect to Claim 7, the "IATC-gangs" claim, the Director's basic position is that the challenge was decided on the merits, so the relitigation bar of 28 U.S.C. § 2254(d) applies, and

Cummings cannot meet the statutory exceptions. There are problems in the particulars, but the Director's entire analytic framework is flawed: this claim was not decided on the merits and so the salient analysis involves procedural default, not § 2254(d).

### 1.   Trial counsel was constitutionally ineffective.

The Director spends almost all of her time disputing whether § 2254(d) precludes relief and whether, in the alternative, Cummings can satisfy *Martinez.* She devotes almost no space to the underlying constitutional violation—that trial counsel's failure to investigate and prepare for the State's gang-banger strategy was prejudicially deficient. None of the underlying deficiency allegations are meaningfully disputed—that Frank AuBuchon was not in fact hired as a gang expert,[31] that billing records and trial counsel's sworn testimony show that neither Pelz, nor anyone else was engaged as a gangs expert, that trial counsel falsely stated that they were refusing to object for fear of suggesting credence to a jury that was (as it turns out) not even in the courtroom when the opportunity to object was presented, and so forth. The Director says almost nothing about the inflammatory video.

The only merits-related discussion of *prejudice* is the Director's attempt to wriggle free of the evidence showing (1) that Cummings' behavior and tattoos were only meant to mimic those of gang members, and (2) that there was no Waco Bloods set. The State speculates that the jury would have seen no difference between "merely emulating a vicious street gang, rather than being members that would pass academic muster or meet the requirements of counterparts in other regions of the country." Ans. 127. Cummings' does not argue that he and the others killed the victims while they were imitating gangsters. Cummings *did not* kill the victims. Prejudice comes from showing the gang-motive and accomplice-liability theory were based on gang membership that did not exist.

---

[31] A gangs expert opines about whether someone is in fact in a gang. A prison classifications expert opines about whether TDCJ would classify a defendant as a gang member. The two categories are not the same and, because of the frequency with which non-members acquire tattoos consistent with membership, the classification is often over-broad. App. 456, ¶ 5.

### 2. 28 U.S.C. § 2254(d) does not restrict relief because Claim 7 was not adjudicated on the merits in state court.

Section 2254(d) of Title 28 restricts relitigation of claims that were "adjudicated on the merits" in state court. The Director argues the claim presented in federal court is the same as the superficially similar gangs claim decided on the merits in state court. Ans. 107-12. Not so. The federal claim contains new and materially different allegations supported by new and materially different evidence, which means that the claim in the Petition was not, under Fifth Circuit law, adjudicated on the merits in state court.

The test for determining whether a federal claim is the same as one presented and adjudicated on the merits in state court asks whether there are allegations or evidence that are sufficiently new and material that they "fundamentally" alter the claim presented to the state court. If so, the federal and state claims are not the same. *See Ward v. Stephens*, 777 F.3d 250, 258-59 (5th Cir. 2015) (asking whether petitioner "presents material additional evidentiary support to the federal court that was not presented to the state court" and finding sameness because "argument on federal habeas varies only slightly" from argument presented to state court); *Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014) (new evidence presented to district court did not "fundamentally alter" claim, but merely provided additional evidentiary support for claim presented and adjudicated in state court); *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012) ("where new affidavits supplement rather than fundamentally alter a state court claim" § 2254(d) bars new affidavits); *Anderson v. Johnson*, 338 F.3d 382, 386-88 (5th Cir. 2003) (relying on fundamental-alteration test and concluding allegations fell on "same-claim" side of line because state and federal claims alleged failure to interview same witness).

The Director's selection of authority is confusing, because *Ward*, *Escamilla*, *Lewis*, and *Anderson*—three of which she cites[32]—establish that a federal claim was not "adjudicated on the merits" in state court if it is "fundamentally" different.[33]

A federal claim is fundamentally altered when it (1) does more than "merely provided additional evidentiary support for his claim that was already presented and adjudicated in the state court proceedings," *see Escamilla*, 749 F.3d at 395, (2) makes "crucial" new factual allegations, *see Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008), or (3) otherwise "places the claim[] in a significantly different legal posture," *Anderson*, 338 F.3d at 387 (internal quotation marks and citations omitted). The Director correctly observes that the mere adduction of new evidence does not *alone* create a distinct claim, but additional evidence does create a new claim when, in isolation or in combination with new allegations, it satisfies any of the three conditions enumerated above. *See, e.g., Sells v. Stephens*, 536 F. App'x 483, 492-93 (5th Cir. 2013) (analyzing claim under *Martinez*

---

[32] *See* Ans. 107-08 (quoting, *inter alia*, *Ward*, 777 F.3d at 258-59, and *Escamilla*, 749 F.3d at 394-95). On pages 107-08 of her Answer, the Director also cites *Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012), and *Lewis v. Thaler*, 701 F.3d 783 (5th Cir. 2012). The decision to invoke those cases is also puzzling, because *Clark* is inapposite and *Lewis* undercuts the Director's position. *See Clark*, 673 F.3d at 417 (observing that inmate affirmatively *pled himself* into *Pinholster* by asserting that his federal allegations were part of same claim presented to state court); *Lewis*, 701 F.3d at 791 (holding federal claim is same when new evidence "supplements" state claim, but not when it "fundamentally alter[s]" it).

[33] These post-AEDPA cases drew from pre-AEDPA rules about sameness. *See, e.g. Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996) (holding that claims were not the same when the inmate "presents material additional evidentiary support to the federal court that was not presented to the state court"); *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983) (federal claim not presented to state court where "federal habeas petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it"). *See also* 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 23.3[c][ii], at 1311 (7th ed. 2017) ("The controlling standard seems to be that the petitioner exhausts the factual basis of the claim as long as she did not either fundamentally alter the legal claim already considered by the state courts or attempt to expedite federal review by deliberately withholding essential facts from the state courts.") (internal quotation marks and alterations omitted).

when evidence and allegations of deficiency and prejudice in federal petition differed materially from evidence and allegations of deficiency and prejudice in state court).

