## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **RICKEY DONNELL CUMMINGS,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. W-18-CV-125-ADA** |
| | § | |
| **ERIC GUERRERO, Director,** | § | **\* DEATH PENALTY CASE \*** |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

### MEMORANDUM OPINION AND ORDER

Petitioner Rickey Donnell Cummings initiated this federal habeas corpus action pursuant to 28 U.S.C. § 2254 to challenge the constitutionality of his 2012 capital murder conviction and sentence of death. Currently before the Court is Cummings's Amended Petition for Writ of Habeas Corpus (ECF No. 73), as well as Respondent Eric Guerrero's Amended Answer (ECF No. 79) and Cummings's Reply (ECF No. 82) thereto. Having carefully considered the record and pleadings submitted by both parties, the Court concludes Cummings is not entitled to federal habeas corpus relief or a certificate of appealability.

## I. Background

### A. The Offense

In June 2011, a McLennan County grand jury indicted Cummings for the March 28, 2011, murders of Tyus Sneed and Keenan Hubert committed by shooting both victims with a firearm during the same criminal transaction. (ECF No. 19-1 at 9) (Indictment).[1] Cummings's trial

---

[1] Pursuant to an order from this Court, Respondent electronically filed a copy of all the relevant state court records from Cummings's trial, appellate, and state habeas corpus proceedings. For reference, the Clerk's Record and Reporter's Record from Cummings's trial are found on the Court's electronic docket at ECF Nos. 19 through 22 (cited in parenthesis throughout).

commenced in October 2012.  After hearing testimony and arguments for nine days, a jury found

Cummings guilty of capital murder as charged in the indictment.  (ECF No. 19-2 at 73-74)

(Judgment).  The Texas Court of Criminal Appeals (TCCA) accurately summarized the evidence

presented at Cummings's trial:

> The State's theory at [Cummings]'s November 2012 trial was that [Cummings] and two co-defendants, Albert Love and [Cummings]'s younger brother, D'Arvis Cummings, committed the murders in revenge against Keenan Hubert, whom they believed had killed their friend, Emuel Bowers III.

> To support its theory, the State presented evidence that Bowers was shot to death in April 2010 near an East Waco park.  [Cummings], D'Arvis, and Love were among Bowers's close friends.  [Cummings] and Bowers's family were intent on determining who killed Bowers, and they came to believe that Hubert was the culprit.  As the first anniversary of Bowers's murder approached, they were frustrated that the police had not arrested anyone.  And, in the period between Bowers's murder and the instant offense, [Cummings] and Hubert had various tense encounters with each other.

> On the evening of the instant offense, [Cummings] and Hubert had another unfriendly encounter.  Specifically, Hubert, Marion Bible, and Deontrae Majors were sitting in Majors's parked car at the Lakewood Villas, an East Waco apartment complex.  They were smoking marijuana and socializing.  [Cummings] walked by the car and "mean mugged" or glared at Hubert.  Hubert responded by rapping some antagonizing song lyrics at [Cummings].  After [Cummings] walked away, Tyus Sneed joined Hubert, Bible, and Majors in the car, and the group continued to smoke and socialize.

> After glaring at Hubert, [Cummings] was in an agitated state.  Around this time, [Cummings] received a text from his girlfriend, asking if he was okay and if he was getting ready to fight someone.  [Cummings] also threatened to "shoot up" a car that was arriving at the complex, because [Cummings] believed the car had almost hit him.  The car's passenger, Darnell "Bo" Atkins, was arriving to visit his girlfriend.  Bo knew [Cummings] and talked to him.  They then went to Bo's girlfriend's apartment, where they talked and smoked marijuana.  Bo's teenage son, Miche'al Atkins, was present and overheard [Cummings] say something about how [Cummings] was going to shoot someone.  Although Miche'al was in another room, Miche'al was able to hear [Cummings]'s statement because of the "above average" volume of [Cummings] and Bo's conversation.  After making the comment about shooting someone, [Cummings] received a telephone call.  Miche'al could not hear [Cummings]'s part of the conversation, but when the call ended, [Cummings] left the apartment.

> At about 11:20 p.m., roughly twenty minutes after [Cummings] left Bo's girlfriend's apartment, assailants riddled Majors's car with gunfire, shooting out

the back windows.  Hubert and Sneed, who were sitting in the back seat, died at the scene from multiple gunshot wounds.  Although they were both wounded, Bible and Majors escaped through the front passenger side door and fled to a nearby apartment that Bible shared with various people, including his girlfriend's aunt, Nickoll Henry.  Henry was inside the apartment and went to the front door right after Bible and Majors burst in.  Henry saw [Cummings] standing about ten feet away, trying to unjam a semiautomatic pistol.  Henry shut the door, locked it, and fled deeper inside the apartment until police and emergency medical personnel arrived.

The shell casings and projectiles recovered from around Majors's car indicated that Hubert and Sneed's assailants probably used an AK–47 or SKS assault rifle, as well as firearms capable of firing .38–, .40–, and .45–caliber ammunition.  In addition, Henry's apartment had bullet damage to the exterior wall and a bullet hole in the wall behind the living room couch.  The bullet damage had not been there before the offense.  There was also a .45–caliber cartridge on Henry's dining room floor.  The cartridge had not been there before the offense.

Minutes after the shooting and less than half a mile away, police officers made a traffic stop of a car that was traveling away from the scene and which generally matched the description of a vehicle reportedly involved in the shooting.

D'Arvis Cummings was the car's driver and sole occupant.  During that stop, officers seized a .45–caliber pistol later shown to belong to [Cummings].  A crime scene unit officer tested D'Arvis's hands for gunshot residue (GSR), obtaining a negative result, and photographed various items that were inside the car.  These items included several cell phones, a white t-shirt on the back seat, and a bottle of hand sanitizer on the backseat's floorboard.

When investigators arrested [Cummings] on April 1, they recovered a .40–caliber Ruger pistol from his vehicle, as well as .45–caliber and .38 Special ammunition, a red sweater, a red hoodie, and hand sanitizer.  [Cummings] had a loaded .40–caliber magazine fitting the Ruger in his front pocket.  [Cummings]'s hands tested negative for gunshot residue.  Ballistic comparisons did not match either of the seized pistols to the shell casings or projectiles recovered from the scene or the victims' bodies.  However, the .45–caliber ammunition recovered from [Cummings]'s car was the same, albeit widely-available, brand as the cartridge collected from Henry's dining room.

Although the seized pistols were later ruled out as the murder weapons and neither [Cummings]'s nor D'Arvis's hands tested positive for gunshot residue, the evidence showed that, about forty minutes before the shooting, Robert Sneed (Tyus Sneed's father) saw and talked to [Cummings] in one of the Lakewood Villas's breezeways.  [Cummings] was wearing a black hoodie with the hood raised.  Two unfamiliar men were standing at the end of the breezeway, although Robert did not know whether the men were with [Cummings].

Immediately before the shooting, another witness saw three black males[2] (one wearing a black top, one wearing a red top, and one wearing a white top) sneaking across the breezeway and around the corner of a building; the man wearing red carried a long gun attached to a shoulder strap. And Bible testified that, in a police interview about the shooting, he reported hearing a rumor that Love's girlfriend had bought Love an AK–47 rifle. Love had also previously shown Bible various handguns that Love owned, including a .38–caliber pistol and a .45–caliber pistol. In addition, on the afternoon of the offense, a witness saw a firearm consistent with an assault rifle lying on the backseat of [Cummings]'s car, although [Cummings] was not in the car and the witness did not recognize the driver. The witness photographed her cousin posing in the car with the weapon; this photograph was admitted at trial and published to the jury.

Cell phone records showed that [Cummings] had several communications with D'Arvis and Love shortly before the shooting occurred and that Love was in the vicinity of the Lakewood Villas at the time of those communications. Further, Brittany Snell was a friend of [Cummings]'s who lived at the Lakewood Villas. Snell testified that, shortly after the shooting, [Cummings] came to her apartment with Love and asked to use her phone so he could call D'Arvis. Snell's cell phone records established that [Cummings] made this call to D'Arvis's at 11:32 p.m., and thus that [Cummings] and Love were present at the Lakewood apartments twelve minutes after the shooting. While in Snell's apartment, [Cummings] used the bathroom and washed his hands, as did Love. After the shootings, other witnesses saw [Cummings] in the parking lot dressed in different clothing and watching while the bodies were removed.

At 1:52 a.m. on March 29, Love called Bowers's mother and had a two-minute-and seven-second conversation with her. Love then sent Bowers's mother a text message, to which she responded at 1:56 a.m. with, "Love yall too!!!" At 1:57 a.m., Love texted [Cummings], "Tbuck5," Bowers's rap name.

The State also presented evidence that, after the offense, [Cummings] tried to establish an alibi; destroy evidence of his participation, including incriminating texts on his cell phone; and intimidate witnesses such as Henry from cooperating with law enforcement. As additional proof of [Cummings]'s motive, the State presented evidence that he and Bowers had not just been friends, but had also been fellow members of a criminal street gang.

[Cummings] testified in his own defense. He denied having had any role in the shooting and he also denied having any involvement in an organized gang.

*Ex parte Cummings*, No. 84,324-01, 2018 WL 1516614, at *1-3 (Tex. Crim. App. 2018).

---

[2]    The record shows that [Cummings] and his co-defendants are black.

B.    **The Punishment Phase**

The punishment phase of Cummings's trial began November 5, 2012, and lasted three days. (ECF Nos. 20-16, 21-1, 21-2).  During that time, the jury heard testimony from nine prosecution witnesses and six witnesses presented on behalf of the defense.  That testimony is briefly summarized below.

1.    Evidence Presented by the State

The State's punishment-phase case consisted of Cummings's prior criminal behavior, including a juvenile charge of resisting arrest, several assault offenses, and a conviction for unlawfully carrying a weapon.

Tarl Llloyd, Jr., a former principal at G.L. Wiley Middle School, testified that Cummings made an unauthorized visit to the school's campus in December 2003.  (ECF No. 20-16 at 12-15). Cummings was not currently enrolled at Wiley and was asked to leave.  *Id*.  Although he was escorted off of campus and told not to return, Cummings later returned.  *Id*.  Former Wiley instructor Clifford Duevall testified that he again informed Cummings that he needed to leave, but Cummings refused.  *Id*. at 25.  When Duevall threatened to call the authorities, Cummings responded, "If I had a gun, you would not be saying that."  *Id*. at 26.  Duevall contacted former Waco ISD Police Chief Gilbert Miller, who arrived shortly thereafter in a marked vehicle.  *Id*. at 26, 31.  Cummings resisted being placed in handcuffs, but was eventually subdued by Miller and Duevall and placed in the car.  *Id*. at 27, 35.  Cummings was charged with resisting arrest and criminal trespass as a juvenile.  *Id*. at 37.

In July 2005, Cummings, still a juvenile, assaulted his grandmother's husband, Choyce Phillips, after an argument over what to watch on television.  *Id*. at 39-47.  Choyce, who is disabled and wears a brace on his leg, was sent to the hospital with several injuries to his face and pain in his knee.  *Id*. at 41.  According to Detective Joe Williams, who interviewed Choyce and his wife,

it took both Cummings's mother and grandmother to separate him from Choyce. *Id*. at 45. Cummings was charged in a juvenile proceeding with assault on a disabled person and placed on probation for one year. *Id*. at 47, 52-53.

Cummings also committed several assaults while attending Waco High School. Gerald Brewer, a former assistant principal in charge of discipline management, testified that Cummings committed his first assault on a student his freshman year. *Id*. at 58. He was suspended from school for three days and sent to alternative school for forty-five days. *Id*. at 58, 63. His senior year, Cummings committed his second assault on a student, again receiving a suspension for three days and assigned to alternative school for forty-five days. *Id*. at 58, 64. Upon returning to school, Cummings committed his third assault on a student—this time with the help of other individuals— in what was classified as gang activity. *Id*. at 60-61. Cummings was given the same punishment— suspended for three days and assigned to alternative school. *Id*. at 62.

As a senior at Waco High School, Cummings also assaulted sophomore Toylon Clark while he was waiting for the bus with his girlfriend, Meagan Sanders. Sanders testified that Cummings approached Clark and, without any provocation, struck Clark in the mouth with his fist. *Id*. at 78-79. Cummings was arrested, suspended from school, and ultimately pled guilty to assault. *Id*. at 82, 87-89.

Lastly, the State presented evidence concerning Cummings's conviction for unlawfully carrying a weapon. On November 2, 2008, Jeremy Neagle was working security outside a popular Waco nightclub when he noticed three men run down the street, enter a car, and speed off. *Id*. at 91-95. A moment later, Cummings appeared from between two parked cars, pointing a handgun at the car that just left. *Id*. at 95. Neagle and another security officer pulled their weapons and ordered Cummings to drop his. *Id*. at 96. Cummings did not comply. Instead, he took off running through the parking lot toward the nightclub, throwing his weapon away somewhere along the

way.  *Id*. at 96-97.  Neagle pursued and eventually apprehended Cummings while his colleague recovered the handgun.  *Id*. at 98.  Waco Police Officer Richard Baldwin ultimately took custody of Cummings and filed charges against him for unlawfully carrying a weapon on a licensed premise and for making a terroristic threat.  *Id*. at 106.  Cummings later pled guilty to unlawfully carrying a weapon, a misdemeanor, and received a sentence of seventy-five days in the county jail.  *Id*. at 109-10.