The Director says that Cummings is parsing his claims too finely, and that the Claim 7 is really the same claim that state post-conviction counsel presented to the state court. Ans. 109-110. Per the Director, the Court should ignore new allegations, supported by new evidence, (1) that trial counsel was deficient for not investigating gang evidence at all, and (2) that the deficiency prejudiced both the guilt-phase inquiry into accomplice liability and the punishment-phase inquiry into dangerousness. *See* Pet. 100-01. Instead, she breezily characterizes the differences between the allegations and evidence presented at the two phases of post-conviction review as "tangential and minor." *See* Ans. 110.

The Director misrepresents the content of the state application. Not going so far as to imply that a violation of the duty to investigate was *alleged* by state post-conviction counsel, she states briefly that the duty was "*mention[ed]*". Ans. 110. In the state post-conviction application, the sentence immediately following the recitation of generic trial counsel duties makes clear that the application *was not* alleging a duty-to-investigate violation: "Based on these accepted minimum standards of professional competence, trial counsel performed deficiently *by not presenting testimony from a gang expert.*" State App. at 67 (emphasis added). The only reasonable interpretation of the allegation is that of a claim that trial counsel deficiently failed to present testimony.

The Director also suggests that a failure-to-present claim necessarily encompasses a failure-to-investigate claim. Ans. 110. The Supreme Court has repeatedly treated failure-to-investigate claims as distinct from claims about the presentation of known evidence. *See, e.g.*, *Wiggins*, 539 U.S. at 521 (rejecting attempt to equate a decision whether to "limit[] investigation" with a decision "not to present mitigating evidence"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (criticizing attempts to conflate an issue involving "the failure to introduce . . . evidence" with an issue about whether trial

counsel "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background"). The difference between the two claims is straightforward. A failure-to-present claim alleges that, given available information, trial counsel unreasonably failed to call a witness. A failure-to-investigate claim alleges that trial counsel deficiently failed to develop the information necessary to decide what evidence to present. The former does not include the latter. In Cummings' state claim, the deficiency was the failure to present Dr. Rotramel. In Cummings' federal claim, the deficiency is the failure to investigate what an expert like Rotramel would have said, and the prejudice includes information along the lines of what he provided to state post-conviction counsel. The state court never decided *that* claim on the merits.

Cummings' new allegations are supported by new evidence—billing records, witness lists, and a declaration of a trial expert demonstrating the falsity of trial counsel's affidavits—as well as layperson declarations establishing prejudice. The Director argues Fifth Circuit precedent about fundamentally altered claims should be ignored because it would "circumvent *Pinholster* by doing exactly what *Pinholster* says that he cannot do—present new evidence in support of his claim." Ans. 110. But that is question begging. *Pinholster* only applies to claims that were adjudicated on the merits in state court; if the federal claim is fundamentally different, *Pinholster* has nothing to say. By the very authority the Director cites, Cummings' federal claim was not adjudicated in state court.

### 3. The object of decisional inquiry is the TCCA decision, not the vacated state findings, and the vacated findings receive no deference.

To the extent that § 2254(d) requires deference to a state court "decision," this case presents an unusual question about what the state decision is. The Director invites the Court to defer to the findings that the TCCA expressly vacated, Ans. 114,—findings that were rejected with a citation to a case that stands for the proposition that the findings were "wholly unreliable and beyond repair,"

Pet. 102 (quoting *Ex parte Reed*, 271 S.W.3d 698, 722 (Tex. Crim. App. 2008)). This Court should reject that invitation, because neither law nor common sense supports it.

Cummings does agree, however, that this situation is unusual, and that if § 2254(d) applies, this Court must piece together, in light of the procedural history, what findings *could have supported* the result. *See* Pet. 102 (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). The reasoning that is most likely to have supported the result, in light of the TCCA's decision to vacate the trial court's findings, is the reasoning in the State's briefing to the TCCA. *See* Pet. 102. Although much of what the State urges in that briefing overlaps with the vacated findings, the vacated findings do not trigger deference of their own force.

The Director makes the odd argument that vacated findings must be presumed correct under § 2254(e)(1). Ans. 115. It is true that when unstated findings are *necessary* to a judgment, they are treated as implicit factual findings and entitled to deference. *See Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). But the TCCA could not have deemed the findings necessary if it vacated them instead of adopting them, and still ruled against Cummings.

Findings that are expressly rejected by the TCCA are directly inconsistent with the TCCA opinion rejecting them. Despite some creative framing, the two pieces of authority that the Director cites do not hold otherwise. Ans. 115 (citing *Murphy v. Davis*, 901 F.3d 578, 595 (5th Cir. 2018) (extending presumption where TCCA left findings with respect to merits intact but dismissed state application on procedural ground); *Wardlow v. Davis*, 750 F. App'x 374, 377 (5th Cir. 2018) (same)). Neither *Murphy* nor *Wardlaw* is a case where the TCCA expressly vacated findings. There is no deference to any factual determination in this case other than those explicitly stated by the TCCA in its opinion, and any implicit findings that are necessary to—not merely supportive of—the judgment.

### 4.  Cummings showed the exception specified in § 2254(d)(2) applies, and the Director waived any response.

Assuming for the sake of argument only that this Court determined that federal Claim 7 was decided on the merits in state court, then § 2254(d) does not bar de novo review because Cummings can show that the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The Director completely ignores, and therefore waives, any response on § 2254(d)(2). Ans. 112-14, 128. The legal criteria for satisfying § 2254(d)(1) and § 2254(d)(2) are distinct, *see* Pet. 105, and, for whatever reason, the Director focused entirely on the former simply omitted any discussion of the latter. Cummings cannot reply to an argument that was not made.