       2.      <u>Evidence Presented by the Defense</u>

In response, the defense presented several of Cummings's family members to testify about Cummings's background and character.  Erma Richards, Cummings's grandmother, testified that Cummings is a good kid who knows right from wrong.  (ECF No. 21-1 at 10-13).  She believed that Cummings would follow all the rules in prison and would not commit continuing acts of violence if given a life sentence.  *Id*. at 11.  Cummings's paternal aunt, Annetta Wilkerson, described Cummings as a caring, trustworthy person who was always willing to provide guidance to her two young boys.  *Id*. at 20-21.  According to Wilkerson, Cummings was a very giving and positive person despite the fact that his father had been in prison the majority of Cummings's life.  *Id*. at 21-22.  Cummings's maternal aunt, Ruby Brown, reiterated that Cummings was a very respectful, kindhearted person.  *Id*. at 34-42.  Cummings helped raise her ten-year-old son, who he treats as a little brother, and was always available to pick him up from daycare or help with homework.  *Id*.  Brown also characterized Cummings as a loving father, cousin, brother and grandson who would "do anything for anybody."  *Id*. at 40.

Cummings's older cousin, Jarrett Embry, testified that Cummings made "pretty good" grades while in school and had not been involved in a gang.  *Id*. at 26-27.  All Cummings wanted to do at the time was "play ball, get the girls, and look fresh."  *Id*.  While recently they have only spoken by phone or at family reunions, Cummings still appeared to "have his head on straight."

*Id*. at 27.  Embry believed that Cummings deserved a chance at living and would follow prison rules if incarcerated for life.  *Id*. at 28.

Brittney Hayes, the mother of Cummings's son, testified that she dated Cummings while they were in high school and had a son, Jayvien, together.  *Id*. at 50-51.  Cummings was a very supportive father, working two jobs to afford an apartment and provide for their son.  *Id*.  He played an active role in Jayvien's life before she was offered a job in Dallas and moved.  *Id*. at 52-53.  Hayes considers Cummings a "great person" and "great dad" who could still play an important role in her son's life.  *Id*. at 54-55.

Finally, the defense presented testimony from Frank AuBuchon, an expert on prison classification, on the question of Cummings's potential for future dangerousness.  *Id*. at 96-124.  As a former Chief of Unit Classification for the state prison system, AuBuchon testified about the custody level and prison security Cummings would be subjected to if given a life sentence.  *Id*.  According to AuBuchon, Cummings would serve his entire life sentence in a maximum-security prison with no less than a "G3" custody level.  *Id*.  He would be housed in a two-person cell and would never be given a job that allowed him to move around the facility or be around female staff.  Based on photographs of Cummings's tattoos, AuBuchon believed Cummings would be classified as a gang member but would be allowed to remain in general population as long as he behaved.  *Id*. at 122-23.

Following this testimony, on November 7, 2012, the jury was instructed on the punishment special issues and heard closing argument by counsel.  (ECF No. 21-2 at 7-60).  After closing arguments, the jury deliberated and returned its verdict, finding unanimously (1) beyond a reasonable doubt there was a probability that Cummings would commit criminal acts of violence that would constitute a continuing threat to society, (2) beyond a reasonable doubt that Cummings either caused the deaths of Tyus Sneed and Keenan Hubert, intended to kill them, or anticipated

that a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, the Cummings's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. *Id*. at 62-63. The trial court accordingly sentenced Cummings to death. *Id*. at 66.

## C.    Post-conviction Proceedings

Cummings appealed his conviction and sentence, raising nine points of error in his direct appeal brief. (ECF No. 23-12).[3] In an unpublished opinion issued December 17, 2014, the TCCA rejected Cummings's allegations and affirmed his conviction and sentence. *Cummings v. State*, No. 76,923, 2014 WL 12713256 (Tex. Crim. App. 2014); (ECF No. 23-5).

While Cummings's direct appeal was pending, the Office of Capital Writs (OCW) was appointed to represent Cummings in pursuing state habeas corpus relief.[4] (ECF No. 23-19). The OCW filed a lengthy state habeas application on Cummings's behalf in the state trial court raising a total of fourteen multi-faceted claims for relief. (ECF Nos. 24-11, 24-12). Following the State's opposition and an evidentiary hearing, the trial court issued findings of fact and conclusions of law recommending that state habeas corpus relief be denied.[5] (ECF No. 24-22 at 74-119). In an unpublished order dated March 28, 2018, the TCCA declined to adopt the trial court's findings of fact and conclusions of law but nonetheless denied Cummings state habeas corpus relief based on

---

[3]    The complete record of Cummings's direct appeal and initial state habeas proceeding can be found on this Court's electronic docket at ECF Nos. 23 through 25 (cited in parenthesis throughout).

[4]    The OCW is now known as the Office of Capital and Forensic Writs.

[5]    The original judge who presided over Cummings's trial was forced to recuse after making public statements disparaging a non-testifying defense expert for overbilling the county. (ECF No. 24-15 at 9-13, 30, 50). A new judge was appointed and presided over Cummings's state habeas corpus proceedings. *Id*. at 38.

the court's own independent review of the record.  *Ex parte Cummings*, No. 84,324-01, 2018 WL 1516614 (Tex. Crim. App. 2018) (per curiam); (ECF No. 24-2).

One year following the denial of state habeas relief, Cummings filed his initial federal habeas corpus petition in this Court raising ten claims for relief supported by eighty-five exhibits. (ECF Nos. 31, 33).  Admittedly, Cummings did not raise the majority of these allegations in his previous state habeas corpus proceeding despite the exhaustion requirement set forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  *See* 28 U.S.C. § 2254(b)(1); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999).  For this reason, this Court granted Cummings's ensuing motion for stay and abeyance to allow him to present his new claims to the state court.  (ECF No. 57). Cummings returned to state court and filed a subsequent state habeas application raising all ten of his new claims.  (ECF No. 71-1).[6]  On March 31, 2021, the TCCA dismissed the subsequent application as an abuse of the writ pursuant to Article 11.071, § 5(a), without considering the merits of the claims.  *Ex parte Cummings*, No. 84,324-04, 2021 WL 1206447 (Tex. Crim. App. 2021) (per curiam) (unpublished).

Thereafter, Cummings returned to this Court and filed an amended federal habeas corpus petition (ECF No. 73).  In the amended petition, Cummings reasserted the same ten allegations that were raised in his original petition, supported by the same eighty-five exhibits plus an additional exhibit.  (ECF Nos. 73, 75).  Respondent filed a lengthy answer to the amended petition (ECF No. 79) to which Cummings replied (ECF No. 82).  The case is now ripe for adjudication.

---

[6]    The record of Cummings's subsequent state habeas proceeding can be found on this Court's electronic docket at ECF No. 71 (cited in parenthesis throughout).

## II.  Claims for Relief

As raised in Cummings's amended federal petition (ECF No. 73), the following ten

allegations are now before the Court:

(1)    The prosecution unlawfully used post-indictment grand jury proceedings to intimidate witnesses, prepare for trial, and suppress information necessary to show the falsity of subsequent trial testimony;

(2)    The prosecution violated *Napue v. Illinois* when it culpably elicited false and misleading testimony from Detective James Owens regarding authorship of inculpatory text messages;

(3)    The prosecution committed misconduct by repeatedly, deliberately, and falsely attributing the text messages to Cummings;

(4)    The prosecution withheld multiple pieces of favorable, material evidence from the defense in violation of *Brady v. Maryland*;

(5)    Trial counsel were ineffective for failing to seek suppression of Cummings's mobile phone records under the Fourth Amendment;

(6)    Trial counsel were ineffective for failing to investigate and present a defense based on alternative suspects;

(7)    Trial counsel were ineffective for failing to investigate or contest evidence of Cummings's gang membership;

(8)    The defense team operated under a conflict of interest that deprived Cummings of his right to effective assistance of counsel;

(9)    Trial counsel were ineffective for failing to raise and competently argue viable objections under *Batson v. Kentucky*; and

(10)    The trial court erroneously excluded relevant mitigation evidence from the punishment phase of trial.

## III.    Procedural Default

As listed above, Cummings raises ten separate allegations in his amended federal petition.

Respondent contends that every allegation, with the exception of Claim 10, is procedurally barred

from federal habeas review because they were raised for the first time in Cummings's subsequent

state habeas petition which was dismissed under Texas law as an abuse of the writ. The Court agrees that these claims are all procedurally defaulted.

## A.    The Procedural Default Doctrine

Procedural default occurs where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that state procedural rule provides an independent and adequate ground for the dismissal. *Davila v. Davis*, 582 U.S. 521, 527 (2017); *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (citing *Maples v. Thomas*, 565 U.S. 266, 280 (2012)). The "independent" and "adequate" requirements are satisfied where the state court clearly indicates that its dismissal of a particular claim rests upon a state ground that bars relief, and that bar is strictly and regularly followed by the state courts. *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012) (citing *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001)). This doctrine ensures that federal courts give proper respect to state procedural rules. *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).

In this case, the TCCA refused to consider the merits of the first nine allegations listed above when Cummings raised them in his subsequent state habeas application, dismissing the application as an abuse of the writ under Article 11.071, § 5(a) of the Texas Code of Criminal Procedure. *Ex parte Cummings*, 2021 WL 1206447. That statute, codifying the Texas "abuse of the writ" doctrine, has repeatedly been held by the Fifth Circuit to constitute an "adequate and independent" state procedural ground that bars federal habeas review. *Ford v. Davis*, 910 F.3d 232, 237 (5th Cir. 2018) (citation omitted); *Canales*, 765 F.3d at 566; *Rocha v. Thaler*, 626 F.3d 815, 832 (5th Cir. 2010). Thus, because "the last state court to review [Cummings]'s claims unambiguously based its denial on a state procedural bar," each of the claims are now procedurally defaulted in federal court. *Mullis v. Lumpkin*, 47 F.4th 380, 387-88 (5th Cir. 2022) (quoting *Gonzales v. Davis*, 924 F.3d 236, 243 (5th Cir. 2019) (per curiam)).

Consequently, Cummings is precluded from federal habeas review of these claims unless he can show cause for the default and resulting prejudice, or demonstrate that the Court's failure to consider his claims will result in a "fundamental miscarriage of justice." *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citing *Coleman*, 501 U.S. at 750-51). Cummings contends he can establish both exceptions with regard to each of his nine procedurally-defaulted claims. Specifically, Cummings argues that: (1) the State's suppression of relevant evidence establishes cause and prejudice for Claims 1 through 4, (2) ineffective representation by Cummings's state habeas counsel establishes cause and prejudice for Claims 5 through 9, and (3) the miscarriage-of-justice exception applies to each claim, with the exception of Claim 9. The Court will discuss each of these arguments in turn.

## B. The Cause-and-Prejudice Exception (Claims 1-4)

Cummings's first four claims for relief allege that the State committed various forms of prosecutorial misconduct prior to and during his capital murder trial. Specifically, he accuses the prosecution of: (1) improperly using grand jury proceedings to intimidate witnesses, prepare for trial, and suppress information, (2) eliciting false testimony from Detective James Owens regarding inculpatory text messages, (3) knowingly misattributing these text messages to Cummings, and (4) withholding multiple pieces of exculpatory evidence.[7] Cummings concedes that each of the claims are procedurally defaulted but argues that the Court may reach the merits of the allegations because he can establish cause for the default and resulting prejudice.

To show cause, Cummings "must show that some objective factor external to the defense impeded counsel's efforts to comply with the [relevant] procedural rule." *United States v. Vargas-*

---

[7] According to Cummings, the State improperly withheld: (1) police interviews that undermine the credibility of State witness Micha'al Atkins, (2) an interview with a woman named Manuela Garcia that undermines the credibility of State witness Nickoll Henry, (3) information that shows Cummings did not author the inculpatory text messages presented at trial, and (4) information that the State's lead investigator, Detective Steven January, may have had a relationship with the aunt of one of the victims.

*Soto*, 35 F.4th 979, 993 (5th Cir. 2022) (citing *Davila*, 582 U.S. at 528). "A factor is external to the defense if it cannot fairly be attributed to the movant." *Id.* While the Supreme Court has not provided "an exhaustive catalog" of what counts as an objective impediment, the Court found that cause can exist where "interference" by state officials makes it "impracticable" to raise the claim in state court. *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004) (noting "the State's suppression of the relevant evidence" can be cause). As to prejudice, Cummings must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Prible v. Lumpkin*, 43 F.4th 501, 518 (5th Cir. 2022) (citations omitted). The Court need not consider prejudice if Cummings fails to show cause, and vice versa. *Id.*

Cummings contends that the State's suppression of each claim's factual predicate constitutes cause to excuse the procedural default. (ECF No. 73 at 49-51, 58, 63, and 87-88). Despite seeking the State's file prior to filing his initial state habeas application in September 2014, Cummings maintains that the State did not turn over the relevant files until June 2015, after the state habeas trial court granted additional discovery. *Id.* at 49-51. These files allegedly contained the factual predicate for Claims 1 through 4—namely, an 18-page log compiled by the State's lead investigator, Detective Steven January (the "January logs"), and various transcripts of grand jury proceedings that took place after Cummings was indicted for capital murder but before his trial began. *Id.* According to Cummings, he did not obtain the last of these transcripts until March 2017, a year before his initial state habeas petition was denied. *Id.* For this reason, Cummings argues that he was unable to develop and present the claims in his initial state habeas application.

Cummings's argument is unavailing. While the suppression of evidence may, in some circumstances, provide cause and prejudice to overcome a procedural bar, such is not the case if the suppressed evidence was discoverable through "reasonable diligence." *Guidry v. Lumpkin*, 2

F.4th 472, 486-87 (5th Cir. 2021) (citations omitted).  To show cause, a petitioner "must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first . . . habeas petition."  *Prible*, 43 F.4th at 514 (citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)).  In assessing the availability of a claim's factual basis, "the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process."  *Id*. at 516 (citations omitted).  If a claim was "reasonably available" at the time of the first petition, a default may not be excused for cause.  *Id*. at 514 (citing *Ford*, 910 F.3d at 237).