### 5.  Cummings showed the § 2254(d)(1) exception applies.

Cummings satisfies not only § 2254(d)(2), but also (and independently) § 2254(d)(1). Under § 2254(d)(1), the relitigation bar is disabled if Cummings shows that the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" In response, the Director cites to law that the Supreme Court overturned in *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), for the proposition that only the "ultimate decision" of the state courts is evaluated for reasonableness, not its underlying reasoning. Ans. 115 (citing *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001)).

The Director concedes that this is not a scenario in which the state habeas decision should be treated as unreasoned, Ans. 114, and as *Wilson* explains, that the reasoning of such opinions is to be scrutinized. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected

58

a state prisoner's federal claims.'"  *Wilson*, 138 S. Ct. at 1191-2 (internal citations omitted). Having identified the "particular reasons" for the state court decision, this Court reviews whether fair-minded jurists could agree with them. *See Wetzel v. Lambert*, 565 U.S. 520, 524 (2012). Language in prior decisions like *Neal* and *Santellan* is irreconcilable with *Wilson*.

The Director, however, *does* correctly state that, if this Court were to determine that the TCCA decided "on the merits" the IATC-gangs claim presented in federal court, then *Pinholster* bars Cummings from introducing new evidence to show that he satisfies § 2254(d)(1). (If Cummings satisfies § 2254(d)(1) on the record before the state court, then *Pinholster* does not restrict the introduction of evidence on the merits of the claim considered thereafter.) For the reasons set forth in the Petition, as well as the reasons set forth in Section II.G.4, *supra*, the record before the state court *does* demonstrate the legal unreasonability of the state decision.

### 6.  Any procedural default is excused under *Martinez*.

As explained above, Claim 7 presented here—one that centers on trial counsel's investigation and preparation rather than their decision not to call an expert or to object—was not adjudicated in state court. That means the precondition for applying § 2254(d) does not exist. Cummings concedes that the claim is unexhausted but not that it is procedurally defaulted. If the claim were procedurally defaulted, however, then the default is excused under *Martinez*.[34] State post-conviction counsel (1) deficiently failed to plead the claim, (2) which is substantial. *See Martinez*, 566 U.S. at 14. The Director makes a generic argument that state post-conviction counsel was effective on the grounds that they reasonably winnowed claims, and this Reply contains responses to that argument that are hereby incorporated by reference. *See* Section II.E.3. What follows are claim-specific responses to the Director's assertion that there is no *Martinez* excuse here.

---

[34] As with the other claims, Cummings could also excuse any default because he can satisfy the miscarriage-of-justice gateway.

With respect to the ineffectiveness of state post-conviction counsel, two of Cummings' state post-conviction lawyers declared that there was no strategic reason for omitting the claim. App. 424; App 427-28. Ashley Steele's explanation is particularly detailed. App. 424. Both attorneys refute the argument that the inexperienced attorneys constructing the state application made a strategic judgment to plead a weaker claim about the deficient failure to call an expert and the failure to object at trial, rather than the far stronger claim presented here with distinct allegations and evidence about upstream investigative deficiencies.

With respect to the substantiality of the underlying claim, a burden Cummings must meet in order to satisfy the *Martinez* excuse, he incorporates by reference all the arguments made in Section II.G.1, *supra*, as well as those appearing in the Petition itself.

### H. CUMMINGS IS ENTITLED TO RELIEF BECAUSE THE DEFENSE TEAM WAS SUBJECT TO A CONFLICT OF INTEREST.

#### 1. Conflicted agents on the defense team resulted in the denial of Cummings' Sixth Amendment right to effective assistance of counsel.

Claim 8 asserts that two agents of defense counsel—the defense team's chief investigator (Ed McElyea) and its most important expert (Mike O'Kelly)—were simultaneously working on the defense of Steven Peace whose interests were antagonistic to Cummings. The State's theory at trial was that Cummings orchestrated gangland-style revenge for Hubert's role in killing Bowers. Trial counsels' priorities should have included showing that the revenge motive was fabricated because someone else killed, and was reputed to have killed, Bowers. Peace was *actually tried* for having killed Bowers, but was barely mentioned in the Cummings case because McElyea and O'Kelly were simultaneously working for Peace. The Director does not contest that this is a conflict of interest, but argues that the conflict does not rise to a level that is cognizable under the Sixth Amendment. She is wrong.

60

There are two ways in which the conflict violated the Sixth Amendment. The first involves a formal conflict-of-interest violation under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which entails a far lower showing of prejudice than what is associated with more familiar *Strickland* claims. *Strickland*, 466 U.S. at 692. The second is a *Strickland* claim, which requires the familiar showing of deficiency and prejudice. No matter which framework this Court applies, there was a Sixth Amendment violation.

*The* Cuyler *claim.* With respect to *Cuyler*, Cummings must show (1) a conflict and (2) some adverse effect. *Strickland*, 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 350). On the conflict prong, the Director's principal argument is that it does not cover a conflict of interest involving the attorney's investigators. Fifth Circuit law flatly rejects the distinction because those defense-team members work in the name of the defendant. *Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003), straightforwardly applied the *Cuyler* framework to an investigator conflict. *See id.* at 352-55. Indeed, *Guy* reflects the well-established rule that the behavior of subordinate defense team members is charged to leadership—attribution akin to what is required by agency law. *See* Pet. 110-11 (collecting state and national standards).

The Director's secondary argument on the conflict prong is that, although there is a conflict, it is "tangential" because the pertinent issue is whether Cummings *believed* Peace was the murderer. Ans. 133-34. Indeed, that is the issue, but the Director writes as though the evidence showing that Peace *actually* committed the murders and that Cummings *believed* he committed them is separate and distinct. That is not the case. Evidence about what actually happened overlaps the evidence about what *Cummings* believed to have happened. An investigation like the one here will involve how the murder for which retaliation was allegedly sought was understood on the street—because that information goes to who *actually* killed Bowers and what Cummings *believed* about that murder.