Despite not being presented with the January log and grand jury transcripts until June 2015, the factual bases of Cummings's first four claims for relief were available had Cummings exercised reasonable diligence.  Certainly, Cummings could have obtained a sufficient basis for both Claims 2 and 3 by the time he filed his initial state habeas application, as both of those claims stem from the prosecution's alleged misconduct in attributing inculpatory text messages to Cummings during the course of his October 2012 trial.  While one of the grand jury transcripts (ECF No. 75-6) may have bolstered Cummings's allegations, his inability to produce this supporting evidence did not cause his delay in asserting them.  *See Prible*, 43 F.4th at 516 (distinguishing the "availability of the factual basis" for claims with "access to evidence supporting them.").  No objective impediment therefore prevented Cummings from raising the allegations earlier.

Claims 1 and 4 meet a similar fate.  Cummings concedes that the factual predicate for these claims—the grand jury transcripts and the January log—were disclosed on June 12, 2015, two weeks after his state habeas counsel filed a discovery motion requesting complete access to the State's file.  (ECF No. 73 at 49-50).  This motion, filed well after the filing of Cummings's initial state habeas application, was filed after counsel reviewed the State's original disclosure and

determined it was likely incomplete.  (ECF No. 24-17 at 52-64).  This begs the question as to why

counsel did not fully review the State's original disclosure *before* filing the initial state habeas

application.  Had counsel done so, it is likely the factual predicate of these claims would have been

discovered much earlier.  Because counsel could have obtained the evidence by exercising

reasonable diligence but failed to do so, there is no "suppression," and thus no cause to excuse

procedural default of these claims.  *Prible*, 43 F.4th at 517 (citing *Rector v. Johnson*, 120 F.3d

551, 558-59 (5th Cir. 1997) (collecting cases)).

    In any event, there was nothing preventing counsel from raising the above claims once the

grand jury transcripts and the January log were obtained from the State in June 2015.  Although

his initial application has already been filed, Cummings's state habeas proceedings remained

pending until the TCCA denied relief in March 2018.  Because the operative facts of the allegations

were available to counsel during the course of Cummings's initial state habeas proceedings, they

could have filed a successive application under Article 11.071, § 5(a) of the Texas Code of

Criminal Procedure and argued that the claims were just recently made available.  Indeed, counsel

appeared to consider doing just that at a status conference held in December 2016.  (ECF No. 25-

9 at 11).  The fact that they ultimately did not pursue one demonstrates a total lack of diligence (or

interest in raising such claims) and precludes finding cause to excuse Cummings's default.  *See*

*Coleman*, 501 U.S. at 753 (finding "[a]ttorney ignorance or inadvertence is not 'cause' because

the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation,

and the petitioner must bear the risk of attorney error."); *Prible*, 43 F.4th at 518 (same).

    Lastly, by dismissing Cummings's subsequent state habeas application as an abuse of the

writ, the TCCA implicitly determined that the factual predicate of the above claims was available

during Cummings's initial state habeas proceedings.  *Cummings*, 2021 WL 1206447.  This

decision reinforces the Court's opinion that no objective impediment prevented Cummings from

raising the allegations much earlier.  *See Ford*, 910 F.3d at 235 (holding that subsequent habeas dismissal means the TCCA "necessarily found that [the petitioner] knew or reasonably could have known about the factual basis").  As a result, he cannot establish cause to excuse his procedural default.

In short, Cummings "possessed, or by reasonable means could have obtained, a sufficient basis to allege [the first four claims] in the first petition and pursue the matter through the [state] habeas process."  *Prible*, 43 F.4th at 519 (citing *McCleskey*, 499 U.S. at 498).  Cummings even concedes that the factual predicates to his claims were available during the course of his initial state habeas proceeding by acknowledging that the *last* of the grand jury transcripts were obtained in March 2017, over a year before the TCCA ultimately ruled on his application.  (ECF No. 73 at 51).  The TCCA's dismissal of his subsequent writ only serves to confirm this fact.  Given the above reasons, Cummings fails to show cause.  And because he has not shown cause, the Court need not consider whether Cummings can demonstrate prejudice.  *Prible*, 43 F.4th at 514 (citing *Murray*, 477 U.S. at 494).  Cummings's default of the above claims therefore bars federal habeas review of their merits.

## C.    The *Martinez* Exception (Claims 5-9)

In his fifth through ninth claims for relief, Cummings alleges that he received ineffective assistance from his trial counsel by counsels' failure to: (1) suppress Cummings's mobile phone records, (2) investigate and present alternative suspects, (3) investigate or contest evidence of Cummings's gang membership, (4) operate a defense team without a conflict of interest, and (5) raise viable *Batson* objections.  Similar to his previous claims, Cummings acknowledges that these allegations are procedurally defaulted, but argues he can overcome the default under

*Martinez v. Ryan*[8] and *Trevino v. Thaler*[9] by demonstrating the ineffectiveness of his state habeas counsel.  (ECF No. 73 at 97, 109, 138, 151, and 162).  As discussed below, Cummings fails to make this showing as well.

      1.    The *Martinez* Standard

Prior to *Martinez*, an attorney's negligence in a postconviction proceeding could not serve as "cause" to excuse a procedural default.  *Coleman*, 501 U.S. at 755.  *Martinez* and *Trevino* carved out a "narrow" exception to the *Coleman* rule for claims asserting ineffective assistance of trial counsel (IATC).  *Trevino*, 569 U.S. at 422.  Now, a petitioner may meet the cause element by showing (1) that habeas counsel provided ineffective assistance during the petitioner's first state habeas proceeding, and (2) that the underlying IATC claims are "substantial," meaning they have "some merit."  *Tong v. Lumpkin*, 90 F.4th 857, 865 (5th Cir. 2024); *Garza*, 738 F.3d at 676.

Once cause has been established, a petitioner must then show "actual prejudice."  *Canales*, 765 F.3d at 562.  That is, he must demonstrate "a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings."  *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014).  "The likelihood of a different result must be substantial, not just conceivable." *Wessinger v. Vannoy*, 864 F.3d 387, 391 (5th Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).  Again, courts need not consider actual prejudice if, as in this case, the petitioner fails to show cause.  *Prible*, 43 F.4th at 514 (citing *Matchett v. Dretke*, 380 F.3d 844, 849 (2004)).

---

[8]     566 U.S. 1 (2012).

[9]     569 U.S. 413 (2013).

2.    <u>State Habeas Counsel</u>

To excuse the procedural default of his IATC claims, Cummings faults the representation he received from OCW during his initial state habeas proceeding.   In the habeas context, allegations of ineffective assistance are reviewed under the familiar two-prong test requiring a petitioner to establish both deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 690 (1984).  To establish that OCW's performance was deficient, Cummings must demonstrate that their representation fell "below an objective standard of reasonableness" in light of "prevailing professional norms."  *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (citing *Strickland*, 466 U.S. at 686, 688).   Judicial scrutiny of counsel's performance is "highly deferential," and must consider "whether counsel's assistance was reasonable considering all the circumstances."  *Hinton v. Alabama*, 571 U.S. 263, 273 (2014); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016).

Here, the record indicates that OCW operated with between four to eight attorneys and two or three investigators at the time Cumming's initial state habeas petition was filed in September 2014.  (ECF No. 73-4 at 25).  Three of these attorneys—Ryan Kent, Janet Gilger-Vanderzanden, and their supervisor, Brad Levenson—were initially assigned to the case and responsible for drafting the initial petition, which spanned 180-pages and raised a total of fourteen claims for relief.  (ECF Nos. 24-11 at 7-160; 24-12 at 1-37, 73-4 at 14, 20).  The petition included ten thorough and well-briefed IATC allegations and was supported by four expert affidavits, fourteen lay witness affidavits, and seventeen supporting exhibits.  (ECF No. 24-13 at 8-9).  Later, three more attorneys—Ashley Steele, Cathryn Crawford, and Benjamin Wolff—joined the team to either replace outgoing attorneys or assist in the three-day evidentiary hearing that was held in June 2015.  (ECF Nos. 25-4 through 25-6, 73-4 at 14, 19).  At the hearing, counsel examined all three of Cummings's trial attorneys as well as a linguistics expert, and presented another eighty-

three exhibits on Cummings' behalf.  (ECF Nos. 25-4 through 25-6).  Counsel also conducted extensive discovery and obtained access to sealed materials, police and district attorney files, and grand jury transcripts.  (ECF No. 24-17 at 133-35, 24-19 at 193-95, 73-4 at 14-16).  In light of these extensive efforts, the record does not support Cummings' assertion that OCW acted below an objective standard of reasonableness when representing him in state court.

Nevertheless, Cummings asserts that OCW rendered ineffective assistance by not including the instant IATC allegations (Claims 5 through 9) with his initial state habeas application.  To support this contention, he provides declarations from two OCW attorneys— Steele and Wolff—attesting that there was no "strategic reason" the claims were omitted.[10]  (ECF No. 73-4 at 14-22).  Rather, the attorneys claim, the omission was likely an oversight caused by excessive workload, inexperience, insufficient resources, and inadequate supervision.  *Id*.  Because the decision to omit the claims was "non-strategic," Cummings argues that OCW's representation was necessarily unreasonable.  He is mistaken.

To start, the Steele and Wolff declarations are not particularly persuasive given that both attorneys began working for OCW only *after* the initial state habeas application has been filed.  Neither attorney was present during the investigation and drafting of the initial petition and thus have little relevant insight into the decision-making process regarding claim development.[11]  Interestingly, Cummings did not provide a statement from Kent, one of the attorneys who actually researched and drafted the application.  And the only other attorneys whose names appear on the

---

[10]    Cummings also provides a statement from former OCW Director Brad Levenson.  (ECF No. 73-4 at 23-27).  Levenson was Director from September 2010 to July 2015, during the time Cummings' initial application was drafted and litigated at an evidentiary hearing.  Levenson stated his belief that OCW was chronically underfunded and, as a result, had difficulty attracting and retaining experienced attorneys.  Unlike Steele and Wolff, however, he gave no opinion as to why certain claims were not raised in the initial application.

[11]    Steele's critique that OCW attorneys lacked the experience to spot potential claims is especially shaky given that she was a recent law school graduate herself at the time she was assigned to Cummings' case.  (ECF No. 73-4 at 14).

application, Gilger-Vanderzanden and Levenson, provide no opinion whatsoever in their respective affidavits on whether there was a reason for omitting the IATC claims. (ECF No. 73-4 at 23-27, 36-43). Thus, Cummings' argument is based solely on exactly the type of second-guessing and subjective hindsight that *Strickland* prohibits. 466 U.S. at 689-90 (finding "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence").

Further, to establish deficient performance under *Strickland*, Cummings must do more than simply identify issues or claims that habeas counsel did not raise that are now barred. *Id*. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."). The fact that current federal habeas counsel, with the benefit of hindsight, was able to unearth new IATC claims that OCW did not is itself unremarkable, and does little to denigrate the substantial work done by OCW on Cummings's behalf, much less demonstrate that it was objectively unreasonable. *See Smith v. Murray*, 477 U.S. 527, 535 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). To prove ineffective assistance, Cummings must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (unpublished) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Yet Cummings make no attempt to demonstrate that the IATC claims he now raises for the first time in federal court are clearly stronger than the ten IATC claims set forth by OCW in his state habeas application.

Instead, citing guidelines from the American Bar Association, Cummings argues OCW was ineffective because they were obligated "to litigate *all issues* . . . that [were] *arguably meritorious*" in order to preserve them for subsequent review. (ECF No. 82 at 50) (emphasis in

original).[12]    While acknowledging that *appellate* counsel are encouraged to limit briefing to stronger claims based on the strict page constraints and closed record of a direct appeal, Cummings argues that no competent *habeas* attorney would do so because such considerations "do not constrain *post-conviction* pleadings." *Id*.  In other words, OCW were obligated to raise the new IATC claims regardless of whether they had a lesser chance of success than the others. *Id*. (stating "no competent post-conviction lawyer forfeits one claim because another might have a greater chance of relief.").

Cummings reliance on the 2003 ABA Guidelines is misplaced.  While such professional guidelines can be instructive, they are not "inexorable command[s] with which all capital defense counsel must fully comply" to provide constitutionally effective representation.  *Van Hook*, 558 U.S. at 17 (finding such standards are "only guides to what reasonable means, not its definition.") (cleaned up).  Moreover, the Fifth Circuit has indicated that, similar to appellate counsel, habeas counsel possess the discretion to focus on certain issues while foregoing others and are not required to raise every nonfrivolous claim.  *Ayestas v. Davis*, 933 F.3d 384, 394 (5th Cir. 2019) (finding habeas counsel may engage in "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.") (citation omitted); *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (unpublished) (habeas counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the

---

[12]      In full, ABA Guideline 10.15.1(C) reads:

> Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules.  Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 952 (2003).

likelihood of success on appeal.") (citation omitted).  Thus, OCW was not deficient simply because they failed to raise every conceivable nonfrivolous allegation.

Again, to demonstrate that he was denied the effective assistance of counsel during his initial state habeas proceeding, Cummings must demonstrate that OCW's representation fell below an objective standard of reasonableness in light of prevailing professional norms.  *Van Hook*, 558 U.S. at 7; *Strickland*, 466 U.S. at 686, 688.  Even considering the 2003 ABA Guidelines, Cummings fails to make this showing.  There is no credible evidence suggesting OCW conducted less than a reasonable investigation, much less that they failed to make "every professionally appropriate effort" to present all available "arguably meritorious" issues.  ABA Guidelines, 31 Hofstra L. Rev. at 952.  To the contrary, the record shows that OCW provided "aggressive, competent, and professional representation."  *Ayestas*, 933 F.3d at 390-91.  Consequently, Cummings fails to demonstrate cause to excuse the procedural default of his IATC claims.