As explained in the Subsection on the adverse effect of the conflict, that is precisely what happened. *See* Pet. 112-16.[35]

With respect to *Cuyler*'s second prong, an adverse effect on the defense, the Director's only response involves a return to a familiar well: the Petition included no affidavit from trial counsel. *See* Ans. 135. Although the Court is by now familiar with this argument and Cummings' response to it, it is particularly out of place here. *See Cuyler*, 466 U.S. at 368 (Marshall, J., dissenting) ("In the usual case, ... we might expect the attorney to be unwilling to give such supportive testimony, thereby impugning his professional efforts."). Under *Cuyler*, the issue is not whether there was a strategic decision about something, but whether there was a conflict of interest that had an adverse effect on the litigation. Of course, it is possible that trial counsel's testimony could be probative on the issue, but there is not a shred of law anywhere suggesting that such affidavits are necessary to a prima facie *Cuyler* showing—there is not even authority suggesting that they are necessary to a *Strickland* showing. The Director makes no attempt to answer the detailed evidence showing the adverse effect on the litigation, *see* Pet. 112-16, opting for the familiar single-sentence reference to trial counsel affidavits.

---

[35] The Director also argues in passing that the Fifth Circuit only applies *Cuyler* in "multiple representation" scenarios. Ans. 133. This *is* a multiple representation scenario in the sense used by the Fifth Circuit to describe *Cuyler* violations, because that term means "representation of multiple criminal defendants." *Hernandez v. Johnson*, 108 F.3d 554, 559 (5th Cir. 1997). *Hernandez* expressly failed to endorse the reading of the Fifth Circuit cases the Director seems to suggest: that "multiple representation" means only the simultaneous representation of co-conspirators in a single criminal case. *See id.* at 559-60 ("We shall assume arguendo that the putative conflict presented by Borchers's prior service as district attorney when Hernandez was convicted of felonies in Webb County presents a *Cuyler* problem, although Borchers did not represent multiple defendants but two parties with arguably disparate interests."). As explained by the very authority the Director cites, the point of the restriction on *Cuyler* scenarios is to ensure that it is *Strickland*, rather than *Cuyler*, that applies when the conflict is between the interest of the client and the *personal interest of the lawyer*. *See United States v. Garza*, 429 F.3d 165, 172 (5th Cir. 2005), *cited in* Answer at 133 (explaining that *Cuyler* does not apply because the conflict alleged was between an obligation to a client and the attorney's "personal interest"); *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000), *cited* at Ans. 133 ("An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.").

Ans. 135. The evidence adduced in the Petition is indeed different from a trial counsel affidavit—it is far better for being contemporaneous and free of influence by the attorney's self-interest.

*The* Strickland *claim. Strickland* requires a showing of (1) deficiency and (2) prejudice. 466 U.S. at 687. On deficiency, the Director's primary response is that "Cummings's claim that counsel should have done a better job emphasizing this evidence through the examination of various witnesses does not rise to the level of constitutional deficiency." Ans. 135-36. Of course, that is not the deficiency that Cummings is asserting. The deficiency is the conflict of interest; the poor trial performance is the *prejudice.*

The Director simply fails to answer the deficiency allegations that are included in the Petition. Trial counsel was deficient on at least two different theories related to the conflict. First, the conflicts are vicariously attributed to trial counsel. Pet. 110-11. Second, even if there were no rule of attribution, trial counsel were deficient for failing to adequately ensure that the defense team was not tainted by conflict. Pet. 111. *Guy* holds that both forms of deficiency can be Sixth Amendment violations. *See* Pet. 111 (citing *Guy*, 343 F.3d at 352-55, and quoting *Matthews v. U.S.*, 682 F.3d 180, 188 (2d Cir. 2012)).

With respect to prejudice, the Director makes the jarring argument that the conflict had little effect because Cummings' belief that Hubert killed Bowers was not an important part of the State's theory. Ans. 136-37. As explained in the Petition, in a case so lacking in physical and testimonial evidence connecting Cummings to the murders, the state relied *heavily* on its theory of motive: that Cummings murdered Hubert because Hubert killed Bowers. Pet. 116-17. The Director's suggestion that the State's theory of motive was somehow a secondary part of its case is refuted by the TCCA's finding that "[t]he State's theory at ... trial was that applicant and two co-defendants ... committed the murders in revenge...." *See Ex parte Cummings*, 2018 WL 1516614 at *1 (Tex. Crim. App. Mar. 28, 2018). That finding is binding on this Court. 28 U.S.C. § 2254(e)(1).

## 2.   If Claim 8 is procedurally defaulted, then any default is excused.

Cummings concedes that Claim 8 is unexhausted, but not that it is procedurally defaulted. If Claim 8 is procedurally defaulted, however, then that default is excused under *Martinez*.[36] Under *Martinez*, Cummings need show (1) state post-conviction counsel's ineffectiveness and (2) the substantiality of the underlying claim. 566 U.S. at 14. Cummings' replies to the Director's generic arguments about the effectiveness of state post-conviction counsel are hereby incorporated by reference. What follows is claim-specific support for the ineffectiveness showing. And, once again, state post-conviction counsel explain for themselves.