   3.    Cummings's Claims are Insubstantial

Regardless of whether he establishes a valid claim of ineffective state habeas counsel under *Martinez*, Cummings still is not entitled to excuse the procedural bar because the underlying defaulted claims are meritless.  Again, to overcome a default under *Martinez*, a petitioner must also demonstrate that the underlying IATC claim "is a substantial one."  *Martinez*, 566 U.S. at 14 (citing *Miller–El v. Cockrell,* 537 U.S. 322 (2003)).  "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'"  *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014) (quoting *Martinez*, 566 U.S. at 14).  "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'"  *Id*.

As discussed in greater depth below, none of Cummings's IATC claims meet these criteria.  Consequently, Cummings fails to establish cause under *Martinez* that would excuse his

unexhausted IATC claims from being procedurally defaulted and is thus barred from receiving federal habeas relief on these allegations.

(a)      The <em>Strickland</em> Standard

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right "entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence." *Hinton*, 571 U.S. at 272. To establish the merits of an IATC claim under the Sixth Amendment, a petitioner must satisfy the *Strickland* test—i.e., that (1) counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88, 690. This standard is both demanding and deferential. *Shinn v. Kayer*, 592 U.S. 111, 118 (2020); *Strickland*, 466 U.S. at 689.

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 580 U.S. 100, 118 (2017). "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687-88). This requires the Court to "affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (cleaned up). As such, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quoting *Strickland*, 466 U.S. at 690).

To satisfy *Strickland*'s second prong, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019) (citation omitted). In

conducting a *Strickland*'s prejudice analysis, a court must "consider all the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam). However, the question "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111-12 (emphasis added) (citing *Wong*, 558 U.S. at 27). Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id*.

> (b)    <u>Phone Records</u> (Claim 5)

Cummings first contends that his trial counsel rendered ineffective assistance by failing to seek suppression of his mobile phone records under the Fourth Amendment. Prior to trial, the State obtained records of texts sent to and from Cummings's mobile phone from his wireless service provider. (ECF No. 73-3 at 277-78). These records were not obtained through a warrant, which would require a showing of probable cause, but rather through a court order based on the judge's "reasonable belief" that the records were "relevant to a law enforcement inquiry." *Id*.[13] As explained by Cummings:

> Two sets of messages present in the wireless provider records but not on Cummings' phone were a central part of the State's circumstantial case against Cummings. The first set of messages discussed getting rid of bullets, and the second was a conversation about identifying alibis. 34 RR 70-71, 74-76. The State used the unlawfully obtained texts at trial to suggest to the jury that Cummings conspired with other suspects, that he disposed of evidence, and that he sought a false alibi. 38 RR 75-77.

(ECF No. 73 at 90).

Because the records were obtained without a warrant, Cummings argues there was no strategic or tactical justification for counsels' decision not to move for suppression. In

---

[13]    Cummings's actual mobile phone was obtained through a search warrant. (ECF No. 73-3 at 286-303).

Cummings's words, "the evidence would have been suppressed had trial counsel simply asked[.]" (ECF No. 82 at 46).

In order to show that counsel was deficient, Cummings must demonstrate that counsels' representation "fell below an objective standard of reasonableness." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (citing *Strickland*, 466 U.S. at 688). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id*. In the context of the Fourth Amendment, counsels' failure to file a motion to suppress may constitute deficient performance if the evidence would have been suppressed as a result of the motion. *Ward v. Dretke*, 420 F.3d 479, 488 (5th Cir. 2005). But judicial scrutiny of counsels' performance must be highly deferential, with every effort must be made to eliminate the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. Cummings therefore bears the burden of proving that the text messages provided by his wireless service provider would have been suppressed as a result of such a motion. *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).

Relying almost exclusively on *Love v. State*, 543 S.W.3d 835 (Tex. Crim. App. 2016), Cummings argues that the inculpatory text messages would have been suppressed by the trial court had counsel asked because they were obtained from his wireless service provider without a warrant. In *Love*, the TCCA overturned the conviction of Cummings's accomplice, Albert Love, after finding that Love had a reasonable expectation of privacy in the content of text messages conveyed through a wireless service provider. 543 S.W.3d at 845. Because he had a reasonable expectation of privacy in the content of the text messages, the court explained, the State was prohibited from compelling the wireless provider to turn the text messages over without first obtaining a warrant supported by probable cause. *Id*.

Based on the similarity between his case and *Love*, Cummings contends that counsels' failure to seek suppression was unreasonable and strategically indefensible. Yet, *Love* was not

decided until December 2016, over four years after Cummings's 2012 capital murder trial began. Cummings offers no direct case law supporting the proposition that, prior to *Love*, a defendant maintained a reasonable expectation of privacy in the content of a text message stored by a wireless service provider. And *Love* itself seems to indicate that the law was previously unsettled, asking whether a defendant "can really maintain a reasonable expectation of privacy" after voluntarily disclosing the content of a text message "knowing it will be stored in a server somewhere and subject to potential scrutiny by a third-party interloper?" 543 S.W.3d at 843. Answering in the affirmative, the TCCA clarified this issue for the first time. *Id*.

Thus, at the time of Cummings's trial in October 2012, it was not clearly established that a valid warrant, supported by probable cause, was needed before the State could obtain mobile phone records from a wireless service provider. *Love*, 543 S.W.3d at 841 ("Traditionally, individuals do not maintain a reasonable expectation of privacy in information voluntarily revealed to third parties.") (citations omitted); *see also Contreras v. State*, No. 02-11-00252-CR, 2012 WL 3737714, at *3 (Tex. App.—Fort Worth, Aug. 30, 2012, pet. ref'd) (finding no reasonable expectation of privacy in text messages located on someone else's cell phone).

For these reasons, Cummings's trial counsel cannot reasonably be faulted for failing to challenge the admissibility of the text-message records obtained from his wireless service provider based solely on his reasonable expectation of privacy in those records. *See United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009) (repeating that "there is no general duty on the part of defense counsel to anticipate changes in the law"); *see also Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013) (counsel is not required to make futile motions or objections); *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir. 2012) ("the failure to lodge futile objections does not qualify as ineffective assistance") (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)).

Regardless, even assuming counsel erred by failing to raise an objection, it is unlikely that this error resulted in prejudice to Cummings due to the substantial amount of evidence aside from the text messages linking him to the double murder. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (noting the weight of the evidence of guilt in finding alleged deficient performance of counsel not prejudicial); *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (same). Again, to establish prejudice, Cummings must show "a reasonable probability that, but for counsel's unprofessional errors, the result of [his] proceeding would have been different." *Padilla*, 559 U.S. at 366 (2010) (citing *Strickland*, 466 U.S. at 694). In assessing prejudice, this Court must consider "the totality of the evidence before the judge or jury." *Mejia v. Davis*, 906 F.3d 307, 315 (5th Cir. 2018) (quoting *Strickland*, 466 U.S. at 696) (internal quotation marks omitted).

As discussed in more detail by the TCCA in their initial state habeas opinion, the evidence against Cummings included: (1) Nickoll Henry's eyewitness identification of Cummings as one of the gunmen, (2) Micha'el Atkins's testimony that he overheard Cummings say that he was going to shoot someone just prior the murders, (3) Cummings's antagonistic interactions with one of the victims (Hubert), including just before the shooting, (4) Cummings's motive to commit the murder as retaliation for the murder of his friend, (5) testimony that Cummings was nearby both before and after the murders, and (6) testimony that Cummings and his accomplices possessed weapons and ammunition similar to what was used in the double homicide, including an assault rifle seen in Cummings's car on the day of the offense. *See* Background, Section I(A), *supra*. In light of this evidence, there is little probability that the results of Cummings's trial would have been different had counsel successfully suppressed Cummings's mobile phone records. *See Ramey v. Lumpkin*, 7 F.4th 271, 282-84 (5th Cir. 2021) (holding no prejudice under *Strickland* where evidence of the defendant's guilt was overwhelming). As such, Cummings fails to demonstrate a substantial IATC claim under *Strickland* and *Martinez*.

(c)     Alternative Suspects (Claim 6)

Cummings's next IATC claim alleges that trial counsel rendered ineffective assistance by failing to adequately investigate and develop a defense based on alternative suspects.  He bases this argument on four pieces of evidence that were "delivered to trial counsel on a silver platter" but not investigated further:  (1) an anonymous tip to the Waco Police Department identifying Paul Hall, Kirby Brown, and Carlos Smith as the shooters, (2) a written statement from Lashonda Moten that she witnessed the shooting and heard someone say, "come on, Carlos," once the shooting stopped, (3) a witness interview statement from Constance Jones, who had dated Carlos Smith, that her sister had tried to contact her through a male friend after the shooting to warn her about Smith because she overheard other people, including Nickoll Henry, say that Smith was the shooter, and (4) a ballistics report showing a potential match between the large caliber rifle used in the shooting and one used in a prior shooting at the same complex by Kirby Brown weeks earlier.  (ECF No. 73 at 99-110).  Cummings faults counsel for failing to further investigate each piece of evidence, connect them, and present evidence to undermine the State's case.

Cummings is correct that trial counsel must engage in a reasonable amount of pretrial investigation.  *Strickland*, 466 U.S. at 690-91 (requiring counsel to undertake a reasonable investigation); *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) (same).  "Purportedly tactical decisions not preceded by reasonable investigations are not sufficiently informed and thereby not entitled to the 'deference typically afforded' to trial counsel's decisions."  *Neal v. Vannoy*, 78 F.4th 775, 790 (5th Cir. 2023) (citing *Escamilla v. Stephens*, 749 F.3d 380, 392-93 (5th Cir. 2014)).  To be reasonable, counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case.  *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013).

Here, the defense team was clearly aware of the above information because it was found in their investigator's files. (ECF Nos. 73-2 at 7, 13-15; 73-4 at 7-9). Perhaps aware that the bulk of this information was inadmissible, Cummings does not argue that counsel was deficient for failing to introduce it—rather, he challenges the extent of their investigation and contends that counsel unreasonably "failed to seize on the inadmissible evidence, follow all leads, and ensure the development of the evidence into an admissible form." (ECF No. 82 at 56). But a petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Trottie v. Stephens*, 720 F.3d 231, 242-43 (5th Cir. 2013) (citing *Druery v. Thaler,* 647 F.3d 535, 541 (5th Cir. 2011)). Cummings makes no such showing. Instead, he makes only the conclusory accusation that counsel failed to "follow up" on the anonymous tip, witness statements, and ballistics report. (ECF No. 73 at 101-04). This is not enough. *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007) ("[C]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel.") (quoting *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)).

Moreover, when counsel focus on certain issues to the exclusion of others, there is a "strong presumption that [they] did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003) (finding "counsel has wide latitude in deciding how best to represent a client. . ."); *see also Pinholster*, 563 U.S. at 196 (indicating a "strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment."). The burden of rebutting this presumption "rests squarely on the defendant," and "[i]t should go without saying that the absence of evidence cannot overcome [it]." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (citing *Titlow*, 571 U.S. at 22-23).

Again, Cummings has not supplied this Court with any evidence or argument as to what counsel should have discovered had they investigated further. Nor has he provided any statements from counsel themselves, despite asserting that counsels' performance was unreasonable on several fronts. This second omission is significant given the "range of possible reasons [Cummings's] counsel may have had for proceeding as they did." *Reeves*, 594 U.S. at 740 (citing *Pinholster*, 563 U.S. at 196). Counsel may very well have determined that the evidence they had already collected regarding possible alternative suspects—which itself hardly indicates professional neglect—was unlikely to lead to persuasive, admissible evidence had they investigated further. But without a chance to testify, counsels' strategic considerations remain unknown. Thus, absent evidence to the contrary, Cummings cannot overcome the presumption that counsels' decision to abstain from further investigating an alternative-suspects theory was the result of sound trial strategy. *See Trottie*, 720 F.3d at 243 (holding the failure to present a particular line of argument is presumed to be the result of strategic choice).

Regardless, even assuming counsels' investigation was deficient, Cummings fails to demonstrate that the results of his trial would have been different had counsel further investigated the alternative-suspects angle. *Strickland*, 466 U.S. at 694. Cummings's entire theory is that, had counsel effectively investigated, they would have uncovered evidence that would have exposed holes in the State's case against him and called into question the credibility of certain witnesses. (ECF No. 73 at 107-08). Thus, at its core, Cummings's claim is one of uncalled witnesses, as he would likely need to present any uncovered evidence through witness testimony. *See Gregory v. Thaler*, 601 F.3d 347, 351-53 (5th Cir. 2010) (analyzing the investigation claim in light of the fact that he intended to present evidence through witnesses).

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations

of what a witness would have stated are largely speculative." *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citations omitted)). To prevail on such a claim, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Gregory*, 601 F.3d at 352; *Day*, 566 F.3d at 538. A failure to present some evidence from the uncalled witness regarding that witness's potential testimony and willingness to testify is usually fatal to an IATC claim. *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001).

Cummings fails to make this showing. In fact, Cummings has not provided a single affidavit from a potential witness regarding the anonymous tip or the ballistics report, and the two hearsay affidavits that Cummings does provide—one from Lashonda Moten (ECF No. 73-4 at 7) and one from Constance Jones's sister, Alicia Harrison (ECF No. 73-4 at 13)—fail to establish that either witness was available and willing to testify at trial. As a result, Cummings's belief that exculpatory information was available to counsel had they investigated further is tantamount to sheer speculation that is insufficient to demonstrate that counsel was ineffective. *Gregory*, 601 F.3d at 353 (finding "conclusory statements regarding the content of the uncalled witness[']s testimony are insufficient to demonstrate ineffective assistance."); *Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007) (reiterating that "complaints of uncalled witnesses are not favored . . .") (citation omitted).