In her declaration, state post-conviction attorney Steele explains that there "was no strategic reason for OCFW leaving that important claim out of the state habeas application." App. 425, ¶ 16. OCFW did not even know that the conflict existed "because of the inadequate investigation our office conducted." *Id.* The Director's generic response to the *Martinez* excuse is to assert that the state post-conviction application included other claims that might have conflicted with one of the omitted claims, but Steele explains that "[t]he omission of this argument was particularly damaging because it could have bolstered the other positions taken in the application." *Id.*

In his declaration, OCFW Director Wolff likewise stated that "there was not and could not have been any strategic reason for omitting an ineffective assistance claim centering on the defense team's simultaneous representation of Cummings and Steven Peace." App. 428, ¶ 11. Wolff also explained what should have happened: "the OCFW team investigating the case should have cross-referenced the Cummings and Peace records, demonstrating the conflict." *Id.* He reinforced that the failure to include the conflicts claim had nothing to do with a decision to present claims that the

---

[36] As with the other claims, Cummings could also excuse any default because he can satisfy the miscarriage-of-justice gateway.

office viewed as stronger, because "[a]sserting the defense team's conflict would have been completely consistent with the other arguments in the petition that OCFW filed." *Id.*

### 3. Relief is not *Teague*-barred.

For the reasons stated regarding Claim 1, *supra*, the State's cursory assertion of a *Teague* bar is inadequate to raise the issue. Without waiving his objection to the inadequacy of the Director's assertion of the defense, Cummings notes the Director's argument founders on the well-settled rule "that the application of established general procedural principles in an analogous context is not a new rule barred by *Teague.*" *Burdine*, 262 F.3d at 344. Here, the Director argues that applying the no-conflicts rule of *Cuyler* and its predecessors would constitute a new rule. Ans. 131. The Director implicitly acknowledges its argument is foreclosed by *Guy, supra*, but contends that decision should be ignored because it "resolves little legally and simply remands for further fact-finding." *Id.* Because the decisions of lower federal courts are probative of whether the application of a principle to an analogous context creates a new rule, *Caspari v. Bohlen*, 510 U.S. 383, 395 (1994); *Saffle*, 494 U.S. at 490, and the remand in *Guy* would have been unnecessary if relief were barred by *Teague*, the case cannot be so easily ignored.[37]

The Director points to no case from any jurisdiction that goes the other way on the question. She cannot. The general principle from *Cuyler* is that "counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Strickland*, 466 U.S. at 688 (citing *Cuyler*, 446 U.S. at 346). Counsel cannot fulfill that duty when he relies upon agents who are simultaneously privy to all the confidences of, and owe duties of loyalty to, two defendants with antagonistic interests. If defense counsel's agents are not bound by the same duty of loyalty as counsel, defense experts could be hired

---

[37] The Director's citations to case law about how there is no constitutional right to effective experts, *see* Ans. 131, are not relevant. Cummings is not asserting such a theory.

by the prosecution and freely walk from the jail to the U.S. Attorney's Office to tell the prosecutor everything they just heard from the defendant.

## I. CUMMINGS IS ENTITLED TO RELIEF BECAUSE TRIAL COUNSEL DEFICIENTLY AND PREJUDICIALLY LITIGATED *BATSON*.

The Director's approach to Claim 9, which asserts ineffectiveness in handling a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), violation, is to mischaracterize it. The claim is not merely that the defense team's *Batson* objection was "not good enough," as the Director suggests. Ans. 138. The claim is that trial counsel, a recent law school graduate conducting her first voir dire, did not understand the basic *Batson* framework used to select a jury in a death penalty case. As a result, she made unreasonably flawed *Batson* objections to venirepersons Cobb and Thomas. Errors or omissions based on misunderstandings of law are deficient. *(Terry) Williams*, 529 U.S. at 395 (trial counsel ineffective for failing to "uncovered extensive records ... because they incorrectly thought that state law barred access to such records"); *Kimmelman*, 477 U.S. at 385 (counsel ineffective for failing to conduct discovery based on "mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense"). As with most of the other trial ineffectiveness claims in the Petition, state post-conviction counsel unreasonably failed to spot the issue in its review of voir dire.

### 1.  There was a *Batson* violation with respect to Cobb.

With respect to prospective juror Cobb, the Director argues that there was no deficiency because trial counsel's unfamiliarity with the three-step *Batson* framework was reasonable, and no prejudice because the *Batson* objections would have failed in any event.

*Deficiency.* The reason the Director chooses to excerpt the TCCA decision, Ans. 141-144, is unclear because it supports the claim. The exclusive thrust of the excerpt is that trial counsel failed

to make out a prima facie case of discrimination at *Batson* Step 1. Cummings agrees.[38] In suggesting that trial counsel reasonably litigated *Batson* because Cobb was not "the last remaining African American," Ans. 145, the Director badly distorts the TCCA opinion. The TCCA was explaining that trial counsel's *exclusive* reliance upon the argument that Cobb was "one of the only African American jurors on this panel that we've even gotten close to qualifying," made it necessary for Cummings to show that she was the *only* qualifying African American panelist. The point of Cummings' claim is that counsel had all that she needed to make a stronger *Batson* claim. She was deficient for making the flawed argument that the Director (correctly) identifies as unmeritorious, and for failing to recognize the other grounds set out in the Petition.

*Prejudice.* In this context, the prejudice prong requires Cummings to show a reasonable probability that the *Batson* objection would have been upheld. (As a corollary, Cummings does not need to show, with certainty, that the *Batson* objection would have prevailed.) The Director's position on prejudice is that trial counsel's unfamiliarity with the *Batson* framework did not matter; the trial court would have upheld the State's peremptory strike of Cobb as race neutral anyway. Ans. 145-46. She argues that Cobb vacillated about whether she could impose the penalty on a non-shooter, and stated that, "a venire member's vacillation on whether he or she could impose a death sentence is a race-neutral reason," Ans. 146 (citing authority), meaning it is in all cases. The cited authority does not support the proposition, because the proposition is untrue; vacillation *can be* a race-neutral reason, but whether it is depends on context. *See Miller-El v. Dretke*, 545 U.S. 231,

---

[38] The brief discussion of the TCCA excerpt includes a footnote suggesting that a *Batson* claimant has to prove some subset of the circumstances specific to Thomas Jo Miller-El's case in order to prevail. Ans. 144-45. Of course, the conduct at issue in *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (*Miller-El I*), and *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*), is an *example* of a *Batson* violation, not a set of *requirements* for proving one. Nor is the material in this footnote relevant to the issue for which it is invoked—to the question of whether trial counsel deficiently litigated Step 1.