Finally, it is unlikely that counsels' allegedly deficient investigation was prejudicial to Cummings because the evidence linking Cummings to the double murder, while mostly circumstantial, was still substantial. *See Berghuis*, 560 U.S. at 390 (noting the weight of the evidence of guilt in finding alleged deficient performance of counsel not prejudicial); *Pondexter*, 537 F.3d at 525 (same). As discussed in the previous section, this evidence included: (1) Nickoll

Henry's eyewitness identification of Cummings as one of the gunmen, (2) Micha'el Atkins's testimony that he overheard Cummings say that he was going to shoot someone just prior the murders, (3) Cummings's antagonistic interactions with one of the victims (Hubert), including just before the shooting, (4) Cummings's motive to commit the murder as retaliation for the murder of his friend, (5) testimony that Cummings was nearby both before and after the murders, (6) testimony that Cummings and his accomplices possessed weapons and ammunition similar to what was used in the double homicide, including an assault rifle seen in Cummings's car on the day of the offense, and (7) evidence Cummings tried to establish an alibi or destroy evidence of his participation after the offense.  *See* Section III(C)(3)(b), *supra*.

In light of the strength of the State's case against Cummings, there is little probability that the results of his trial would have been different had counsel presented evidence concerning anonymous tips, rumors, hearsay, and inconclusive ballistics tests.  *Ramey*, 7 F.4th at 282-84 (holding no prejudice under *Strickland* where evidence of the defendant's guilt was overwhelming).  Consequently, Cummings fails to demonstrate either that his trial counsel acted deficiently or that he was prejudiced by this alleged deficiency as required under *Strickland*.

(d)    Gang Membership (Claim 7)

In his seventh claim for relief, Cummings asserts that his trial counsel rendered ineffective assistance by failing to investigate and contest evidence implying that he was a member of the Bloods criminal street gang.  At the guilt-innocence phase of trial, the State presented a significant amount of evidence of Cummings's gang membership, including pictures of his numerous gang-affiliated tattoos, pictures with Cummings and his friends wearing red clothes and using gang-related hand signs, and text messages from Cummings with a linguistic style indicative of gang affiliation.  Cummings contends that counsel was deficient in preparing for this narrative by failing

to: (1) investigate and develop information necessary to dispute his gang membership, and (2) object to the State's repeated reference to such membership.

Cummings presented similar, if not identical, claims during his initial state habeas corpus proceeding.[14]  In response to these allegations, all three of Cummings's trial attorneys—Russell Hunt, Sr., Walter Reaves, Jr., and Michelle Tuegel—submitted identical affidavits explaining their preparation and strategy:

> [Cumming]'s third claim is that we were ineffective for failing to present an expert to rebut the State's assertion that [Cummings] was affiliated with the Bloods.  Prior to the trial and in preparation for the trial, we consulted with Prison Expert Frank Aubuchon and gang expert Terry Pelz.  Aubuchon testified as an expert, and we chose not to duplicate his testimony with a second expert.  We additionally chose to turn the gang allegations around on the State by showing that using such allegations showed how weak their case was.

> [Cumming]'s fourth claim is that we were ineffective for failing to object to the admission of inflammatory, irrelevant, and highly prejudicial gang evidence.  In preparation for the defense, we prepared evidence to rebut the State's claim of gang involvement.  The State objected to our proposed evidence, and the Trial Court prohibited us from offering it to the jury.  Similarly, we did not object to much of the State's testimony of such evidence because we believed that the Trial Court would overrule our objections, and such ruling would bolster the credibility of the State's testimony.  We then chose to ridicule the proffered evidence during argument.

(ECF No. 24-17 at 24-35).

Counsel also testified about their defense strategy at an evidentiary hearing before the state habeas trial court.  (ECF Nos. 25-4 through 25-6).  In essence, counsel explained their belief that

---

[14]      Presumably to skirt the substantial deference that would be afforded to state court's adjudication of his state habeas claims under the AEDPA, Cummings contends that the instant allegation is fundamentally different from the claims raised in his initial state habeas application.  (ECF No. 73 at 131-32).  Cummings attempts to distinguish the claims by noting (1) the instant claim concerns counsels' alleged failure to *investigate*, rather than counsels' failure to present evidence, and (2) new evidence is used to support the instant claim.  *Id*.  The Court is skeptical of this argument, as additional evidentiary support and minor linguistic changes do not "fundamentally alter" the underlying nature of an allegation.  *See Ward v. Stephens*, 777 F.3d 250, 258 (5th Cir. 2015) (finding new affidavit in support of IATC claim did not "place the claims in a significantly different legal posture.").  Nevertheless, out of an abundance of caution, the Court will accept Cummings's assertion and will review the instant claim as it has Cummings's other IATC claims—to determine whether the claim is substantial under *Martinez* and *Trevino* in order to potentially excuse a procedural default.  *See* Section III(C)(1), *supra*.

the State's reliance on the alleged gang affiliation, as opposed to direct evidence of Cummings's involvement in the charged offense, tended to show that the case against him was relatively weak. Thus, while they attempted (unsuccessfully) to prevent certain evidence from being admitted, they ultimately chose a strategy based on ridiculing the State's evidence of gang membership rather than trying to exclude or rebut it.

Cummings has not shown that counsels' choice of strategy fell below "an objective standard of reasonableness." *Rhoades*, 852 F.3d at 431-32. Trial counsel have broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (indicating counsel has "wide latitude in deciding how best to represent a client") (citing *Yarborough*, 540 U.S. at 5-6, 8). For this reason, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). This makes an attorney's choice of defense and his strategy in arguing that defense to a jury "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Counsels' decision in this case to ridicule the gang evidence in order demonstrate the relative weakness of the State's overall case certainly did not "permeate[] the entire trial with obvious unfairness." *Cotton*, 343 F.3d at 752-53. Quite the opposite, given that counsels' attempt to admit rebuttal evidence was unsuccessful, along with their belief, based on years of criminal trial experience, that any objection to the State's gang evidence was likely to have been overruled, counsels' chosen strategy appears imminently reasonable under the circumstances. This Court is mindful that, on federal habeas review, "*Strickland* does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529, 534 (5th Cir. 2006). In other words, simply because counsels' strategy

was not ultimately unsuccessful does not mean their performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009).

Interestingly, Cummings does not contend that counsels' proffered strategy of ridiculing the State's gang evidence was itself unreasonable; rather, he argues counsel were deficient in implementing it by conducting an unreasonably limited investigation into the evidence they intended to ridicule.  According to Cummings, counsel made this decision without having consulted a gang expert or otherwise having sought evidence that Cummings was not a member of the Bloods street gang.  The record does not support this contention.

Cummings is correct that "[p]urportedly tactical decisions not preceded by reasonable investigations are not sufficiently informed and thereby not entitled to the 'deference typically afforded' to trial counsel's decisions."  *Neal*, 78 F.4th at 790 (citing *Escamilla*, 749 F.3d at 392-93).  Counsel must, at a minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case.  *Kately*, 704 F.3d at 361.  But counsel is given wide latitude to determine how best to utilize the limited investigative resources that are available.  *Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Here, despite Cummings's assertions to the contrary, the record indicates that counsel sought the opinion of two different experts prior to trial concerning Cummings's alleged gang membership.  The first was Frank AuBuchon, a prison expert, who indicated that Cummings would likely be classified as a gang member in prison based on his tattoos, markings, and the linguistics used in his text messages.[15]  (ECF No. 25-6 at 29-30).  The second was Terry Pelz, a gang expert,

---

[15]    AuBuchon later testified as such for the defense at the punishment phase of trial.  *See* Background, Section I(B)(2), *supra*.

who agreed with AuBuchon that the above description would be consistent with Cummings being a member of the Bloods street gang. *Id*. Counsel ultimately chose not to call Pelz as a witness because (1) it would not have been helpful at the guilt-innocence phase to call a gang expert to testify that their client was, in fact, a gang member, and (2) such testimony would have been redundant at the punishment phase in light of AuBuchon's testimony. *Id*.

It was reasonable for counsel to rely on the opinions of the experts they had contacted instead of continuing to search for a more favorable viewpoint. *Murphy v. Davis*, 901 F.3d 578, 592 (5th Cir. 2018) ("[C]ounsel should be able to rely on [an expert] to alert counsel to additional needed information . . ."); *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) (refusing to find counsel ineffective for relying on "reasonable expert evaluations" of evidence). While Cummings now believes, with the benefit of hindsight, that counsel should have sought other expert or lay witnesses capable of establishing that he was not a gang member, there was no reason for them to have doubted the conclusions given by the experts they consulted at the time. *See Murphy*, 901 F.3d at 592 ("Without a red flag . . . it is too much to insist that counsel second-guess [his expert].").

Furthermore, as discussed in the previous section, complaints of uncalled witnesses are disfavored as means of establishing an IATC claim, in part because allegations of what a witness would have testified are largely speculative. *Nelson*, 952 F.3d at 669. To prevail on such an IATC claim, a petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Gregory*, 601 F.3d at 352. The requirements of showing availability and willingness to testify "[are] not a matter of formalism." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). A petitioner must present evidence on these points as part of the burden of proving trial counsel could have found and presented witnesses, including expert witnesses. *Id*.

Cummings relies heavily on the affidavit of Charles Rotramel, a Houston-based gang expert retained by OCW during Cummings's initial state habeas proceedings to evaluate Cummings's possible gang affiliation based on the same factors mentioned by AuBuchon and Pelz. (ECF No. 73-3 at 259-76). After interviewing Cummings and reviewing various records and transcripts, Rotramel concluded that Cummings was not a member of the Bloods or any other legitimate street gang. *Id*. at 267. Rotramel noted there was no evidence to suggest that there were any organized Bloods gangs in Waco, and opined that Cummings's tattoos and use of language were only indicative of "young African-American men [trying] to show their machismo by adopting symbols of gang membership without actually being gang members themselves." *Id*. at 275. However, neither Cummings nor Rotramel offer any evidence that Rotramel was available and willing to testify at the time of Cummings's original trial in 2012. *See Day,* 566 F.3d at 538 ("[T]he petitioner must . . . demonstrate that the witness was available to testify and would have done so"); *Woodfox,* 609 F.3d at 808 (experts required to state that they could and would have testified at original trial even where they otherwise state they would be willing to testify in future proceedings). Given this complete abdication of the requirements of *Gregory*, *Day*, and *Woodfox*, Rotramel's affidavit does little to establish that counsel fell short in their investigation of the gang issue.[16]

Cummings assertion that counsel should have identified certain "disinterested" lay witnesses capable of establishing that he was not a gang member is similarly unpersuasive. In support, Cummings provides affidavits from three proposed witnesses: Pastor Richard Thomas

---

[16]    Even if Rotramel was willing and able to testify, it is debatable whether his testimony would have been "favorable" under the fourth *Gregory* requirement. 601 F.3d at 352. The gist of Rotramel's proposed testimony appears to be that Cummings was only imitating being a Blood gang member but was not actually affiliated with the gang due, in part, to the fact that no organized Blood gangs exist in Waco. But as noted by Respondent, whether Cummings was an "official" Blood member or merely mimicking one is a distinction without a difference that likely would have had little sway with a jury. (ECF No. 79 at 149).

(knew Cummings and Bowers through his own son), Annetta Wilkerson (Cummings's aunt), and Patricia Chisholm-Miller (the local County Commissioner).  (ECF No. 73-4 at 31-35).  These witnesses would have testified generally that Cummings was not in a gang, Waco does not actually have a gang problem, and the State's insinuation that people wore red to Emuel Bowers's funeral as a "gang thing" was "nonsense."  *Id*.  Such testimony, even if admissible, would not have been favorable to Cummings because it would have largely been redundant of other trial testimony.[17] Thus, like Rotramel, these uncalled witnesses are largely unhelpful in demonstrating that counsels' investigation was somehow lacking.  *See Trottie*, 720 F.3d at 246-47 (finding IATC claim for failing to call a witness fails if the proposed testimony was cumulative of evidence already in the record); *Skinner*, 528 F.3d at 345 n. 11) (same).

In any event, even if counsel fell short in their investigation of Cummings's alleged gang affiliation, Cummings has not established that this deficiency ultimately prejudiced his defense under *Strickland*.  Again, to demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The "likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112.

As discussed in the previous sections, it is unlikely that counsels' allegedly deficient investigation was prejudicial to Cummings during the guilt-innocence phase of trial because the evidence linking him to the double murder, while mostly circumstantial, was still substantial.  *See* Sections III(C)(3)(b), (c), *supra*; *see also Berghuis*, 560 U.S. at 390 (noting the weight of the

---

[17]     *See* ECF No. 20-7 at 146-47 (testimony from Bowers's wife that people wore red at his funeral as a show of respect, not gang-related), 20-8 at 176 (testimony from Deontrae Majors that shirt color and hand signals pointed out by State do not indicate gang activity), 20-12 at 34-37 (same testimony from Bowers's mother), 20-12 at 94-95 (testimony from Cummings's former girlfriend about hand gestures and that, to her knowledge, there were no actual gangs in Waco), and 21-1 at 26-27 (punishment phase testimony from Cummings's cousin that Cummings was not involved in a gang).

evidence of guilt in finding alleged deficient performance of counsel not prejudicial). It is also unlikely to have affected the punishment phase of trial given the extensive aggravating evidence presented by the State concerning the brutal nature of the instant offense coupled with evidence of Cummings's escalating penchant for violence. *See Ramey*, 7 F.4th at 282-84 (holding no prejudice under *Strickland* where evidence of the defendant's guilt was overwhelming). This includes evidence that, as a juvenile, Cummings committed several assaults, including one against an elderly disabled family member, and unlawfully brandished a weapon while outside a local nightclub. *See* Background, Section I(B)(1), *supra*. As a result, any deficiency in counsels' gang investigation was rendered harmless by the overall strength of the State's case at both phases.

In summary, Cummings contends that counsel deficiently implemented their chosen strategy of ridiculing the State's inference of gang affiliation by not developing their own evidence establishing that he was not a Bloods member. But "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Although it is possible, in hindsight, to speculate that counsel could have investigated more, hired different experts, or presented more witnesses, this Court is "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)) (internal quotation marks omitted).