256 (2005) (rejecting "expressed ambivalence about the death penalty" as race-neutral reason given context). Only by comparing the treatment of similarly situated white panelists can a court know if vacillation is race neutral in a given case. *See id.* at 257-58.

The Director falsely narrates voir dire to portray Cobb as exhibiting extreme vacillation that justified treating her differently from similarly vacillating white jurors. When asked, however, Cobb immediately and without hesitation declared that she could—across all categories specified in the Texas statute—find defendants guilty of capital murder. 24 **RR** 149-52; *see also* 24 **RR** 152 (responding "I agree" when asked whether she thought it was "good for all of those cases" that offenders in Texas capital murder categories could be receive "death by lethal injection"). *See also* 25 **RR** 186 (agreeing with Texas law of parties); 25 **RR** 188 (saying "yes" she could impose death on a non-shooter in a bank-robbery case); 25 **RR** 189-90 (saying repeatedly and without qualification she could impose death on lookout in same fact pattern).

When the trial court clarified a hypothetical about a non-shooter with no criminal record, Cobb stated, without qualification, that she could impose the death penalty on such a defendant. 25 **RR** 194. The prosecutor thereafter continued to badger Cobb to say that she would not impose the death penalty for a non-shooter with no criminal history. 25 **RR** 197-99. When she appeared to indicate that she would not, the State exercised a challenge for cause. 25 **RR** 199.

What the Director calls "vacillation" was Cobb's confusion at the form of the State's questioning. When Cobb was asked straightforwardly whether she could "answer those questions honestly and based on the evidence," she answered in the affirmative, without equivocation. 25 **RR** 202. The State thereafter became frustrated, even though Cobb *again* emphasized she could impose the death penalty on a non-shooter. 25 **RR** 206 (prosecutor telling Cobb that she was "chang[ing] her mind"). Cobb explained that her confusion had disappeared because she had come to understand that there was a separate punishment phase in which the evidence would be considered

independently. 25 RR 206. It was at that point that the State exercised a peremptory strike. 25 RR 207.

The question of prejudice comes down to the comparison between Cobb and another panelist, Reed. Pet. 125-26. In contrast with its treatment of a black panelist who expressed unconditional willingness to impose the death penalty on a non-shooter, the State responded gently to the (ultimately seated) white panelist who expressly stated that she did not "know that [she] could say [she] could absolutely sign that paper" *under any circumstances.* 13 RR 22-23. Juror Reed's ability to deviate from her baseline willingness to impose the death penalty in accomplice-murder scenarios is secondary to the fact that her baseline level was far lower than Cobb's to begin with.

Moreover, and with respect to accomplice liability specifically, even just a *glance* at the voir dire questioning for Reed (the white panelist) reveals the differences with the questioning of Cobb (the black one). 13 RR 34-35. In Cobb's case, the State explained that it was exercising a peremptory strike because, despite her answers, it was insufficiently satisfied that she could be open to the death penalty in *every* capital accomplice-liability scenario. In Reed's case, the State gently explained, "all we ask that you do is be open to the possibility"—i.e., the State accepted Reed it there was *any* accomplice-liability scenario in which she would impose the death penalty. 13 RR. 34-35. There is a reasonable probability that the deficiently litigated *Batson* objection would have been upheld had trial counsel been familiar with the *Batson* framework and presented the disparate treatment.

## 2.  There was a *Batson* violation with respect to Thomas.

There was also an IATC-*Batson* violation with respect to Thomas.[39] Moments after the State struck the first qualified black panelist for which a peremptory could be exercised, the State did it

---

[39]  Cummings has verified Thomas' race by cross-referencing information from earlier investigations, her date of birth, information on social media, addresses, and other sources.

*again.* After having just been chided for not understanding *Batson* Step 1 on the Cobb objection, trial counsel did not even get that far.

The Director's Thomas-specific answers are somewhat disorganized, and contradictory. On the one hand, the Director makes what undersigned assumes is a prejudice argument that the deficiency would not matter because there "likely" were race neutral reasons Thomas to be *disfavored by the State.* Ans. 147. The Director then appears to return to deficiency, arguing that trial counsel's decision might have been strategic, based on what attributes of Thomas's profile *favored by the State.* Ans. 147-48. Not only do these contradict one another, each is unsupported by facts. Further discovery should determine the outcome of this claim.

Consider what one can infer to be the Director's position on prejudice. The Director speculates the State struck Thomas "because her husband had unfavorable interaction with the police," because she "had a brother who was in jail," or because "she would want to see a strong circumstantial case." Ans. 147. These arguments are make-weight. In terms of her husband's interactions with the police, for example, Thomas referred to the fact that police stopped her husband several times on the way home from his night club, early in the morning. 25 RR 457-58. She explained that "it was not that big of a deal" and that she believed that they were being vigilant about "drinking and driving" at "that time of the morning[.]" 25 RR 458.

Whether the Director can ultimately find evidence to support her responses is beside the point. At the pleading stage, post-hoc rationalizations not clearly supported by the record cannot form the basis for summary dismissal. All the Petition need contain is the allegations and factual support necessary to establish that the prejudice showing is plausible. At the appropriate time, the prosecutors can submit statements or otherwise provide an account under penalty of perjury.

### 3.   If Claim 9 is defaulted, any default is excused.

Cummings concedes that Claim 9 is unexhausted, but not that it was procedurally defaulted. If Claim 9 is procedurally defaulted, however, then that default is excused under *Martinez*.[40] Under *Martinez*, Cummings need show (1) state post-conviction counsel's ineffectiveness and (2) the substantiality of the underlying claim. 566 U.S. at 14. The responses to the Director's generic arguments about the effectiveness of state post-conviction counsel are hereby incorporated by reference. What follows is claim-specific support for the ineffectiveness showing. Post-conviction counsel's declarations present more than sufficient grounds to proceed.