The objective evidence present in the record demonstrates that counsel chose their strategy after consulting with both a prison expert and a gang expert. Cummings provides little persuasive evidence to the contrary, and the evidence he has presented is, for the most part, either unfavorable or cumulative of the evidence already adduced at trial. Moreover, Cummings's evidence does not

come close to outweighing the substantial evidence presented by the State at both the guilt-innocence and punishment phases of trial. He thus fails to demonstrate either deficient performance or prejudice as required under *Strickland*, rendering Claim 7 insubstantial.

          (e)    <u>Conflict of Interest</u> (Claim 8)

Cummings's eighth claim for relief asserts that his defense team operated under a conflict of interest that materially impaired its representation in violation of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments. According to Cummings:

> The defense team's chief investigator [Ed McElyea] and its chief expert [Mike O'Kelly] were working for Cummings, who stood accused of killing [Keenan] Hubert to avenge Hubert's supposed murder of [Emuel] Bowers. The two were simultaneously working for Steven Peace, who stood accused of killing Bowers. Due to the State's theory of the case against Cummings, defense counsel's duty of loyalty to Cummings required that the defense develop evidence that Peace killed Bowers, and its duty of loyalty to Peace required that the same members of the defense team develop evidence that Peace did not kill Bowers.

(ECF No. 73 at 139).

Cummings argues that this alleged conflict resulted in tangible damage to his defense, as the defense team "failed to explore and target the obvious holes in the State's revenge narrative." *Id*. at 145. As discussed below, this allegation is not substantial enough to establish cause under the *Martinez* exception to the procedural default doctrine.[18]

Typically, in order to prevail on an IATC claim, a defendant must show both that (1) his trial counsel was deficient, and (2) the deficiency was prejudicial. *Strickland,* 466 U.S. at 687. Prejudice is presumed, however, in the narrow class of cases where counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's

---

[18]     As Cummings's allegation is arguably one regarding conflicts, not ineffective assistance, it is unclear whether the *Martinez* exception would even apply in this instance. *See Trevino*, 569 U.S. at 423 (stating that *Martinez* exception applied only to claims asserting "ineffective assistance of trial counsel."). Cummings fails to provide any case law extending *Martinez* to encompass conflict-of-interest claims. Nevertheless, the Court need not decide this issue, as Cummings's allegation is clearly not "substantial" as required by *Martinez* and *Trevino*. *Id*.

performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350 (1980). A claim under the *Cuyler* framework thus sets a "lower threshold" for habeas relief than does *Strickland,* as it does not require a defendant to establish how effective representation would have altered the outcome of the challenged proceeding. *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995).

Cummings argues that the *Cuyler* framework should apply to his case because his defense counsel relied upon an investigator and expert with divided loyalties. True, an "actual conflict" generally refers to a party "compelled to compromise his or her duty of loyalty or zealous advocacy." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). But under *Cuyler*, there is no actual conflict of interest unless it is defense counsel who "is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *United States v. Palacios*, 928 F.3d 450, 455 (5th Cir. 2019); *Perillo*, 205 F.3d at 781. In other words, the *Cuyler* standard applies only to conflicts of interest created by an *attorney* representing multiple clients. *See United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002); *Beets*, 65 F.3d at 1270-72. Because Cummings alleges a conflict of a different ilk—i.e., one created by a defense team investigator and expert working on behalf of multiple clients—the standard enunciated in *Strickland* applies.[19] *Beets*, 65 F.3d at 1272.

Cummings fails to demonstrate that counsel's performance was deficient under the *Strickland* standard. Indeed, his argument for deficiency is difficult to follow. As the Court

---

[19]    Citing *Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003), Cummings argues that the Fifth Circuit has rejected this distinction and "straightforwardly applied the *Cuyler* framework to an investigator conflict." (ECF No. 82 at 72-73). This is incorrect. Quite the opposite, the district court in *Guy* flatly rejected Guy's argument that *Cuyler* should apply, and the Fifth Circuit did not even mention *Cuyler* in its opinion on direct appeal. *See Guy v. Johnson*, No. CIV.A.5:00-CV-191-C, 2001 WL 34157813, at *6 (N.D. Tex. 2001) (concluding "Guy's claim of actual conflict must be analyzed under *Strickland*."); *Guy*, 343 F.3d at 352-55 (applying *Strickland* before remanding for further proceedings).

understands it, Cummings faults counsel for failing to sufficiently supervise two members of the defense team who allegedly harbored a conflict that prevented them from developing evidence pointing to Steven Peace as being responsible for the murder of Emuel Bowers.  While Cummings was not accused of murdering Bowers, such evidence, the argument goes, could have undermined the State's theory that Cummings murdered Keenan Hubert in retaliation for the murder of Bowers by showing that neither the police nor the community considered Hubert responsible for killing Bowers.  By not further investigating Peace, Cummings argues, counsel were unable to undermine the State's revenge narrative by either cross-examining numerous witnesses on the subject or presenting new witnesses on his behalf.

The main problem with Cummings's convoluted allegation is that it did not matter whether the police or the community considered Hubert responsible for killing of Bowers—what mattered is whether Cummings himself believed Hubert was the murderer.  Whether or not Peace was the actual murderer (or at least considered to be by others) was irrelevant.  It certainly would not have created the "cloud of suspicion" over the State's revenge narrative as Cummings now contends. (ECF No. 73 at 145).

Cummings also provides no guidance as to what, exactly, the defense team was supposed to uncover that would have undercut the State's theory that Cummings was seeking retaliation against Hubert.  Citing the fact that Peace was a key suspect in the Bowers murder, Cummings states the most obvious answer would be law enforcement records relating to the case against Peace.  *Id*.  But again, such records, which were not provided by Cummings as support for his federal petition, would be useless in determining Cummings's subjective state of mind at the time. Cummings's assertion that "obvious holes" existed in the State's revenge narrative is thus conclusory and speculative.  *Gregory*, 601 F.3d at 353 (finding "conclusory statements regarding the content of the uncalled witness[']s testimony are insufficient to demonstrate ineffective

assistance."); *Demik*, 489 F.3d at 646 ("[C]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel.").

While couched in terms of a conflict of interest within the defense team, Cummings's complaint effectively boils down to, at most, a disagreement about trial strategy issues. In particular, Cummings faults counsel for failing to call more attention to the fact that Peace was a suspect in Bowers's murder, not Hubert. But "[m]ere disagreement about strategic litigation decisions is not a conflict of interest." *United States v. Fields*, 483 F.3d 313, 353 (5th Cir. 2007) (citation omitted). Conflicts of interest occur "when defense counsel places himself in a position conducive to divided loyalties." *United States v. Infante*, 404 F.3d 376, 392 (5th Cir. 2005) (citations omitted); *see also Vega v. Johnson*, 149 F.3d 354, 360 (5th Cir. 1998) (finding conflicts of interest exist when counsel "is prevented, by his own self-interest or by his interest in another's welfare, from vigorously promoting the welfare of his client."). If counsel is required to choose between advancing his client's interests in a fair trial or advancing other interests, including his own, to the detriment of his client's interest, a conflict of interest may exist. *See Bostick v. Quarterman*, 580 F.3d 303, 307 (5th Cir. 2009) ("A speculative or potential conflict is not enough; rather, a conflict exists when counsel is compelled to compromise duties of loyalty to his client.").

Cummings fails to allege any sufficient facts demonstrating a conflict of interest between himself and counsel. The record does not suggest counsel faced a choice between advancing either Cummings's or Peace's interest, as counsel neither represented Peace nor had any legitimate reason to further investigate his role in Bowers's murder. Nor does the record suggest that Cummings's interest in a fair trial somehow diverged from counsels' interest, even if they later differed in opinion as to how best to achieve that goal. As such, Cummings's conclusory allegation of a conflict is insufficient for obtaining habeas corpus relief. *Perillo,* 205 F.3d at 781.

44

In any event, Cummings has not shown that he was prejudiced by counsels' alleged conflict of interest. *Strickland,* 466 U.S. at 694. Cummings essentially faults counsel for failing to call attention to Peace's alleged involvement in the Bowers murder or neighborhood rumors to that effect. But as Cummings's acknowledges, the jury *was* aware that Peace was a suspect in the Bowers murder. *See* ECF Nos. 20-7 at 148-49 (Bowers's wife testifying that Peace had been the subject of rumors and was arrested for murder), 197, 211 (Detective Alston testify that Peace was eventually arrested and indicted for murder); 20-12 at 40-41 (Bowers's mother testifying that she believed Peace was a suspect in his son's murder). Not that this mattered, as again, the only pertinent issue was what Cummings believed, not what the neighborhood believed. To that end, Cummings testified that he never had a problem with Hubert, contradicting the State's theory that he murdered Hubert out of revenge. *See* ECF No. 20-13 at 84 ("We never had any problems with each other.").

Despite Cummings's testimony to the contrary, the jury still heard substantial evidence that he and Hubert had various tense encounters with each other, including the evening of the instant offense. *See Cummings*, 2018 WL 1516614, at *1. They also heard a substantial amount of other evidence linking Cummings to the instant offense. *See* Sections III(C)(3)(b), (c), *supra*. Consequently, it is highly unlikely that the results of Cummings's trial would have been different had the jury heard additional testimony that Peace was the main suspect for the Bowers murder, not Hubert. *Strickland,* 466 U.S. at 694; *see also Berghuis*, 560 U.S. at 390 (noting the weight of the evidence of guilt in finding alleged deficient performance of counsel not prejudicial).

Because he has not shown that counsel were conflicted or that he was prejudiced by any presumed conflict as a result, Cummings has not demonstrated a substantial claim.

(f)     _Batson_ Objections (Claim 9)

In his final IATC claim, Cummings contends that counsel neglected to raise and competently argue objections based on violations of *Batson v. Kentucky,* 476 U.S. 79 (1986), the Supreme Court's seminal Equal Protection Clause case preventing race from being a factor in the use of peremptory challenges of prospective jurors during voir dire.  Specifically, Cummings faults counsel for: (1) failing to put forth the necessary factual basis to establish a prima facie case of discrimination with regards to prospective juror Cindy Cobb, and (2) failing to raise any *Batson* objection with regard to the peremptory strike of prospective juror Thressa Thomas.  Neither of these arguments is meritorious.

It is well-settled that "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."  *Ramey v. Lumpkin*, 7 F.4th 271, 279 (5th Cir. 2021) (citing *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019)).  In *Batson*, the Supreme Court established a three-part burden shifting scheme to address allegations of race-based peremptory strikes.  476 U.S. at 96-97.  Under the *Batson* framework, (1) a defendant must make a prima facie showing that a prosecutor exercised a peremptory challenge on the basis of race, (2) if he does, the State must then present a race-neutral explanation for striking the juror in question, and (3) the trial court must then determine whether the defendant has proved purposeful discrimination.  *Pitchford v. Cain*, 126 F.4th 422, 427 (5th Cir. 2025) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)).  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Id*. (citing *Rice v. Collins*, 546 U.S. 333, 338 (2006)).

On direct appeal, Cummings raised a free-standing *Batson* claim alleging that the trial court erred in overruling his challenge to the State's use of a peremptory challenge on prospective juror Cobb.  In denying the claim, the TCCA adequately summarized the voir dire record regarding Cobb:

The record shows that Cummings and the State agreed to challenges for cause as to certain venire persons, some of whom were African-Americans. A limited number of qualified African-American prospective jurors remained in the jury pool after the agreed challenges. During individual voir dire, the State questioned Cobb about her response to a questionnaire item that asked whether she supported the death penalty. Cobb had written that she supported the death penalty only for certain offenses such as serial killings and acts of terrorism.

After a lengthy voir dire exchange in which Cobb appeared to vacillate in her responses, the State exercised a peremptory challenge. Cummings objected to the challenge claiming a *Batson* violation, and the State requested that Cummings meet his obligation to show a prima facie case. Cummings explained that Cobb was one of the few African-Americans to be individually questioned and one of the few African-Americans who remained qualified to sit on the jury. The judge ruled that Cummings failed to make a prima facie case and denied the *Batson* challenge. The State then requested an opportunity to put its race-neutral reasons for the challenge on the record even though the judge had already overruled the *Batson* challenge. The judge allowed the State to make a record, in which the State cited Cobb's vacillation on whether she could impose the death penalty for a non-shooter. Following the individual voir dire of several other jurors, the judge reiterated that Cummings failed to make a prima facie case regarding Cobb and clarified that this failure was why he denied the *Batson* challenge.

*Cummings*, 2014 WL 12713256.

Cummings now argues that the trial court denied the *Batson* challenge regarding Cobb because his trial counsel failed to adequately articulate the factual basis for a prima facie case of discrimination. According to Cummings, had counsel understood the *Batson* framework, they would have further argued that: (1) by the time Cobb was questioned, ten jurors had already been seated, all of whom were white, (2) prior to Cobb, several prospective African-American jurors had already been excused from the jury by agreement, and (3) by striking Cobb, the State kept the first qualified prospective African-American juror off of the jury, all but insuring that the jury remained all white. (ECF No. 73 at 156-57). Had counsel presented these facts, Cummings argues, they would have established a prima facie case of discrimination and shifted the burden to the State to provide race-neutral reasons. *Id*. These facts could also have been used to support a *Batson*

challenge to the peremptory strike of Thressa Thomas, the very next prospective juror called during voir dire.  *Id.* at 160-61.

Under *Batson*'s first step, a prima facie showing exists when "the facts and circumstances [give] rise to an inference that the State exercised peremptory challenges on the basis of race." *Price v. Cain,* 560 F.3d 284, 287 (5th Cir. 2009).  It is possible for this showing to be made solely with evidence concerning the prosecutor's exercise of previous peremptory challenges at the defendant's trial.  *Batson,* 476 U.S. at 96.  But to establish such a case, the defendant first must show "that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  *Id.* Ultimately, the proper "yardstick by which to measure the sufficiency of a prima facie case" is whether "the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California,* 545 U.S. 162, 168 (2005) (quoting *Batson,* 476 U.S. at 94).