State post-conviction attorney Steele explained that she believed that "there was no strategic reason for omitting this claim . . . with respect to these two jurors." App. 425, ¶ 18. State post-conviction attorney and OCFW Director Wolff provided even more detail, declaring that "it is clear to me that the defense attorney conducting the voir dire of those two panelists was unfamiliar with how the three-step *Batson* framework worked in practice." App. 428, ¶ 12. He continued, "Because *Batson* error is structural, there was no strategic reason for OCFW having failed to include a claim about trial counsel's failure to adequately litigate it." *Id.*

State post-conviction counsel's failure to include an IATC-*Batson* claim is also inconsistent with the Director's general argument that state post-conviction counsel successfully identified and asserted only the strongest claims, and left weaker ones out for fear of inconsistency. Steele lamented the failure to include the IATC-*Batson* claim as "particularly unfortunate because of the way the prosecution used Rickey's race and purported status as a gang member to attempt to instill fear in the jurors who ended up being all white." App. 425, ¶ 18. Wolff similarly observed that "[t]he fact that there were constitutional violations in the course of obtaining an all-white jury would have

---

[40] As with the other claims, Cummings could also excuse any default because he can satisfy the miscarriage-of-justice gateway.

complemented a number of other positions OCFW was taking in the state post-conviction proceeding." App. 429, ¶ 12.

> **J.** **CUMMINGS IS ENTITLED TO RELIEF BECAUSE THE STATE VIOLATED *EDDINGS* WHEN IT EXCLUDED MITIGATING EVIDENCE AT THE PUNISHMENT PHASE.**
>
> ### 1.  There was an *Eddings* violation.

Claim 10 asserts the state courts misapplied *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Specifically, in refusing to admit the Nguyen testimony, the state courts violated well-established constitutional rules (1) requiring that evidence relevant to the sentencing determination be admitted, and (2) emphasizing "relevance" for the purposes of sentencing means the same thing as it does in other contexts. Cummings is not, as the Director suggests on several occasions, seeking relief on a claim that Texas courts misapplied Texas law—an argument that would not form a cognizable basis for federal habeas corpus relief.

Tellingly, the Director leads with language tracing to a concurrence by Justice Kennedy that has since been declared non-controlling: Justice Kennedy's observation that *Eddings* requires no more than the presence of a non-"severe" restriction that permits some consideration of relevant mitigating evidence. Ans. 155-56 (citing *Johnson v. Texas*, 509 U.S. 350, 361-62 (1993) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456 (1990) (Kennedy, J., concurring in judgment))). In *Abdul Kabir v. Quarterman*, 550 U.S. 233 (2007), and *Brewer v. Quarterman*, 550 U.S. 286 (2007), the Supreme Court refused to treat this phrasing as a holding, and emphasized that *Eddings* requires that a jury be able to hear all relevant mitigating evidence, and be able to give it full mitigating effect. *See Brewer*, 550 U.S. at 295 (overturning court of appeals for having ignored requirement that jury be able to give "full effect" to mitigating evidence); *Abdul Kabir*, 550 U.S. at 246 ("[O]ur cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty . . . .").

As explained in the Petition, the trial court made a flagrant *Eddings* error by restricting the introduction of relevant mitigating evidence. The discussion does not need too fine a point; when presented with the *Eddings* violation, the TCCA invoked "abuse of discretion review" to repackage the trial court's relevance holding as a reliability holding. Pet. 132-33. Likely discerning the egregiousness of the trial court's *Penry* error, the Director focuses on the TCCA decision. Ans. 156. The TCCA assumed that Nguyen's testimony was relevant, and instead rejected it on a different state procedural ground: that, even though the testimony was relevant, she was not reliable. Pet. 132-33. This scenario therefore implicates questions about whether that state ground is sufficiently adequate and independent so as to restrict federal habeas review, but not questions about whether Cummings alleges a constitutional violation.

On the harmfulness of the error, the Director offers only the following sentence: "Under *Brecht*, Cummings has not demonstrated a substantial and injurious effect on the verdict." There is no substance whatsoever to this answer, and Cummings simply refers the Court the discussion of harm appearing in the Petition. Pet. 133-34.

## 2.  Review of the *Eddings* claim is unrestricted by 28 U.S.C. § 2254(d).

Section 2254(d) restricts relitigation only for claims decided "on the merits" in state court. Cummings presented the TCCA with an *Eddings* claim and the TCCA invoked a state procedural law to affirm the trial court decision on alternate grounds. Such a determination is not a decision "on the merits" of the claim, and it is therefore not a claim subject to the § 2254(d) preclusion bar. *Johnson v. Williams*, 568 U.S. 289, 302-303 (2013). Cummings has not argued that he satisfies the exception for legally unreasonable decisions appearing in § 2254(d)(1) because the TCCA's application of state law terminates the inquiry.

That the trial court plainly made a relevance holding is evident from the full context of the State's objection, and the trial court's responsive determination. The Director crops the language of the objection, but it is reproduced below:

> THE COURT: And what's the State's objection?
> MR. DAVIS: *Our objection is that this is not relevant.* The witness is unable to tie any of these factors to this particular defendant, and I believe the Courts have made it abundantly clear that sentencing in a capital case is to be an individualized procedure. If she were able somehow to tie any of these risk factors to this particular defendant, I might have a different opinion, but simply to get up here and to cite a study with no relationship whatsoever to this defendant, whether any of these factors actually did affect him, she keeps continuing to say, "they could have," but there is no showing that any of these factors had any affect [*sic*] on this defendant. They are just generalized information, and she's unable to tie it to this particular defendant. That's the problem that I have. I'm also troubled very greatly by the racial breakdown here. I don't want this jury looking at this defendant as an African American defendant, and I feel that these slides would do so. That's not a proper consideration for this jury, to take into account this individual's race. He's to be judged as a man and not as a particular member of a race. Also, just to add to that objection, I asked this witness if she has any expertise outside of her degrees with regard to geography, and she said no. She has no work in social studies whatsoever, and that expertise perhaps would allow this witness to make some connection between the DOJ study and this defendant, but she doesn't hold that expertise either, and for that reason, *I also would say that she's not qualified as an expert in this matter.*

44 RR 81-82 (emphasis added). The State made a relevance objection, and then tacked an objection about the expert's qualifications onto the end of it.