Here, Cummings's proffered facts do not give rise to an inference of discriminatory purpose.  There is no pattern of peremptory strikes that may lead to concerns about discrimination. *See Purkett v. Elem,* 514 U.S. 765, 770 (1995) ( "[A] pattern of peremptory challenges of black jurors may establish a prima facie case of discriminatory purpose.").  In fact, as Cummings acknowledges, the State had not used *any* peremptory strikes on prospective African-American jurors prior to Cobb and Thomas, as the previous African-American jurors who had been excused for cause from the jury were excused by agreement from both sides.  (ECF No. 73 at 156-57).  Nor do Cummings's proffered facts offer any indication that Cobb and Thomas were excused *on account of their race* other than baldly stating that they were African-American while the other jurors seated before them were white.

In essence, Cummings is asking this Court to find a prima facie case of discrimination simply by identifying the racial identity of the stricken prospective jurors (Cobb and Thomas) and

of those eventually seated on the jury without any evidence of discriminatory motive.  But to make the showing required under *Batson*'s first step, a defendant must provide "more than the bare fact that the minority venire-person was struck by peremptory challenge."  *Soria v. Johnson,* 207 F.3d 232, 239 (5th Cir. 2000) (quoting *United States v. Branch,* 989 F.2d 752, 755 (5th Cir. 1993)). "Where the only evidence is that a [minority] prospective juror was struck, a prima facie *Batson* claim does not arise."  *Branch,* 989 F.2d at 755.

Because he offers no persuasive evidence of discriminatory purpose, Cummings's argument that counsel was ineffective in failing to raise an adequate *Batson* challenge collapses. *See United States v. Slape*, 44 F.4th 356, 360 (5th Cir. 2022) (finding IATC claim cannot arise from counsel's "failure to raise a legally meritless claim").  Like the other IATC claims before it, Cummings's *Batson* allegation is not substantial.

### 4.   Lack of Prejudice

Assuming that Cummings has demonstrated that (1) OCW provided ineffective assistance during his state habeas proceedings, and (2) the underlying IATC claims discussed above are substantial, he must still show "actual prejudice" in order to overcome procedural default. *Canales*, 765 F.3d at 562.  To do so he would have to show that, had OCW presented the IATC claims in his initial state habeas application, "there is a reasonable probability that he would have been granted state habeas relief."  *Newbury*, 756 F.3d at 872; *see also Mamou v. Davis*, 742 F. App'x 820, 828 (5th Cir. 2018) (unpublished).  Cummings "must show that *all* fairminded jurists *would* agree there *was* prejudice." *Sanchez v. Davis*, 936 F.3d 300, 307 n.39 (5th Cir. 2019) (emphasis in original).

As discussed at length above, Cummings failed to establish that OCW was ineffective in their representation during Cummings's initial state habeas proceeding or that his new IATC claims were substantial.  Counsel raised fourteen multifaceted and well-briefed allegations

(including ten IATC claims) in his original state habeas petition that were supported by affidavits from four expert witnesses and seventeen lay witnesses. With the heavy deference given to OCW's strategic choices under *Strickland*, Cummings has not shown a reasonable probability that the state habeas court would have granted relief had counsel advanced his unexhausted IATC claims, much less that the new claims had a better chance of success than the claims actually raised by OCW in the original state habeas application. Accordingly, Cummings has not shown that OCW's representation was either deficient or prejudicial enough to overcome the procedural bar of his unexhausted claims.

**D.    The Miscarriage-of-Justice Exception (Claims 1-8)**

Finally, Cummings relies on the doctrine of "fundamental miscarriage of justice" to overcome the procedural default of his first eight claims.[20] This exception is limited to cases where a petitioner can make a persuasive showing that he is "actually innocent" of the charges against him. *Finley*, 243 F.3d at 220 (citing *Coleman,* 501 U.S. at 750). Such is a difficult obstacle to traverse, as a convicted defendant "comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Schlup v. Delo*, 513 U.S. 298, 326 (1995). As a result, "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Wilkerson v. Cain*, 233 F.3d 886, 889 (5th Cir. 2000) ("[A] substantial showing of actual innocence is extremely rare").

To make a threshold showing of actual innocence, a petitioner must demonstrate that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329).[21] To do so, he must support his

---

[20]    Cummings does not assert that this exception applies to Claim 9 concerning trial counsels' alleged failure to raise viable *Batson* challenges.  (ECF No. 73 at 161-62).

[21]    The miscarriage-of-justice doctrine also allows a death-sentenced individual like Cummings to challenge that sentence by demonstrating with clear and convincing evidence that, "but for a constitutional error, no reasonable juror

allegations of constitutional error with "new reliable evidence" that was not presented at trial. *Schlup*, 513 U.S. at 324. Examples of such evidence are "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Fratta v. Davis*, 889 F.3d 225, 232 (5th Cir. 2018) (quoting *Schlup*, 513 U.S. at 324). The habeas court must then decide on the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted . . . and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id*.

In the instant case, Cummings asserts that a fundamental miscarriage of justice will occur if the merits of his first eight allegations are not reviewed because "[t]he evidence proffered with [his] petition negates the State's case at trial." (ECF No. 82 at 22). According to Cummings, each allegation itself, along with the evidence provided to support it, establishes that no reasonable juror would have voted to convict him had the constitutional error not occurred. (ECF No. 73 at 51, 59, 63, 88, 98, 109, 138, and 152). But Cummings provides no evidence or argument that he is *factually* innocent of the substantive crime—rather, his argument is essentially that he would not have been convicted absent the "constitutional taint" of the alleged errors. *Id*. This is not enough to show that he is actually innocent of capital murder. *Bousley v. U.S.*, 523 U.S. 614, 623 (1998) (finding the actual innocence to excuse a procedural default requires "factual innocence," not "mere legal insufficiency"); *Vargas-Soto*, 35 F.4th at 999 (finding "exclusively legal" claim of

---

would have found the petitioner eligible for the death penalty under the applicable state law." *Busby v. Davis*, 925 F.3d 699, 710 (5th Cir. 2019) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). In such a scenario, the error in question "must tend to negate not just the jury's *discretion* to impose a death sentence but the petitioner's very *eligibility* for that punishment." *Rocha v. Thaler*, 626 F.3d 815, 826 (5th Cir. 2010) (emphasis in original). While Cummings cites this death-eligibility standard, he makes no argument that his allegations, most of which concern only the guilt-innocence phase of trial, would affect his eligibility for the death penalty. As such, the Court will focus solely on Cummings's alleged innocence of the crime.

innocence insufficient); *McGee v. Lumpkin*, No. 22-10188, 2022 WL 18935854, at *1 (5th Cir. 2022) (unpublished) (same).[22]

Furthermore, as discussed previously in this opinion, the majority of the evidence relied upon by Cummings to support his claim of innocence is not "new" because it was available upon reasonable investigation either before or during Cummings's trial.  *See* Section III(B) and (C), *supra*.  Cummings effectively concedes as much regarding several of his IATC claims when he argues that counsel was ineffective for failing to (1) object to evidence presented at trial, (2) investigate an alternate suspect defense, and (3) investigate evidence of his alleged gang membership.  This is fatal, as evidence that was "always within the reach of [Cummings's] personal knowledge or reasonable investigation" does not qualify as "new" under the *Schlup* actual-innocence standard.  *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018) (citing *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)).

Regardless, even assuming the evidence presented by Cummings is new and reliable, he still fails to show he is actually innocent of the charges against him.  Again, this Court must consider "all the evidence," including evidence that is "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'"  *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327-28).  Here, Respondent succinctly summarizes the compelling evidence presented by the State that established Cummings's guilt:

> In its presumptively correct recitation of the facts, the [TCCA] noted: evidence of a strong motive (retaliation for the Bowers murder); Cummings's antagonistic interactions with Hubert (including shortly before the killings); Micha'el Atkins's testimony that he overheard Cummings say that he was going to shoot someone; testimony that Cummings was nearby both before and after the murders; the fact

---

[22]    To conclude otherwise "would mean that actual innocence amounts to little more than what is already required to show prejudice," allowing a petitioner to avoid showing cause before a federal court reviewed the merits of a defaulted claim.  *Vargas-Soto*, 35 F.4th at 999 (quoting *Sawyer*, 505 U.S. at 345).

that a witness saw a firearm consistent with an assault rifle lying on the backseat of Cummings's car on the afternoon of the offense; Cummings's communications between D'Arvis and Love shortly before the shooting; Cummings's and his accomplices' possession of weapons and ammunition similar to what was used to murder the victims; and Nickoll Henry's eyewitness identification of Cummings as one of the gunmen.

(ECF No. 79 at 53-54).

Given the relative strength of the State's case, the Court finds that Cummings failed to establish that no reasonable juror would have found him guilty beyond a reasonable doubt had they considered Cummings's new evidence. Accordingly, Cummings has not established a miscarriage of justice, and his first nine allegations (Claims 1-9) are procedurally barred from federal habeas review.

## IV. Merits Analysis

In his lone remaining allegation (Claim 10), Cummings contends that his Eighth and Fourteenth Amendment rights were violated when the trial court erroneously excluded relevant mitigating evidence from the punishment phase of trial. Specifically, Cummings sought to introduce the testimony of Amy Nguyen, an expert in "community risk factors," to discuss "the socio-economic circumstances and crime rates of the local neighborhoods in which Cummings had been raised." (ECF No. 73 at 163-64). The trial court sustained the State's objection to this testimony, finding the testimony irrelevant. (ECF No. 21-1 at 83). Citing *Eddings v. Oklahoma*, 455 U.S. 104 (1982), Cummings asserts that the trial court's ruling was erroneous because such evidence was relevant mitigating evidence concerning Cummings's background and character that a juror could have relied upon to impose a non-death sentence.

Cummings raised this allegation on direct appeal to the TCCA. *Cummings*, 2014 WL 12713256. While the TCCA assumed without deciding that the proposed testimony was relevant, the court ultimately determined that the trial court did not abuse its discretion in excluding

Nguyen's testimony because Cummings failed to show that she was qualified to testify as an expert. *Id*. As discussed below, this determination was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Accordingly, federal habeas relief is unwarranted under the heightened standard of review provided by the AEDPA. *See* 28 U.S.C. § 2254.

### A.    <u>Relevant Background</u>

At trial, Cummings proffered Nguyen to discuss certain "community risk factors" and the "general unhealthiness of the community in which [Cummings] was raised." (ECF No. 21-1 at 62-63). Nguyen's proposed testimony would identify these risk factors—which include the number of single-parent homes, poverty rate, median household income, lack of education, and exposure to violence in his community—and explain how those factors could have influenced Cummings to commit an act of violence. *Id*. Nguyen acknowledged that she knew nothing about Cummings or his actual experience growing up, as she did not conduct any interviews or research into his social history. *Id*. at 65-67. Rather, based solely on census data, crime data, and a 1995 study conducted by the Department of Justice, her testimony would focus on the overall health of the neighborhoods where Cummings had resided. *Id*. at 63, 71.

The State objected that (1) Nguyen's testimony was not relevant because she could not tie any of the risk factors to Cummings in particular, (2) her data required the improper consideration of race, and (3) Nguyen was not qualified as an expert. *Id*. at 80-81. The trial court sustained the State's objection, explaining that Nguyen's generalized data had not been individually tailored or connected to Cummings. *Id*. at 83. As a result, Nguyen did not testify at the punishment phase of Cummings's trial.

On direct appeal, the TCCA assumed without deciding that Nguyen's testimony was relevant, but found that she was not qualified to testify as an expert under Rule 702 of the Texas

Rules of Evidence:

> Nguyen testified on voir dire that she has a degree in Physical Science and a Master-level certification in Geographic Information Systems. However, she acknowledged that she did not hold any social-science degrees such as social work or anthropology. Nguyen also acknowledged that the basis for her testimony would be limited to a Department of Justice (DOJ) study and census data. She did not participate in the DOJ study, and there was no evidence that she had ever prepared any such studies or analyses. Nguyen knew nothing about [Cummings], his family, his education, his income level, or background aside from the specific addresses at which he resided from birth to present day. [Cummings] failed to show Nguyen was qualified to testify regarding how "community risk factors" could have influenced [Cummings] to commit an act of violence.

*Cummings*, 2014 WL 12713256. Thus, the court concluded that the trial court did not abuse its discretion in excluding Nguyen's testimony. *Id.*

## B.     The TCCA's Decision Was on the Merits

This Court must apply the AEDPA's deferential standard of review when reviewing claims that were "adjudicated on the merits in State court." 28 U.S.C. § 2254(d). Cummings argues that § 2254(d) is inapplicable to his *Eddings* claim because the TCCA affirmed the trial court's decision to exclude Nguyen's testimony on a state law issue (Rule 702) instead of addressing the merit of the constitutional issue before it. (ECF Nos. 73 at 163, 167; 82 at 88-91). But for claims, like the instant allegation, that have been fully and fairly presented to the state court, there's a rebuttable presumption that the state court adjudicated the claims on the merits. *Lucio v. Lumpkin*, 987 F.3d 451, 464 (5th Cir. 2021) (citing *Johnson v. Williams*, 568 U.S. 289, 298 (2013)). Cummings can rebut this presumption by offering: (1) evidence the claim was adjudicated using "state-law procedural principles" that are contrary to a merits determination, or (2) evidence that "leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Jimenez v. Guerrero*, 133 F.4th 483, 489 (5th Cir. 2025) (citations omitted). He fails to make either showing.