The full context of the trial court's ruling, however, plainly discloses that the trial court accepted the first part of the State's objection (relevance), not the second (qualifications):

> THE COURT: Okay. I'm going to sustain the State's objection. I don't think this information was proven to be scientifically reliable. I don't see any -- I don't think the methodology has been proven. I don't think that the standard of reliability is there. This testimony has never been offered in any capital case, by the defense's own -- at least what you're telling me, it has not been offered.
> MR. REAVES: No capital case in Texas. She said she testified in some other        cases.
> THE COURT: Only three in the whole country. Is that what I understood? Were these capital cases you testified in?
> THE WITNESS: They were capital cases. I have been involved in 23 cases at the State level and 11 at the federal level. However, other experts used the maps that I created.
> THE COURT: *I might have a different opinion if this data were individually tailored to this defendant, but it's not. It's a series of generalizations that you-all are asking the jury to apply*

> *specifically to this defendant, and there is no -- there is really no connection, so I'm not allowing it.*

40 RR 83.

On appeal, the TCCA ignored the trial court's ruling and assumed that the testimony was relevant. Pet. 132-33. It ultimately affirmed the ruling on a state procedural ground, however, swapping in the qualifications rationale urged by the Director. Pet. 132-33. The *Eddings* claim, therefore, was not "adjudicated on the merits in State court proceedings," which is a precondition for applying the relitigation bar in § 2254(d).

### 3.   This Court can decide the claim because the procedural ground imposed by the Texas court was inadequate.

The TCCA did not resolve the *Eddings* claim on the merits, and instead denied the claim on a state procedural ground. Such a procedural refusal bars federal habeas review only if it is both "adequate," meaning, as relevant here, that it is firmly established and regularly followed so as support the judgement, and independent of federal law, meaning that it is not intertwined with the merits of a constitutional question. *See Cone v. Bell*, 556 U.S. 449, 465 (2009); *James v. Kentucky*, 466 U.S. 341, 348 (1984). The TCCA's procedural ruling—an alternative holding purporting to affirm on a ground not relied upon below and for which there was no notice to the disadvantaged party—does not disable this Court's ability to hear the constitutional challenge. Under controlling precedent, the state procedural ground was inadequate, and the adequacy of the state ground is a federal question. *See Cone*, 556 U.S. at 465 ("adequacy is itself a federal question") (internal quotation marks and citations omitted).

This Court has "an independent duty to scrutinize the application of state rules that bar our review of federal claims[.]" *Cone*, 556 U.S. at 468. In this case, the procedural basis for barring review of the claim was inadequate. In *Lee v. Kemna*, 534 U.S. 362 (2002), the Supreme Court considered the adequacy of a state appellate decision that rejected a due process claim on a

procedural ground that had been available to, but not relied upon by, the trial court. *See id.* at 372-73. Again emphasizing that the adequacy of the procedural ground was itself a federal question, *id.* at 375, the Court explained that there exist "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Id.* at 376.

Under *Lee*, the state procedural ground falls within the narrow category of inadequacy, because a rule permitting appellate courts to affirm on alternative procedural grounds—the qualifications rationale—is not "firmly established and regularly followed." *James*, 466 U.S. at 348. The trial court decided that the testimony was not relevant because testimony about community risk factors was not "individualized." The ruling had nothing whatsoever to do with Nguyen's qualifications. The TCCA then held that, the trial court did not deny its discretion in refusing Nguyen's testimony based on her qualifications—something that did not happen. App.195. In so doing, it cited *Coble*, 330 S.W.2d at 272, another case about whether the trial court's *actual ruling* was abuse of discretion. *See id.* at 272-73.

In short, the *Eddings* claim was not decided on the merits, but this Court should not treat it as having been procedurally defaulted because the state procedural ground that the TCCA invoked was inadequate under *Cone*, *Lee*, and *James*.

## CONCLUSION

Wherefore, based on the foregoing, Cummings respectfully requests that the Court grant Cummings' motions for discovery and stay and abeyance, and grant the relief sought in the Petition.

///

///

///

///

76

Dated: October 14, 2019


Respectfully submitted,


Maureen Franco
Federal Defender
Western District of Texas

*/s/ Tivon Schardl*
Tivon Schardl
Capital Habeas Unit Chief
Florida Bar No. 73016
Timothy Gumkowski
Assistant Federal Defender
Texas Bar No. 24104788
919 Congress Avenue, Suite 950
Austin, Texas 78701
737-207-3007 (tel.)
512-499-1584 (fax)
Tivon_schardl@fd.org
Tim_gumkowski@fd.org

*/s/ Lee B. Kovarsky*
Lee B. Kovarsky
Phillips Black
A Non-Profit Law Practice
Texas Bar No. 24053310
500 West Baltimore, Room 436
Baltimore, Maryland 21201
434-466-8257 (tel.)
l.kovarsky@phillipsblack.org


*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of October 2019, I electronically filed the foregoing

Petitioner's Reply to Respondent's Answer and Brief in Support with the Clerk of Court using the

CM/ECF system which will send notification of such filing to the following:


Stephen M. Hoffman
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711
(512) 936-1400
Stephen.hoffman@oag.texas.gov


_/s/ Timothy Gumkowski_____
Timothy Gumkowski