To start, Cummings fails to demonstrate that the TCCA's ruling was based on "state-law procedural principles" that are contrary to a merits determination.  Cummings contends that the TCCA's ruling was tantamount to a state procedural ruling rather than an adjudication on the merits because it relied solely on state law.  But a state court's reliance on state law principles to deny relief on a claim does not necessarily mean the claim was not adjudicated on the merits for purposes of § 2254(d).  Quite the opposite, the term "on the merits" simply refers to a "determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief[.]"  *Gonzalez v. Crosby,* 545 U.S. 524, 532, n. 4 (2005) (contrasting such a determination with a ruling "which precluded a merits determination," such as one for failure to exhaust or procedural default).

Here, the TCCA clearly determined that habeas relief on Cummings's *Eddings* claim was unwarranted, not that a merits adjudication itself was precluded.  In fact, the state court did not say it was denying the claim for any reason other than that the claim lacked merit.  Thus, while Cummings may disagree with the court's reasoning, he fails to overcome the presumption that the claim was adjudicated on the merits.

Similarly, Cummings provides no evidence that "very clearly" shows his *Eddings* allegation was "inadvertently overlooked in state court."  *Jimenez*, 133 F.4th at 489.  To the contrary, the TCCA opinion clearly sets forth the allegation in the second paragraph of the opinion before rejecting it.  *See Cummings*, 2014 WL 12713256 ("In his first point of error, Cummings claims that the judge violated his Fifth, Eighth, and Fourteenth Amendments rights under the United States Constitution during the punishment phase by excluding mitigating evidence relevant to Cummings's background.").  As there is ample evidence the TCCA was well-aware of the *Eddings* allegation, Cummings fails to establish "the exceedingly rare" exception to the presumption that the claim was adjudicated on the merits.  *Jimenez*, 133 F.4th at 490-91 (finding

that such a showing "is probably impossible in practice."). This Court will therefore review the allegation under the deferential standard set forth by the AEDPA.

## C.    The AEDPA Standard

The AEDPA imposes "a highly deferential standard of review" for federal courts evaluating state court rulings that "demands that state court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam). Under this heightened standard of review, a federal habeas petitioner may not obtain relief on any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Richter*, 562 U.S. at 102 (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

For purposes of § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the Supreme Court has on a set of materially 'indistinguishable' facts." *Senn v. Lumpkin*, 116 F.4th 334, 339 (5th Cir. 2024) (citation omitted). On the other hand, a state court decision is an "unreasonable application of" clearly established federal law when "no fairminded jurist would agree" with the ruling. *Andrew v. White*, 604 U.S. 86, 145 S. Ct. 75, 80 (2025) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). This requires a petitioner to "show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam). Instead, a petitioner must show

that the state court's "determination was *unreasonable*—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) (emphasis added).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion itself. *Richter*, 562 U.S. at 102. So long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief. *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (finding federal habeas relief unavailable unless the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.") (citation omitted).

Lastly, § 2254(d)(2) of the AEDPA affords significant deference to a state court's ultimate determination of the facts. *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015). Similar to review under § 2254(d)(1), state court factual determinations may not be characterized as unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination." *Id*. (citation modified). In other words, a petitioner does not overcome the § 2254(d)(2) standard unless "*every* fairminded jurist would agree" that the state court's decision was based on an unreasonable determination of the facts. *Brown v. Davenport*, 596 U.S. 118, 136 (2022).

**D.**    <u>Analysis</u>

Cummings asserts that the trial court's exclusion of Nguyen's punishment phase testimony violated his rights under the Eighth and Fourteenth Amendments.  State court evidentiary rulings will only be overridden when there is error "so extreme that it constituted denial of fundamental fairness." *Prystash v. Davis*, 854 F.3d 830, 840 (5th Cir. 2017) (citation omitted); *Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005).  As such, the "sole inquiry" before this Court is not whether the state trial court properly applied state evidentiary rules, but rather whether the exclusion of the challenged evidence "violated the Constitution." *Bigby*, 402 F.3d at 563.  If the evidence exclusion rendered the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a basis for relief. *Id.*  But showing such fundamental unfairness is "a high hurdle, even without AEDPA's added level of deference." *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011) (quotation marks and footnote omitted).[23]

The Constitution guarantees that a jury will make "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California,* 512 U.S. 967, 972-73 (1994).  To achieve that end, a criminal defendant may present mitigation evidence relevant to "any aspect of [his] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110 (citing *Lockett v. Ohio,* 438 U.S. 586, 604 (1978)).  Relevant mitigating evidence is any evidence "which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004)

---

[23]    As discussed previously, this Court is reviewing Cummings's *Eddings* claim under the AEDPA's deferential standard of review because it was adjudicated on the merits in state court.  Nevertheless, out of an abundance of caution, the Court has also reviewed Cummings's claim under a *de novo* standard of review. *See Jimenez v. Guerrero*, 133 F.4th 483, 488 (5th Cir. 2025) (finding district courts can "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies.") (citation omitted).  For the reasons discussed herein, federal habeas relief is unwarranted regardless of the standard applied.

(citation omitted). Thus, a state court cannot exclude evidence from the jury's consideration "if the sentencer could reasonably find that it warrants a sentence less than death." *Id*. at 285. This is a "low threshold for relevance." *Id*.

Citing *Eddings* and *Tennard*, Cummings argues that his constitutional rights were violated because he was prevented from presenting evidence that he came from a disadvantaged background that a juror could have relied upon to impose a non-death sentence. Cummings believes this evidence would be relevant at punishment because of a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." (ECF No. 73 at 163) (citing *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)). According to Cummings, the trial court's exclusion of Nguyen's testimony violated both *Eddings* and *Tennard* because (1) the jury has to be permitted to hear *any* relevant mitigating evidence, and (2) the mitigating value of a disadvantaged background was well-established at the time of his trial. *Id*. at 166. Cummings, however, overstates the force of these cases.

To start, neither *Lockett*, *Eddings*, nor *Tennard* "federalize[d] the law of evidence." *Prystash*, 854 F.3d at 840 (citing *Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983)). True, the Supreme Court has held that there are "virtually no limits . . . placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Payne v. Tennessee*, 501 U.S. 808, 822 (1991). But despite the expansive definition of relevant mitigating evidence, trial judges still retain their traditional authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Rhoades v. Davis*, 914 F.3d 357, 366 (5th Cir. 2019) (citing *Lockett*, 438 U.S. at 604 n.12); *Prystash*, 854 F.3d at 840 (reaffirming that a capital defendant's right to present mitigating evidence is limited

by state rules of evidence).  And questions regarding the admissibility of mitigating evidence are generally left to the sound discretion of state courts.  *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998) (finding "federal courts do not sit to review the mere admissibility of evidence under state law.").[24]

Moreover, the *Lockett*/*Eddings* line of cases do not provide Cummings a path to relief because they deal "with the exclusion of specific *types* of evidence rather than specific *items* in evidence."  *Simmons v. Epps*, 654 F.3d 526, 544 (5th Cir. 2011) (finding exclusion of mitigating videotape did not render trial fundamentally unfair).  In *Lockett,* the Supreme Court struck down Ohio's death penalty statute because it only permitted the sentencer to consider three mitigating circumstances.  438 U.S. at 607-08.  In *Eddings*, the Court reversed a death sentence because the trial judge concluded that the defendant's violent upbringing and background was not relevant mitigating evidence.  455 U.S. at 112-14.  And in *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986), the Court held that evidence regarding a defendant's good behavior in prison while awaiting trial may not be excluded.

Unlike these cases, the trial court in Cummings's case did not disallow all mitigating evidence regarding Cummings's disadvantaged background.  Rather, it excluded a specific item of evidence—Nguyen's testimony—because the court found her proposed testimony unreliable and irrelevant.  Cummings was therefore not subject to the categorical exclusion of certain *types* of mitigating evidence that were at issue in *Lockett*, *Eddings*, and *Skipper*.  *See Rhoades*, 914 F.3d

---

[24]     To the extent that Cummings challenges either the trial court's or TCCA's application of Texas evidentiary rules, such claims are not cognizable in a federal habeas corpus proceeding, as this Court must defer to the state-court determination of Texas law.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (stating that the Court has repeatedly held that "federal habeas corpus relief does not lie for errors of state law.") (citations omitted); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

at 366 n.24.  In fact, the trial court made no ruling prohibiting Cummings from presenting other evidence concerning his background.  Consequently, Cummings's jury was not precluded from considering "as a mitigating factor, any aspect of [his] character or record [or] any of the circumstances of the offense." *Lockett,* 438 U.S. at 604-05.  Because the exclusion of Nguyen's testimony did not render Cummings's trial fundamentally unfair, federal habeas relief is unwarranted.

Even assuming the trial court erred in excluding Nguyen's testimony, Cummings would still not be entitled to relief because the error was harmless.  The Supreme Court has held that the test for harmless error on federal habeas review is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Davis v. Ayala*, 576 U.S. 257, 267-68 (2015) (outlining distinction between "actual prejudice" under *Brecht* and the requirements of the AEDPA).  In other words, to be entitled to federal habeas relief due to a trial error, a petitioner must show the error actually prejudiced him.  *Brecht,* 507 U.S. at 637.

Cummings fails to make this showing as well.  While Cummings correctly notes that evidence of a defendant's disadvantaged background may sometimes be relevant to punishment under *Penry*, Nguyen's proposed testimony concerning the "general unhealthiness" of the community in which Cummings was raised "has only a tenuous connection to [his] moral culpability." *Smith v. Quarterman*, 515 F.3d 392, 414 (5th Cir. 2008) (cleaned up).  Indeed, the mere fact that Cummings grew up in a poor, high-crime area has little, if any, relationship to Cummings's actual character, and the record contains no evidence attempting to connect the two. Unless it can be assumed that every individual who grew up in poverty and in a crime-infested neighborhood has, by that fact alone, a potentially reduced moral culpability, Cummings cannot demonstrate that he was harmed by the trial court's preclusion of Nguyen's generalized testimony.

Further, even if Nguyen had individually tailored this information to Cummings, testimony that Cummings's community may have influenced him to commit an act of violence risks undercutting other mitigating evidence presented by trial counsel—including the testimonies of Cummings's grandmother, paternal aunt and maternal aunt—that Cummings was a kindhearted person raised by a loving family. *See* Background, Section I(B)(2), *supra*. Moreover, the marginal benefit of such testimony is outweighed by the extensive aggravating evidence presented by the State concerning the callous nature of the instant offense and Cummings's previous escalating penchant for violence. This includes evidence that, as a juvenile, Cummings committed several assaults, including one against an elderly disabled family member, and unlawfully brandished a weapon while outside a local nightclub. *Id*. at Section I(B)(1). As a result, any error in precluding Nguyen's testimony was rendered harmless by the overall strength of the State's case and the overwhelming evidence of Cummings's potential for future danger. Because it is clear that the exclusion of Nguyen's testimony simply had no prejudicial effect on the jury's ultimate verdict, relief is denied. *Brecht*, at 637.

## V. <u>Certificate of Appealability</u>

The Court must now determine whether to issue a certificate of appealability (COA). *See* Rule 11(a) of the Rules Governing § 2254 Proceedings; *Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)). A district court may deny a COA *sua sponte* without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). But a COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires Cummings to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. 100, 115 (2017) (citing *Miller-El*, 537 U.S. at 327).

The Supreme Court has explained that the showing required under § 2253(c)(2) is straightforward when a district court has rejected a petitioner's constitutional claims on the merits: The petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The issue becomes somewhat more complicated when the district court denies relief on procedural grounds. *Id.* In that case, the petitioner seeking COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012) (citing *Slack,* 529 U.S. at 484). Whatever the basis for the denial, however, the Court must bear in mind that, as Cummings faces the death penalty, "any doubts as to whether a COA should issue must be resolved in [Cummings]'s favor." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (quoting *Clark v. Thaler*, 673 F.3d 410, 425 (5th Cir. 2012)).

In this case, Cummings has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor could reasonable jurists debate the denial of federal habeas corpus relief on either substantive or procedural grounds, or find that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, Cummings is not entitled to a COA.

## VI. <u>Conclusion and Order</u>

The Court has thoroughly reviewed the extensive record and pleadings submitted by both parties in this case. The record indicates Cummings was well-represented in state court during both his direct appeal and initial state habeas corpus proceeding by competent counsel who raised numerous well-researched claims for relief on his behalf, albeit unsuccessfully. Yet, for reasons unclear, Cummings chose not to bring forth any of those allegations, save one, in his amended

federal petition. Instead, armed with perhaps more attorneys and resources than he was afforded at his actual trial, Cummings chose a different strategy—to start anew with entirely different claims for relief that he admits are procedurally defaulted.

After careful consideration of the record and pleadings before it, the Court concludes that the majority of Cummings's allegations (Claims 1 through 9) are indeed procedurally barred from federal habeas review. Cummings has not shown cause and prejudice to excuse the procedural default, or demonstrated that the Court's failure to consider the claims will result in a "fundamental miscarriage of justice." Consequently, the Court is precluded from reviewing the merits of Cummings's first nine claims for relief.

Concerning Cummings's lone viable allegation (Claim 10), Cummings has failed to establish that the state court's rejection of the allegation on the merits during his direct appeal was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in Cummings's state trial and appellate proceedings. Alternatively, even when evaluated under a *de novo* standard of review, the claim does not warrant federal habeas relief because it wholly lacks merit. As a result, Cummings's amended federal habeas corpus petition does not warrant relief.

Accordingly, based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Federal habeas corpus relief is **DENIED** and Petitioner Rickey Donnell Cummings's Amended Petition for Writ of Habeas Corpus (ECF No. 73) is **DISMISSED WITH PREJUDICE**;

2. No Certificate of Appealability shall issue in this case; and

3. All other remaining motions, if any, are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

**SIGNED this the 5th day of January, 2026.**

**ALAN D. ALBRIGHT
UNITED STATES DISTRICT JUDGE**